# EXHIBIT 5

BOARD OF APPORTIONMENT PUBLIC HEARING

LITTLE ROCK, ARKANSAS

August 24, 2021

1              (Recording Begins)

2         JUSTICE DICKEY:  Good evening.  Thank you

3    for masking up, social distancing and erring on

4    the side of caution in this pandemic of the

5    unvaccinated.  Thank you for coming tonight.

6    My name is Betty Dickey and I am coordinator

7    for the Board of Apportionment for

8    Redistricting.

9         With me are the men who were doing the

10   hard work, to my far right is Brad Nye from the

11   AG's office, attorney general's office.  Kevin

12   Niehaus from the secretary of state's office.

13   Doug House from the attorney general's office.

14        To my far left is Doug -- I'm sorry.  Nick

15   Ortiz from the governor's office.  And to my

16   immediate left is Shelby Johnson, who is the

17   head of Geographic Information Systems.  I'll

18   get it straight someday.

19        And PBS is live streaming and videoing

20   these hearings, so you can watch them again on

21   MyArkansasPBS.org.  The purpose of the hearings

22   is to give you the information as it relates to

23   the charts that have been prepared, 2019 and

24   now 2020, to ask for your comments.

25        And there were comment sheets as you

1           walked in, or we will provide comment sheets

2           for you where you can go online to the website

3           and make comments.

4                It's for you -- after Shelby explains some

5           maps and I talk to you momentarily about the

6           criteria, we ask you to make your comments or

7           ask your questions.

8                The legal basis for the criteria that you

9           see in front of you is Article 8 of our State

10          Constitution, the Voters Rights Amendment of

11          1965 is amended in the Equal Protection clause

12          of the 14th Amendment.

13               The first of the nine criteria, one

14          person, one vote is the balancing -- refers to

15          the balancing of each of the legislative

16          districts every ten years after the federal

17          census so that they're substantially equal,

18          which is a plus or minus deviation, unless

19          there is an impermissible violation of the

20          other criteria.

21               There are a hundred House seats, so the

22          district should be about 30,000 each.

23          Thirty-five Senate seats that should be about

24          86,000 per district.

25               Section 2, the second one, Section 2 of

1          the Voters Rights Amendment as not -- of 1965,

2          prohibits discrimination based on race, color,

3          or language minority.

4               The third one, Equal Protection Clause of

5          the 14th Amendment, limits redrawing district

6          boundaries strictly on the basis of race.  The

7          next four referred to the geographic

8          principles; the fourth one, compactness, the

9          eyeball test refers to the shape of a district,

10         whether it's round or square.

11              In 1812, Governor Gerry of Massachusetts

12         drew the area around Boston so that it looked

13         like a salamander, hence the word

14         gerrymandering.

15              The fifth one is contiguous or contiguity

16         of having a common border, no partial districts

17         that are islands.

18              Six is a core of existing districts.  We

19         -- our goal is whole counties, whole cities,

20         whole precincts to minimize splitting political

21         subdivisions.  That is our goal; in some cases,

22         it is not possible.

23              The seventh one, communities of interest

24         that have commonalities, economical, social,

25         political, cultural, ethnic, or religious

1    interests.

2        The eighth one is continuity of

3    representation.  You may ask why (inaudible)

4    pay deference to incumbents.  Incumbents

5    reflect the will of the majority, the voters.

6    And we try to avoid making incumbents run

7    against each other.  That again, as you look at

8    the maps and as Shelby explains them, you'll

9    understand that may not be possible this time.

10        The ninth one is to minimize partisanship,

11    no targeting nor giving preferential treatment.

12    Rucho versus The Common Cause of 2019 case, the

13    federal courts said partisan gerrymandering, a

14    political question that's not justiciable in

15    the federal courts.

16        They did not exclude state courts, so any

17    partisan litigation apparently will be in state

18    courts, your State Supreme Court.

19        Shelby's going to explain the maps and

20    then we'll open it for questions.

21        MR. JOHNSON:  Good evening.  It's a

22    delight to be here in Little Rock at the

23    University of Arkansas at Little Rock.

24        My name is Shelby Johnson and I'm in the

25    Arkansas Geographic Information Systems Office.

1          We're a part of the Arkansas Department of

2      Transformation and Shared Services.  One of our

3      statutory roles is to record the election

4      geography of Arkansas.

5          We keep up with digital maps of election

6      precincts, school boards justice of peace

7      districts, the State House and Congressional

8      Districts, State Senate Districts and municipal

9      wards.

10         We did a lot of work over the last four or

11     five years in preparation for the census for

12     2020 and fed a lot of the geography into the

13     census so that, as population was counted, it

14     could be assigned to the correct jurisdictions.

15         On August the 12th, the Census Bureau

16     released what they've termed a legacy format of

17     the 2020 census data.  And we immediately

18     downloaded the data for Arkansas and began to

19     process.

20         For the first several board hearings that

21     were held in Arkansas, we were only able to

22     show the public estimates or what we thought

23     was going to be the population differences or

24     population change among the House and Senate

25     Districts.

1          Last Tuesday evening, at our meeting in

2      the Fort Smith, we were able to share for the

3      first time the variances based on the 2020

4      maps.

5          So the first map I'm going to walk you

6      through is on the screen behind me showing our

7      population change by county across Arkansas

8      from the period of April 1st, 2010, April 1st,

9      2020.  And the numbers that you see are not

10     indicative of total county population.

11         The numbers are expressing how much the

12     county changed in population, either up or

13     down, across that ten year period.

14         Here in Central Arkansas, was also modest

15     growth in several of the counties.  Faulkner

16     County, for example, gained 10,261.  And

17     Pulaski County, gained 16,377 across the ten

18     year period.

19         Those are two of the counties that are

20     shown in the darkest blue shade.  The darkest

21     blue shade indicates to us that those counties

22     experienced the greatest growth.  Then as the

23     scale turns in the lighter shades of blue,

24     those are showing counties where there was

25     growth, but not quite as much.

1          Then next on the scale, indicating

2     counties which grew modestly.  The lightest

3     shades indicate counties where there was not

4     much population growth, nor a population

5     decline across the ten year period.

6          Those are shown in white.  Then the color

7     scale transitions to shades of red.  And as you

8     start at the lowest shade of red, that's

9     indicating that a county's population declined

10    a little bit.

11         As it gets to a darker shade of red, it

12    indicates the county declined more.  And then

13    the darkest shades illustrating that the

14    counties had the greatest amount of population

15    decline.

16         So not too far away here from Central

17    Arkansas, in Jefferson County, was one of our

18    counties which had dramatic population decline

19    across the ten year period.  And it declined

20    10,175 in the ten year span.

21         Farther to the west, you can see Yell

22    County, indicating a county where we had pretty

23    good population decline, 1,922.

24         We're going to move now from the county

25    maps and look at the House, the State House

1     Districts.  And that'll be the next map that

2     we're looking at.

3           In the State House Districts, what we did,

4     we took the population data that was released

5     and we cast that data up against the current

6     design of our House Districts and we applied

7     the same color shading or same color scheme.

8           So the House Districts you see that are in

9     the darkest shades of red are indicative of

10    House Districts where the population is too

11    small.  And the House Districts that are in the

12    shades of blue are indicating House Districts

13    where the population is too great.

14          What this tells us is tracking with the

15    national trends, our national trend is that, if

16    you're in a rural area, that rural area, it is

17    becoming more rural.  And if you're in an urban

18    area, that urban area is tending to see

19    population growth.

20          Here in Central Arkansas, one of the

21    largest gains in terms of population would be

22    House District 31.  House District 31, which is

23    mostly in Saline County, is -- has a population

24    that's 7,500 over the target population.

25          In Arkansas, what we do is we take our

1      current population, which is 3,115,024 people

2      and we divide that by 100 House Districts and

3      that yields a target just slightly over 30,000.

4      So each House District ought to have about

5      30,000.

6           Currently, today, the darkest shades of

7      blue, the darkest shades of red, those are

8      districts where their population is far above

9      that the 30,000 mark or far below.  And those

10     districts in -- to put it in proper context,

11     are currently illegal.

12          We'll move next on to the Senate map in

13     the Senate Districts.

14          TONI MAGHREBLIAN:  (Inaudible.)

15          MR. JOHNSON:  If you would -- ma'am, if

16     you would hold, I'll wrap up with the Senate

17     really quick and then we'll move into public

18     comments.

19          The Senate, mostly the same thing that I

20     just explained.  We put the same data against

21     the Senate Districts that we currently live

22     under.  And the darker shades are indicative of

23     Senate Districts that need to grow.  They need

24     to get geographically larger to gain additional

25     population.

1           And, at the opposite end, the darkest

2       shades of blue represent districts which need

3       to shrink or share that population with it --

4       with the neighboring areas so that all of the

5       districts can come up to become more equal.

6           Our target population calculation for the

7       35 Senate seats is the same three million

8       population figure divided by the 35 Senate

9       seats.  And so each Senate District ought to

10      have about 86,044 persons in it.

11          And currently you can see more than half

12      of our Senate Districts are very far out of

13      balance.

14          So with that, that's a very quick tour of

15      the maps that we are able to show for now,

16      which are representing the change and shift in

17      Arkansas's population.

18          And I'll turn it back over to Justice

19      Dickey to receive public comments.

20          JUSTICE DICKEY:  Now, would you like to

21      step -- there's a microphone at the end of each

22      aisle.  You want to step up and ask your

23      question or make your comment.  Anyone?

24          TONI MAGHREBLIAN:  (Inaudible.)

25          JUSTICE DICKEY:  If you'll step down so

```
 1          that everyone can hear you.  And turn the
 2          microphone on if it's not.  Is it on?
 3               TONI MAGHREBLIAN:  Hello?
 4               JUSTICE DICKEY:  Now.
 5               TONI MAGHREBLIAN:  Testing.  Hey.  Yeah.
 6               JUSTICE DICKEY:  If you will, state your
 7          name.  And I assume you're from Pulaski County
 8          in this District.  If you're not, please tell
 9          us.
10               TONI MAGHREBLIAN:  My name is Toni
11          Maghreblian.  I live in Chenal Valley, part of
12          Little Rock.
13               My question is, the whole illegal --
14               JUSTICE DICKEY:  If you'll step up.  Put
15          --
16               TONI MAGHREBLIAN:  Hello.
17               JUSTICE DICKEY:  Okay.
18               TONI MAGHREBLIAN:  I'm going to give you
19          COVID, I'm afraid, now.
20               I -- my name is Toni Maghreblian,
21          M-e-g-h-r-e-b-l-i-a-n, in case anybody cares.
22          I live in West Little Rock.  And I have a
23          question about what it means, illegal.
24               I mean, is anyone going to jail for that?
25          Because that's what illegal means, you know?
```

1          JUSTICE DICKEY:  You understand?  Okay.

2     Step up.

3          MR. JOHNSON:  It just simply means that

4     the variation between the districts, each

5     district's population, it's too far out of

6     balance.  The concept of one person, one vote.

7          And so that means that each House District

8     ought to have about 30,000.  But in the context

9     with, for example, Senate District 31 in Saline

10    County that I mentioned, its population is

11    currently 30,000 -- 37,500.

12         TONI MAGHREBLIAN:  Uh-huh.

13         MR. JOHNSON:  And those numbers are

14    illustrated on the charts that you saw in the

15    foyer with the details.

16         It just means that that district is

17    underrepresented and then -- or

18    overrepresented.  And then the opposite would

19    be true for a district where its population is

20    not large enough.  So that -- it's --

21         TONI MAGHREBLIAN:  Okay.  I think that

22    you're saying that if you're in the blue,

23    they're overrepresented?

24         MR. JOHNSON:  They have -- that district

25    has too much population.

1          TONI MAGHRELIAN:  For one person?  They
2     need more people?  Is that what you mean?  They
3     need more representation?
4          In the rural counties, it looks like
5     they're losing population --
6          MR. JOHNSON:  That's correct.
7          TONI MAGHRELIAN:  -- so they -- I would
8     assume that means they have less
9     representatives, you're going to have to cut
10    some of those people out.
11         MR. JOHNSON:  Let me -- let me give you
12    another example.  Senate District --
13         TONI MAGHRELIAN:  That's --
14         MR. JOHNSON:  Senate District 1 in the far
15    Northwest Arkansas is another really good
16    example.  It's the one in the Senate that's the
17    most out of balance.
18         So currently it has -- if the target would
19    be 86,000 per district --
20         TONI MAGHRELIAN:  Uh-huh.
21         MR. JOHNSON:  -- Senate District 1 has
22    43,500 population above 86,000.
23         TONI MAGHRELIAN:  I know.  That's -- all
24    those people only have one person, while if you
25    live in, you know, Texarkana or Hope or

1       somewhere else, you have double the
2       representation --
3            MR. JOHNSON:  That --
4            TONI MAGHRELIAN:  -- on -- based on
5       percentage of how many people live there.  Is
6       that -- is that what we're talking about?
7            MR. JOHNSON:  Yeah.  The short of it is
8       that, in a district that has fewer population
9       than it should, their vote is outsized --
10           TONI MAGHRELIAN:  Uh-huh.
11           MR. JOHNSON:  -- compared to a district
12      where the population is too great.
13           TONI MAGHRELIAN:  Kind of like our
14      country, when Wyoming has as much say as
15      California.
16           UNIDENTIFIED SPEAKER:  She doesn't
17      understand --
18           JUSTICE DICKEY:  No.
19           UNIDENTIFIED SPEAKER:  That's before
20      redistricting.
21           JUSTICE DICKEY:  I know it.
22            (Indiscernible Crosstalk)
23           SYDNEY RUSH:  Good evening.  Can you hear
24      me?  Good evening.  I just have --
25           JUSTICE DICKEY:  If you will, state your

1      name and where you're from.  If you can step
2      down and get closer to the mic, that may help.
3          SYDNEY RUSH:  Yes, ma'am.  Good evening.
4      My name is Sydney Rush, I'm from North Little
5      Rock.
6          And I just was curious about how you're
7      going to ensure that minority areas are
8      continued to be rep -- continue to be
9      represented, especially considering, you know,
10     in Pulaski County, there are certain seats that
11     are kind of insinuated to be, you know,
12     minority seats.
13         And so I just wanted to kind of ask about
14     that and ensure that, you know, those seats
15     will be continued -- it will continue to
16     represent the populations that live there.
17         JUSTICE DICKEY:  I think if I can refer
18     you to -- to -- of the criteria --
19         SYDNEY RUSH:  Yes, ma'am.
20         JUSTICE DICKEY:  -- and what's important
21     to us as far as it goals, the second and third.
22         Yeah, the population per district has to
23     be substantially equal.  That's the first.  So
24     we have -- every ten years, you have to redraw
25     the district lines based on a substantially

1       equal population.

2           The second one, the second of the criteria

3       prohibits discrimination based on race, color,

4       or language minority.  And yet you cannot draw

5       a district, as the third one points out, based

6       on the 14th Amendment, that is just because

7       it's a minority district.

8           So we preserve them, we balance it, but

9       you don't show preferential or discriminatory

10      treatment.  Does that answer your question?

11          SYDNEY RUSH:  Partially.  I guess my main

12      consideration is that -- I meant -- I think my

13      main consideration or my main concern rather is

14      that current seats held by, you know, minority

15      representatives may be, you know, drawn larger

16      to encompass, you know, nonminority areas,

17      especially North Little Rock, specifically.

18          And so I just wanted to kind of see if

19      y'all had a plan in place to kind of deal with

20      that.

21          JUSTICE DICKEY:  Do you understand what

22      she said?

23          SYDNEY RUSH:  Thank you.

24          JUSTICE DICKEY:  I don't think we can

25      understand what your question or your point is.

1          SYDNEY RUSH:  Okay.

2          JUSTICE DICKEY:  If you can either

3    slightly remove your mask while you're talking,

4    it --

5          SYDNEY RUSH:  Thank you.  I'm -- I'm okay.

6    Thank you.

7          UNIDENTIFIED SPEAKER:  I think what she's

8    asking (inaudible) --

9          JUSTICE DICKEY:  Well, you'll -- you'll

10   need to come to the microphone if you want to

11   interpret for her.  And your name?

12         ROSE REIGNS:  My name is Rose Reigns.  I'm

13   from Jacksonville.

14         She was asking -- asking for more direct

15   verbiage, other than the generic criteria that

16   you guys have.

17         What are you directly doing to make sure

18   that these people are not being discriminated?

19         JUSTICE DICKEY:  Drawing the maps fairly

20   and transparently.

21         ROSE REIGNS:  Okay.  So well then, while

22   I'm here, I do have --

23         JUSTICE DICKEY:  Well --

24         ROSE REIGNS:  -- other questions.

25         JUSTICE DICKEY:  -- there was someone

1          ahead of -- okay.  If she doesn't mind, I

2     don't.

3          ROSE REIGNS:  Okay.

4          JUSTICE DICKEY:  What --

5          ROSE REIGNS:  So how will these meetings,

6     the questions asked and the comments being

7     made, directly impact what's happening here

8     with redistricting?

9          JUSTICE DICKEY:  Well, it --

10          ROSE REIGNS:  Was I loud enough?

11          JUSTICE DICKEY:  You want to answer it?

12          REPRESENTATIVE HOUSE:  Sure.

13          JUSTICE DICKEY:  I didn't hear the last

14     part of it.

15          REPRESENTATIVE HOUSE:  Thank you.  It's a

16     good question.  How's this done.

17          I think there might have been some

18     misunderstanding, just to make sure nobody

19     misunderstands, these are not the current maps.

20          ROSE REIGNS:  Right.

21          REPRESENTATIVE HOUSE:  This is the

22     existing maps that were drawn ten years ago and

23     they have grown out of balance over ten years.

24     And I think there might have been a

25     misunderstanding about that.

1          The way we comply with the Voting Rights

2     Act is, number one, we have to make equal

3     populations among districts.  We have a general

4     idea because we are all Arkansans, the governor

5     -- and we're working for the governor, the

6     secretary of state and the attorney general.

7          We have a general idea of where people

8     live.  And so that is considered when the lines

9     are drawn.

10          The next thing that happens, if there

11     appears to be a population group that meets

12     minority status, whether they are black or

13     Hispanic or Marshallese or some other group,

14     Asian group, then that shows up in the census

15     data.

16          That information is then overlaid over the

17     maps to make sure that districts are the

18     appropriate size so that we have what is called

19     a minority/majority district.

20          You can see these districts even now today

21     from ten years ago.  So we make sure that where

22     there is a sufficient concentrate -- in an area

23     of sufficient number and compacted enough to

24     form a district, then that district will be

25     detailed out in accordance with federal law,

1          the Voting Rights Act of 1965, as amended.  And

2          that is the process.

3               Did I answer your question?

4               ROSE REIGNS:  That directly answers that

5          question.

6               How are you guys held accountable to those

7          standards?  What are the repercussions of these

8          illegal districts, as you guys call them?

9               REPRESENTATIVE HOUSE:  The word illegal

10         means -- is not a legal word.  Okay?  This is

11         from the attorney general's office.  It's not a

12         legal word.

13              But it's a representation to show how far

14         out of balance those districts have become in

15         the last ten years.  That's why we are

16         redistricting, to bring them all into balance.

17              We follow the Voting Rights Act as best as

18         we know.  We present that information to the

19         governor, the secretary of state, and the

20         attorney general.

21              They make the decision, not who the people

22         you see here.  And they are there to ensure

23         that it's done, as Justice Dickey said, openly,

24         fairly, comply with all federal and state laws,

25         and is completely transparent.

1          If someone does not like that, they may

2     bring a lawsuit.  And the books are full of

3     lawsuits all over the country where people have

4     been held to account for not doing the right

5     thing.

6          So their purpose, their intent, is to

7     comply with state and federal laws, transparent

8     and open.  I hope I've given you an answer.

9          ROSE REIGNS:  Yes.  That works for that.

10    The --

11         REPRESENTATIVE HOUSE:  Can you step a

12    little closer?

13         ROSE REIGNS:  I'm sorry.  I'm short.

14         So the question that I personally had of

15    what do our questions, what does these

16    meetings, what do the comments, how does that

17    affect this process?

18         REPRESENTATIVE HOUSE:  The comments that

19    people make -- and I'll use an example.

20         Up in Baxter County, when we were in

21    Mountain Home the other day, a lady pointed to

22    a neighborhood in Baxter County, but her

23    representative lived 90 miles away.  And she

24    says, it's not right because we go to the

25    Walmart in Baxter County in Harrison or

1          Mountain Home.  We go to -- that's -- yeah,
2          Baxter County.
3               We go to the Walmart, we get to that
4          County Courthouse, we buy our cars, we get our
5          hair done, everything in Mountain Home.  Yet,
6          our State Representative lives 90 miles away
7          because of gerrymandering that was done ten
8          years ago.
9               Those kind of comments are very important
10          to us as we collect information and present
11          that to the governor, the secretary of state
12          and the attorney general.
13               You mentioned you're from Jacksonville.  I
14          live out your way.  There's a part of the
15          district that I used to represent that extends
16          over into Jacksonville.  It's a finger.  It was
17          done to help somebody out ten years ago.
18               Those are the kinds of things that the
19          governor or the secretary of state and the
20          attorney general are alert to that are not
21          fair, that are not right, and are inconsistent
22          with all of these principles you see underneath
23          you.
24               ROSE REIGNS:  So I will just go ahead and
25          say that you -- you mentioned the Jacksonville

1          finger, not me, so -- but -- so how can
2          somebody, say, for instance, that works a night
3          job, how can they get their questions and
4          comments heard?
5               REPRESENTATIVE HOUSE:  Very good.  Very
6          good.  Justice Dickey?
7               ROSE REIGNS:  And that's all of my
8          questions.
9               JUSTICE DICKEY:  Thank you.  Yes, ma'am.
10               UNIDENTIFIED SPEAKER:  She just asked
11          something (inaudible) the website --
12               ROSE REIGNS:  How can those questions and
13          comments be heard outside of this meetings?
14               JUSTICE DICKEY:  Oh, you want the website?
15          ArkansasRedistricting.org.
16               ROSE REIGNS:  Okay.  What -- forward slash
17          -- is it on the main home screen?
18                    (Indiscernible Crosstalk)
19               ROSE REIGNS:  It's on the main home
20          screen?  Okay.
21               JUSTICE DICKEY:  Public comment.
22               ROSE REIGNS:  All right.  Thank you.
23               JUSTICE DICKEY:  You're welcome.
24               Yes, ma'am.  If you'll state your name.
25               REPRESENTATIVE ENNETT:  Good after -- or

1          sorry, good evening.  I want to thank the Board

2          of Apportionment for -- can you hear me?

3               JUSTICE DICKEY:  Just step closer to the

4          microphone.

5               REPRESENTATIVE ENNETT:  I don't want to

6          fall off.

7               JUSTICE DICKEY:  I don't want you to fall

8          off either.

9               REPRESENTATIVE ENNETT:  Good evening.  Can

10          you hear me?

11               JUSTICE DICKEY:  Good evening.

12               REPRESENTATIVE ENNETT:  I want to thank

13          the Board of Apportionment for hosting these

14          forms throughout the state.

15               I am Representative Denise Ennett and I

16          represent District 36, which is parts of

17          downtown and Pulaski County.

18               And I have a couple questions to ask, so

19          please bear with me.

20               JUSTICE DICKEY:  Okay.

21               REPRESENTATIVE ENNETT:  When will the

22          Board of Apportionment begin drawing maps?

23               JUSTICE DICKEY:  After the September

24          30th -- they have -- they have information now.

25          Thank you, Eddie Joe.

1          Information now that has to be formatted

2     and there -- but when the September 30th final

3     census figures are in.  They don't expect

4     changes; but, if there are, then they start

5     drawing.

6          They may start drafting before, but they

7     can't start drawing until after September 30th.

8     Can't have any final maps drawn.

9          REPRESENTATIVE ENNETT:  Okay.

10          My next question, what is your projected

11     timeline for drawing and finalizing the maps?

12          JUSTICE DICKEY:  We hope to do this in

13     October.  We hope to do it in a few weeks,

14     depending on how -- I mean, it -- and it's

15     challenging.

16          If you'll look at the dark red and the

17     dark blue, it's going to be very challenging

18     for all three entities to draw a map that's

19     fair to as -- and that meets these criteria, to

20     the extent that we can.  So most of October.

21          Then the -- and I don't want to get ahead

22     of your questions, but then the three

23     principles, the governor, attorney general and

24     secretary of state vote.  And then there is a

25     30-day waiting period or a 30-day period in

1          which there is some feedback.

2               We hope to be able to show those maps, to

3          show the final proposed map, hopefully through

4          PBS or some way to get that out all over the

5          state before that 30 days.

6               REPRESENTATIVE ENNETT:  Okay.  I think you

7          answered my next one.  How long will the public

8          have to comment?

9               JUSTICE DICKEY:  If you'll -- I know you

10         have to look at your papers, but --

11              REPRESENTATIVE ENNETT:  I'm sorry.

12              JUSTICE DICKEY:  -- if you'll face the

13         microphone.

14              REPRESENTATIVE ENNETT:  Okay.  How long

15         will the public have comment on these maps?

16         You mentioned 30 days.

17              JUSTICE DICKEY:  The 30 days --

18              REPRESENTATIVE ENNETT:  Okay.

19              JUSTICE DICKEY:  -- yes.

20              REPRESENTATIVE ENNETT:  When does the

21         Board of Apportionment expect to vote on

22         proposed maps?

23              JUSTICE DICKEY:  Well, I can't -- I would

24         think soon after they've seen the map that the

25         three entities, that three different groups,

1            you know, agree on a map and give that to the

2            attorney general, secretary of state, and

3            governor.

4                 So it shouldn't take very long, but I

5            can't predict how long they'll take.

6                 REPRESENTATIVE ENNETT:  Okay.  One more

7            question.

8                 JUSTICE DICKEY:  Okay.

9                 REPRESENTATIVE ENNETT:  Is December the

10           31st a hard deadline for the Board of

11           Apportionment to complete its work?

12                JUSTICE DICKEY:  Yes.

13                REPRESENTATIVE ENNETT:  One more -- one

14           more question.

15                JUSTICE DICKEY:  One more.

16                REPRESENTATIVE ENNETT:  Okay.  Does the

17           Board of Apportionment plan to have the

18           finalized map voted on by then, by December

19           31st?

20                JUSTICE DICKEY:  The finalized map?  Well

21           before then.  I mean, it -- well before then,

22           and the 30 days pass before then.

23                REPRESENTATIVE ENNETT:  Okay.

24                JUSTICE DICKEY:  Everything ends then, so

25           yes.

1            REPRESENTATIVE ENNETT:  Okay.  Thank you.

2            JUSTICE DICKEY:  Thank you.

3            GOLDIE GAINES:  Good evening.

4            JUSTICE DICKEY:  Good evening.

5            GOLDIE GAINES:  My name is Goldie Gaines

6       and I'm from North Little Rock.  I have a few

7       questions.

8            JUSTICE DICKEY:  Okay.

9            GOLDIE GAINES:  Generally speaking, what

10      are the most significant changes from the

11      existing maps that you anticipate, apart from

12      the reshuffling districts due to population

13      shifts?

14           JUSTICE DICKEY:  What are the most

15      significant changes?

16           GOLDIE GAINES:  Yes, apart from --

17           JUSTICE DICKEY:  Apart from the population

18      shift?

19           GOLDIE GAINES:  -- the reshuffling.

20      Uh-huh.

21           JUSTICE DICKEY:  Do you want to answer

22      that?  Is it --

23           MR. JOHNSON:  What you would expect to

24      see, for example, in the rural areas where the

25      population has declined, the district must

1      become larger, geographically bigger, to reach

2      out and grab population from its neighbors.

3            So in rural areas, you would expect some

4      of the districts to become larger.  And I think

5      one of the easy ways to explain that might be

6      to look at far Southeast Arkansas.

7            And that Senate District 26, for example,

8      it can't grow east across the Mississippi River

9      or it can't grow south into Louisiana.  It can

10     only grow west or north to get additional

11     population.  So that might be exemplary of that

12     circumstance.

13           In the urban areas where you have

14     districts that are too large or too great in

15     population, those districts will need to

16     contract.  They'll get geographically smaller

17     in order to share that population with the

18     neighboring districts.

19           So those might be some examples of how you

20     might see the districts change based on their

21     current size.

22           JUSTICE DICKEY:  Thank you.

23           GOLDIE GAINES:  Okay.  So are those the

24     significant changes from the existing map that

25     you anticipate in regards to the reshuffling or

1          redistricting?

2               JUSTICE DICKEY:  Yes.  There will be

3          larger districts, it appears, within the red

4          districts that have to expand geographically

5          and smaller in the blue.

6               GOLDIE GAINES:  Okay.

7               Secondly, in the area of transparency,

8          Arkansas, has been hit hard by COVID-19

9          pandemic and cases are currently surging due to

10         the Delta variant.

11              In light of this, will there be an

12         opportunity for concerned citizens who cannot

13         attend in-person hearings to have their

14         questions and answers -- questions answered by

15         you?

16              JUSTICE DICKEY:  Yes.  I mean, it -- there

17         are comments and you can make those at the

18         ArkansasRedistricting.org, the website, or

19         SOS.Arkansas.gov.

20              You can add these comments given to us

21         tonight or mail them in.  They will be posted

22         online.  After the maps are drawn, there is

23         still -- and we get to show those to the

24         general public through a television broadcast,

25         hopefully PBS, then you get to make comments

1        again.  Or if --

2             GOLDIE GAINES:  Okay.  Now, more specific

3        -- I'm sorry.

4             More specifically, the Hispanic community,

5        those that speak, you know, Hispanic, Latino,

6        will there be a process in place --

7             JUSTICE DICKEY:  Yes.

8             GOLDIE GAINES:  -- for those that do not

9        speak English perhaps --

10            JUSTICE DICKEY:  Yes.

11            GOLDIE GAINES:  -- to still be able to

12       submit --

13            JUSTICE DICKEY:  They are giving comments

14       in Spanish online.  I don't have those here

15       tonight.

16            GOLDIE GAINES:  Okay.

17            JUSTICE DICKEY:  They can read -- at the

18       -- read at the website, read that in Spanish.

19       That should be up tomorrow.

20            GOLDIE GAINES:  Okay.  So the Spanish will

21       be available tomorrow?

22            JUSTICE DICKEY:  Yes.  So it -- that's

23       available for Hispanics.

24            GOLDIE GAINES:  Okay.

25            My third question, how is this public

1    hearing going to affect your redistricting

2    process?

3         JUSTICE DICKEY:  How is the public hearing

4    going to affect the redistricting process?

5         GOLDIE GAINES:  Yes.

6         JUSTICE DICKEY:  There are legitimate, and

7    most are legitimate, comments that to the

8    extent we recognize -- I mean, you live in

9    these areas.  You know what the problems are.

10   You know where it's divided down the middle of

11   the street.

12        And for those of us who don't and who are

13   trying to do the redrawing, that's important

14   information where Senate in House lines that

15   could overlap, don't.

16        There are lots of opportunities to make

17   comments that help us fix problems that they

18   had ten years ago.

19        GOLDIE GAINES:  Okay.  So you would

20   definitely take in our -- our comments --

21        JUSTICE DICKEY:  So when we don't -- we

22   read them --

23        GOLDIE GAINES:  Uh-huh.

24        JUSTICE DICKEY:  -- we publish them

25   online, we give them to the three principles or

1 the three voting groups, the three voting --

2 governor, attorney general and secretary of

3 state.

4  GOLDIE GAINES:  Okay.

5  JUSTICE DICKEY:  We make them -- all of

6 that.  So your comments are copied several

7 times for us and on the website.

8  GOLDIE GAINES:  Okay.

9  And will you commit to making your

10 decision-making process public?

11  JUSTICE DICKEY:  I think we already have.

12 But if we don't, yes, we -- we commit to making

13 the decisions public.  Now, the process --

14  GOLDIE GAINES:  Yeah, now that's --

15  JUSTICE DICKEY:  -- as far as what we

16 think, you know, I don't know that we could

17 make all that available.  But the process, yes.

18 The -- you know, the different maps, yes.

19  GOLDIE GAINES:  Okay.

20  And then I want to move into the data.  So

21 are you using total population, voting age

22 population, VAP, citizen voting age population,

23 CVAP, or something else, as your base

24 population metric?

25  UNIDENTIFIED SPEAKER:  Total population.

1              JUSTICE DICKEY:  Total.  Total population.

2              GOLDIE GAINES:  Total?  Okay.  Thank you.

3         And, lastly, how will incarcerated people

4    be counted?  Will incarcerated people be

5    treated as residing where they were

6    incarcerated, where they previously lived, or

7    excluded from the redistricting?

8              JUSTICE DICKEY:  You can answer that.  I

9    know it, but you -- no, not you.  Brad.

10             MR. NYE:  Sure.  And thank you for the

11   question.

12             GOLDIE GAINES:  Uh-huh.

13             MR. NYE:  So the Arkansas Constitution

14   sets out that we use Federal Census data

15   provided to draw the lines.  And we do use

16   total population data.

17        To do what you are talking about, to

18   reallocate people away from congregant living

19   and type environments would have required a

20   statute change here in the state.  And that's

21   not something that was done during the last

22   legislative session.

23        So we will be using total population data,

24   as required by current law.

25             GOLDIE GAINES:  Okay.  And for the

1          incarcerated, does that include them?  Again,

2          regarding to them, how will people be counted?

3          We got that.  So you said that you would use

4          the total population.

5               But will incarcerated people be treated as

6          residing where they're incarcerated or their

7          previous living address or will they be totally

8          excluded from the redistricting?

9               MR. NYE:  No, under current Arkansas Law,

10         as it exists today, they are counted as where

11         they reside.

12              So where they are currently -- where they

13         were incarcerated as of April 1st, 2020, census

14         day.

15              GOLDIE GAINES:  Okay.  Thank you.

16              JUSTICE DICKEY:  Thank you.

17              Yes, sir?

18              MICHAEL McCRAY:  Good evening.  Can you

19         hear me?  Good evening.

20              JUSTICE DICKEY:  Good evening.

21              MICHAEL McCRAY:  This is more of a public

22         comment, as opposed to a question --

23              JUSTICE DICKEY:  If you'll say your name

24         and get as close as you can to the mic, please.

25              MICHAEL McCRAY:  Okay.  Thank you.

1           My name is Michael McCray and I've lived

2      in the Pine Bluff community of Jefferson County

3      for over 40 years.  And I believe we have a

4      serious problem with gerrymandering and

5      district maps and boundaries on both the state

6      and local levels.

7           JUSTICE DICKEY:  Let me -- I'm sorry to

8      interrupt you again, but either your mic's

9      turned off or you're not close enough to it.

10          MICHAEL McCRAY:  Can you hear me now?

11     Okay.  Sorry.

12          Once again, my name is Michael McCray.  I

13     have lived in the Pine Bluff community of

14     Jefferson County for over 40 years.

15          I believe we have a serious problem with

16     gerrymandering and district maps and boundaries

17     on both the state and local levels.  I live in

18     the southern part of the city, which is on the

19     southeast part of the county.

20          Jefferson County has about 67,000

21     residents into its State Senate Districts.  One

22     district has about 52,000 residents and the

23     remaining 15,000 of us have been drawn in

24     another State Senate District that goes all the

25     way south to Union County.  As a result, we're

1          in a county that's not fairly represented.

2               Also, Pine Bluff is home to UAPB, SEARK,

3          the Pine Bluff Arsenal and the Port of Pine

4          Bluff, which is part of one Senate District.

5               On the other hand, the Jefferson County

6          Regional Hospital and Pine Bluff Airport is

7          under the boundaries of the other -- the other

8          senator who lives three counties away from us.

9          So, therefore, our county -- our community is

10         segregated by these district lines.

11              On the local level, we are -- we're

12         fighting to -- fighting for schools

13         consolidation and maintaining the resources for

14         Pine Bluff School Districts, but we have a

15         neighboring city who has a school district that

16         encroaches on our city maps.

17              So, from my point of view, we've kind of

18         got a mess of the maps all around.  And I just

19         hope that you can do what you can with

20         whatever, I guess, this proceeding is and if

21         there's other for the local.  These are my

22         concerns.

23              JUSTICE DICKEY:  We -- will you either

24         give -- I'm sorry.  Don't fall.  Will you turn

25         that in as a comment, please?  Thank you.

1          LAURIE EVANS:  Hello.  Can you hear me

2     okay?

3          JUSTICE DICKEY:  Yes.  Thank you.

4          LAURIE EVANS:  Okay.  Great.  My name is

5     Laurie Evans, I'm representing Indivisible

6     Little Rock in Central Arkansas.  I'm here

7     tonight, where a grass roots voting rights

8     advocates, an organization with over 2,000

9     members across Arkansas.  And we do have

10    members in most of our states, 35 Senate and

11    100 House Districts.

12         I did just want to say thank you to all of

13    y'all for traveling across the state and

14    providing these public opportunities to

15    comment.  I know y'all are probably tired of

16    traveling and thanks for being back here --

17         JUSTICE DICKEY:  Thank you.

18         LAURIE EVANS:  -- ending up here in

19    Central Arkansas.  Appreciate that.

20         So what I'd like to do, if you don't mind,

21    I know a number of the things that I'm going to

22    mention have been mentioned before in your

23    criteria; but, of course, you know, the purpose

24    of these public meetings and the public

25    comments are to provide public paper trail and

1        documentation of the criteria that we all agree

2        on as Arkansas citizens.  So I'm just going to

3        go ahead and mention those for the public

4        record.

5            Many of us at Indivisible have, of course,

6        been following these very helpful and

7        informative public meetings.  We'd like to

8        state, for the record, some of the core

9        principles that years of precedent and court

10       decisions have set for the Arkansas

11       Redistricting process.

12           One, a redistricting process that ensures

13       no racial dilution or redistricting based on

14       racial gerrymandering, which of course has been

15       mentioned tonight a couple of times, district

16       map shapes that are compact and contiguous,

17       district boundaries that preserve, county, and

18       town boundaries whenever possible, new maps

19       that preserve the cores of existing districts

20       to avoid constant reshuffling.  And that was

21       described very helpfully this evening as well.

22           And communities of interest are preserved

23       and not divided by district lines.  Communities

24       of interest being any Arkansas neighborhood

25       that shares certain social, cultural, ethnic,

1          or religious connections.

2                  We know this is a tall order with lots of

3          complicated considerations, but it's doable

4          with meaningful involvement, with meaningful

5          community involvement like the folks here

6          tonight, as well as the folks here watching.

7                  The last principle is where we know you

8          especially need input from Arkansans as Justice

9          Dickey has asked and mentioned this evening.

10                  Indivisible will continue asking our

11          members from across the state to share feedback

12          on their neighborhood's activities and

13          services, their cultural and historical

14          interests, there economic and environmental

15          interests, their area's needs and concerns, the

16          things that tie their community, your

17          neighborhood, together.

18                  And we do appreciate a public commitment

19          from the Board of Apportionment to preserve

20          these neighborhoods that Arkansans are right

21          now describing to you through the public

22          comments.  That's how they'll have an

23          opportunity to elect officials who will meet

24          their community's needs.

25                  Everyone needs a real and meaningful

1          opportunity to elect candidates of their

2          choice.  I think we all agree on that.  We ask

3          that the Board set a goal that every Arkansas

4          voter has an equal opportunity to elect

5          officials who will represent their values and

6          their interests.

7               Unfortunately, as has been mentioned, past

8          redistricting practices have ended up creating

9          unequal voting power for minority groups.  Map

10         lines have fragmented minority groups in our

11         state, for example.

12              As we know, and has been mentioned, about

13         Voting Rights Act bans the drawing of district

14         lines that water down the voting strength of

15         community's color, yet it's still been a

16         problem, and we're simply requesting that the

17         redistricting process in this decade do better.

18         Thank you very much, as you have addressed

19         that.

20              I do have some more written questions,

21         which for the time -- some of them have been

22         addressed.  And for time, I will just submit

23         them -- some of them, rather than ask them all.

24              JUSTICE DICKEY:  Thank you.

25              LAURIE EVANS:  What I might ask if you,

1        respectfully, is I know that there's many

2        Arkansans who are interested in this process

3        who haven't been able to make it to one of

4        these public meetings.

5               Is there -- are y'all -- is the Board or

6        staff responding to questions online that are

7        submitted in the public comments?  Is that

8        something that can be requested that folks --

9        Arkansans can ask questions through the public

10       comment and then have them responded to?

11              JUSTICE DICKEY:  I'm -- I'm not sure

12       whether they've been answered online.  Most of

13       them are comments about futuristically in the

14       sense of asking that this be done, not

15       questions --

16              LAURIE EVANS:  Right.

17              JUSTICE DICKEY:  -- about how was it done

18       or --

19              LAURIE EVANS:  Right.

20              JUSTICE DICKEY:  -- how is it being -- I

21       mean, we -- we're showing you --

22              LAURIE EVANS:  Perhaps that's something

23       that could be done.  However, if -- I'm just

24       asking on behalf of other community members, if

25       they do have questions -- or if they do have

1 questions and couldn't make a meeting, is there

2 another means by which you would suggest that

3 they contact the Redistricting office?

4  JUSTICE DICKEY:  The -- yes.  The

5 ArkansasRedistricting.org.

6  LAURIE EVANS:  Okay.

7  JUSTICE DICKEY:  And those questions will

8 be sent to the person or the entity to respond.

9  That's been done, as far as where to send

10 the comment sheets; because, initially, we

11 didn't have the address on it, things like

12 that.

13  But I -- if it's a prolonged explanation

14 that -- that -- one person can't answer that.

15 So, you know, we can follow your suggestions.

16 I'm not sure we can answer complicated,

17 prolonged questions.

18  LAURIE EVANS:  Gotcha.  Okay.  So is that

19 --

20  JUSTICE DICKEY:  Can you answer that?  Not

21 you.

22  UNIDENTIFIED SPEAKER:  (Inaudible) to the

23 questions, but (inaudible).

24  JUSTICE DICKEY:  We do have an e-mail

25 address too where --

1          LAURIE EVANS:  Okay.  That's great.  Yeah.

2          JUSTICE DICKEY:  And, of course, you --

3     you and I have corresponded --

4          LAURIE EVANS:  Yes.  Yes, ma'am.

5          JUSTICE DICKEY:  -- more than once.

6          LAURIE EVANS:  Yes, ma'am.  And, I guess,

7     one thing I just -- I like the phone.  So I now

8     have your direct -- the direct Redistricting

9     phone number.  But the phone number that's on

10    the actual website is -- actually goes to the

11    secretary of state, so it might be -- I don't

12    -- I don't know if we want to update that or

13    not.

14         JUSTICE DICKEY:  Something else to fix,

15    but --

16         LAURIE EVANS:  But --

17         JUSTICE DICKEY:  -- you found us.

18         LAURIE EVANS:  Yes, ma'am.

19         JUSTICE DICKEY:  And we've corresponded to

20    you, even for a couple hours today, so --

21         LAURIE EVANS:  Yes, ma'am.

22         JUSTICE DICKEY:  -- we're trying.

23         LAURIE EVANS:  You are.  You are, yes.

24    And then back -- yes.  And I appreciate all of

25    the responses that you've given so far.

1           And, in fact, you've already answered many

2      of my questions, one of which is -- was with

3      regard to drawing the maps in October and then

4      there will be a 30-day period -- opportunity

5      for public feedback, what -- how -- how would

6      -- should we anticipate providing that feed

7      back?  What will that process look like?  We'll

8      only have 30 days, so we just want to be

9      prepared to communicate with our members what

10     -- what they need to be doing.

11          JUSTICE DICKEY:  You already have all the

12     resources as far as how to contact us.  If --

13     when the map is agreed on by the principles and

14     that 30 -- and presented to you on PBS, I hope,

15     you'll have that 30 days to respond to any or

16     all of us.

17          LAURIE EVANS:  So it'll just be like

18     direct e-mail or should they -- will they have

19     public comment forum still be up, should we --

20          JUSTICE DICKEY:  The forms you've been

21     using.  I mean, you've managed to reach several

22     people.  I -- I think you probably --

23          LAURIE EVANS:  Okay.

24          JUSTICE DICKEY:  -- can find us.

25          LAURIE EVANS:  Yeah.  We'll -- we'll

```
 1              follow -- okay.  We'll --
 2                   JUSTICE DICKEY:  But the -- that -- if it
 3              -- if there's a specific place, when we showed
 4              the map, we will tell you --
 5                   LAURIE EVANS:  Yes, ma'am.
 6                   JUSTICE DICKEY:  -- where and how.
 7                   LAURIE EVANS:  Yes, ma'am.  Because I'm --
 8              I'm -- that's -- that's the -- that's the
 9              process that we just want to be able to clearly
10              communicate to our members.
11                   So I know I've taken a lot of time here,
12              so I think -- I think we'll just end it there.
13              And I'll just submit these --
14                   JUSTICE DICKEY:  If you'll sub --
15                   LAURIE EVANS:  -- in writing.
16                   And I just wanted to thank you so much for
17              your public service.  This is such an important
18              task.  And I really appreciate you taking the
19              time.
20                   JUSTICE DICKEY:  Thank you, Ms. Evans.
21              Yes, ma'am?
22              DIANE CURRY:  Good evening.
23                   JUSTICE DICKEY:  Good evening.
24              DIANE CURRY:  Can y'all hear me okay?
25                   JUSTICE DICKEY:  If -- if you --
```

1              DIANE CURRY:  I am --

2              JUSTICE DICKEY:  -- if you'll state your

3       name.

4              DIANE CURRY:  Okay.

5              JUSTICE DICKEY:  But if you will either,

6       like you're doing, bring the microphone close

7       or take your mask down --

8              DIANE CURRY:  Okay.  Thank you.

9              JUSTICE DICKEY:  -- temporarily.

10             DIANE CURRY:  Good evening.  I'm Diane

11      Curry with -- representing the State NAACP.

12      However, I am president of the Little Rock

13      branch NAACP.

14             Several things have already been answered

15      this evening, so I won't try to repeat --

16      request those.

17             One of the things that we would like to

18      know, has any consideration being given -- I

19      know you've done several hearings across the

20      state, to a majority/minority population --

21      majority/minority district, Congressional

22      District.

23             However, I know you -- you're not supposed

24      to give preferential treatment.  However, in

25      view of a lot of the map changes that have

1          occurred, at least we would like for

2          considerations should be looked at on that.

3              The other thing we'd like to ask, how

4          would we submit citizen's map if we would like

5          to submit a map to the Apportionment Board or

6          to the entities?

7              JUSTICE DICKEY:  I think that Ms. Evans

8          had asked about that earlier.  And that's being

9          done as far as a way to access; am I correct,

10         as a way to -- as a way to submit your own map

11         of your own community.

12             You have to understand, you know, this is

13         a jigsaw puzzle of a hundred pieces for House

14         seats, 35 pieces for Senate seats, and nobody's

15         an island in this.

16             And, you know, you're welcome to submit

17         your plan for your community, but it has to

18         work with the others.  And I know you know

19         that.

20             DIANE CURRY:  Yes.  We would have a

21         demographer to do that.  I'm sure we would,

22         especially from the State National NAACP.

23             Also, I'd like to ask, in view of the fact

24         that we do have upcoming filings for

25         candidates, I believe, November.  Is it

1        November?  November.  So I know the timeline

2        here seems to be very tight.

3            What thoughts have you all given to that

4        issue for filing?  Because, otherwise, you may

5        not know what district that you're actually

6        filing in.  That's something that is --

7            JUSTICE DICKEY:  (Inaudible.)

8            DIANE CURRY:  -- a concern.

9            JUSTICE DICKEY:  What?

10       MR. NYE:  Let me answer it.

11       JUSTICE DICKEY:  Okay.

12       MR. NYE:  I'm sorry, I had a hard time

13      under -- are you asking about filing dates for

14      the --

15       DIANE CURRY:  Yes.

16       MR. NYE:  -- upcoming --

17       DIANE CURRY:  Because -- yes.  November, I

18      understand, is some of the filing dates for

19      various candidates.

20        So I know people are concerned because

21      that would change where people vote and all of

22      that as well, but I know that that would come

23      later.

24       MR. NYE:  In 2022, the primary's going to

25      be in May, which will mean, the filing period

1           will take place February 22nd to March 1st --

2                DIANE CURRY:  Okay.

3                MR. NYE:  -- so we're lucky in the sense

4           that, you know, in the presidential years, the

5           Primary is in March and the filing period does

6           take place in November, like you mentioned.

7           But this year --

8                DIANE CURRY:  Uh-huh.

9                MR. NYE:  -- the Primary is going to be in

10          May, which means filing is in February --

11               DIANE CURRY:  February, okay.

12               MR. NYE:  -- which gives us a little bit

13          of time.

14               DIANE CURRY:  Okay.  All right.  Thank you

15          so much for that clarity.

16               We'd just like to say, on behalf of the

17          NAACP, we are concerned with some of the things

18          that's happened previously in gerrymandering

19          from across the state.  And we do want to

20          encourage the criteria to be followed.  Thank

21          you.

22               JUSTICE DICKEY:  Thank you.  That's why

23          that's listed as one of the concerns that we

24          have.

25               If you see that in any of the maps that

 1          are drawn, let us know.  We don't expect that.

 2              Yes, ma'am?

 3              RICHELLE BRITTAIN:  Yes.  My -- my name is

 4          Richelle, R-i-c-h-e-l-l-e, Brittain,

 5          B-r-i-t-t-a-i-n.  I live in Jacksonville.  I

 6          happen to live in the same ward as Rose Reigns,

 7          same ward of Jacksonville as Rose Reigns who

 8          spoke earlier.  I also happen to be a member

 9          both in the -- just happen to be a member of

10          both Indivisible and the Jacksonville Branch

11          NAACP, the last two people who spoke spoke for

12          those organizations.

13              But I have -- I have a question

14          specifically about the last criteria, the

15          minimized partisanship, talking about, you

16          know, be aware of salamanders, you know --

17              JUSTICE DICKEY:  Minimize the partisanship

18          --

19              RICHELLE BRITTAIN:  -- yes, the

20          salamanders.  We know that's --

21              JUSTICE DICKEY:  -- the -- not draw maps

22          in favor of Republicans or Democrats.

23              RICHELLE BRITTAIN:  Yeah.  Because, I

24          mean, we know -- because, I mean, you know, we

25          know ten years -- we know -- we know the

1          parties do that.  Ten years ago the Democrats

2          tried to do that and it backfired on them.  Now

3          it's Republicans running it.  But, it's, you

4          know --

5                JUSTICE DICKEY:  Well --

6                RICHELLE BRITTAIN:  -- it tends to happen

7          whether you do it -- whether -- what you do.

8          And I would like to hear specifically -- and,

9          of course, I said, I'm in -- live in the same

10         area as Rose Reigns.

11               So y'all brought up the Jacksonville

12         finger.  And that's -- you know, it says avoid

13         little fingers.  We want to know -- you know,

14         we want to know specifically what strategies

15         you intend to use to carry out that last

16         criteria so there's no gerry -- so there is --

17         so to avoid gerrymandering, especially in a

18         part -- especially, you know, when dealing with

19         a partisan Board of Apportionment.

20               We, you know --

21               JUSTICE DICKEY:  You want to know about

22         how we're going to avoid partisan

23         gerrymandering?

24               RICHELLE BRITTAIN:  Yes.

25               JUSTICE DICKEY:  Well, I quoted you on the

```
1          ninth point, the -- a case called Rucho versus
2          the Common Cause, a 2019 case.
3               If you want to read that, R-u-c-h-o is the
4          case.  And it deals with this issue that says
5          it should go to state courts because the states
6          can better understand -- well, it doesn't say
7          it has to go to state courts, it says federal
8          courts not handling.  It doesn't --
9               RICHELLE BRITTAIN:  Federal Court, yeah.
10         The Supreme Court says --
11              JUSTICE DICKEY:  So you see those fingers
12         or you see where they've drawn somebody in or
13         out of a district like they did ten years ago,
14         you call -- you call us out on it.
15              I don't think with the integrity of the
16         people I'm working with that you'll see that.
17              RICHELLE BRITTAIN:  So -- so basically if
18         that needs to be brought during the state --
19         that there is --
20              JUSTICE DICKEY:  Any --
21              RICHELLE BRITTAIN:  -- (inaudible) window,
22         that type --
23              JUSTICE DICKEY:  -- any litigation is --
24              RICHELLE BRITTAIN:  -- that type of
25         illegality needs to be brought up during the
```

1          state challenge window?  Because I think it's

2          like 30 -- I think after it's finalized, they

3          have like 30 days to go before the Arkansas

4          Supreme Court, if I -- if I remember the -- if

5          I remember the Constitutional provisions on

6          legislative districts for state, for the state

7          lawsuits as opposed to the federal Lawsuits.

8              Feds -- Feds are something totally

9          different.  And that's what you were citing in

10         the Rucho case because the Supreme Court said

11         -- that's where the Supreme -- Supreme Court

12         basically said we can't do anything about it.

13         The US Supreme Court.

14             Arkansas Supreme Court -- sorry, you're

15         saying it's the Arkansas Supreme Court can?

16             JUSTICE DICKEY:  I'm saying that's where

17         the feds have said you file your lawsuits now,

18         in state court.

19             RICHELLE BRITTAIN:  Well --

20             JUSTICE DICKEY:  And the state court --

21         the state's better able to see where those

22         fingers and drawing someone in or out of a

23         district --

24             RICHELLE BRITTAIN:  Salamanders --

25         salamanders, gerrymanders, whatever.

1          JUSTICE DICKEY:  Gerrymandering,

2     gerrymandering, salamandering --

3          RICHELLE BRITTAIN:  Yeah.

4          JUSTICE DICKEY:  I think in -- recently

5     they called it dummymandering.  Any of the

6     above.

7          RICHELLE BRITTAIN:  Whatever you call it.

8     Whatever.  All right.  Thank you.

9          JUSTICE DICKEY:  Thank you.

10         Yes, ma'am?

11         ANNA McCLUNG:  Good eve -- excuse me.

12    Good evening.  My name's Anna McClung, I'm from

13    Lonoke.

14         And it's just kind of a follow-up to what

15    was being said.  This is probably the simplest

16    you're going to get tonight.

17         With today's technology and you have such

18    incredible amount of data for -- through the

19    census of how many people, households, race, to

20    some extent, throughout the state, it would

21    seem to me that it would be quite

22    straightforward for a computer to come up with

23    a well-balanced potential map.

24         Because, I guess, my concern is --

25    everybody's concern is about objectivity.  And

1          if I were to go in with no bias and draw a map,

2          you know, I don't know about these fingers and

3          that sort of thing, but I'm just going based

4          upon population, demographics, trying to get

5          equal representation, why would that not be at

6          least a starting point to go forward?

7              MR. JOHNSON:  I would agree with you that

8          the technology today has that capability and

9          the software is very, very good.

10         There's one deficiency that the software

11        can't overcome.  There's no way for the

12        software and data to indicate a community of

13        interest.  And communities of interest are

14        people who affiliate together for common

15        reasons or certain parts of the community.  And

16        the software just simply doesn't recognize

17        cultural differences and communities of

18        interest in the way that we, as humans, do.

19          UNIDENTIFIED SPEAKER:  What?

20          ANNA McCLUNG:  If I can give just a

21        follow-up.  I mean, it would seem to me that

22        communities of interest are closely connected

23        in proximity.

24          And so I guess my thinking is, if you had

25        a potential layout of an objective map, at that

1          point, people can come in, oh, we need to make

2          sure it's moved across the street a little bit

3          or whatever.

4              But it would seem to me that that would

5          instill more trust by the people that it was

6          done in an objective manner.

7              JUSTICE DICKEY:  To the extent that we can

8          comply with that, we try.  It does not outweigh

9          the substantially equal population.

10             And communities of interest, some that are

11         rural, may not have the population and so they

12         are linked with cities.  That's been done in

13         the past.

14             But, to answer your question, communities

15         of interest are very important.  But they're

16         not more important than the first three of the

17         criteria you see in front of you.

18             ANNA McCLUNG:  He's the one that brought

19         up community of interest.

20             What -- what I'm saying is I just seem

21         like -- we have the technology.  We can -- we

22         can map streets and houses with a satellite

23         now.  Why can't we do this in a very objective,

24         almost topographical manner and make this very

25         --

1          JUSTICE DICKEY:  You make it sound so
2     easy.  It is not as easy, especially when
3     you're looking at the deeply red and deeply
4     blue districts.
5               (Indiscernible Crosstalk)
6          JUSTICE DICKEY:  Do you have any other
7     questions?  If you --
8          ANNA McCLUNG:  No.  I appreciate -- I
9     thank you for trying.
10         JUSTICE DICKEY:  Thank you.
11              If you have a question, please come to the
12    microphone.
13         LATONY HONORABLE:  Hi.  I know there
14    haven't really been any --
15         JUSTICE DICKEY:  I'm sorry.
16         LATONYA HONORABLE:  Can you hear me?
17         JUSTICE DICKEY:  Yes.  Thank you.
18         LATONYA HONORABLE:  Okay.  You're welcome.
19    Thank you.  My name is Latonya Austin
20    Honorable.  And I have just a couple of
21    questions.
22              The first is you mentioned a 30-day wait
23    period after the plans are finalized.  Do I
24    remember that correctly?
25         JUSTICE DICKEY:  The -- after the three

1          principles vote, there is a 30-day period for

2          yet another round of feedback or con -- or, you

3          know, concern.

4                    LATONYA HONORABLE:  During those 30 days,

5          will it be disclosed to the public how the

6          final plans were determined or what -- what led

7          to the final plans?  How -- how we got there,

8          how we got to the final plans --

9                    JUSTICE DICKEY:  Well, other than these

10         criteria -- and some of them are in order of

11         importance.

12                   I mean, the first -- obviously, the first

13         three.  You're giving me a general question and

14         I can give you a general answer.

15                   But specifically, what are you asking?

16                   LATONYA HONORABLE:  What is the -- what is

17         the substantive purpose of the 30-day wait

18         period?  Will any comments that are provided or

19         given during those 30 days going to be used to

20         then modify the final plan or is it just

21         informative?

22                   Or what is the actual substantive purpose

23         of the 30 days?

24                   JUSTICE DICKEY:  It -- It did last time.

25                   (Indiscernible Crosstalk)

1          JUSTICE DICKEY:  It changed the way they
2     -- they -- the final map was drawn the last
3     time, so there's no reason to think it won't
4     this time.
5          If there is an error, something that needs
6     to be adjusted -- and the three principles
7     agree on that.  And if you have that, if you
8     feed -- give us that feedback and we take it to
9     them and say, wait, we got it wrong here.
10         LATONYA HONORABLE:  And so -- and let me
11    also say this.
12         I represent a group of people that are not
13    extremely knowledgeable about this entire
14    process and may not even know how to formulate
15    the right questions to get the answers that
16    they're truly looking for.
17         So your answer in terms of this changed --
18    you know, that 30-day wait period changed the
19    way the lines were drawn in 2010, when I asked
20    the question, what will be disclosed in terms
21    of how the lines were drawn, how will someone
22    know that it's drawn improperly or incorrectly
23    if the person doesn't know how you arrived at
24    the lines anyway?  That's my question.
25         Other than the criteria, I mean, what --

1          what is it that will let someone know that the

2          lines are improper, such that the three

3          principles, as you call them, that would cause

4          them to go back and modify it?  I mean, if it's

5          not a legal --

6               JUSTICE DICKEY:  You want to answer that?

7               LATONYA HONORABLE:  -- challenge in court,

8          what is it that one should bring up that says,

9          hey, these lines are drawn wrong?

10              JUSTICE DICKEY:  Well, I think Shelby

11         mentioned -- you talked about one where the

12         Senate and House lines could have overlapped,

13         but there was a gap.  You know, you want to --

14              LATONYA HONORABLE:  Anyone from the panel

15         can answer.  I'm -- I'm just curious.

16              JUSTICE DICKEY:  Yeah.  And --

17              MR. JOHNSON:  One example would be, for

18         the public to evaluate, would be the

19         demographic reports and the variances.  That'll

20         be a part of the -- part of the record that the

21         Board most likely would base some of their

22         decision making on, looking at the population,

23         the population variance among the districts.

24              Another example is looking at an instance

25         where, for example, and I'm just making this as

1          an example, but a city might have been split

2          and that split could have been avoided and not

3          created an egregious issue with the variance.

4          So that would be an example.

5               And the best way to know that is, when the

6          Board gets to the point that they're ready to

7          look at those final maps, one of our challenges

8          or one of our jobs will be to put that onto a

9          high quality base map that would have community

10         names, city names, the county lines, all of

11         those other things that you would want to see,

12         so that, as a member of the public, anyone

13         would look at and go, oh, they made this

14         mistake.

15              And that -- that would be another way that

16         the public would be able do to that, is by

17         looking at these better quality maps.

18              LATONYA HONORABLE:  Thank you.

19              JUSTICE DICKEY:  Yes, ma'am?

20              LATONYA HONORABLE:  I do have another

21         question.

22              JUSTICE DICKEY:  Okay.

23              LATONYA HONORABLE:  And this is a

24         micro-question, so I ask for your -- a little

25         bit of indulgence.  And it's a micro-question

1          only insofar as it addresses lines dealing with

2          municipalities.

3               So there aren't a lot of people that

4          really understand that the Board of

5          Apportionment is responsible for drawing the

6          federal lines, let alone knowing who's

7          responsible for drawing local lines and

8          redistricting in that way.

9               Is there someone who might be able to

10         share whether this Board or what body is

11         responsible for the drawing of local lines?

12               JUSTICE DICKEY:  Yes.

13                (Indiscernible Crosstalk)

14               JUSTICE DICKEY:  Or, Doug, you want to do

15         that?

16               The legislature does the Congressional --

17         the Federal Congressional seats.  We do the

18         State House and Senate.  And Doug will tell you

19         the rest of the --

20               LATONYA HONORABLE:  Well, actually since

21         you're there, Justice Dickey, I -- and you're a

22         former Chief Justice; correct?

23               JUSTICE DICKEY:  Yes.

24               LATONYA HONORABLE:  Okay.  So you might be

25         poised to answer this question, because the

1          question somewhat deals with the drawing of
2          judicial lines.  I'm sure you're familiar with
3          Hunt Decree.  Will any of this process --
4               JUSTICE DICKEY:  Somewhat.
5               LATONYA HONORABLE:  -- or any other
6          process similar to it affect the drawing of
7          those judicial districts?
8               JUSTICE DICKEY:  I don't know.
9               LATONYA HONORABLE:  Do you know who would
10         know?
11              JUSTICE DICKEY:  This man loves reading
12         about it --
13              LATONYA HONORABLE:  Okay.
14              JUSTICE DICKEY:  -- much more than I.
15         So -- both of these men do --
16              LATONYA HONORABLE:  I'll take all the
17         answers.
18                  (Indiscernible Crosstalk)
19              REPRESENTATIVE HOUSE:  Yes, Ms. Honorable.
20         The answer to your question about judicial
21         lines, there's a federal court case going on
22         right now in the -- in the District Court,
23         Little Rock, United States District Court, and
24         they're discussing that very issue now.
25              So I don't know the answer to your

1          question, but that's where the answer can be

2          found, when the court reaches its decision.

3               JUSTICE DICKEY:  Okay.

4               LATONYA HONORABLE:  Are there any other

5     municipal lines that might be affected that are

6     not dictated by this body of individuals?

7               JUSTICE DICKEY:  Huh?

8               (Indiscernible Crosstalk)

9               JUSTICE DICKEY:  The City Councils?  Draw

10    --

11              LATONYA HONORABLE:  And -- and what body

12    of individuals determines the drawing of those

13    lines?

14              JUSTICE DICKEY:  The City Council.  Those

15    -- those --

16              LATONYA HONORABLE:  The City Council draws

17    its own lines?  Okay.  May I hear what you have

18    to say?

19              REPRESENTATIVE HOUSE:  The City Councils

20    draw their -- their ward lines.

21              The County Boards of Election

22    Commissioners for each of the 75 counties draws

23    the justices of the peace lines.  I think they

24    also draw the school board lines, school board

25    lines as well.

1          The Board of Apportionment, the governor,

2      secretary of state, and the attorney general do

3      not draw any of those lines.

4          LATONYA HONORABLE:  Okay.  Thank you.

5          REPRESENTATIVE HOUSE:  Yes, ma'am.

6          JUSTICE DICKEY:  Thank you.

7          Yes, ma'am?

8          CLARICE BAY:  Hi.  My name's Clarice Abdul

9      Bay, I live in Pulaski County.

10          I have a couple of questions to ask.

11      Latonya touched on it, but I wanted to go into

12      a little more detail with a question.

13          Will you explain --

14          JUSTICE DICKEY:  If you will speak into

15      the microphone, everyone can hear you.

16          CLARICE BAY:  Okay.  Can you hear me?

17      Will you explain which public comments you did

18      or did not factor into your proposed maps and

19      why?

20          JUSTICE DICKEY:  If you'll speak into the

21      microphone.  I can't understand you.

22          CLARICE BAY:  Okay.  Can you hear me?

23          JUSTICE DICKEY:  Yes.  Now, I can.

24          CLARICE BAY:  All right.

25          Will you -- well, first, will you commit

1          to making your decision-making process public;

2          and, to be more specific, will you explain

3          which public comments you did or did not factor

4          into your proposed maps and why?

5               JUSTICE DICKEY:  Will, we take the

6          thousand comments that we've gotten and -- and

7          tell you which ones you we did and did not use?

8               CLARICE BAY:  Well --

9               JUSTICE DICKEY:  Why don't you go online

10         and read those comments and pick out the ones

11         you think that we ought to respond to, because

12         some of them are just, I like it like it is or

13         change it or -- you know, there are multiple

14         comments that we factor into it as far as

15         things that should be changed.  And they've

16         mentioned some of those as far as not drawing

17         -- splitting up a precinct.

18               CLARICE BAY:  Okay.

19               JUSTICE DICKEY:  Splitting up a --

20               CLARICE BAY:  To me, if you have to read a

21         thousand comments, then you have to read a

22         thousand comments --

23               JUSTICE DICKEY:  Oh, we've read them.

24               CLARICE BAY:  Right.

25               JUSTICE DICKEY:  But do we --

1          CLARICE BAY:  But my question --

2          JUSTICE DICKEY:  -- ever respond to them

3     --

4          CLARICE BAY:  My question was --

5          JUSTICE DICKEY:  -- no.

6          CLARICE BAY:  -- will you explain which

7     public comments you did or did not factor into

8     your proposed maps and why?

9          And I mean the ones that make sense to

10    you.  That's what I mean.  So if you have to

11    read a thousand of them and pick those out,

12    then will you do that?

13         JUSTICE DICKEY:  And -- if we have time

14    drawing the maps, maybe.

15         CLARICE BAY:  No, it's not about -- okay.

16    Thank you for that.

17         JUSTICE DICKEY:  You're welcome.

18         CLARICE BAY:  I'm -- I'm -- I'm filing it.

19         JUSTICE DICKEY:  Is there another

20    question?

21         CLARICE BAY:  There is another question.

22    And I don't understand the energy, but I'm

23    going to ask this question anyway.

24         There was a question asked about

25    incarceration and people being counted.  And my

1          question is, in regards to the prison county,

2          you stated that the Board of Apportionment, and

3          I think this gentleman here --

4               JUSTICE DICKEY:  Which one?

5               CLARICE BAY:  -- will be counting

6          prisoners where they are incarcerated.

7               However, during the recent Committee of

8          Government Affairs, it appeared that they were

9          looking into doing it differently in the

10         accordance with the red book that they are

11         using.  Are you aware of that?

12              JUSTICE DICKEY:  Who answered the

13         question?  Doug, is that -- did you answer that

14         before?

15              REPRESENTATIVE HOUSE:  Thank you.  It's an

16         interesting question for this reason.  The

17         Census Bureau does the counting, not the Board

18         of Apportionment.

19              The Census Bureau counts people where they

20         reside.  If they reside at a college campus,

21         they are counted there.  If they reside in a

22         hospital or nursing home, they are counted

23         there.  If they reside in a correctional

24         institution, be it juvenile, adult, men or

25         women, as the case may be, they are counted

1        there.

2             CLARICE BAY:  Uh-huh.

3             REPRESENTATIVE HOUSE:  Two states,

4        California and New York, have reallocated their

5        people in their institutions back to their

6        homes, if they have a home.

7             Other questions arise about what do you do

8        about the homeless, where are they reallocated

9        and those kinds of things.

10           Two or three other states have talked

11       about doing -- one other state, and I believe

12       it's Kansas, but don't hold me to that, did it

13       and decided to undo it because it became a

14       problem.

15           CLARICE BAY:  Uh-huh.

16           REPRESENTATIVE HOUSE:  Right now, the way

17       the Constitution says is that we allocate

18       districts based on population where people

19       reside.

20           CLARICE BAY:  Uh-huh.

21           REPRESENTATIVE HOUSE:  There was a bill

22       introduced several years ago by then

23       Representative Andrea Leigh, now the state

24       auditor, to reallocate the prisoners around the

25       state.  The legislature declined to adopt it.

1          Another -- some proposals were bandied

2     about the last legislative session, the

3     legislature decided not to adopt it.

4          So when those people are placed in a

5     district, they will be placed in the district

6     where they live.

7          Now, that makes a difference sometimes

8     with the number of registered voters for that

9     particular district, but they are constituents

10    all the same.

11         I'm very proud of our Representatives and

12    Senators who represent prison populations

13    because they get inundated with hundreds and

14    hundreds of requests, demands, complaints, and

15    sort of things like that.

16         So just because they're elected, it's kind

17    of a tradeoff, they have fewer people voting

18    for them into office, but they have tremendous

19    workload because those people in prison are

20    constituents too.

21         CLARICE BAY:  Okay.

22         REPRESENTATIVE HOUSE:  Does that answer

23    your question?

24         CLARICE BAY:  Yes.  Thank you for

25    answering that question.  And thank you for

1          being kind about it.

2                  JUSTICE DICKEY:  Yes?  You go ahead.  Yes,

3          ma'am.

4                  RHONDA KIMBALL:  Hi, my name is Rhonda

5          Kimball.  Can you hear me?  Rhonda Kimball.

6                  JUSTICE DICKEY:  Okay.

7                  RHONDA KIMBALL:  Can you hear me?

8                  As we speak, they are voting on the John

9          Lewis Voting Rights Act.  And part of that Act

10         is the accountability of states to submit their

11         plans to the Department of Justice.  I know the

12         Department of Justice has rejected 13 such

13         plans.

14                 Is Arkansas required to submit their plan

15         to the Department of Justice right now for

16         pre-clearance?

17                 JUSTICE DICKEY:  They're not.  No.

18                 RHONDA KIMBALL:  They're not?

19                 Now, you've mentioned several federal

20         regulations.  I'm sure you're aware of what's

21         in that bill that pertains to redistricting.

22                 So how far are you off the mark?  Are you

23         in compliance with that?  Are you taking that

24         -- that into consideration when it comes to

25         this Federal Act?  Does that make sense?

1          JUSTICE DICKEY:  Which Federal Act?

2          RHONDA KIMBALL:  So they're going to have

3     requirements in that Federal Acts.  How far are

4     we off the mark for -- with complying with that

5     Federal Act as far as redistricting?

6          JUSTICE DICKEY:  What Federal -- which

7     Federal Act?

8          RHONDA KIMBALL:  The John Lewis Voting

9     Rights Act and what's in that Act.

10         JUSTICE DICKEY:  Doug, are you familiar

11    with that?

12         RHONDA KIMBALL:  Pardon?

13         REPRESENTATIVE HOUSE:  Ma'am,

14    clarification of your question, has that

15    particular Act -- and I've seen the bill.  I

16    haven't seen an Act --

17         RHONDA KIMBALL:  Bill, yeah, it's a bill.

18    I'm sorry, it's a bill.

19         REPRESENTATIVE HOUSE:  It's a bill?

20         RHONDA KIMBALL:  Uh-huh.

21         REPRESENTATIVE HOUSE:  And has it become

22    an Act?

23         RHONDA KIMBALL:  It has not.  So I -- I --

24    I digress with that.

25         REPRESENTATIVE HOUSE:  Okay.

1          RHONDA KIMBALL:  It's a bill.

2          REPRESENTATIVE HOUSE:  All right.

3          RHONDA KIMBALL:  So how far are you off

4      the mark with what's in that bill?

5          REPRESENTATIVE HOUSE:  Ma'am, we follow

6      the law as it exists.  If the law changes, we

7      change as well.

8          RHONDA KIMBALL:  Okay.

9          REPRESENTATIVE HOUSE:  You -- you asked

10     about pre-clearance, that's Section 5 and 4 of

11     the Voting Rights Act.

12         Section 4 was declared unconstitutional

13     and that's selection of states that have to get

14     pre-clearance, that was declared

15     unconstitutional in a case called Shelby

16     County, Alabama --

17         RHONDA KIMBALL:  Uh-huh.

18         REPRESENTATIVE HOUSE:  That's the short

19     name and I forgot the rest of it.  That was

20     declared unconstitutional a few years ago.  No

21     state has pre-clearance anymore.

22         RHONDA KIMBALL:  Okay.  Okay.

23         So going back to what someone else asked

24     earlier, there is no other accountability

25     besides what happens at the state level;

1          correct?

2              JUSTICE DICKEY:  Well, there are all kinds

3          of levels of --

4              RHONDA KIMBALL:  I mean, except for the

5          three things you mentioned --

6              JUSTICE DICKEY:  Yeah.

7              RHONDA KIMBALL:  -- except for the things

8          that you mentioned that are now required.

9          Other than that, there's no other

10          accountability?

11              (Indiscernible Crosstalk)

12              JUSTICE DICKEY:  That's not correct, he

13          says.  And that's not -- there are all kinds of

14          laws that require accountability in one way or

15          another.  We've mentioned some and, you know,

16          but the --

17              RHONDA KIMBALL:  Okay.  That's what --

18              JUSTICE DICKEY:  That's not correct.

19              RHONDA KIMBALL:  That's what I needed to

20          know.  I was -- I was just interested in the --

21              JUSTICE DICKEY:  The bill?

22              RHONDA KIMBALL:  -- the noncompliance and

23          what's going on with the bill.  And then how

24          far off the mark we will be and if we will have

25          to start over if that should become an Act.

1              Thank you.

2              JUSTICE DICKEY:  Yes, sir?

3              ALEXANDER JONES:  My name's Alexander

4         Jones.  I'm from Little Rock.  And I have a

5         question about the document entitled House

6         Districts 2020 Population Variance, which is

7         published up there.

8              The Arkansas Board of Apportionment

9         published this on August 17th, 2021.  This is a

10        table of all the districts ranked highest in

11        population to lowest in population.  The

12        document includes a table, a column, marked

13        status.  And my questions have to do with that

14        column.

15             This appears tied to percent deviation

16        from the target number, which is 30,115.

17        Deviations greater than ten percent, either

18        higher or lower, are marked illegal.  Questions

19        have already arisen about that earlier in this

20        comment period.

21             Deviations between five percent and ten

22        percent appear to be labeled either excessively

23        high or excessively low.  The most interesting

24        status to me though is not either illegal or

25        excessive, but rather preferable.

1            Preferable appears to be labeled for

2       deviations for less than one percent, higher or

3       lower than the target of 30,115.

4            So my first question about these

5       categories is this.  Who or what entity

6       designated these categories?

7            JUSTICE DICKEY:  You can answer that.

8            MR. JOHNSON:  That would be my office.  In

9       preparing that table, we looked at -- you are

10      very intuitive.  We did look at the percent

11      variance.

12           And so those are classes or categories

13      that we assigned based on that percent variance

14      that you observed in those charts.

15           ALEXANDER JONES:  Then a second question.

16      Thank you.

17           How did you designate one category as

18      illegal?  And by how, I mean, what source of

19      law?

20           MR. JOHNSON:  The -- there is existing

21      precedent that suggests when the variances are

22      excessively high, outside of ten percent, those

23      have not held up in previous court cases.

24           ALEXANDER JONES:  Which court case?

25           MR. JOHNSON:  I -- I'm not --

1          JUSTICE DICKEY:  He's not a lawyer.

2          MR. JOHNSON:  I'm not the scholar on legal

3     court precedents here.

4          ALEXANDER JONES:  Is it fair to assume

5     that the Board of Apportionment will adhere to

6     binding U.S. federal precedent on one man, one

7     vote?

8          JUSTICE DICKEY:  The Board of

9     Apportionment should follow the federal

10    precedent, yes.

11         ALEXANDER JONES:  Would it be fair to say

12    it is obligated to do so under law?

13         JUSTICE DICKEY:  If it's in the -- if it

14    follows the Eighth Circuit, for sure.  Any the

15    others, probably.

16         ALEXANDER JONES:  Is -- what is the target

17    deviation being sought by the Board of

18    Apportionment?

19         JUSTICE DICKEY:  The plus or minus five,

20    as -- as indicated, which is a ten percent

21    variation.

22         If it's -- if it's over ten percent, case

23    law indicates that it's not.  That's not

24    acceptable unless there are -- the cases are --

25    can be explained for other reasons.

```
1              ALEXANDER JONES:  Isn't it true that there
2      is federal precedent that is held less than ten
3      percent --
4              JUSTICE DICKEY:  That's correct.
5              ALEXANDER JONES:  -- to have been
6      impermissible?
7              JUSTICE DICKEY:  That's why I said other
8      reasons.  Yes.
9              ALEXANDER JONES:  Doesn't preferable mean
10     best?
11             JUSTICE DICKEY:  Preferable is not best.
12     Preferable is a comparison.
13             ALEXANDER JONES:  I read in
14     Merriam-Webster, it says, having greater value
15     or desirability.
16             JUSTICE DICKEY:  Okay.  It's greater, not
17     greatest.
18             ALEXANDER JONES:  What makes a lower
19     deviation preferable?
20             JUSTICE DICKEY:  What makes a lower
21     deviation preferable?
22             ALEXANDER JONES:  Yes.
23             JUSTICE DICKEY:  Because it is more -- it
24     is closer to the words, the magic words of
25     substantially equal, which is the -- what
```

1          courts have said.

2                 ALEXANDER JONES:  And I know that this is

3          a bit more than a legal question; it's actually

4          a political question that is tempered by law.

5          But why is it better to have equal districts?

6                 JUSTICE DICKEY:  Well, that goes back to

7          the one person, one vote, so that your votes

8          aren't diluted.

9                 It's a balancing -- it is a -- the right

10         -- the Equal Rights Amendment, the balancing

11         that my vote shouldn't count anymore or less,

12         but should be substantially equal to yours.

13         Same way with districts.

14                ALEXANDER JONES:  I just have two more

15         questions, if you'll indulge me.

16                Would it be possible for the Board of

17         Apportionment to approve a map that apportions

18         each district within one percent of the target

19         number?

20                JUSTICE DICKEY:  It's not -- it's remotely

21         possible.  Anything is possible.  But they're

22         held to substantially equal, which is by the

23         court decisions, plus or minus five percent.

24         Ten percent -- no more than ten, below or

25         above.

1          ALEXANDER JONES:  And I think that you're

2     coming at this from a legal perspective, so I'd

3     like to ask the gentleman from GIS, is it

4     possible, based on computer science, to

5     equalize the districts within one percent?

6          MR. JOHNSON:  Technically, yes.  But doing

7     so would be at the expense of potentially

8     splitting a city or splitting an election

9     precinct or splitting a county.  And those are

10    goals that you would try to avoid if you -- if

11    you -- if possible.

12         ALEXANDER JONES:  And, turning back to the

13    Chief Justice, isn't it true that the one

14    percent amount is actually constitutionally

15    mandated in the federal context?

16         JUSTICE DICKEY:  For the Congressional

17    seats, but not for -- not for the State's House

18    and Senate seats.  They are call -- it's not --

19    it's substantially equal.  And that is not one

20    percent.

21         ALEXANDER JONES:  And I think --

22         JUSTICE DICKEY:  That's not a one percent

23    mandate.

24         ALEXANDER JONES:  And I think I know the

25    answer to this question, but will the Board of

1      Apportionment agree to ensure each district is

2      within the range it's document deems

3      preferable?

4          JUSTICE DICKEY:  What's the question?

5      Will the Board of --

6          ALEXANDER JONES:  Very precise yes or no

7      question.

8          Would the Board of Apportionment agree to

9      ensure its districts each fall within one

10     percent, as defined by it, to be preferable?

11         JUSTICE DICKEY:  Each fall, once a year,

12     is that your question?

13         ALEXANDER JONES:  No.  Would be Board of

14     Apportionment agree to apportion each district

15     within one percent, as defined as preferable in

16     its own documents?

17         JUSTICE DICKEY:  I doubt it.

18         ALEXANDER JONES:  Is that a no?

19         JUSTICE DICKEY:  I didn't say it's no.

20         ALEXANDER JONES:  Same a question for the

21     Senate.

22         JUSTICE DICKEY:  Same answer.

23         ALEXANDER JONES:  One percent population

24     deviation for the State Senate?

25         JUSTICE DICKEY:  Would they -- would they

 1          assure us that it's one percent?

 2                  ALEXANDER JONES:  Not us, the people of

 3          Arkansas.

 4                  JUSTICE DICKEY:  Well, us being the people

 5          of Arkansas.  No, I don't think so, but maybe.

 6                  ALEXANDER JONES:  Thank you.

 7                  JUSTICE DICKEY:  Yes, ma'am.  Or yes, sir.

 8                  STEVEN:  So, my name is Steven from

 9          Pulaski County.  So given that data can produce

10          an objective solution, I would like to just go

11          back to what the gentleman had mentioned about

12          community interest; because it sounds like that

13          may -- can be a subjective variable.

14                  So, if you would, can you please expound

15          on that?  How do you -- how would you calculate

16          that?

17                  REPRESENTATIVE HOUSE:  The analogy that I

18          like to draw, and this may take a minute, but

19          bear with me --

20                  STEVEN:  Yes, sir.

21                  REPRESENTATIVE HOUSE:  -- is in elementary

22          school attendance zone.  So one elementary

23          school might be the Cardinals and the other

24          elementary school might be the Tigers.

25                  Those two attendance zones were

1            representative of moms, dads, grandparents,

2            guardians that attend the same PTA meetings.

3            They send -- they're involved in the same civic

4            clubs like 4H or Boy Scouts or Girl Scouts.

5                 So, for example, the Cardinals all

6            affiliate together.  They potentially go to the

7            same houses of worship, et cetera.  And then on

8            the other side of town would be the Tigers and

9            they would have a different group that they

10           affiliate through the same associations I

11           described.

12                Those are examples of community of

13           interest.  And none of what I just described is

14           contained in the census data.

15                  (Indiscernible Crosstalk)

16                UNIDENTIFIED SPEAKER:  Okay.  Well, then I

17           have follow-up to that.  Oh, I'm sorry, go

18           ahead.

19                  (Indiscernible Crosstalk)

20                UNIDENTIFIED SPEAKER:  Okay.  Well, you

21           know, this community of interest.  I live in

22           Chenal Valley, West Little Rock.  There's

23           50,000 people that live there, 30

24           neighborhoods.  It's in Little Rock city

25           limits.

1          We are gerrymandered in with the Bigelow

2     and Perry and Maumelle and all of these little

3     towns that have really no interest, no common

4     interest with one of the largest growing areas

5     in Arkansas.

6          Why?  Why are we gerrymandered in with

7     these little rural areas when we really should

8     be in Little Rock?  Little Rock is the most

9     gerrymandered place in Arkansas.

10          And there's all these fingers and these

11     swirls and this guy from Maumelle, who

12     represents us, he represents this doughnut,

13     this half of the doughnut.

14          So I don't see why anybody in Little Rock

15     or West Little Rock has any sort of common

16     interest with all these little small towns that

17     are actually losing population.

18          Oh, and I have more thing.  You said --

19          REPRESENTATIVE HOUSE:  Can we answer one

20     question at a time?

21          UNIDENTIFIED SPEAKER:  Okay.  Sure.

22          REPRESENTATIVE HOUSE:  The first question

23     you answered was why you're in with Bigelow.

24          UNIDENTIFIED SPEAKER:  And I lived here

25     ten years ago and still --

1            REPRESENTATIVE HOUSE:  I'm answering.

2            UNIDENTIFIED SPEAKER:  -- we still should

3       not have been --

4            REPRESENTATIVE HOUSE:  I'm answering.

5            UNIDENTIFIED SPEAKER:  -- (inaudible) with

6       there.

7            REPRESENTATIVE HOUSE:  The districts that

8       were drawn were drawn ten years ago.  A lot has

9       changed out in West Little Rock in the last ten

10      years --

11           UNIDENTIFIED SPEAKER:  Sir, I've lived

12      here --

13           REPRESENTATIVE HOUSE:  Ma'am, I -- ma'am

14      --

15           UNIDENTIFIED SPEAKER:  -- for 15 years.

16      It is not changed that much.

17           REPRESENTATIVE HOUSE:  Ma'am, we can talk

18      one in a time.  It's my turn.

19           When those districts were drawn, they were

20      drawn ten years ago.  And the area has built up

21      considerably in the last ten years.

22           And whatever population is out there is in

23      that district.  It's an unequal population, as

24      you can see from the maps.

25           That's going to change.  The maps are

1    going to be redrawn.  I don't know where your

2    district will be and no one up here knows where

3    it will be until they get the census data down

4    to the block level.

5         And some areas in very far West Pulaski

6    County will probably go over into Perry or may

7    go over into Perry or over into Saline or over

8    into rural areas.

9         It's population driven more than anything.

10   They're looking for 30,115 people per House

11   District and 86,000 and something for Senate

12   District.  And those areas expand or contract

13   to reach that population goal, as the laws say,

14   for State Houses and state that is

15   substantially equal.  That's the goal.

16        UNIDENTIFIED SPEAKER:  There's a big

17   finger going up through Chenal Valley.

18        REPRESENTATIVE HOUSE:  Ten years ago that

19   was drawn.

20        UNIDENTIFIED SPEAKER:  Ten years ago there

21   was still 30,000 people that lived out there.

22        REPRESENTATIVE HOUSE:  Yes, ma'am.

23        UNIDENTIFIED SPEAKER:  There were not --

24   there were 30 neighborhoods --

25        REPRESENTATIVE HOUSE:  That's why we do

1     the census and why we've redistrict every ten

2     years.  That's the law.

3          UNIDENTIFIED SPEAKER:  And then one more

4     thing I wanted to correct.

5          You said that the Supreme Court ruled

6     Section 5 unconstitutional.  It was in Shelby

7     County.  It was Section 4(a), it was 4(a), not

8     5.  Five was the pre-clearance.

9          They did not rule pre-clearance as

10    unconstitutional.  They ruled that the 40 years

11    of data that they had for apportionment, based

12    on the previous 4(a) was not unconstitutional.

13    And they -- and they pushed that to the

14    Congress to -- to deal with.

15         So, yeah, you can use -- you can have

16    pre-clearance.  It's just Congress is going to

17    have to mandate it is what the Supreme Court

18    said.

19              (Indiscernible Crosstalk)

20         REPRESENTATIVE HOUSE:  This is the law

21    now?

22         UNIDENTIFIED SPEAKER:  Well, the law is --

23    that's why we have it going through Congress

24    right now with --

25         JUSTICE DICKEY:  Yes, ma'am?

1          WENDY NEWSOME:  My name is -- actually --
2      yeah.  My name is Wendy Newsome.  I'm here in
3      Little Rock.
4          I have a question that might have already
5      been answered, but I kind of want to get a
6      little more clarification on it.  What --
7          JUSTICE DICKEY:  Speak up.
8          WENDY NEWSOME:  What type of statistical
9      analysis will you be using to actually make
10      that counties bigger or smaller?  Are we using
11      a chi-square or are we using a multifactoral
12      ANOVA?  How is this going to work?
13          JUSTICE DICKEY:  It's your turn.
14          MR. JOHNSON:  It's a lot simpler than
15      that.  It's just divide 3,115,024 by 100 and
16      then divide that same figure by 35, drive or
17      design each district so that each district is
18      roughly about 30,000, or roughly about 86,000.
19          WENDY NEWSOME:  Okay.  So almost kind of
20      like a chi-square, but how do you make sure
21      that is nonpreferential?
22          How do you make sure that your variables
23      that you have listed in number seven are taken
24      into consideration when you make those, when
25      you redraw the lines so it's not -- so it is

1          more random than we're going to pick from here

2          and we're going to pick from here?

3                How do you make it random and not biased?

4                MR. JOHNSON:  Well, each -- each block

5          that's contained within the census data

6          receives a population assignment.  Some blocks

7          contain zero population.

8                For example, an industrial park might have

9          not any population.  A park might not have any

10         population.  Other areas where we have high

11         density population, that block would carry the

12         total count at that -- at that area.

13               You would then grab or group clusters of

14         blocks together and you might do it at the

15         precinct level.  And that would be all of the

16         population that's contained within that

17         precinct.

18               Blocks are nested in precincts.  Precincts

19         are nested in counties.  And then the counties

20         are nested within the state.

21               Each one of those unique levels carries a

22         population total.  So as you're designing or

23         developing a district, you would grab groups of

24         those together.  And a key -- a key practice in

25         that process would be to do it contiguously so

1          that you don't have areas that are separated by

2          another part.

3               And, as you continue to grab additional

4          blocks, the software totals that and then

5          expresses the statistics.  And you continue

6          design and you continue design until you have a

7          district that is near that target population.

8               WENDY NEWSOME:  What software will you be

9          using for that?

10               MR. JOHNSON:  The -- the software is

11          called AutoBoundEDGE.

12               WENDY NEWSOME:  What was that again?  I

13          missed that.

14               MR. JOHNSON:  I'm sorry.  I didn't hear

15          you.

16               WENDY NEWSOME:  Sorry.  I missed what you

17          said.

18               JUSTICE DICKEY:  She didn't hear you --

19               WENDY NEWSOME:  What was the name of the

20          software package?

21               MR. JOHNSON:  The software is called

22          AutoBoundEDGE.

23               WENDY NEWSOME:  AutoBoundEDGE?

24               MR. JOHNSON:  Yes.

25               WENDY NEWSOME:  Okay.  Okay.  Thank you.

1      LATONYA HONORABLE:  Latonya Austin
2      Honorable again.  Just two questions.
3          When I looked up the members of the Board
4      of Apportionment, I do not see your faces or
5      names.  I just want to be clear about your
6      specific role.
7          So, when you talk about the Board of
8      Apportionment, are you talking about yourselves
9      or are you talking about the principals that
10     you reference?
11         JUSTICE DICKEY:  We're talking about the
12     people that we work for, represent.  I don't
13     know if you were here when we first started.
14         LATONYA HONORABLE:  I was.
15         JUSTICE DICKEY:  I introduced myself.  I
16     am a coordinator for the Board of
17     Apportionment.  And with me are -- are men from
18     each of the three entities.  The governor -- if
19     you want me to point them out again, I will.
20         LATONYA HONORABLE:  No.  I think more
21     specifically I'm asking, so whenever you talk
22     about a certain act being done by the Board of
23     Apportionment, are those acts being done by you
24     or are they being done by the three principal
25     members of the Board of Apportionment?

1          JUSTICE DICKEY:  Well, the three

2     principles are also fulfilling the jobs that

3     were just described.

4          We are doing the hearings.  We are taking

5     your comments and posting them online and

6     getting them back to the three entities, the

7     governor, secretary of state, and attorney

8     general.

9          We, as in these men and some other people,

10    will be working on drawing maps that will be

11    then ironed out, any problems that we see with

12    them, with input from you before, during, and

13    after, and then take those to the three

14    entities when we, you know, get the population

15    amount balanced and make sure that it -- that

16    it doesn't violate any of these criteria to the

17    extent that we can avoid it.  I'm talking about

18    the -- the last six.

19         And then give that -- then give that to

20    those three and explain it to them and let them

21    vote.

22         Then come back to you or in a public

23    broadcast and say this is where we are and this

24    is what they've done and you have 30 days to

25    then add more input.

1          And then it has -- then it all has to end

2     by December 31st.

3          LATONYA HONORABLE:  Okay.  Thank you.

4          JUSTICE DICKEY:  Thank you.

5          LATONYA HONORABLE:  Last question.  And,

6     I'm sorry, may I have your name on the end, the

7     gentleman at the far right, my far right?

8          JUDGE DICKEY:  Doug --

9          REPRESENTATIVE HOUSE:  My name is Douglas

10    House, H-o-u --

11         LATONYA HONORABLE:  Oh, yeah.  Okay.

12         REPRESENTATIVE HOUSE:  I know you.

13         JUSTICE DICKEY:  Former representative.

14         LATONYA HONORABLE:  Okay.  That's even

15    better because we now each other.

16         So here's the question.  You referenced a

17    lawsuit in U.S. District Court as it relates to

18    the drawing of the judicial lines.

19         Were you referencing the lawsuit that was

20    filed in 2009 as it relates to the Court of

21    Appeals and Supreme Court lines?

22         REPRESENTATIVE HOUSE:  (Inaudible.)

23         LATONYA HONORABLE:  Do you know the name

24    of that lawsuit?

25         REPRESENTATIVE HOUSE:  I was -- I was not

1          working for the attorney general in 2019.

2          (Inaudible.)

3               LATONYA HONORABLE:  So that would be a no,

4          you don't know the name of the lawsuit?  2019,

5          I'm sorry.  If I said '9, I meant 2019.

6               The reason I'm asking is because those --

7          so I'm trying to make sure -- you directed me

8          to a case.  I'm looking for that case.

9               I am aware of a lawsuit that was filed in

10         District Court in 2019 that challenged those

11         judicial seats that were Court of Appeals seats

12         and Supreme Court seats.

13              I'm unaware of a lawsuit that discusses

14         the drawing of the lines for circuit court

15         judges, and there's a big difference.

16              So I'm asking you, since you referenced

17         the lawsuit, do you happen to know the parties

18         names of that lawsuit or, at the very least,

19         when it was filed?

20              MR. NYE:  Ms. Honorable.

21              LATONYA HONORABLE:  Yes.

22              MR. NYE:  Brad -- Brad Nye with the

23         attorney general's office again.

24              LATONYA HONORABLE:  Hi, Brad.

25              MR. NYE:  The case I believe we are

1        referencing is -- is still pending in court.  I
2        cannot discuss pending litigation.
3            High-level, it is -- Christian Ministry
4        Alliance is the plaintiff's name.  And it deals
5        specifically with the drawing of Court of
6        Appeals seats.
7            LATONYA HONORABLE:  Okay.  That's all I
8        needed to know, so --
9            MR. NYE:  Yes.
10           LATONYA HONORABLE:  -- that doesn't
11       address my concern with the circuit court
12       lines, which was my original question.
13           But I appreciate that.  That answers my
14       question.  Thank you so much.
15           JUSTICE DICKEY:  Thank you.
16           Yes, ma'am?
17           TRACY SHAWN:  Happy Tuesday, everybody.  I
18       am Tracy Shawn (ph).  And my question is just
19       simply around the staffing for those persons
20       collecting the data and recording it.
21           So do we have the same staff, team,
22       support staff, data team, and legal team
23       representing for this redistricting?
24           Do we have the same team in here, year,
25       GIS, you have the same?  Did you have any

1          turnover?  Have you had any turnover?

2               JUSTICE DICKEY:  Any turnover in what

3          staff?  The redistricting?

4               TRACY SHAWN:  The staff you use collecting

5          the data, using to report the data, using to

6          help through this process.

7               JUSTICE DICKEY:  I haven't been here that

8          long.  I've only been here since June.  And

9          these men have worked in state government for

10         several years.

11              But not -- not until June the 15th did we

12         start working on this.

13              TRACY SHAWN:  Okay.  (Inaudible.)

14              Also, the other staff members and other

15         persons that are assisting with the data

16         collecting, not just you all, but all the other

17         persons, do you have any turnover?

18              JUSTICE DICKEY:  Since --

19              TRACY SHAWN:  Do you have any new -- since

20         when?

21              JUSTICE DICKEY:  You don't --

22              TRACY SHAWN:  Since -- well, say, since --

23              UNIDENTIFIED SPEAKER:  Turnover since

24         when?

25              TRACY SHAWN:  Well, say, since May.  May.

1          Can you hear me?  May.

2              (Indiscernible Crosstalk)

3          JUSTICE DICKEY:  Yes, ma'am.

4          WENDY NEWSOME:  All right.  I'm back.  I

5     was actually looking at the AutoBoundEDGE like

6     you were talking about.

7          JUSTICE DICKEY:  I can't hear you.

8          WENDY NEWSOME:  Can you hear me now?

9     Okay.

10          JUSTICE DICKEY:  Barely.

11          WENDY NEWSOME:  Barely?

12          I was taking a look at the AutoBoundEDGE

13     software package that you guys were talking

14     about.  And one of the big things they tout

15     about it is demographics and political.

16          How big is political affiliations going to

17     be taken into consideration with redistricting

18     and using the software package?

19          JUSTICE DICKEY:  Political consideration.

20          MR. JOHNSON:  That -- that's not on our

21     data.  We're just looking at the demographics.

22          JUSTICE DICKEY:  In AutoBoundEDGE, just

23     looking at the demographics.

24          WENDY NEWSOME:  So it won't be looking at

25     the political?  It'll just the demographics of

1          the area?

2                JUSTICE DICKEY:  Yeah.  I mean, it -- yes.

3                Any other questions?  We still have 15

4          more minutes.

5                   (Indiscernible Crosstalk)

6                JUSTICE DICKEY:  Yes.

7                   (Indiscernible Crosstalk)

8                JUSTICE DICKEY:  Well, there's been no

9          turnover since May.

10               Do you have another question?  Okay.  Yes,

11         ma'am?

12               CAROLINE BENNETT:  Yes.  My name is

13         Caroline Bennett.

14               My question is, when I hear red lining and

15         redistricting, it really kind of concerns me

16         because it's always the African-Americans that

17         kind of get left out or get the bad end of the

18         deal on most cases.

19               So are you all taking anything in

20         consideration when y'all doing this red lining

21         and all this stuff?  Redistricting?

22               JUSTICE DICKEY:  Is that a question?

23               CAROLINE BENNETT:  Yes.  Are y'all taking

24         in the communities and making sure that it's

25         being done equitably?

1          JUSTICE DICKEY:  I think that's --

2          CAROLINE BENNETT:  (Inaudible) --

3          JUSTICE DICKEY:  I mean, that's what the

4     criteria sets out.  And that's what we've said

5     over and over again.  Yes.

6          CAROLINE BENNETT:  You said, yes, you are

7     all taking that in consideration?

8          JUSTICE DICKEY:  What is she --

9          (Indiscernible Crosstalk)

10         CAROLINE BENNETT:  Oh, you said yes?

11         (Indiscernible Crosstalk)

12         ANNA McCLUNG:  Anna McClung from Lonoke.

13    So just a follow-up about the AutoBoundEDGE

14    program that was mentioned, and so you just

15    said -- I understood you to say, it's just

16    going to be based upon demo -- was it the

17    population or demographics?

18         JUSTICE DICKEY:  The program is based on

19    demographics, not --

20         ANNA McCLUNG:  So that will include race?

21         JUSTICE DICKEY:  That's part of the

22    demographics.

23         ANNA McCLUNG:  Right.  Right.

24         JUSTICE DICKEY:  Political parties aren't.

25         ANNA McCLUNG:  Right.  Okay.  I just

1          wanted to make sure; because you mentioned

2          before about making sure like mark -- different

3          race groups would be accounted for.

4               And I was just wanting to make sure that

5          that was what you were saying.

6               JUSTICE DICKEY:  That's --

7               ANNA McCLUNG:  Yeah.

8               JUSTICE DICKEY:  Yes, that's correct.

9               ANNA McCLUNG:  All right.  Thank you.

10              JUSTICE DICKEY:  Thank you.

11              Yes, sir?  Yes, ma'am?

12              LAURIE EVANS:  Hello, Laurie Evans again

13         from here.  I live here in Little Rock.

14              You know, I don't -- I'm -- I -- I cannot

15         speak for many of the folks here who have

16         raised the -- the concerns that keep coming

17         back over and over again about, for example,

18         concerns over racial gerrymandering.

19              And, of course, you know, we hear that,

20         you know, you are affirming that, of course, it

21         is a criteria.  And I know that you're

22         definitely -- that's a foremost -- one of the

23         -- one of the things that's foremost in your

24         mind.

25              What I think is -- perhaps, I wonder, if

1          there is any -- it just feels a little

2          nebulous, I guess.  Like -- like how the

3          process is going to work with regard to

4          ensuring, once the maps are drawn, for example,

5          in October and they proposed and we get to that

6          30-day comment period, I wonder if it -- if

7          there is perhaps some information that could be

8          placed on the Board of Apportionment's website

9          that would perhaps walk citizens through the --

10         the actual procedure of how some of these

11         criteria are going to indeed be met with regard

12         to like, once you've got the map, how do you

13         ensure that there has been no gerrymandering

14         that's taken place?

15              Just to -- to just, you know, something

16         that would, you know, boost public trust in the

17         process.

18              JUSTICE DICKEY:  Well, when we talk about

19         the eyeball test, you -- you recognize when

20         there's a weird shape or there's a finger or --

21         or you can look and see where they've drawn

22         around this elected woman's house, so that they

23         drew her out of her district and so she just

24         moved, you know, you'll see.  You saw some of

25         those ten years ago, or 20.

1          I'm hoping.  And I don't intend to be a

2     part of one where there is gerrymandering.  If

3     so, then I'll have to say to you, okay, we

4     failed.  You know, just because my word is not

5     worth anything if I can't be truthful.

6          And if that means calling it out, as far

7     as gerrymandering, I don't think you'll find

8     that.

9          LAURIE EVANS:  And that sounds great.  I

10     think what -- what folks are just asking for is

11     what is -- I mean, we can all sit here and say,

12     oh, we're going to -- I -- I believe you, you

13     know, that we're going to be able to eye -- do

14     the eyeball test.

15          But, once we've done that eyeball test,

16     you know, it -- it looks like it's that 30-day

17     period then that's the magic window for

18     ensuring that there is feedback, which can --

19     which is actionable and that we can see that

20     any changes would be made.

21          JUSTICE DICKEY:  I -- I said that --

22          LAURIE EVANS:  Thank you so much for

23     addressing that again.

24          JUSTICE DICKEY:  Thank you.

25          Okay.  Last question.

1          ALEXANDER JONES:  I'll be -- I'll be more

2     brief this time.

3          JUSTICE DICKEY:  Good.

4          ALEXANDER JONES:  I have -- I have a

5     couple questions for you though.

6          First question, and I don't know who is

7     best to direct it, so --

8          JUSTICE DICKEY:  Well, ask it and I'll

9     figure it out.

10          ALEXANDER JONES:  Thanks.

11          What steps has the Board of Apportionment

12     and its agents taken to address differential

13     privacy as used by the U.S. Census Bureau?

14          JUSTICE DICKEY:  None.  What's the next

15     question?

16          ALEXANDER JONES:  Do you intend to take

17     any steps to address differential privacy as

18     used in the Census Bureau?

19          JUSTICE DICKEY:  No.

20          ALEXANDER JONES:  One more question.

21          What is the -- what difficulties would

22     federal courts have in determining salamanders

23     or little fingers or abrupt lines, as defined

24     in these criteria, that a state court would not

25     have?

1          JUSTICE DICKEY:  The -- all right.  You're

2      talking about gerrymandering, political

3      partisanship.  Federal courts won't -- won't

4      look at it this time, not the political

5      partisanship.

6          ALEXANDER JONES:  But state courts may?

7          JUSTICE DICKEY:  State courts can, yes.

8      And it -- you know, that's where you file if

9      you're going to file a lawsuit.

10          ALEXANDER JONES:  Thank you.

11          JUSTICE DICKEY:  You're welcome.

12          All right.  Last question.

13          UNIDENTIFIED SPEAKER:  Thank you.

14          Okay.  So once the maps are drawn and it's

15      presented to the principals, do they have the

16      opportunity to change those maps?

17          JUSTICE DICKEY:  Sure.  I mean, they're

18      the ones that vote.

19          UNIDENTIFIED SPEAKER:  They're the ones

20      that vote?

21          JUSTICE DICKEY:  We don't vote.

22          UNIDENTIFIED SPEAKER:  Right, right,

23      right.  So in -- in that process, when they rec

24      -- let's say they suggest a change, is that

25      then presented for public comment?

1          JUSTICE DICKEY:  Yes.  I mean, if -- if

2     that's one that they've -- well, not before

3     they vote on it.

4          UNIDENTIFIED SPEAKER:  So -- okay.  I'm

5     just trying to understand the process.

6          So you folks are -- present a map to the

7     principals.  Leslie Rutledge wants to see

8     something changed and she wants this, doesn't

9     agree to it, and so they want to wiggle a

10    boundary.

11         Will that new changed boundary be shown to

12    the public prior to their voting or is it they

13    vote and that's what it's going to be and --

14         JUSTICE DICKEY:  You know, the principals

15    will have talked to the people who work for

16    them.  That's -- that would -- that's not

17    something that all -- all of the sudden -- I

18    don't anticipate, oh, it's a surprise move on

19    one of the three's parts.  That's unlikely.

20         Now, we can speculate on what might

21    happen, but that's unlikely.  They will have

22    looked probably individually before they look

23    at it together to have asked questions and

24    question changes.

25         So I don't think that there is a -- a

1        coming to you again, except now and when the

2        map is present -- you know, we have a map

3        that's presented to them and they vote on it.

4            Then there's a 30 days when you say, why

5        that or change that.

6            UNIDENTIFIED SPEAKER:  So do they agree or

7        -- do they agree to accept or not accept or are

8        they just saying they want to --

9            JUSTICE DICKEY:  I think they have several

10       options, you know, agree, two out of three

11       agree, send it back.

12           UNIDENTIFIED SPEAKER:  Okay.  So it's an

13       iterative process at that point?

14           JUSTICE DICKEY:  No.  It's a what?

15           UNIDENTIFIED SPEAKER:  A process to go

16       through getting it where they can get to

17       something that they can agree to with what was

18       presented to begin with?

19           JUSTICE DICKEY:  Yes.

20           UNIDENTIFIED SPEAKER:  Okay.  All right.

21       Thank you.

22           JUSTICE DICKEY:  Thank you.

23           We're down to the last four minutes before

24       everything closes, the TV goes off.

25           UNIDENTIFIED SPEAKER:  Okay.  I don't have

1        a question, but I just want to just make a

2        statement.

3            You talked about using the AutoBound

4        program.  And that concerns me because it's

5        known to side with the Republican party, the

6        ability to use that.

7            And I'm looking at this program, this EDGE

8        here.  In step five, it talks about merging in

9        political data.  And my question is, throughout

10       this process, will that political data button

11       be pressed and on or will this really be more

12       of a partisanship process?

13           Because, based on the history here, this

14       particular program --

15           JUSTICE DICKEY:  Who's your source?

16           UNIDENTIFIED SPEAKER:  -- has been used to

17       ensure that Republicans maintain control.

18           JUSTICE DICKEY:  Who's your source of

19       that?  A Democratic --

20           UNIDENTIFIED SPEAKER:  No.  The Supreme

21       Court ruling.

22           JUSTICE DICKEY:  It's a what?

23            (Indiscernible Crosstalk)

24           JUSTICE DICKEY:  All right.  Here's your

25       answer.

1          MR. JOHNSON:  So we've furnished technical

2    support to the Board and the staff and the

3    software.

4          The data that has been loaded for the

5    AutoBound product that's been installed for the

6    staff that are working, it's simply the public

7    law 94-171.  That's the census data.  It

8    contains the population and the demographic

9    data.

10          None of the -- we haven't installed any

11    political data on the staff that are working on

12    this because we don't have the ability to pull

13    it all together.  So they're not going to be

14    using that data because we don't have it.

15          JUSTICE DICKEY:  Thank you.

16          Thank you for coming tonight.  We

17    appreciate it.  If you want to talk to us

18    afterwards, you can come up.  This --

19          UNIDENTIFIED SPEAKER:  Well, I have one

20    question.  Are there any Democrats involved at

21    all in the apportionment?

22          Because we've got a Republican government,

23    Republican attorney general, and a Republican

24    secretary of state.

25          JUSTICE DICKEY:  Thank you.  Is it still

1        on?  I mean, it --

2           UNIDENTIFIED SPEAKER:  Well, I don't want

3        to be on TV.  I don't care.

4           JUSTICE DICKEY:  Well --

5           UNIDENTIFIED SPEAKER:  (Inaudible) want to

6        be on TV, so --

7           JUSTICE DICKEY:  Well, you know --

8           UNIDENTIFIED SPEAKER:  -- but that's an

9        easy yes or no question.

10          JUSTICE DICKEY:  Those --

11          UNIDENTIFIED SPEAKER:  Any Democrats at

12       all --

13          JUSTICE DICKEY:  Those are the three

14       principals.  They're all Republicans.

15          UNIDENTIFIED SPEAKER:  Okay.  There you

16       go.

17          ROSE REIGNS:  Ma'am, so it is 8:28.  As it

18       is, I do still have a question.  I'm, again,

19       Rose Reigns from Jacksonville.

20        I want to know what quantitative standard

21       operating procedures you guys have taken place

22       to adhere to the criteria that you guys have

23       listed to us today?

24          JUSTICE DICKEY:  Any of you want to answer

25       it?

```
1                    (Indiscernible Crosstalk)
2              UNIDENTIFIED SPEAKER:  It's everything
3         that's on your criteria.
4              ROSE REIGNS:  Right.
5              ROSE REIGNS:  Right.  But what's the
6         standard operating procedures that you guys are
7         adhering to make sure that you're going through
8         all of this process?
9              And as far as like saying that you guys
10        don't have this data, the caucus, the
11        Republican Caucus and the Democratic Caucus,
12        both have a database filled with all of this
13        information that you guys can just simply go to
14        one of your friends and say, hey, we need this
15        information, why don't you shoot it to us.
16             Actually, that's something that you get
17        for being a member.
18             So what are the standard operating
19        procedures, what are the quantitative, not
20        qualitative words that you can give us, what
21        are the quantitative standard operating
22        procedures that you guys have put to place to
23        adhere to those standards that you got listed?
24             JUSTICE DICKEY:  Read the criteria.
25             ROSE REIGNS:  Quantitative, not
```

```
 1              qualitative.
 2                   What is the quantitative standard
 3              operating procedures that you guys have, as a
 4              Board, have put in place?
 5                   JUSTICE DICKEY:  Gentlemen?  Okay.  My
 6              feet are tired.
 7                     (Indiscernible Crosstalk)
 8                   ROSE REIGNS:  Exactly.  Yeah, for sure.
 9                   REPRESENTATIVE HOUSE:  Young lady, you're
10              -- thank you for your question.
11                   This is a human activity, it is not a
12              mathematical process.  Determining --
13                   ROSE REIGNS:  Yes, exactly.
14                   REPRESENTATIVE HOUSE:  -- ma'am, wait a
15              minute.
16                   ROSE REIGNS:  And so we do need a
17              mathematical way of -- we have P-values,
18              standard deviations, like come on.
19                   REPRESENTATIVE HOUSE:  We have to begin
20              with a basic premise.  You talk, then I talk
21              and then you talk.  And we don't interrupt each
22              other.  Fair enough?
23                   ROSE REIGNS:  Fair.
24                   REPRESENTATIVE HOUSE:  Okay.
25              Redistricting is a human activity.  The Supreme
```

1          Court calls it a political activity.  So it is

2          not necessarily quantitative except in terms of

3          the numbers.

4                You can take the computer systems and they

5          have mathematically created a Googol, which is

6          ten to the 100th power number of maps for a

7          given area.  That has been done.

8                But when you start adding rivers, when you

9          start adding Voting Rights Act, when you start

10         adding municipal boundaries and things like

11         that, these are human decisions.

12               To make sure that the objective criteria

13         listed one, two, and three and there are -- are

14         observed, that's pretty straightforward.  The

15         rest of it is a judgment factor.

16               And the three people that you have elected

17         to be your governor, secretary of state, and

18         attorney general are charged with that human

19         responsibility of doing this in the best

20         interest of all of the people of Arkansas.

21               That is the process and that's how it

22         works.  That answers your question.

23               ROSE REIGNS:  No, that does not answer my

24         question.

25               REPRESENTATIVE HOUSE:  I'm so --

1          ROSE REIGNS:  I said quantitative standard

2     operating procedures, that means that that is

3     your manual that you adhere to.

4          That is, are you guys going by Robert's

5     Rules of Order?  Are you guy -- like what are

6     you guys doing?  What are you putting into

7     place?  What are you quantifying?

8          What are the quantifiable standard

9     operating procedures that you guys have put

10    into place to make sure that you adhere to

11    those qualitative standards as you have

12    gracefully stated to us here today?

13         REPRESENTATIVE HOUSE:  There are engineers

14    who are operating the computer systems.  There

15    are GIS people who -- a GIS office that are

16    operating the computer systems, so they're

17    mathematical processes.

18         There are attorneys who are making sure

19    that the law is followed, not a process.  And

20    then there are public hearings where we hear

21    people back and make objective and subjective

22    suggestions and criticisms and ideas to do

23    that.

24         Those things are being -- happening right

25    here before your very eyes.  This meeting was

1        set at a definite time and place and we are

2        hearing subjective comments back that we will

3        incorporate as best as we can.  It's happening

4        before your very eyes.

5            There is not quantitative, as in the

6        military use, I did 38 in the military years, I

7        know how to do those.  But that's not what this

8        is.  This is a legal and subjective and human

9        activity.  There's your answer.

10       ROSE REIGNS:  So what I'm hearing is a

11       refusal to answer my --

12       REPRESENTATIVE HOUSE:  Okay.  That's all.

13       ROSE REIGNS:  -- question.

14           (End of Recording)

15           * * * * * * * *

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2  STATE OF ARKANSAS    )
                         )
 3  COUNTY OF PULASKI    )

 4       I, CRIS M. BRASUELL, Certified Court Reporter and
    Notary Public do hereby certify the proceedings which
 5  appear in the foregoing pages contain a true and correct
    record of the testimony given by said witness held to the
 6  best of my ability, along with all items of evidence
    admitted hereto.

 7
         I FURTHER CERTIFY, that I am not a relative or
 8  employee of any attorney or employed by the parties
    hereto, nor financially interested or otherwise, in the
 9  outcome of this action, and that I have no contract with
    any parties within this action that effects or has a
10  substantial tendency to affect impartiality, that
    requires me to relinquish control of an original
11  transcript or copies of the transcript before it is
    certified and delivered to the custodial attorney, or
12  that requires me to provide any service not made
    available to all parties in the action.

13

14       WITNESS MY HAND AND SEAL this 5th day of October,

15  2021.

16

17

18                  _____
                    CRIS M. BRASUELL, CCR
19                  Arkansas State Supreme Court
                    Certified Court Reporter No. 742
20

21

22  My Commission Expires:
    August 16, 2031
23

24

25
```

CRIS M. BRASUELL, CCR
BUSHMAN COURT REPORTING