# EXHIBIT 9

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

THE ARKANSAS STATE CONFERENCE
NAACP, ARKANSAS PUBLIC POLICY
PANEL,

*Plaintiffs*,

vs.

THE ARKANSAS BOARD OF APPOR-
TIONMENT; THE STATE OF ARKAN-
SAS; ASA HUTCHINSON, in
his official capacity as the Governor of Ar-
kansas and Chairman of the Arkansas Board
of Apportionment; JOHN THURSTON, in
his official capacity as the Secretary of State
of Arkansas and as a member of the Arkan-
sas Board of Apportionment; LESLIE
RUTLEDGE, in her official capacity as the
Attorney General of the State of Arkansas
and as a member of the Arkansas Board of
Apportionment.

*Defendants*.

Case No.: 21-cv-1239-LPR

## DECLARATION OF JAY BARTH, Ph.D.
## PRELIMINARY REPORT

Pursuant to 28 U.S.C. § 1746, I, Jay Barth, hereby declare as follows:

1.      I earned my B.A. in American Studies at Hendrix College in 1987 and my M.A.

in 1989 and Ph.D. in 1994 in Political Science from the University of North Carolina at Chapel

Hill. I am currently the M.E. and Ima Graves Peace Distinguished Professor Emeritus of Politics

at Hendrix College in Conway, Arkansas. During my 26-year career as a professor of American

politics at Hendrix (1994-2019), I served in a variety of other roles including Bill and Connie

Bowen Odyssey Professor of Politics, Director of Civic Engagement Projects, Director of the

1

Odyssey Program, and Director of the Crossings Program. During my time at Hendrix, I was a member of the Inaugural Faculty of the University of Arkansas Clinton School of Public Service. Following my shift to emeritus status at Hendrix, I have also served as an adjuct faculty member at the University of Arkansas at Little Rock William H. Bowen School of Law. A copy of my curriculum vitae is attached as an exhibit. I am being compensated $200 per hour for my work on this case.

2.      My expertise is in American politics generally. However, my teaching and research interests have ranged widely—from the politics of the American South to political parties and elections to American Constitutional Law to race in American politics to LGBTQ politics to research methods. I am the co-author of the second edition of the book *Arkansas Politics and Government: Do the People Rule?* (University of Nebraska Press, 2005). In addition to seventeen chapters in varied collections, I have published almost 30 authored and co-authored pieces in peer-reviewed journals such as Social Science Quarterly, Political Behavior, Policy Studies Journal, Political Research Quarterly, Publius: The Journal of Federalism, Political Psychology, Polity, State Politics & Policy Quarterly, and Politics & Policy. My research combines qualitative and quantitative methodologies. Since 2010, I have been a collaborator on the Talk Business & Politics-Hendrix College poll that does survey work on attitudes towards politics and policy in the state of Arkansas. In addition, I have authored, co-authored, or mentored approximately twenty reports for a variety of foundations and advocacy organizations on public policy in Arkansas.

3.      In 2007, I was named Arkansas Professor of the Year by the Carnegie Foundation for the Advancement of Teaching and the Council for Advancement and Support of Education (CASE). In 2014, I was named winner of the Southern Political Science Association's Diane

Blair Award for Outstanding Achievement in Politics and Government. In 2018, I received the Distinguished Scholar Award from the Arkansas Political Science Association for, among other work, my research on Arkansas politics and government, and I gained the 2019 Distinguished Service Award from the National Association of State Boards of Education. In 2000-01, I received the Steiger Congressional Fellowship from the American Political Science Association to serve on the staff of the late U.S. Sen. Paul Wellstone (MN) working on education and civil rights policy.

4.      In addition to my academic work, I have taken on leadership roles with a variety of governmental, political, and non-profit boards. From 2012 to 2019, I was a member of the Arkansas State Board of Education and chaired that body for two years. I also served as a member of the Arkansas Non-Legislative Commission on the Study of Landlord-Tenant Laws (2011-2012) and the Arkansas Governor's Task Force on Best Practices for After-School and Summer Programs (2008). Since 2019, I have been a commission member of Central Arkansas Water, the water service serving the greater Little Rock and North Little Rock area. At present, I also serve as a member of the Democratic National Committee representing Arkansas and chair of the Democratic Party of Arkansas Rules Committee. I have served as a delegate to two Democratic national conventions and was a candidate for the Arkansas State Senate in 2010. I have chaired the boards of Arkansas Advocates for Children and Families, the National Association of State Boards of Education, Just Communities of Arkansas, the ACLU of Arkansas, the Arkansas Single Parent Scholarship Fund, the Single Parent Scholarship Fund of Pulaski County, and Planned Parenthood Great Plains, and I was a twelve-year member of the board of the National ACLU. I also presently serve as Vice-Chair of the Downtown Little Rock Community Development Corporation.

5.      In this report, I examine Arkansas's racial past and present in terms of five of the enumerated "Senate Factors" traditionally examined in Voting Rights Act cases involving limitations on representation of racial minorities. For each of these five areas, consistent and troubling patterns emerge regarding the structures created in the past that limited, and continue to limit, Black voices in politics and policymaking, often through acts of intimidation, and the politics and policy outcomes in today's Arkansas.

**SENATE FACTOR ONE**

6.      **Senate Factor One** addresses the degree to which a history of official discrimination grounded in race exists in the state of Arkansas.

*Race and Arkansas's Origins*

7.      Race is at the heart of Arkansas's existence, and official racial discrimination has permeated the bulk of the state's history. Most fundamentally, during a period of careful balancing between slave and free states in the admissions of new states by the Congress following the Missouri Compromise of 1820, Arkansas came into being as a state in 1836 despite its relatively tiny population, entering the Union as a slave state (paired with Michigan, over three times its size in population, as a free state). The small number of Arkansans at the state's birth (52,240 persons spread across 53,335 square miles, according to a special census a year before admission as a state) led to a variety of obstacles such as insufficient tax revenues to fund the necessities of a state government, much less allow the investments in essential infrastructure

needed in a densely-forested and swampy place. Some argue this "premature birth" has harmed Arkansas's vitality as a state to the present.[1]

8.     Many arguments were advanced on behalf of Arkansas's premature agitation for admission, but there is no doubt that the most compelling of these reasons was the determination to enter the Union while the legal status of slavery could still be secured.[2] Thus, the enshrinement of slavery in the founding documents of the state brought the pernicious consequences of slavery for Black and white citizens alike.

9.     Following Arkansas's admission to the Union, slavery spread across the southeast quadrant of Arkansas in the agriculturally vibrant Delta where large plantations came into being. While a relatively small percentage of white Arkansans had sufficient wealth to own enslaved individuals, a vast majority of white Arkansans had come to the state from another slaveholding state meaning that white supremacy was deeply embedded in the state's political culture. Furthermore, highly disproportionate numbers of the political leadership were planters who owned twenty or more enslaved individuals. An initial meeting of a special convention to consider secession from the Union resulted in an impasse in March 1861. However, after the firing on Fort Sumter, the convention was rapidly called back into session, and this time the vote was 65 to 5 for secession in early May 1861.[3]

---

[1] Blair, Diane D., and Jay Barth. *Arkansas Politics and Government: Do the People Rule?* 2d ed. (Lincoln: University of Nebraska Press, 2005); Bolton, S. Charles. *Arkansas, 1800–1860: Remote and Restless.* (Fayetteville: University of Arkansas Press, 1998).

[2] Blair and Barth, *Arkansas Politics and Government*; Grif Stockley, *Ruled by Race: Black/White Relations in Arkansas from Slavery to the Present*. (Fayetteville: University of Arkansas Press, 2009).

[3] Blair and Barth, *Arkansas Politics and Government*; DeBlack, Thomas A. *With Fire and Sword: Arkansas, 1861–1874.* (Fayetteville: University of Arkansas Press, 2003); Orville W. Taylor, *Negro Slavery in Arkansas.* (Durham, NC: Duke University Press, 1958); Robert Walz, "Migration into Arkansas, 1834–1880" (PhD diss., University of Texas at Austin, 1958), 214; Ralph A. Wooster, "Notes on the Membership of the Thirteenth General Assembly of Arkansas," *Arkansas Historical Quarterly* 17 (1958): 45– 55; Stephen Houser, "The Arkansas Legislature" (University of Arkansas, 1983, typescript); Gene W. Boyett, "The Whigs of Arkansas" (PhD diss., Louisiana State University, 1972), 113–14.

10.     Although the civil war itself had devastating personal and economic consequences for Arkansans, Reconstruction, especially Radical Reconstruction (1867–74), had the most lasting political consequences. To the Reconstructionists' credit, civil rights were secured for the formerly enslaved individuals, the Ku Klux Klan's intimidation was thwarted in Arkansas more than in other states through a declaration of martial law by Governor Powell Clayton, the first genuine effort to establish common schools was initiated, the University of Arkansas was finally established, and the first significant railroad development was begun. Still, whatever may have been its original ideals and intents, the most lasting effects of this imposed administration included an additional $10 million debt, primarily extended for internal improvements and railroad construction that never materialized; election processes that continued to lack openness and transparency; and an intensified suspicion of and contempt for strong state government. Most relevant for future political and governmental actions, the period created a long-lived belief among most white Arkansans that a Republican vote was a vote for arrogant, alien, untrained, and dishonest public officials; this belief among white Arkansans, of course, was deeply tied to race as Black voters and officeholders were overwhelmingly Republican during this period.[4]

### *Race in Post-Reconstruction Arkansas*

11.     Reconstruction ended in Arkansas in 1874 and Arkansas's own, so-called "Redeemers," recaptured power. With the return to power of these white elites, Black power in the state was diminished. The Pulitzer Prize-winning historian C. Vann Woodward, born in Arkansas, provided this description of this period: "The Redeemers tried by invoking the past to avert the future. The politics of Redemption belonged to the romantic school, emphasizing race and

---

[4] Blair and Barth, *Arkansas Politics and Government*; DeBlack, *With Fire and Sword*; Kenneth C. Barnes, *The Ku Klux Klan in Arkansas: How Protestant White Nationalism Came to Rule a State*, (Fayetteville, AR: University of Arkansas Press, 2021).

tradition and deprecating issues of economics and self-interest." This meant Arkansas saw elections where race and the Lost Cause of the Confederacy increasingly became a focus of campaigns, while issues consequential to the daily lives of Arkansans such as the allocation of goods and services receded from politics and policy alike.[5]

12.      In the mid-1880s, a biracial coalition rose up to challenge the Redeemers who led a generally do-little state government. This fusion movement of Republicans—white and Black—and economic populists provided a genuine threat to the Democratic majority. In 1888, the threat reached its apex with an exceptionally close gubernatorial race between Democrat James Philip Eagle and Union Labor and Republican fusion candidate Charles M. Norwood in which significant electoral fraud was key to the Democratic victory. A congressional race in the central portion of the state in that same election resulted in an even more marginal (and even more dubious) Democratic victory. When the Republican candidate John Clayton attempted to provoke a federal investigation into the voting process, he was murdered in Conway County. In the chaos following the death of Clayton and threats of additional political violence against supporters of Clayton, many Black residents fled the county (with some even fleeing the country as part of a "back to Africa" movement).[6]

13.      White Democrats, alarmed by the electoral threat posed by the Republican coalition of Black and white populist voters, passed a series of anti-democratic electoral "reforms" to entrench their own power. The most important of these reforms was the Election Reform Act of 1891. The Act's two most important provisions were obviously intended to ensure the future electoral fortunes of the white Democratic establishment. One provision effectively turned over

---

[5] C. Vann Woodward, *Origins of the New South, 1877–1913* (Baton Rouge: Louisiana State University Press, 1951), 51.
[6] Blair and Barth, *Arkansas Politics and Government*; Kenneth C. Barnes, *Who Killed John Clayton? Political Violence and the Emergence of the New South, 1861–1893*. (Durham, N.C.: Duke University Press, 1998).

all the state's election machinery to the Democratic Party, with only token representation for Republicans and populist parties on county election commissions, which guided the operation of elections. The other provision significantly disfranchised illiterate Arkansans (over one-fourth of the population at that time, a majority of whom were African-American according to the 1900 Census) by removing all political symbols from the ballot and providing that only the precinct judges (not a friend or fellow party member) could assist illiterates in preparing their ballots.[7]

14.     The legislature also initiated a constitutional amendment that placed a one-dollar state poll tax on voting, and in 1892 (by which time the 1891 reforms were in effect) this amendment was ratified.[8] Counties could add an additional dollar poll tax as well, creating a *de facto* two-dollar tax across much of the state. The Democratic legislature also gerrymandered the congressional districts to dilute and confine the remaining pockets of Republicanism, a move that only layered on the disempowerment of Black voters since African-Americans had constituted at least one-third of the Republican vote and were hardest hit by the ballot reforms and poll-tax requirement because of their illiteracy rates and low incomes. It is estimated that the Black participation rates dropped from seventy-one percent of eligible voters in the 1890 election to thirty-eight percent in the 1892 election. Moreover, the escalating racist rhetoric of the period cannot be ignored or mistaken.[9]

15.     What also cannot be ignored is the demise of African American representation in the state. Between 1868 and 1893 at least 87 Black men were members of the Arkansas General

---

[7] Election outrages of 1888 in Joe T. Segraves. "Arkansas Politics, 1874–1918." (PhD diss., University of Kentucky, 1973). Details of the 1891 act are in John W. Graves, "Negro Disfranchisement in Arkansas," *Arkansas Historical Quarterly* 26 (1967): 199–225; David M. Tucker, *Arkansas: A People and Their Reputation* (Memphis, TN: Memphis State University Press, 1985), 46–47, provides evidence of white resumption of power through violence. For a more recent analysis of the disfranchisement process in Arkansas, see Michael Perman, *Struggle for Mastery: Disfranchisement in the South, 1888–1908* (Chapel Hill, NC: University of North Carolina Press, 2001), 59–67.

[8] $1.00 in 1892 equals just over $30 in 2021. Around the turn of the century, a dollar per day was a common wage in the state.

[9] Chris M. Braman "Another Look at Disfranchisement in Arkansas, 1888–1894." *Arkansas Historical Quarterly* 69 (2010): 245–262.

Assembly. With the introduction of the election reforms of the early 1890s, representation dropped precipitously and by 1895 there were no African American legislators.[10]

16.      As in other southern states where white legislators passed disenfranchisement measures heavily aimed at Black voters at the close of the Nineteenth Century, Arkansas manifested all the major expressions of southern segregation and white supremacy in the decades that followed, including "Jim Crow" laws, the "white primary" (in which only whites were allowed to participate in party primaries), and consistently inferior public services for African Americans such as inequitable segregated schools. Arkansas's key Jim Crow laws included a Separate Coach law (1891) akin to that considered by the Supreme Court in the Louisiana *Plessy* v. *Ferguson* case (1896), a Streetcar Segregation Act (1903), a 1903 law mandating segregation in prisons, a 1911 bar on interracial marriage, and a 1921 law barring white and Black Arkansans from cohabitating.[11]

### Race-Based Violence

17.      While rhetoric grounded in racism, discussed more fully below, increasingly became more common than physical violence in the aftermath of the Election Reform Act, physical violence against Black Arkansans did not totally recede from the Arkansas political landscape, particularly when local elites perceived threats to the racial or economic order. The most notorious of such events came in the Elaine Race Massacre of 1919 in Phillips County. This race massacre marked, probably, the deadliest event of racial violence in U.S. history.

---

[10] Blake J. Wintory. "African–American Legislators in the Arkansas General Assembly, 1868–1893: Another Look." In *A Confused and Confusing Affair: Arkansas and Reconstruction*, edited by Mark Christ, 86–145. (Little Rock: Butler Center Books, 2018); Blake J. Wintory. "African-American Legislators in the Arkansas General Assembly, 1868–1893." *Arkansas Historical Quarterly* 65 (2006): 385–434.

[11] John W. Graves. "The Arkansas Separate Coach Law of 1891." *Arkansas Historical Quarterly* 32 (1973): 148–165; Charles F Robinson. *Dangerous Liaisons: Sex and Love in the Segregated South*. (Fayetteville: University of Arkansas Press, 2003); Blair and Barth, *Arkansas Politics and Government*.

18.     In that Delta community, unsubstantiated rumors began to spread that a number of white plantation owners were being targeted for killing as part of black sharecropper union organizing efforts. After a shooting incident at a union organizing meeting (the exact facts of the event remain murky although white residents thought it to be precipitated by Black-on-white violence), dozens of whites were deputized by the Phillips County sheriff, a white official, to put down the imagined uprising; whites began to arrive from surrounding communities to assist. An appeal by Phillips County officials was made to Governor Charles Brough for support, and he asked Washington to allow him to direct federal troops to the scene, skipping the typical first step of activating the Arkansas National Guard. The exact number of people killed across the several days of the massacre is unknown but likely more than 200 African Americans and five whites died in the race-based violence.[12]

19.     At the scene, Governor Brough worked with local white elites to develop a plan to prosecute several dozen Blacks for the violence in exchange for avoidance of a mass lynching event. Immediately, a dozen Blacks involved with the union were prosecuted. They were defended by Scipio Africanus Jones, a Little Rock-based African-American attorney. Despite his defense, all twelve were quickly tried and sentenced to death. As six of the twelve neared execution by electrocution at the state penitentiary, Jones threw a legal Hail Mary, and these cases were accepted for review by the U.S. Supreme Court. There, in *Moore* v. *Dempsey* (1923), a majority on the Court led by Justice Oliver Wendell Holmes agreed with the argument of Jones, working

---

[12] Stockley, Grif, Brian K. Mitchell, and Guy Lancaster. *Blood in Their Eyes: The Elaine Massacre of 1919.* Rev. ed. (Fayetteville: University of Arkansas Press, 2020).

with the NAACP, and significantly expanded the reach of the 14th Amendment's due process clause to ensure a legitimate appeals process in capital cases.[13]

20.     Understandably, because of the scope of violence and the engagement of the United States Supreme Court, the Elaine Massacre of 1919 has been the most analyzed of the numerous Arkansas events grounded in race-based violence. But two other significant events have also gained notice in recent years among observers of the period: the dramatic racial cleansing of communities and the "last lynching" in Little Rock.[14]

21.     Across northwest and western Arkansas, a number of communities came to be identified as so-called "sundown towns." Such communities are ones where explicit or implicit commands were made to African Americans that they should not be found in the community after dark. In some cases, literal signs existed making clear this rule, as in the Franklin County community of Alix where this sign existed as late as 1970: "N****r, Don't Let The Sun Go Down On You In Alix." Some communities, like Mena in western Arkansas, advertised their absolute whiteness to prospective visitors. In some towns, significant Black populations existed but these African Americans were expelled by white residents. Most infamous was the case of Harrison in Boone County where several hundred Black residents lived as late as the early 1900s. In 1905, however, mobs spread through the town demanding that Black residents leave the community; many left their belongings behind as they quickly escaped. As late as 1954, just after the *Brown v. Board of Education* decisions, a more polite expulsion of Blacks occurred in Sheridan where the owner of the local sawmill offered to move Blacks who lived in homes owned by the

---

[13] Stockley, Mitchell, and Lancaster, *Blood in Their Eyes*; Richard C. Cortner. *A Mob Intent on Death: The NAACP and the Arkansas Riot Cases. (*Middletown, CT: Wesleyan University Press, 1988); Tom Dillard. "Scipio A. Jones." *Arkansas Historical Quarterly* 31 (1972): 201–219.

[14] James Loewen, *Sundown Towns: A Hidden Dimension of American Racism*, (New York: New Press, 2004); Jacqueline Froelich, "Race, History, and Memory in Harrison, Arkansas: An Ozarks Town Reckons with Its Past" In *Race and Ethnicity in Arkansas: New Perspectives*, edited by John A. Kirk. (Fayetteville; University of Arkansas Press, 2014).

sawmill company to Malvern (25 miles away) at no cost. If they refused, the promise was that the workers would be evicted and their belongings burned. All of the Blacks living in the company's housing moved to Malvern and, aware that they were not welcome, other Blacks in Sheridan moved soon thereafter.[15]

22.     In what became known as the "last lynching" in Little Rock, John Carter was brutally lynched in the spring of 1927, during a moment of intense racial tension in the city of Little Rock. The tension was produced by the discovery of the body of a 12-year-old white girl in the belfry of the First Presbyterian Church in downtown Little Rock. The Black church janitor, who found the body, and his biracial son Lonnie Dixon, who ultimately confessed, were arrested for the murder. To avoid mob justice in the form of attacks on the men, officials relocated them to Texarkana until their trials could occur. A penal farm escapee named John Carter, a Black man with no ties to the original crime, took their place in the rabid white community's bull's-eye after being accused of an assault on two white women in a rural area just west of the state's capital city.[16]

23.     An armed group of white men searched for Carter, found him, hung him from a telephone pole and shot him. Cars then dragged Carter's body through the streets of the city, finally stopping at 9th and Broadway—which at the time was the heart of the city's vibrant Black business community. The horror continued as a crowd of an estimated 5,000 whites converged on the area, setting Carter's now-mangled body afire and keeping the fire stoked with furniture

---

[15] Guy Lancaster. *Racial Cleansing in Arkansas, 1883–1924: Politics, Land, Labor, and Criminality*. (Lanham, MD: Lexington Books, 2014); Guy Lancaster. "'There Are Not Many Negroes Here': African Americans in Polk County, Arkansas, 1896–1937." *Arkansas Historical Quarterly* 70 (2011): 429–449; Froelich, Jacqueline. "Race, History, and Memory in Harrison, Arkansas."

[16] Brian D. Greer. "The Last Lynching: A New Look at Little Rock's Last Episode of Deadly Mob Justice." *Arkansas Times*. August 4, 2000, 12–19; Stephanie Harp. "Stories of a Lynching: Accounts of John Carter, 1927." In *Bullets and Fire: Lynching and Authority in Arkansas, 1840–1950*, edited by Guy Lancaster. (Fayetteville: University of Arkansas Press, 2018); Jay Barth, "Remember the 1927 Lynching in Little Rock," *Arkansas Times*, 1 August 2012.

from Black businesses and churches in the neighborhood. Thus, the vigilante attack on one accused Black man became an attack on the entire African-American community. Hours after the riots began, Governor John Martineau deployed the National Guard to the scene. Upon their arrival, the National Guard found a member of the white mob directing traffic using one of Carter's arms—charred and dismembered from his body.[17]

24.     The lynching of John Carter was widely covered in national newspapers at the time; in response, two Black publications—the *Chicago Defender* and the *Pittsburgh Courier*—were barred from sale in Little Rock by the City's Board of Censors. While this event was omitted from the official community history of Little Rock for most of the 20th century, modern historians have not just recounted the lynching and its aftermath but recognized their importance in shaping African-American perceptions of what it meant to be a resident of a white-dominated Southern city. In many ways, the tale of John Carter played the jarring role that the killing of Emmett Till, the Chicago teen killed while visiting relatives in Mississippi in 1955 for "whistling" at a white woman, did elsewhere in the South. For instance, members of the Little Rock Nine report the Carter lynching's centrality to worries about their own safety in the midst of the 1957 Central High Crisis.[18]

25.     The decade in which the Carter killing occurred was one in which white nationalism became institutionalized in Arkansas through the second wave of the Ku Klux Klan (KKK). During 1923 and 1924, through effective political machinations such as running a slate of Klan candidates up and down the ballot, the KKK became a controlling force in the Arkansas legislature along with dominating the politics of the state's largest county, Pulaski. The Arkansas Klan (known as the Realm of Arkansas) had tens of thousands of members across 150 chapters, lead-

---

[17] Greer, "The Last Lynching"; Harp, "Stories of a Lynching."
[18] Ibid.

ing Kenneth A. Barnes to conclude in his recent analysis of the movement that the Klan seemed to wield power everywhere in 1920s Arkansas. Led by physicians, lawyers, elected officials, and business elites, the Klan consciously emphasized its respectability in its efforts to control politics at all levels in the state.[19]

26.     The Klan-dominated General Assembly took several actions to promote the goals of the KKK, including alterations to the state's school curriculum to emphasize the idealized role of white Founders of the Republic and a law requiring all pistols in the state to be registered with white county officials with only those of "good moral character" allowed to keep their weapons. One law that persists today is the addition of a fourth star to the field of the Arkansas state flag denoting the state's period as one of the Confederate States of America.[20]

### The Central High Crisis and Its Legacy

27.     The middle of the Twentieth Century exhibited some signs of moderation of the state-backed racial discrimination as Governor Sid McMath (1949-1953) set a tolerant tone in race relations, including unsuccessfully urging repeal of the state poll tax, supporting a state anti-lynching law, and appointing some African Americans to previously all-white boards and commissions. In one of his first acts as Governor, Orval Faubus—a McMath protégé—enlarged the State Committee of the state Democratic Party to add six Black members. Moreover, the immediate response to the 1954 and 1955 *Brown* decisions in Arkansas was hopeful with two northwest Arkansas school districts (Charleston and Fayetteville) quickly desegregating voluntarily. The northeast community of Hoxie, which was much more racially diverse, also desegregated by

---

[19] Barnes, *The Ku Klux Klan in Arkansas*.
[20] Barnes, *The Ku Klux Klan in Arkansas*.

vote of the school board and the majority on that board held firm in its decision even when active resistance from inside and outside the state occurred.[21]

28.     Then came the events at Little Rock Central High starting in 1957. Feeling pressure from segregationists, Governor Faubus had opposed the Little Rock School Board's desegregation plan and had appeared in chancery court to support a request for an injunction to halt desegregation, which was granted. When this injunction was overturned in federal court, Faubus ordered the Arkansas National Guard to seize the school and prevent the first nine black students to enroll at Central—the "Little Rock Nine"—from entering. After a further federal court order directed that the National Guard be withdrawn and that integration proceed, hundreds of angry white agitators gathered on September 23, 1957, and hurled racist vulgarities at and threatened physical violence against the African-American students. In the aftermath of the riotous behavior, President Eisenhower ordered in the 101st Airborne Infantry Division, under whose protection Central High was ultimately integrated. Though Governor Faubus always maintained that his actions were necessitated by his obligation to preclude violence, most analysts of the event suggest that Faubus was even more strongly motivated by his desire for reelection to an extraordinary third gubernatorial term by protecting himself from attacks from ardent segregationists. While this political goal was achieved (followed by three additional successful re-elections), Arkansas acquired an instant global identity as a state characterized by racism, violence, and demagoguery.[22]

---

[21]Jay Barth. "Bridge to Modernity: The Political Legacy of Sid McMath." *University of Arkansas at Little Rock Law Review* 26 (2004): 535; Blair and Barth, *Arkansas Politics and Government*; David Appleby, producer. *Hoxie: The First Stand*. PBS Documentary, 2003.

[22] An extensive account of the Central High Crisis is in Tony Freyer, *The Little Rock Crisis: A Constitutional Interpretation* (Westport, CT: Greenwood Press, 1984); David Wallace, "Orval Eugene Faubus," in *The Governors of Arkansas*, 2nd ed., ed. Timothy P. Donovan, Willard B. Gatewood Jr., and Jeannie M. Whayne (Fayetteville: University of Arkansas Press, 1995), provides an excellent bibliography, 329–31. For Faubus's version, see Orval E. Faubus, *Down from the Hills* (Little Rock: Pioneer Press, 1980), chaps. 11–24. For a much more objective account see Roy Reed, *Faubus* (Fayetteville: University of Arkansas Press, 1997), 159–263, and several articles and inter-

29.     The Central High Crisis did not end with the headline-grabbing events of the fall of 1957, however. Across three legislative sessions, Governor Faubus lobbied the General Assembly to pass a flurry of laws to "protect" white Arkansans against the threat of integration. These included creation of a state Sovereignty Commission given broad authority to investigate groups and individuals seen as threats to the sovereignty of the state because of their support for "encroachment by the federal government" in the aftermath of the *Brown* decision, the passage of legislation invading the private records of the NAACP in Arkansas and prohibiting NAACP members from teaching or gaining political office, and a mandate that any blood donated be marked with the race of the individual and that any person to receive a transfusion of blood be notified of the race of the donor. Most important, the Governor was given the power to close any school in which integration was being forced by the federal government (Act 4 of 1958). When the Supreme Court affirmed Arkansas' duty to abide by the *Brown* decision in the landmark *Cooper* v. *Aaron* case in the fall of 1958, requiring the Little Rock School Board to respect federal court decisions on desegregation, Faubus immediately closed the public high schools in Little Rock creating the "lost year" in public education in the City. A spring 1959 "purge" by the conservative members of the school district's board of directors of Little Rock teachers and staff thought to be supportive of integration led to recall votes of both militant segregationists and moderates on the board. The close vote in which moderates were retained and militants were removed ended the most intense period of the Central High Crisis.[23]

30.     However, the legacy of the Central High Crisis persisted for decades. The long legal odyssey of the desegregation of the Little Rock school district in the federal courts contin-

views in the 19 September 1997 *Arkansas Times*. The Little Rock Crisis is placed in the broader historical context of African American activism in the city and state in John A. Kirk, *Redefining the Color Line: Black Activism in Little Rock, Arkansas, 1940–1970* (Gainesville: University Press of Florida, 2002).
[23] Sarah Riva. "Acting Up and Courting Controversy: The Arkansas General Assembly Legislative Sessions of 1957, 1958, and 1959." (MA thesis, University of Arkansas at Little Rock, 2013); Freyer, *The Little Rock Crisis*.

ued into the twenty-first century. Again and again, the district returned to federal district court to make the case that it had achieved "unitary" status and should be released from federal court oversight as a fully desegregated district. During the 2002 case in which the district ultimately was deemed unitary in a number of aspects, one witness for those opposing a "unitary" declaration—an African-American Central High alum about to enroll at Amherst College—described the two institutions that existed simultaneously within the walls of Central High: "Central College" where mostly white students take challenging courses, and "Central High" where mostly African-American students take distinctly less rigorous courses. The nearly half-century of discord over the desegregation of the schools also affected the Little Rock metropolitan area by causing significant "white flight" to the surrounding suburban school districts.[24] Moreover, while Little Rock was certainly the most high profile school district in the state to oppose desegregation, many other districts in Arkansas—some urban and others more rural—had desegregation litigation that persisted for decades because of the inability of the state and local district officials to remedy the effects of the segregation of the past.

### *Later Voting Rights Challenges in Arkansas*

31.     Just as the legacy of school segregation persisted, so did the legacy of state infringement on voting rights. It is estimated that in 1940 only 3 percent of African-American adults had, through payment of poll taxes, qualified themselves to vote; by 1958, the estimated percentage of registered voters had grown to about one in three Black adults.[25] In this era, and continuing through the 1960s, electoral manipulation—with Black voters often used as pawns—

---

[24] On the 2002 testimony, see Cynthia Howell and Kimberly Dishongh, "Black Students Face Obstacles, U.S. Court Told," *Arkansas Democrat-Gazette*, 24 June 2002. For a detailed timeline of the Little Rock school case, see *Arkansas Democrat-Gazette*, 26 October 2003.

[25] These estimates come from Donald R. Matthews and James W. Prothro, "Negro Voter Registration in the South," in *Change in the Contemporary South*, ed. Allan P. Sindler (Durham, NC: Duke University Press, 1963), 119–49.

was normalized in the Arkansas political setting.[26] For example, those who had not paid their poll taxes often had their tax paid by a political operative who then, holding the tax receipt, employed it to enhance their voting power. Plantation owners often engaged in such shenanigans by gathering the tax receipts of sharecroppers or tenant farmers working on their land.

32.     Another area of voting ripe for abuse was absentee balloting because of the lack of oversight of the voting process at that time. As one example from 1964, anti-fraud activist, and future state Supreme Court Justice, Tom Glaze recounted the story of voting corruption based on absentee balloting from Phillips County:

> Nearly all the absentee ballots for African Americans came from Helena's Fourth Ward, and the clerk told us he gave them to…proprietors of the Dream Girls Beauty Shop. Our handwriting analyst determined that a hundred of the voter statements, which are supposed to be signed by the absentee voter, were forged by the same person….The absentee African Americans voted amazingly alike: for Governor Faubus (and not for the champion of equal rights and justice who was his opponent), for legalized gambling, and against the permanent voter registration amendment that at long last would lift the yoke of the poll tax from the beleaguered blacks of the Mississippi Delta.[27]

33.     While Arkansas elections are now absent such severe abuses, the remnants of these practices remain. Voter participation in Arkansas is consistently among the lowest across the nation.[28] Indeed, in 2020, Arkansas trailed only Oklahoma in voting participation, according to the United States Elections Project, with only 56 percent of those eligible to vote casting ballots.[29] Black Arkansans have even lower rates of voting in the state, with participation rates

---

[26] Branam. "Another Look at Disfranchisement in Arkansas, 1888–1894." 245–262; Sidney R. Crawford. "The Poll Tax." (MA thesis, University of Arkansas, 1944); James H. Fain. "Political Disfranchisement of the Negro in Arkansas." (MA thesis, University of Arkansas, 1961); Tom Glaze, with Ernie Dumas. *Waiting for the Cemetery Vote: The Fight to Stop Election Fraud in Arkansas*. (Fayetteville: University of Arkansas Press, 2011).

[27] Glaze, *Waiting for the Cemetery Vote*, 44.

[28] Cordell Campbell, *The Results Are In: Gauging Civic Health in the Natural State*, (Arkansas Policy Program, Hendrix College, 2018).

[29] United States Election Project, http://www.electproject.org/.

dropping below 50 percent for Black Arkansans in recent high-profile elections.[30] Such low participation rates by Black Arkansas is a clear legacy of the long history of official state-sanctioned attempts to limit Black political power. The role of this disenfranchisement in creating such racial disparities in voter participation is discussed in more detail below.

34.     Finally, Arkansas has a clear legacy of limiting Black Arkansans' ability to gain representation in legislative bodies equal to their share of the population through the use of practices such as multi-member districts. In *Jeffers* v. *Clinton* (1989), a federal district court in Arkansas's Eastern District found particularly troubling vote dilution practices at work in the Delta region of the state and mandated a change to the districting (specifically an increase from five majority Black districts in the state House and Senate to 16 such districts) as a remedy to those problematic district lines. The District Court's ruling, which was affirmed by the 8th Circuit, found that the legacy of official racial discrimination by state officials in Arkansas was a factor in limiting Black Arkansans ability to elect their candidates of choice: "[T]here is a long history of official discrimination. It has a present effect. And some instances of it are still occurring."[31] Since the 1989 ruling, although unsuccessful in their litigation, Black plaintiffs have filed numerous challenges to both state legislative and congressional reapportionment plans in most redistricting cycles on the grounds that such plans were acts of ongoing racial discrimination.[32] This report further reaffirms the depth and breadth of that history of discrimination against Black Arkansans by state officials across much of the state's history.

---

[30] "Voting and Registration in the Election of November 2020," U.S. Census. Bureau, accessed Dec. 26, 2021, https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-585.html.
[31] *Jeffers* v. *Clinton,* 730 F. Supp. 196, 211 (E.D. Ark. 1989).
[32] See *Wilson* v. *Huckabee*, 2008 WL 360617 (E.D. Ark. Feb. 8, 2008); *Jeffers* v. *Beebe*, 895 F. Supp. 2d 920 (E.D. Ark. 2012); *Larry* v. *Arkansas*, 2018 WL 4858956 (E.D. Ark. Aug. 3, 2018).

## SENATE FACTOR THREE

35.    **Senate Factor Three** examines the extent to which the state has used voting prac-

tices or procedures that tend to enhance the opportunity for discrimination against the minority

group, such as unusually large election districts, majority-vote requirements, and prohibitions

against bullet voting.

36.    Voting procedures—most of which were grounded in the Jim Crow era—that lim-

it the voice of racial and ethnic minorities in determining election winners continue to shape

elections in Arkansas. The most obvious of these have been majority-vote requirements in elec-

tions for most all positions, elections held off-cycle from presidential elections that promote

higher turnout among racial minorities, a predilection for at-large voting districts that make it

decidedly more difficult for minority candidates to have success in a state where racially polar-

ized voting is common, and limitations on voting by those who have been convicted of felonies.

In recent years, however, the Arkansas legislature has also adopted new voter suppression

laws—with a potentially potent impact on limiting participation by voters of color. The full im-

pact on voting in Arkansas of these new restrictions is just beginning to be felt.

### *Majority-Vote Requirements*

37.    Majority-vote requirements, with their inherent limiting impact on racial minori-

ties' ability to gain representation in contexts where racially polarized voting exists, permeate

Arkansas voting laws. While a minority candidate with strong support in the Black community

might win a plurality in a contest with multiple candidates, she might well then be disadvantaged

in a subsequent runoff election to ensure a majority winner.

38.     In the state, a majority-vote (50 percent plus one vote) requirement is required to gain a party nomination for the U.S. Senate, U.S. House, and all state and county-level executive and legislative offices. By state law, all partisan elections require a runoff to obtain the party nomination if no candidate gains a majority of the vote in the first primary election. All of the races for the U.S. Senate and U.S. House, all seven state constitutional officers, all members of the state Senate and state House, and up to 11 different county and township offices are covered by this runoff provision for party nominations. Runoffs, when necessary, take place four weeks following the first primary.[33] This is crucial since party nominations have been almost essential for successful election to these offices in the state.

39.     For county offices, it is actually possible that there could be a runoff for an office twice in the same election year. This is because, in addition to the partisan primary runoff, there could also be a runoff four weeks following the general election if there were multiple candidates, including third party and independent candidates, and none was able to achieve a majority in the general election. This means that politics at the most grassroots level is particularly subject to majority-rule elections that diminish the likelihood of racial minority success in the case of racially polarized voting patterns.[34]

40.     In Arkansas, state court judges at all levels and prosecuting attorneys are elected in nonpartisan elections, but again runoffs are required for their ultimate election. The first round of elections for these posts takes place at the time of the party primary election (in March, during presidential election years, and in May, in nonpresidential election years). Voters mark a separate ballot in these races than in primary races; if voters choose to not participate in a party primary election, then they receive only the nonpartisan ballot including any nonpartisan justice system

---

[33] Ark. Code Ann. § 7-7-102; Ark. Code Ann. § 7-7-202; Ark. Code Ann. § 7-7-203(a).
[34] Ark. Code Ann. § 7-5-106.

elections on the ballot. When a majority vote is not achieved by the top vote-getting candidate in the initial primary, a runoff occurs at the time of the general election in November.

41.     This is a particularly challenging situation for candidates in that the timing of judicial elections means that those candidates who must compete in a runoff election in November essentially run an entirely separate second campaign six to eight months following their first evaluation by Arkansas voters. Moreover, their candidacies are considered by an entirely different (and substantially larger) group of voters in November. In 2018, for instance, 306,590 voters participated in the first-round, three-person race for a position on the state Supreme Court. Six months later, the top two finishers in the first round were considered by an electorate well over twice as large (832,983 voters). In 2020, such ratios between voters in the spring first-round election and November runoff in circuit court judgeship races were quite common across the state. This means that candidates may be forced to spend decidedly more to reach voters in a much larger electorate despite the race for the same office in the same election cycle.[35]

42.     To be elected, school board members—elected either at the time of the spring primary election or the November general election, based on the decision of the local board—must also obtain a majority vote. If they are unsuccessful, a runoff takes place four weeks following the initial election. This also ensures a majority-vote winner of the election.

43.     Most municipalities of all sizes in Arkansas operate under a mayor-council form of government. Mayors in these cities are elected at the time of the November general election either through a majority-vote or plurality-runoff system. In the latter, if a candidate gains 40 percent of the vote <u>and</u> exceeds the vote of the second-place finisher by 20 percent, she is elected. If either of these conditions is not met, the top two finishers meet in a runoff election four

---

[35] Arkansas Secretary of State, Official Election Results; Jay Barth, "Post-Amendment 80 Judicial Politics in Arkansas: Have the Changes Undermined the Argument for Selection by Appointment?" *The University of Arkansas at Little Rock Law Review* 30 (2008): 753-769.

weeks following the general election.[36] While most municipalities in the state are also allowed by state law to invite political parties to have partisan primaries to nominate candidates for the fall municipal general election; only a handful actually have this in place.[37] The nonpartisan nature of almost all of these elections does demobilizes minority voters, according to research on local election turnout patterns.[38]

44.      A handful of cities in Arkansas operate under a city manager form of government. Under this system, the nonpartisan city directors who serve as policymakers for the city are elected through plurality vote whether they are elected by ward or at-large. Under later reforms, however, a city operating under the system may alter their rules to establish a direct election of a mayor and may choose a system other than majority rule.[39] In Little Rock, for instance, the nonpartisan elected citywide mayor is elected if she gains 40 percent of the vote in the general election; otherwise, the top two finishers meet in a runoff.

***Off-Year Elections***

45.      Research has clearly shown that turnout ratchets up decisively in presidential election cycles and, importantly for the discussion of representation, voters of color are disproportionately more likely to participate in presidential elections than are their white voting

---

[36] Ark. Code Ann. § 14-43-304; Ark. Code Ann. § 7-5-106.
[37] Correspondence with the Arkansas Municipal League, 2021.
[38] Thomas M. Holbrook and Aaron C. Weinschenk. "Campaigns, Mobilization, and Turnout in Mayoral Elections." *Political Research Quarterly* 67 (2014): 42–55.
[39] Ark. Code Ann. § 14-47-110; Ark. Code Ann. § 14-61-111.

peers.[40] This is particularly true in Arkansas where Black voters' share of the electorate consistently drops in midterm elections as compared to presidential elections.[41]

46.     Moreover, many of the positions on Arkansas ballots at the time of a midterm elections are also nonpartisan (all judicial, municipal, and school elections). This reality only makes this pattern more emphatic since research has also shown that participation rates are highest in partisan elections. Such is particularly true for Black voters' rates of participation.[42]

47.     All statewide elections in the state—except for the occasional state Supreme Court positions with runoffs—occur away from presidential elections in even-numbered years. Races for countywide positions, with four-year terms, also occur away from presidential elections in these same election cycles. For state legislative seats, county district officials, and municipal offices, elections pivot back and forth between elections in presidential and non-presidential election years. School boards have the power to hold their elections separately from the general election and most have chosen to hold elections in the spring. Even when school boards determine to hold November elections, this means that only one in four elections for the office take place in a presidential year. This means that the vast majority of elections take place away from presidential years.

48.     Such election timing clearly limits the voice of Black Arkansans at the ballot box.

***At-Large Voting Districts***

---

[40] Zoltan Hajnal and Jessica Trounstine. "Where Turnout Matters: The Consequences of Uneven Turnout in City Politics." *The Journal of Politics* 67, no. 2 (2005): 515–35; Zoltan L. Hajnal and Paul G. Lewis "Municipal Institutions and Voter Turnout in Local Elections." *Urban Affairs Review* 38(5) (2003): 645-668.
[41] Andra Gillespie and Tyson King-Meadows, "Black Turnout and the 2014 Midterms," (Washington, DC: Joint Center for Political and Economic Studies, 2014).
[42] Hajnal and Trounstine, "Where Turnout Matters"; Hajnal and Lewis, "Municipal Institutions and Voter Turnout in Local Elections."

49.     While not as omnipresent as majority-rule elections, at-large elections also remain prominent in determining election outcomes in Arkansas, particularly at the grassroots level. This is relevant to the issue of minority representation because recent research has solidified the notion that ward elections lead to representation for racial and ethnic minorities that is descriptively stronger, i.e. the representative body is more reflective demographically of the population of the community.[43] Scholars have also begun to explore the impact that institutional arrangements have not only on descriptive representation (the governmental body "looks like" those for whom it makes decisions), but also policy outcomes, demonstrating that school board members elected under ward elections are also more likely to hire administrators and teachers in a way that is more favorable to minorities.[44] Meier, et al., not only show the effect empirically, but also provide a thorough theoretical discussion, linking the distance between the median voter citywide and the typical minority voter within a ward to the better responsiveness of representatives elected in a ward race.[45]

50.     While much of the existing literature has focused on descriptive and, in some rare cases, substantive representation, scholars have recently shifted to exploring the impact that at-large and ward-based election systems might have on campaign finance. According to Brian Adams, at-large elections are associated with much higher costs of running for office than ward-

---

[43] Theodore Arrington and Thomas Gill Watts. "The Election of Blacks to School Boards in North Carolina." *The Western Political Science Quarterly* 44 (1991): 1099–1105; Bullock, Charles S., III. Bullock and Susan A. MacManus. "Testing Assumptions of the Totality-of-the-Circumstances Test: An Analysis of the Impact of Structures on Black Descriptive Representation." *American Politics Quarterly* 21 (1993): 290–306; David Leal, Valerie Martinez-Ebers, and Kenneth Meier. "The Politics of Latino Education: The Biases of At-Large Elections." *Journal of Politics* 66 (2004): 1224–44; Jessica Trounstine and Melody Valdini. "The Context Matters: The Effects of Single Member versus At-Large Districts on City Council Diversity," *American Journal of Political Science* 53 (2008): 554-569.
[44] Kenneth Meier, Eric Juenke, Robert Wrinkle, and J Polinard. "Structural Choices and Representational Biases: The Post-Election Color of Representation." *American Journal of Political Science* 49 (2005): 758–68.
[45] Meier, Juenke, Wrinkle, and Polinard, "Structural Choices."

only elections.[46] This finding is important for making it more feasible for members of historically disadvantaged groups to gain election to office because of their special challenges in gaining access to campaign contributions.

51.     Prior to the *Jeffers* v. *Clinton* (1989) decision, but after the "one-person, one-vote" decisions of the 1960s, multi-member districts were commonly used in the Arkansas legislature. This meant that multiple candidates represented one geographical area with a population multiple times larger than a single-member district. In *Jeffers*, the federal courts found this practice, among others, to be a key vote dilution strategy limiting the ability of the state's Black residents to gain representation in the state legislature.[47] In the decades since that decision, single-member districts have been employed in all state legislative districts.

52.     In school districts and municipal politics, however, at-large districts are still commonly employed with the accompanying disadvantages for minority candidates. Importantly, when such at-large elections take place, voters consider candidates for a single position at a time, meaning that the electoral advantage of the racial majority expresses itself in each race. Moreover, Arkansas law makes no provision for ranked choice voting or a similar system that allows for minority voters to elevate certain candidates preferred by a subgroup of voters over other candidates. Recent research has shown that such ranked choice voting systems can effectively lead to enhanced minority representation.[48]

53.     In recognition of the disadvantage that at-large elections have presented for minority communities to elect candidates of choice, under an Arkansas state law enacted in 1993, for school boards with a population of potential voters at least 90 percent white, the school zones

---

[46] Brian Adams. *Campaign Finance in Local Elections: Buying the Grassroots*. (Boulder, CO: Forum/Lynne-Rienner, 2010).
[47] 730 F. Supp. at 211.
[48] Gerdus Benade, Ruth Buck, Moon Duchin, Dara Gold, and Thomas Weighill, "Ranked Choice Voting and Minority Representation" (2021). Available at SSRN: https://ssrn.com/abstract=3778021.

(either 5 or 7 in number) may be elected entirely at-large. When greater than 10 percent of the electors are nonwhite, however, all members must be elected by zone or by a "5-2 model" with five zone representatives and two at-large representatives.[49]

54.     Arkansas state laws governing the rules by which elections are held across the state's approximately 500 municipalities explicitly allow the use of at-large elections in some or all elections for city council member or city director in the largest and smallest communities across the state. While state statutes greenlight the use of at-large elections in all municipalities, city governments are given some power to determine their balance between at-large and ward elections. This is true even in the state's largest city, Little Rock, where three of the city's ten city directors are elected at-large. As noted below, this provides a unique opportunity to empirically evaluate the impact of the two election systems in the same city.

55.     Across municipalities in Arkansas employing a mayor-council form of government, at-large systems of elections are the norm. In the smallest municipalities (those below 500 in population), at-large elections are used without any requirement that the representatives live in a particular section of the town. For "first-class" (at or above 2,500 in population) and "second-class" (between 500 and 2,499 in population) cities, while city council members do have to reside in a given ward (as defined through a "one-person, one-vote" process), both ward representatives may be elected by voters across the city unless the city government chooses to adopt a system where, in a given ward with two representatives, one is elected at-large and the other is elected only by the voters in that voting turf.[50]

---

[49] Ark. Code Ann. § 6-13-630; Ark. Code Ann. § 6-13-631.
[50] Ark. Code Ann. § 14-37-102; Ark. Code Ann. § 14-37-103; Ark. Code Ann. § 14-45-102; Ark. Code Ann. § 14-43-307; Ark. Code Ann. § 14-44-103.

56.     In cities using a city manager mode of governance, a mix of at-large and district/ward representatives may be used.[51] The deepest dive into the impact of such differences in the method of election in municipalities examined Little Rock and found that those elected by ward were decidedly more likely to be Black, providing evidence of the importance of single-member elections in ensuring minority voices in legislative bodies. In addition, this research found that ward representatives were more likely to be female and also to be elected with lower campaign spending. Finally, ward elections evidenced more competitiveness both in terms of campaign spending and final vote totals, in accordance with the political science literature referenced above.[52]

### Felon Disenfranchisement and Prison Gerrymandering

57.     One contributing factor to the low voter participation rates among Black Arkansans is the significant number of Arkansans temporarily removed from the voting rolls by their status as felons who are not yet eligible to regain their voting rights. Such bars on felons participating as voters go back to the Reconstruction era when it was allowed by the state Constitution of 1868 as a condition for Arkansas's readmission to the Union.[53] Arkansas has one of the highest incarceration rates of any state in the United States and, while rates of imprisonment have dropped in other states, they have not dropped in Arkansas. Those incarcerated in Arkansas are disproportionately Black—while only about 16 percent of the state's population is African-American, approximately 41 percent of those imprisoned in the state are Black. This means that Black Arkansans are impacted not just by the criminal justice system itself but also by the linger-

---

[51] Ark. Code Ann. § 14-61-107.
[52] Kiril Kolev, Jay Barth, Lora Adams, and Brett Hill, *Governance in Little Rock, Arkansas: At-Large and District Elections and the Impact on Representation*, (Conway, AR: Hendrix College Arkansas Policy Program, 2015).
[53] Alice E. Harvey, "Ex-Felon Disenfranchisement and its Influence on the Black Vote," *University of Pennsylvania Law Review* 142 (1994): 1145-1189.

ing impact of a prior felony conviction limiting their voting rights.[54] More specifically, while just under 4 percent of all Arkansans above the age of 18 were disenfranchised for the 2020 election because of their felony status, nearly 9 percent of Black Arkansans were.[55]

58.     Arkansans who have completed their service for felonies may ultimately regain access to the vote, but it is a multi-stage process involving: (1) discharge from parole or probation; (2) payment of all parole or probation fees; (3) satisfying all terms of imprisonment; and (4) payment of all court costs, fines, or restitution.[56] This is an onerous and costly process resulting in a situation where approximately three in four prospective voters disenfranchised by their criminal history are no longer incarcerated.

59.     Connected to the issue of felon disenfranchisement is so-called "prison gerrymandering." This practice disproportionately impacts minorities in the drawing of election lines in Arkansas. In the state, prisoners are counted as residents of the locale where the prison is located rather than the community where they lived prior to being incarcerated. However, due to felon disenfranchisement these prisoners cannot vote and thus artificially inflate the voting population of a district. As noted earlier, prisoners in Arkansas are disproportionately Black. Prisons, however, are more likely to be located in white, rural areas which end up with more political power as a result.[57] An excellent local example of this practice occurred during the last redistricting process in Jackson County, Arkansas, in the northeast quadrant of the state. Two state prison units are located in the county and, through the redistricting process, both were included in the same justice of the peace district. Together they made up 87 percent of the total population of the

---

[54] "Incarceration Trends in Arkansas," Vera Institute of Justice, accessed Dec. 26, 2021, https://www.vera.org/downloads/pdfdownloads/state-incarceration-trends-arkansas.pdf.
[55] "Locked Out 2020: Estimates of People Denied Voting Rights Due to a Felony Conviction," The Sentencing Project, Oct. 30, 2020, https://www.sentencingproject.org/publications/locked-out-2020-estimates-of-people-denied-voting-rights-due-to-a-felony-conviction/.
[56] "Felon Restoration of Voting Rights Brochure," Pulaski County (AR) County Clerk.
[57] Hillary Fenton, "Perfect Storm in Arkansas County Worsens Prison-Based Gerrymandering," *Prison Gerrymandering Project*, 10 August 2012, https://www.prisonersofthecensus.org/news/2012/08/10/ar-jackson/.

district following the 2010 redistricting, meaning that the remaining non-incarcerated residents had dramatically more voting power in the selection of their justice of the peace to represent them on the county quorum court for the decade that followed.[58]

## SENATE FACTOR FIVE

60.     **Senate Factor Five** examines the extent to which Black Arkansans bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process.

61.     From its beginning, Arkansas has been an impoverished state. Sociologist Juanita Sandford told the story of what it was to be poor in Arkansas in the 1970s, concluding, "Arkansas is a land of opportunity, but many are discovering in this state…that their only opportunity is to be poor."[59] The state's poverty levels compared to the rest of the United States remain a key characteristic of state. Just as defining is the intersection between race and poverty in Arkansas. While a majority of Arkansas's poor are white, disproportionate percentages of the poor are persons of color, indicating the manner in which past discrimination has current effects on economic opportunities for Blacks in the state. While 18.8 percent of African Americans nationwide found themselves in poverty according to 2019 Census data, 27.6 percent of all Arkansas African Americans are poor.[60] Moreover, the gaps between poverty among whites and persons of color—over twice as many Arkansas Blacks lived a portion of the year in poverty as did whites in the state—are larger than in other parts of the country. Children are among those hardest hit by con-

---

[58] Fenton, "Perfect Storm in Arkansas County."

[59] Juanita Sandford, *Poverty in the Land of Opportunity* (Little Rock: Rose Publishing Co., 1978), 15.

[60] The federal poverty line is adjusted annually based on a variety of elements; it also varies by the size of the household. In 2019 the poverty line for a family of four was $25,750. "Annual Update of the HHS Poverty Guidelines," Federal Register, 12 February 2019, https://www.federalregister.gov/documents/2019/02/01/2019-00621/annual-update-of-the-hhs-poverty-guidelines.

ditions of poverty. Nearly one in every four children in Arkansas lived in poverty (24.7 percent) in 2018. The poverty rate among children is highest for African Americans, with nearly half, or 44.9 percent, of African-American children experiencing poverty in Arkansas; this was the highest rate of impoverished Black children in any state in the nation.[61] Unfortunately, it also represents the ongoing cycle of poverty facing the state's youngest Black residents.

62.     Another way of thinking about economic fragility focuses on so-called "ALICE" families. ALICE families are headed by **A**sset **L**imited, **I**ncome **C**onstrained, **E**mployed individuals. ALICE individuals are not technically in poverty but live one job loss or health calamity away from being impoverished because of their inability to save. In 2018, nearly half of all Arkansas households were either impoverished or households living below the ALICE survival income threshold.[62] Again, just as with those Arkansans in poverty, these "working poor" households in Arkansas are disproportionately Black.[63] Specifically, nearly 60 percent of Black households in the state had 12-month incomes less than $40,000 according to 2019 Census data, while a slight majority of white households had incomes above $60,000.[64] Moreover, these Black households were typically larger, meaning that those lower incomes had to cover the living expenses for more individuals.

63.     A lack of wealth is also shown in the value of homes owned in the state. First, there was a significant racial gap in homeownership in the last decade with only 44 percent of Black adults owning a home as compared to 71 percent of white Arkansans.[65] The stability that accompanies homeownership is tied to voting because Arkansas requires prospective voters to

---

[61] Children's Defense Fund, "The State of America's Children 2020," 2020.
[62] As with the poverty line, the line for ALICE status moves annually and varies by size of household. In 2018 the ALICE survival threshold for a family of four was $66,890. "Research Center – Methodology," United for Alice, accessed December 26, 2021, https://www.unitedforalice.org/methodology.
[63] United for ALICE, *On Uneven Ground: ALICE and Financial Hardship in the U.S.*, 2020.
[64] U.S. Census, American Community Survey, 2019.
[65] U.S. Census data reported in "Families, Home Ownership," Aspire Arkansas, A Project of Arkansas Community Foundation, accessed December 26, 2021, https://aspirearkansas.org/families/homeownership-rate.

register to vote anew when they relocate. For those who are homeowners in the state—a marker of wealth in the first place—the value of the homes of nearly seven in ten Blacks (69.1 percent) was below $60,000, according to 2000 Census data. In contrast, in the same data, two-thirds (66.8%) of white Arkansans who are homeowners had a home worth over $60,000.[66] Arkansas is also marked by its residential segregation. According to analysis of 2010 Census data, Arkansas was the 12th most segregated state.[67]

64.     No matter whether it is impoverishment, as defined by the federal poverty line, or the economic precariousness that comes with living without the ability to save for the inevitable rainy day, Arkansas's Black residents continue to live with the ramifications of the clear discrimination of the past. These economic challenges limit access to health care, educational opportunities, and tools for future economic empowerment. Of course, these are also the tools with the greatest promise to produce new economic hope or break cycles of poverty. As a result, sitting at the intersection of race and poverty in Arkansas are a proverbial chicken and egg. Race and poverty are also the social factors with the largest linkages to entering the juvenile justice system and, ultimately, the prison system in Arkansas.

65.     Access to economic resources, education and health are all inherently linked to political participation in the United States with the well-educated, the healthy, and the economically vibrant more likely to participate in elections and in other democratic activities. On the other hand, and particularly deepened by Arkansas's limitations on voting rights for those who are (or have been) incarcerated, as discussed previously, entrance into the criminal justice system places significant barriers to engagement with the electoral process.

---

[66] U.S. Census, 2000.
[67] Daniel T. Lichter, Domenico Parisi, Helga de Valk, *State of the Union 2016: Residential Segregation* (Palo Alto, CA: The Stanford Center on Poverty and Inequality, 2016).

### The Educational Achievement Gap

66.     One of the most significant factors in sustaining disparities in poverty in Arkansas is the educational achievement gap. While children across the state are born into a vast array of economic circumstances, each has access to a free public-school education under the Arkansas state Constitution.[68] These schools, it is hoped, will prepare students for the work-force, trade school, college, or whatever else they should choose to pursue after graduation. Because education plays such a significant role in determining one's future earnings potential, and thus, economic status, it is a crucial component in an examination of poverty in the state.

67.     Despite progress in recent years, Arkansas's education system lags behind the nation as a whole in several key indicators such as test scores and graduation rates. There are clear disparities in achievement across groups of students, especially racial groups. Of all Arkansas fourth graders in public schools in 2019, 68.8 percent perform below grade level in reading on standardized exams according to the National Assessment of Education Progress (NAEP), the so-called "Nation's Report Card." While only 62.5 percent of non-Latino white students performed below grade level, the rate at which minority students performed below grade level was significantly higher than the state average. Among Black students, 84.8 percent were below grade level. Even larger racial disparities exist in Arkansas's student math scores. In 2019, 66.8 percent of Arkansas fourth-graders performed below grade level. When examined by race, 58.8 percent of White students, 74.3 percent of Latino students, and 86.8 percent of Black students performed below grade level. The racial disparity in test scores continues to middle school. Sixty-five percent of eighth grade white students in Arkansas were reading below grade level in 2019. Among Black students, the rate was 89 percent. The racial gap in math performance among eighth-grade Arkansas students was even larger with 92.5 percent of Arkansas's Black

---

[68] Arkansas Constitution, Article 14, Section 1.

youth scoring below proficiency while 65.3 percent of white eighth graders were.[69] In 2020-21, a significant race gap was also shown in ACT composite scores—which are used to determine admissions to many colleges—in the state. Black students' performance on the required 11th grade exam in the state averaged 15.3 while white students scored an average of 19.6 (the top score on the ACT composite is 36).[70]

68.     Differences exist between races not only in terms of academic performance, but in school disciplinary action as well. Black students are suspended from school at higher rates than other students. In 2015-16, 4.3 percent of white public-school students in Arkansas were suspended from school. Among Black students, the rate was 15.9.[71]

69.     What is disconcerting about these figures is not simply the suggestion that Black students receive harsher discipline than other students, but also the implications for the morale of Black students. The harsher disciplinary measures Black students receive from school administrators certainly do not go unnoticed by classmates who may become bitter and resentful of school authority figures. Students who are suspended are less likely to graduate, but even those who are not suspended may come to feel that the school's administration is set against their academic success. A 2007 survey of residents in the state's largest county (Pulaski) found that Black respondents were more than three times as likely as white respondents to feel that they were treated unfairly because of their race during their K-12 educational experience.[72] These disparities in disciplinary treatment are in turn also linked to an increased risk of dropping out of school

---

[69] All NAEP data reported in Children's Defense Fund, "The State of America's Children 2021," 2021.
[70] The ACT Profile Report, "Arkansas State Testing 2020-21."
[71] Children's Defense Fund, "The State of America's Children 2021."
[72] UALR Institute of Government's Survey Research Center & Institute on Race and Ethnicity, Little Rock, Arkansas, *Racial Attitudes in Pulaski County Annual Survey Focus on Education, 2006-07,* https://ualr.edu/race-ethnicity/research/racial-attitudes/.

and, therefore, make it more likely that Black youth in Arkansas will find their way into the criminal justice system.

70.     A variety of forces inside and outside the educational arena shape graduation rates, and those forces have disproportionate impacts on Black students in Arkansas. In Arkansas in 2019, 26.6 percent of Black residents over the age of 18 had not obtained a high school diploma, compared to 16.3 percent of whites. Because Black students are consistently performing below the academic level of white students, as well as graduating from high school at lower rates, their college graduation rates are also significantly lower than those of white students in the state. Only 17 percent of Blacks in Arkansas aged 25 or older in 2019 had obtained at least a bachelor's degree, compared to 24.9 percent of whites. One factor limiting college graduation rates of Black students is that students of color are more likely to have to take remedial classes once they arrive at Arkansas's higher education institutions; in 2014-15, the Arkansas Department of Higher Education reported that over 70 percent of Black students had to remediate in some subject while less than one-third of white students did.[73] Such remediation in basic skills delays progress in higher education and, in some cases, limits the ultimate goal of graduation.

71.     Less education makes it more difficult to obtain a high-paying, stable job.[74] A lower education level also makes it less likely that an individual will participate in the electoral process as a voter.[75]

### Health Care Disparities

---

[73] Arkansas Department of Higher Education, "Remediation Report Fall, 2014-15," https://www.adhe.edu//publications/details/remediation-fall-academic-year-2014-2015.
[74] Dennis Vilorio, "Education Matters," (United States Bureau of Labor Statistics, 2016).
[75] Rachel M. Sondheimer and Donald P. Green. "Using Experiments to Estimate the Effects of Education on Voter Turnout." American Journal of Political Science 54 (2010): 174–189.

72.     The plight of those living in poverty is further complicated by poor health. Areas plagued by persistent poverty generally have people in poorer health than wealthier communities.[76] This pattern is starkly apparent for Black communities in Arkansas. Black Arkansans were over twice as likely to die as a result of diabetes or its complications than were white Arkansans between 2011-2015 and nearly six times as likely to die from HIV/AIDS during that same period.[77] Black Arkansans are also prone to higher levels of infant mortality, low birth weights, and cardiovascular disease than are white residents of the state.[78] All told, white Arkansans can expect to live 2.7 years longer than Black Arkansans, with white males living 3.9 years longer than Black males in the state.[79]

73.     According to a 2019 Arkansas Racial and Ethnic Health Disparities Study carried out by the University of Arkansas at Little Rock, significantly larger portions of both urban and rural Blacks in the state reported having health problems. The same study showed that significantly higher percentages of Black Arkansans responded that they had been victims of discrimination while obtaining health care services. This led to Black respondents being more likely to seek out health information via the Internet or other written materials rather than relying upon doctors and other health professionals.[80]

74.     A key challenge facing the state's residents is access to health care professionals, particularly in certain practice areas. In the area of dental health, for instance, general practice dentists are in short supply outside of the most urban and suburban counties which, with the exception of Pulaski County, have disproportionately white populations. However, dental special-

---

[76] Chris Crothers. *Male: Why the Mid South Cannot Afford to Ignore the Disparities Facing its Men and Boys.* Foundation for the Mid South (2007).
[77] Arkansas Department of Health, "Disparities in Diabetes Mellitus Mortality Among Blacks in Arkansas," 2018.
[78] Crothers, *Male*; Arkansas Department of Health, "Disparities in Diabetes."
[79] Diego Caraballo, "Life Expectancy and Age-Specific Mortality Rates in Arkansas," (Arkansas Economic Development Institute, 2021).
[80] University of Arkansas at Little Rock Survey Research Center, "Arkansas Racial and Ethnic Health Disparity Study: A Minority Health Update," 2019.

ists, such as orthodontists and pediatric dentists, are even more rare across the state's rural counties, particularly in the Delta counties with heavy African-American populations.[81] A basic dental screening of the state's 3rd graders during the 2019-20 school year found that 29.5 percent of Black students had untreated tooth decay as opposed to 19.6 percent of their white 3rd grade peers.[82] Studies have shown that bad teeth prevent otherwise strong candidates from getting jobs because of the negative perceptions associated with poor dental care.[83]

75.    Finally, Black Arkansans are more likely to be disabled than their white peers, according to U.S. Census data. Although disabilities are the result of a variety of causes and take a variety of forms, much of this 5-point "disability gap" is due to injuries from the workplace.[84]

76.    Health has an important connection to voter participation because serious health conditions can dramatically increase the "costs" of voting. Unless one votes absentee, traveling to a voting site is necessary to vote either early or on Election Day, making it less likely that the infirm will take that step. Voters with disabilities are distinctly more likely to have difficulty in casting votes than their non-disabled fellow citizens, according to a recent analysis.[85]

***The Gaps in Economic Opportunities***

77.    Unsurprisingly, considering the racial gaps in economic livelihood present in the state, Arkansas's adult Black population is less likely to be employed. According to American Community Survey data between 2014-2019, 66 percent of white Arkansans were employed,

---

[81] Office of Rural Health and Primary Care, Arkansas Department of Health, Dental Health Professional Shortage Areas, 10 March 2016; Arkansas Department of Health, "Arkansas Dental Health Plan, 2012-2015."
[82] Office of Oral Health, Arkansas Department of Health, "3rd Grade Basic Screening Survey, School Year 2019-2020, Arkansas."
[83] Mercedes White, "No Teeth Means No Job," *Deseret News*, 27 December 2012, https://www.deseret.com/2012/12/27/20511676/no-teeth-means-no-job.
[84] U.S. Census, 2000.
[85] Lisa Schur, Mason Ameri, and Meera Adya. "Disability, Voter Turnout, and Polling Place Accessibility." *Social Science Quarterly* 98 (2017): 1374-1390.

compared to only 58 percent of Black adults. Black Arkansans were both more likely than whites to be unemployed but still in pursuit of a job and more likely to have opted out of the labor force entirely for various reasons including no longer seeing seeking work as viable.[86]

78.     Consistent transportation is a key to employability, particularly in an automobile-centric state with limited investment in public transportation such as Arkansas. According to 2000 Census data, Black Arkansans were nearly four times as likely to lack access to a vehicle. While just under 6 percent of white Arkansans lacked access to a vehicle, over 20 percent of Blacks in the state lacked vehicle access.[87]

79.     Finally, digital equity (in the form of access to consistent broadband internet, appropriate devices, and digital literacy skills) is crucial to educational opportunities, economic empowerment, and civic engagement.[88] Black Arkansans are both less likely to have consistent access to a computer and also less likely to have access to broadband internet. All told, according to Census data, 79.2 percent of white Arkansans have access to a computer with broadband access while only 69.4 percent of African Americans in the state do.[89] Some of the gap is driven by lack of broadband access while the rest is driven by lack of access to a device.

80.     The absence of economic opportunity—inherently linked to diminished educational opportunities—ties to entrance into the criminal justice system, starting at early ages. Unsurprisingly, a significant racial divide is also shown in this area of policy outcomes in Arkansas.

***Interaction with the Justice System***

---

[86] U.S. Census, American Community Survey, 2019.
[87] U.S. Census, American Community Survey, 2000.
[88] "Louisville's Digital Inclusion Plan," Louisville Metro, 2017, https://digitalinclusion.louisvilleky.gov/.
[89] U.S. Census, American Community Survey, 2019.

81.     According to 2019 data, Arkansas has an overall juvenile incarceration rate just above the national average.[90] However, considering other patterns in data shown throughout this section, it is unsurprising that a slight plurality (42 percent) of the juveniles incarcerated in Arkansas are Black, meaning that Black minors are nearly three times as likely as their white peers to be incarcerated.[91] The vast majority of those incarcerated in the juvenile justice system have committed non-violent crimes, particularly drug offenses. Despite the fact that a similar percentage of juveniles, both white and Black, admit to using illicit drugs, Blacks are arrested for drug offenses decidedly more often than whites.[92]

82.     Because of the challenges facing the Arkansas juvenile justice system, youth who spend time there—regardless of their offense—are at increased risk of later entering the adult criminal justice system, with all the resulting negative economic, social, and political ramifications for their lives. For instance, those leaving prison face tremendous difficulty obtaining and maintaining employment, and many end up in the justice system again. The families of those incarcerated must contend not only with the loss of a source of income, but also with potential legal costs. In addition, they often face social sanctions because of the incarceration of their kin.

83.     As noted in a previous section (on Senate Factor 3), there are also significant disparities based on race in the rates of incarceration of adults in Arkansas. Moreover, while other states have reformed incarceration policies in recent years, Arkansas has continued to show significant growth in rates of confinement in both jails and prisons, particularly for drug-related offenses. While drug use may create the serious health problems for individuals mentioned earlier,

---

[90] "Youth Residing in Juvenile Detention, Correctional and/or Residential Facilities in the United States," The Annie E. Casey Kids Count Data Center, July 2021, https://datacenter.kidscount.org/data/tables/42-youth-residing-in-juvenile-detention-correctional-and-or-residential-facilities?loc=1&loct=2#detailed/2/2-8/false/1729,871,573,36,867,133,18,17,14,12/any/17599.
[91] Children's Defense Fund, "The State of America's Children 2020."
[92] "Decades of Disparity: Drug Arrests and Race in the United States," Human Rights Watch, March 2, 2009, https://www.hrw.org/report/2009/03/02/decades-disparity/drug-arrests-and-race-united-states#.

conviction on a drug offense can have as significant a consequence. A drug conviction can limit one's ability to obtain work, as employers typically pass over candidates with a drug conviction in favor of one without a conviction.[93] These realities of the criminal justice system in Arkansas have particularly devastating impacts on political participation rates—both directly through the felon disenfranchisement practices in the state and indirectly through the ramification on the future earning power of felons. Again, Black Arkansans, particularly Black men, are distinctly more likely to face these ongoing ramifications.

### Linkages to Participation in the Political Process

84.     All of these gaps in access to opportunities (educational, economic, and health-related), as well as limitations created by the criminal justice system, have direct ramifications for Arkansans' participation in the democratic process. As stated in Article 14 of the Arkansas Constitution, "Intelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the State…shall adopt all suitable means to secure to the people the advantages and opportunities of education." While Arkansas has made great strides in promoting the adequacy of its educational offerings in this century, as discussed above, significant racial inequities continue to exist across the state, disproportionately limiting "the advantages and opportunities of education" for its Black residents. As a result, Black Arkansans lack the same opportunities to fully participate in the democratic process because of the lack of access to information and analytical skills that should be provided by a high-quality education at the K-12 and higher education levels.

---

[93] The Vera Institute, *The Prison Paradox: More Incarceration Will Not Make Us Safer*, 2017.

85.     In addition, as discussed earlier in this section on Senate Factor 5, there is a con-
nection between access to economic opportunities and more fulsome participation in the electoral
process. Having to care for family members by working multiple jobs provides less time to vote
and engage in other manners. Moreover, a lack of access to transportation limits one's ability to
participate at the voting booth, particularly in a rural state like Arkansas. Finally, a lack of access
to digital equity diminishes the ability to gain knowledge about candidates and their positions on
policy issues to ensure more confidence in voting decisions. In all respects, a race-based gap ex-
presses itself in Arkansas with Black residents more limited in their opportunities. As noted pre-
viously, Arkansas has one of the lowest Black voting participation rates in the country.[94]

86.     Being of sound body and mind also makes it more likely for Arkansans to take
full advantage of their citizenship rights, including participation in electoral politics. Again, a
distinctive race-based disparity is shown in rates of good health—physical and mental—and ac-
cess to health care in Arkansas, which in turn impacts the ability of Black Arkansans to partici-
pate effectively in the political process.

87.     Finally, and linked closely to these previous issues, Black Arkansans are more
likely to interact with the criminal justice system in Arkansas, leaving them more likely to be
incarcerated as youth and, ultimately, as adults. Such a history with the legal system directly lim-
its access to the franchise in the state both during their time of incarceration and in its aftermath.
This is because Arkansas's felon disenfranchisement laws limit participation not just during
one's time in prison, but until a variety of hoops are jumped through including the payment of
fines and fees tied directly to access to income.

**SENATE FACTOR SIX**

---

[94] U.S. Census, "Voting and Registration in the Election of November 2020."

88.     **Senate Factor Six** examines the degree to which a pattern of subtle or overt racial appeals in campaigns exists in the state of Arkansas.

89.     Electoral politics in the state of Arkansas has exhibited ongoing race-based appeals. In the earliest years of mass participation in the state's politics through the first decades of the twentieth century, such appeals were generally quite explicit. With the rise of the Civil Rights Movement and the accompanying changing of norms on political equality, such appeals have become more likely to be implicit in nature. However, even in the contemporary era, on occasion—and particularly on "narrowcast" media like radio and social media—more explicit race-based appeals continue to surface in Arkansas.

### *Race-Based Appeals During the Jim Crow Era*

90.     During the Jim Crow era, overt racial appeals were common in vote-garnering rhetoric in Arkansas. The accepted master of such rhetoric was Jefferson ("Jeff") Davis—elected Attorney General (in 1898), Governor (in 1900), and U.S. Senator (by the state legislature, in 1906). Much of Davis's rhetoric centered on economic and social populism against what he termed the "high-collared roosters" who used their economic status to control policymaking in the state. However, a key element of his effective rhetorical appeal to rural white voters in the state was a racial demagoguery employed with vehemence and skill unprecedented in Arkansas politics. Davis told white voters that Black voters were an "ever present eating, cankerous sore" on democracy and that the granting of Black Arkansans the vote during the Reconstruction era was "the most cruel blow that was ever struck a helpful and defenceless [*sic*] people." Davis was gruesome in his campaign imagery, saying at one point: "We may have a lot of dead n***ers in Arkansas, but we shall never have Negro equality, and I want to say that I would rather tear,

screaming from her mother's arms, my little daughter and bury her alive than to see her arm in arm with the best n***er on earth."[95]

91.     Davis went so far as to justify the lynching of Black Arkansans in a public event with President Theodore Roosevelt in Little Rock in 1905. Davis argued:

> Charitable and indulgent as we have been to an inferior race, charitably contributing bountifully of our time and means toward their material and moral betterment, still, if the brutal criminals of that race…lay unholy hands upon our fair daughters, nature is so riven and shocked that the dire compact produces a social cataclysm, often, in its terrible sweep far beyond the utmost efforts of all civil power.[96]

Noting that sexual assault was at issue in only a minority of lynching events, a quick-thinking Roosevelt responded to Davis's comments: "To avenge one heinous crime by another heinous crime is to reduce the man doing so to the bestial level of the bestial scoundrel; and the hideous effects of lynch law shown by the fact that three-fourths of the lynchings are not for that crime at all, but for other crimes."[97]

92.     Other Arkansas politicians felt comfortable using race-based imagery during the decades following Davis's era of power, particularly when threats to segregationist institutions showed themselves. For instance, Governor Homer Adkins, running for the U.S. Senate in 1944, made the *Smith* v. *Allwright* decision a centerpiece of his campaign when the United States Supreme Court handed down that decision banning the exclusion of non-white voters from party primary elections across the South. When a high-profile Black Democrat offered his support to

---

[95] Blair and Barth, *Arkansas Politics and Government*, 13; Stockley, *Ruled by Race*, 135.
[96] Stockley, *Ruled by Race*, 133; Fon Gordon, *Caste & Class: The Black Experience in Arkansas, 1880-1920* (Athens: University of Georgia Press, 1995), 108-9.
[97] Ibid.

Adkins in the Senate primary, Adkins spurned it, saying: "If I cannot be nominated by the white voters of Arkansas, I do not want the office."[98] Adkins lost the subsequent primary.

### *Militant Segregationist Appeals in the Civil Rights Era*

93.     Across the South, in the aftermath of the *Brown* v. *Board of Education of Topeka, Kansas* Supreme Court decision in 1954, which declared *de jure* segregation in public schools inherently unequal in the eyes of the Constitution, candidates for political office began emphasizing opposition to the United States Supreme Court ruling as a primary value of their campaigns. Political scientist Earl Black has provided empirical evidence that, before *Brown*, most nominees for governor in the South were "moderate segregationists" who supported the maintenance of Jim Crow but did not emphasize the issue during campaigns. Following the Supreme Court decision, candidates who were successful in statewide campaigns in the South were much more likely to be what Black terms "militant segregationists," because of the centrality of segregation to their campaigns and their willingness to say it was a more important value than other matters such as the economic development in their state.[99]

94.     Orval Faubus was running for governor when the first *Brown* decision was handed down in May 1954. At that point, Faubus, a social moderate, was able to simply say that he would respect the decisions of local school boards regarding implementation of the decision. By the time of his first reelection campaign in 1956, Faubus was challenged by state Senator Jim Johnson, the head of the white supremacist, segregationist White Citizens' Council, who emphasized Faubus's inaction in allowing the desegregation in school districts including Hoxie. While

---

[98] John Kirk, "Gov. Adkins and Race," KUAR Public Radio, 30 November 2020, https://www.ualrpublicradio.org/2020-11-30/gov-adkins-and-race.

[99] Earl Black, *Southern Governors and Civil Rights: Racial Segregation as a Campaign Issue in the Second Reconstruction*, Cambridge, (MA: Harvard University Press, 1976).

Faubus won still taking a more moderate stance, it was clear that a more explicitly segregationist stance had appeal with many white voters in the state.[100]

95.     As noted in the section on Senate Factor One, Faubus became decidedly more militant in his response during the months of the Little Rock Crisis. In September of 1958, following the United State Supreme Court's *Cooper v. Aaron* decision that affirmed the lower court's desegregation ruling in the Little Rock School District, Faubus went on statewide television and radio to reassert his defense of states' rights on issues of racial segregation in schools:

> To you people in this struggle who seek to preserve our form of government, I am proud of my role as a leader in the fight. I did not seek this role. It was thrust upon me in the course of events. I did not, nor do I now, shrink from my responsibilities in what is perhaps the greatest struggle for constitutional government during this century.[101]

While Faubus ultimately lost the battle of Little Rock following the so-called "Lost Year," he fought for an array of segregationist policies during that period and continued to remind voters that he had stood up against integration until the end of his record six terms as governor.

96.     Upon Faubus's retirement, then-state Supreme Court Justice Johnson won the Democratic nomination for governor in 1966. During the campaign, Johnson infamously refused to shake the hands of Black voters on the campaign trail and said he would stand up against federal civil rights actions such as the Civil Rights Act of 1964 that threatened "the preservation of our right to own and control private property."[102]

### The Emergence of More Implicit Racial Appeals

---

[100] Stockley, *Ruled by Race*.
[101] Governor Orval Faubus Speech, 18 September 1958; Stockley, *Ruled by Race*.
[102] John Kirk, "The Election that Changed Arkansas Politics," *Arkansas Times*, 28 March 2012, https://arktimes.com/news/cover-stories/2012/03/28/the-election-that-changed-arkansas-politics.

97.     In the aftermath of the civil rights era, racial egalitarianism became normalized in American politics, including in the politics of Arkansas. This meant that widespread use of explicit racial appeals—potent forces for moving votes in the past—would now be rejected and, indeed, could produce a backlash against a candidate employing them. Despite this progress, racial stereotyping remained very much alive in the psyches of American voters. In her important work on the potency of implicit racial appeals in campaign advertising even in an era of egalitarian norms related to race, Mendelberg found strong evidence that implicit racial appeals still had the power to activate such race-based stereotypes and focus voters on race in evaluating candidates and issues. This was most notoriously seen in the use of Massachusetts prisoner William Horton, Jr. (renamed "Willie Horton" for the ad) during the 1988 presidential campaign.[103]

98.     Mendelberg presents her definitions of "explicit" and "implicit" group-based campaign messages with a particular focus on race. "[A] racial appeal is explicit if it uses racial nouns or adjectives to endorse white prerogatives, to express anti-black sentiment, to represent racial stereotypes, or to portray a threat from African Americans." In contrast, implicit group-focused appeals attempt to present the same content as explicit appeals, but in them such "nouns and adjectives" are replaced by more "oblique references." Implicit group-based appeals rely upon the activation of negative stereotypes through carefully chosen, often coded, words and images. Another scholar, Ian Haney López, has also examined the increasing use of such so-called "dog whistles" in political campaign rhetoric.[104]

99.     Mendelberg emphasized the special power of visual images in the activation of voters' race-based stereotypes. While Mendelberg noted that it was feasible for implicit racial

---

[103] Tali Mendelberg. *The Race Card: Campaign Strategy, Implicit Messages, and the Norm of Equality*. (Princeton, NJ: Princeton University Press, 2001).
[104] Mendelberg, *The Race* Card, 8-9; Ian H. López, *Dog Whistle Politics: How Coded Racial Appeals Have Reinvented Racism and Wrecked the Middle Class* (Oxford: Oxford University Press, 2014).

appeals to be created through text or spoken words, she argued it was difficult for those words to be spoken or written in a manner that were not explicit racial appeals. As Mendelberg writes, "Stereotypical or threatening images can communicate derogatory racial meaning in a more subtle way than an equivalent verbal statement."[105]

100.     Text can be used in subtle ways, however, to create clear—but also clearly implicit—racial appeals. Radio advertising, now nearing a century of usage in political campaigns, continues to be a heavily-used medium particularly in rural states like Arkansas where car culture dominates. Research has shown that visual representations are not necessary for people to create visual images themselves. In examining brain patterns of listeners, one scholar found that highly evocative radio advertisements engage visual cognitive resources despite their auditory nature.[106] As another observer of radio has put it, "Radio outstrips television as a means of conveying intimacy and, precisely because it doesn't show but can only tell, may stir the active imagination more deeply."[107]

101.     Radio ads are ripe for such implicit racial appeals because they are "narrowcast" to specific audiences because of the demographically segmented nature of radio advertising. In the post-"Willie Horton" era, using radio to make group-based appeals is also considerably safer; it reduces the potential for a backlash effect when the group that is the object of the ad is one around which an egalitarian norm has been established, but it still permits the invocation of potent stereotypes regarding demographic characteristics such as race.

102.     For instance, in his brief run for the U.S. Senate from Arkansas in 1996 (aborted when he became governor following the resignation of his predecessor), Republican Mike Huck-

---

[105] Mendelberg, *The Race Card,* 9.
[106] Paul D. Bolls "I Can Hear You, but Can I See You? The Use of Visual Cognition During Exposure to High-Imagery Radio Advertisements." *Communication Research* 29 (2002): 537-63.
[107] Dave Marsh, "Radio Days," *New York Times,* 28 January 2007.

abee ran a radio ad titled "Oprah" on a number of MOR ("middle of the road") and country stations with largely white audiences. This ad defined the kind of people whom Huckabee would represent in Washington as "people who get up at six in the morning, fix a sandwich for lunch and come home at dark worn out ... [who are] tired of paying taxes for those who get up at 10 o'clock, watch *Oprah* all afternoon, and cruise the streets at night." Although race is never mentioned explicitly in the ad, direct references to Oprah Winfrey and "cruis[ing] the streets at night," and veiled references to welfare recipients, unquestionably triggered stereotypically racial images in the minds of many white listeners. But, as they did when questions were raised about the advertisement, Huckabee campaign operatives could deny any racial appeal because of the absence of explicit racial references.[108]

### Racial Appeals Related to President Barack Obama

103.     The arrival of President Barack Obama on the political scene led to a reassertion of racial politics in Arkansas to a degree unmatched since the civil rights era, with meaningful political effects. Such shifts were seen most clearly among white rural voters in the state in the 2008 election cycle, primarily in rural counties that had swung back and forth between Republican and Democratic candidates across election cycles. There is some empirical evidence from 2008 that Arkansas voters were race-conscious in their attitudes regarding Obama. For example, in the Arkansas Poll conducted in October of that year by the University of Arkansas, half of the respondents were asked how many (of five) statements "troubled" them about Obama; the other half heard a list that differed in only one respect: the item "he has two children" was replaced

---

[108] L. Marvin Overby and Jay Barth, "Radio Advertising in American Political Campaigns: The Persistence, Importance, and Effects of Narrowcasting." *American Politics Research*. 34 (2006): 451-478; Blair and Barth, *Arkansas Politics and Government*, 76; John Brummett, "Huckabee Leads with the Race Card," *Arkansas Democrat-Gazette*, 31 October 1995; John Brummett, "Walking Into the Huckabee Trap," *Arkansas Democrat-Gazette*, 2 November 1995.

with "if elected, he will be the first black president." The result of this simple list experiment was telling: The average number of statements respondents deemed "troubling" was higher for the group where Obama's race was included rather than the fact that he is a father (1.55 versus 1.49). For whites only, it was 1.74 and 1.63. (All differences were statistically significant at the .001 level.)[109] Much more qualitative data from the politics of the era reaffirms many white Arkansans' concerns about the first Black President.

104.     By the time of Obama's reelection campaign in 2012, his polarizing role in the state's politics had become even more central—with race at the heart of that polarization. As one national reporter based in Arkansas put it in the middle of the 2012 campaign:

> People will deny it, but racism runs deep in Arkansas.
> In 2008, white people I have known my entire life confessed to me that they would not vote for Obama because of his race. They won't go on record. They will say otherwise in public. But in a comfortable environment over iced tea when they forget I'm a reporter, they will say this in rural Arkansas – and much of this state would be considered the country.[110]

105.     While the 2012 presidential election was only superficially contested in the state, with no chance that Obama would win the state's electoral college votes, the battle for control of the state legislature (in Democrats' hands for 138 years) was hotly contested. That campaign for legislative control, fought out in districts across the state, was about one man: President Obama. As a billboard in Fulton County, a rural county in the northeast quadrant of the state, summed it up:

> Save America.
> Vote Republican.
> Every Democrat Elected Helps Obama.[111]

---

[109] Janine A. Parry and Bill Schreckhise, *The Arkansas Poll, 2008* (Fayetteville, AR: Diane D. Blair Center of Southern Politics and Society, University of Arkansas, 2008).
[110] Suzi Parker, "In Arkansas, Racism Cuts Against Obama," *Washington Post*, 25 May 2012.
[111] Jay Barth, "In Arkansas, Dixie's Last Democratic Legislature Faces a Red Tide," *The New Republic,* 29 October 2012.

106.    Direct mail, another form of narrowcast communications, is also heavily used by partisan and non-partisan groups alike. During the 2012 battle for control of the state legislature, President Obama was front and center in these attacks as well. Mailers about Obamacare primed racial sentiments by using an image of an African-American doctor. Recipients were asked to "thank [Republicans] for protecting our health care freedom."[112]

**The Role of Race in Recent Election Cycles**

107.    Campaigns have continued to regularly employ racialized rhetoric in recent election cycles. In a contested 2018 race for U.S. Congress, several such communications were produced by or on behalf of the reelection campaign of U.S. Representative French Hill. A television ad endorsed by Hill showed the dark and heavily tattooed faces of what were purported to be members of the primarily Salvadoran "MS-13" gang and contended that his opponent's immigration policies would lead to an increase in immigrant-driven criminal activity in Arkansas.[113] Very similar mailers regarding the gang, denounced as "racist" by Hill's opponent Clarke Tucker, were run by a Super PAC, the Republican Majority Fund.[114] In that same election, a radio advertisement targeted at "urban" radio stations, which primarily focus on younger Black audiences, attacked Democrats like Tucker for their behavior during the confirmation hearings for Supreme Court nominee and future Justice Brett Kavanaugh. Two Black women's voices are heard in the ad discussing the sexual assault charges lobbed against Kavanaugh during the hear-

---

[112] Jay Barth and Janine Parry, "Arkansas: Another Anti-Obama Aftershock." In *Second Verse, Same as the First: The 2012 Presidential Election in the South*, eds. Scott E. Buchanan and Branwell DuBose Kapeluck. (Fayetteville: University of Arkansas Press, 2014).

[113] Mara Salvatrucha, more commonly known as MS-13, has its origins in the Los Angeles of the late 1970s and early 1980s. It is now internationalized and is known for its extreme violence, including the use of machetes in killings.

[114] Hannah Grabenstein, "Democratic House Candidate Calls Attack Mailers 'Racist,'" *Associated Press*, 21 September 2018.

ings: "All of her witnesses including her best friend say it didn't happen? What will happen to our husbands, our fathers, or our sons when a white girl lies on them? Girl, white democrats will be lynching black folks again." Both Hill and Tucker condemned the ad as racist.[115] Two years later, in the home stretch run of his campaign for reelection against state Senator Joyce Elliott, a Black woman, Hill gave an interview in which he emphasized his opponent's race: "If Joyce Elliott were elected to Congress, she'd be a member of the Democratic conference and she'd be a member of the Congressional Black Caucus."[116]

108.    In judicial races in the state, outside organizations have run "dark money" ads targeting candidates for their judicial rulings, particularly those involving Latinx defendants. In 2018, Judicial Crisis Network produced an attack ad on State Court of Appeals Judge Kenneth Hixson regarding a case in which a Court of Appeals panel including Judge Hixson awarded a Latinx man a new trial after being convicted and sentenced in a rape case. The tag line of the ad: "Don't let another convict threaten our children."[117] In another Court of Appeals race in the same election cycle, Judge Bart Virden was attacked for his role in the same case by the Republican State Leadership Committee, a 527 political organization, which closed its ad by stating that "violent convicts pray for judges like Bart Virden."[118]

109.    While implicit racial appeals remain decidedly more common, explicit race-based appeals do occasionally continue to be expressed by candidates in Arkansas. For example, in recent months, Chris Bequette, a candidate for the Republican nomination for Lieutenant Governor in 2022, regularly employed racialized rhetoric in a series of Twitter posts on topics such as

---

[115] Brittany Reese, "Candidates Hill and Tucker Condemn Racist Advertisement and Each Other," KATV, 20 October 2018, https://katv.com/news/local/candidates-condemn-racist-advertisement-and-each-other.
[116] Frank Lockwood, "Hill, Elliott In Tight Race for U.S. House Seat," *Arkansas Democrat-Gazette*, 18 October 2020.
[117] David Ramsey, "Judge Kenneth Hixson Responds to Judicial Crisis Network's Dark-Money Attacks," *Arkansas Times*, 14 May 2018.
[118] Benjamin Hardy, "Court of Appeals Race Draws Yet Another Attack Ad Funded by Outside Group," *Arkansas Times*, 15 May 2018.

crime in Little Rock (which Bequette termed "the Chicago of the South"); the City's first elected Black mayor; diversity, equity, and inclusion efforts; and post-score celebrations by Black athletes. Twitter and other forms of social media go well beyond political radio in their ability to narrowcast communications to white audiences with whom such racially charged communications will be effective. In addition, a Pine Bluff City Council member received significant attention for using a racial epithet in an online debate in 2015.[119] The following year, a district judge candidate in central Arkansas withdrew from his campaign after it came to light that he had made a racial slur in a written social media attack on another elected official.[120] Finally, in 2020, a southeast Arkansas elected sheriff was forced to resign following release of an audio recording in which a racial epithet was repeated by him nine times.[121]

110.    The nature of race-based appeals in Arkansas has clearly changed across the decades but remains a component of the state's political atmosphere, providing ongoing evidence that Senate Factor Six is clearly met in the state.

**SENATE FACTOR SEVEN**

111.    **Senate Factor Seven** examines the extent to which Black candidates have been elected to public office in Arkansas.

112.    Black Arkansans remain underrepresented in their rates of election to all levels of public office. As one moves from the most local level offices, such as municipal government and school boards, to statewide offices, the barriers to representation for candidates of color become more pronounced.

---

[119] John Worthen, "Council: No Faith in Official," *Arkansas Democrat-Gazette*, 7 April 2015.
[120] Jamie Dunaway, "District Judge Candidate Withdraws from Race After Text with Racial Slur Surfaces," *Arkansas Democrat-Gazette*, 16 February 2016.
[121] Daniel Villarreal, "Arkansas Sheriff Resigns After Recording of Racist Language Leaks," *Newsweek*, 28 August 2020.

***Federal Offices***

113.     Arkansas stands out as the sole southern state that has never sent a Black member to Washington to represent the state in the United States House or Senate. While Black Arkansans have gained nominations to the U.S. Senate on one occasion and the U.S. House on several occasions in recent election cycles, and some of these races have appeared to be competitive during the months leading up to Election Day, none of these Black candidates has ultimately come close to winning an election.

***Statewide Offices***

114.     Only one Black person has ever been elected to a statewide office in Arkansas's history. Joseph Corbin was elected the state's superintendent of education in 1873, just as Reconstruction came to a close. In recent decades, a number of Black candidates have sought office, and a handful have gained party nominations to statewide office, but only one—Democratic Lieutenant Governor candidate Ron Sheffield in 2002—has gained over four in ten general election votes; Sheffield barely exceeded that mark with 40.04% of the vote in the general election.

***The State Judiciary***

115.     To this point, no African Americans have been elected to another statewide office—a seat on the state supreme court. All judges in Arkansas are selected by election except in the case of a vacancy. Black justices, however, have come to the Court through gubernatorial appointment when vacancies have occurred. Five African Americans have achieved seats through this process. However, under Arkansas law, judicial appointees may not seek the seat to

which they are appointed at the time of the next election. None of these Black appointees were able to seek election to keep their seat.

116.    African Americans also remain underrepresented at the trial court level in Arkansas. Black candidates had tremendous challenges gaining judgeships focused on criminal matters during the long period, from 1874 until 2001, when "circuit" (criminal) and "chancery" (civil) judgeships were separated. Some suggest that a distrust by white voters about Black judges' ability to deal with criminal matters in a balanced manner contributed to this disparity.[122] The dissolution of a dual court system has merged all state courts into one system where judges have the capability to hear both criminal and civil matters, however, thus lessening this challenge grounded in race-based stereotypes.

117.    In fact, it took a 1992 federal district court order (typically referred to as the *Hunt* Decree) under the federal Voting Rights Act to make inroads into diversifying the state judiciary. The *Hunt* Decree required that judicial "subdistricts" be created within five existing general-jurisdiction court districts with the goal of allowing Black voters to elect their judicial candidates of choice. For each of these new judicial subdistricts, the African-American voting age population was originally at least 60 percent. All told, 15 judgeships were covered by the decree, which immediately resulted in a sustained increase in the number of African-American jurists across the state, with Pulaski County most directly impacted.

118.    However, even with these assertive Voting Rights Act applications at the lower court levels, the judicial ranks continue to not be reflective of the racial composition of the state's population. In 2019, the NAACP Legal Defense Fund (LDF), which was lead counsel on the *Hunt* case, filed an additional suit charging that the state's Court of Appeals lacked sufficient

---

[122] Kristin L. Karl and Timothy J. Ryan. "When Are Stereotypes about Black Candidates Applied? An Experimental Test." *The Journal of Race, Ethnicity, and Politics* 1 (2016): 253-279.

Black representation and that the statewide elections for the state Supreme Court inherently limited Black representation. "In over two decades, no Black candidate for the Arkansas Court of Appeals has ever won against a white candidate or in a district comprised of a white voter majority," the LDF claimed in the suit, which remains active.[123]

### State Legislative Seats

119.    No African Americans served in the Arkansas legislature from 1893 until 1972, when three Black representatives and one Black Senator were elected.[124] Reapportionments after the Voting Rights Act of 1982, however, have created additional majority-Black districts in both the state House and Senate, and, in many cases, African Americans have been selected to represent these areas. The 2021 session, for instance, saw ten Black House members and three African Americans in the Senate. One majority-Black House district (District 12, as numbered at the time of the 2020 election) was represented by a white representative. Though the legislature was dramatically more representative than those of the prior legislators whose pictures line the hallways of the capitol building, this meant that 89 percent of the legislature was white in a state where a decidedly smaller percentage of the state population was white, according to the 2020 Census.[125] While more than 16 percent of the population of Arkansas is Black, there were only ten Black House members.

---

[123] Billy Corriher, "Voting Rights Lawsuits Challenge Lack of Black High Court Justices," *Facing South*, 15 July 2019.
[124] Janine Parry and William Miller, "'The Great Negro State of the Country?' Black Legislators in Arkansas: 1973-2000," *Journal of Black Studies* 36 (2006): 833-872.
[125] Legislative demographic data from the National Conference of State Legislators; in addition, one member of the current house identifies as Latino. Census data from U.S. Census, 2020.

*Local Elected Officials*

120.     Local offices (at the county, municipal, and school levels) have shown themselves to be much more obtainable than federal and state offices by Black Arkansans. Still, a significant gap remains between the state's Black population and the percentage of local elected officials who are African American.

121.     Currently, Arkansas has 24 Black mayors,[126] meaning that African Americans hold fewer than 5 percent of the mayorships in the state. The overwhelming majority of these African-American mayors were elected by towns with majority-Black populations. More troubling, the number of Black mayors in Arkansas has been steadily decreasing. Two decades ago there were 37 Black mayors across the state.[127]

122.     As in the state legislature and state courts, voting rights lawsuits—particularly after the passage of the Voting Rights Act of 1982—have been a force for racial change in local government. This has been achieved by shifts from at-large elections to ward or district elections that maximize the opportunity for African Americans to gain office, with the most dramatic results coming in several east Arkansas cases. Some were brought about by litigation while others were achieved through voluntary actions by municipal governments aware of the threat of potential litigation. While the racial demographics of local elected officials is now not tracked as it once was by the Joint Center for Political and Economic Studies, the organization's last census in 2000 found that there were 235 Black members of municipal boards in Arkansas (out of about 3,000 total), 55 Black members of county quorum courts (out of approximately 750 total), and

---

[126] "Directory." Arkansas Black Mayors Association, accessed December 26, 2021, https://arblackmayors.org/directory/.
[127] Blair and Barth, *Arkansas Politics and Government*.

122 Black school board members (out of approximately 1,800 at the time).[128] In each case, the percentage of Black officeholders for a particular office marked less than half the overall percentage of Black residents in the state. As this number was gathered just before a significant consolidation of school districts across the state, which likely decreased the electoral chances of Black candidates in these new consolidated districts (76 school districts have been consolidated or eliminated via annexation since 2000), it likely marks the high-water mark for the number of Black elected officials in the state. Just as with other state legislative and judicial categories discussed above, it marks progress compared to the pre-Voting Rights Act past, but it still identifies a major gap between Black Arkansans in the state's population and the percentage of elected representation at all levels.

**CONCLUSION**

123.    Based on the preceding analysis of five key "Senate Factors" examining a wide array of evidence from Arkansas's past and present, I can state, with confidence, that Arkansas clearly satisfies Senate Factors One, Three, Five, Six, and Seven when it comes to the status of Black residents in the state.

---

[128] David A. Bositis, "Black Elected Officials: A Statistical Summary 2000" (Washington DC: The Joint Center for Political and Economic Studies, 2002).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of December, 2021.

Jay Barth, Ph.D.

# *JAY BARTH*

M. E. and Ima Graves Peace Distinguished Professor of Politics, Emeritus
Hendrix College
1600 Washington Avenue
Conway, AR 72032
*barth@hendrix.edu*
(501) 944-9453 (Cell Phone)

## *EDUCATION and OTHER TRAINING*

Ph.D., The University of North Carolina at Chapel Hill (1994)
    Field: Political Science
    Major: American Politics
    Dissertation: "Republican Problems Down Ticket: The Persistence of Democratic Control Below
        the Presidential Level in the South"
    Minors: Public Law and Political Theory
    Advisor: Professor Thad Beyle

M.A., The University of North Carolina at Chapel Hill (1989)
    Thesis: "The Success of Republicanism in the New South"
    Advisor: Professor Merle Black

B.A., Hendrix College (1987)
    Magna Cum Laude with Departmental Distinction
    Major: American Studies

Participant, Summer Institute in Political Psychology, The Ohio State University, 1996

Participant, Summer Seminar on the History and Philosophy of Freedom of Speech, Oxford University, 1997

Participant, Associated Colleges of the South Summer Teaching and Learning Workshop, Rollins College, 1997

Participant, National Endowment for the Humanities Summer Institute, "Teaching the History of the Southern
    Civil Rights Movement, 1865-1965," Harvard University, 1998

Participant, Experiments in Social Sciences Summer Program, Institution for Social and Policy Studies, Yale
    University, 2003

Participant, Wye Faculty Seminar, The Aspen Institute, 2006

Participant, NITLE Introducing GIS Workshop, Lake Forest College, 2007

Participant, Management Development Program, Harvard University Graduate School of Education, 2008

Faculty Fellow, ENACT: The Educational Network for Active Civic Transformation, International Center for
    Ethics, Justice and Public Life, Brandeis University, 2016

Participant, International Instructor Training Institute of The Inside-Out Prison Exchange Program, 2018

Participant, Standard and Open Pathways Training for Peer Reviewers, Higher Learning Commission, 2018

## HONORS and AWARDS
### ACADEMIC

Distinguished Scholar Award, Arkansas Political Science Association, 2018

Bill and Connie Bowen Odyssey Professor, Hendrix College, 2014-2017
+With this $25,000/year professorship, developed a variety of engaged learning activities for students tied to the theme of Arkansas public policy. This included the establishment of the Arkansas Policy Program, an undergraduate think tank focused on Arkansas in which students collaborated with advocacy groups and foundations on public policy reports, an interdisciplinary study trip focused on the Buffalo River region, and research projects and internships tied to the study of politics and public policy in the state.

Diane Blair Award for Outstanding Achievement in Politics and Government, Southern Political Science Association, 2014

Butler Center Fellowship, The Butler Center for Arkansas Studies, 2008

Arkansas Professor of the Year, Carnegie Foundation for the Advancement of Teaching and the Council for Advancement and Support of Education (CASE), 2007

Steiger Congressional Fellowship, American Political Science Association, 2000-2001
+Staff member, U.S. Senator Paul D. Wellstone
+Primary focus of legislative work: Education and civil rights policy

Faculty Appreciation Award, Hendrix College, 1995, 1997, 1998, 2000, and 2009
+Presented by the Senior Class to the faculty member who has shown "excellence in instruction and concern for the welfare of Hendrix students."

John Patrick Hagan Award for Outstanding Teaching by a Graduate Student, Department of Political Science, The University of North Carolina at Chapel Hill, 1993

Pogue Fellowship, The University of North Carolina at Chapel Hill, 1987-1990

### COMMUNITY

Impact Award, WaterNow Alliance, 2021 (with other members of the Central Arkansas Water Board of Commissioners)

Distinguished Service Award, National Association of State Boards of Education, 2019

Harold Jinks Democratic Man of the Year Award, Democratic Party of Arkansas, 2019

Ed Fry Democrat of the Year Award, Democratic Party of Arkansas, 2016

Humanitarian Award, Just Communities of Arkansas, 2015

## TEACHING EXPERIENCE

Adjunct Professor, William H. Bowen School of Law, University of Arkansas at Little Rock, Fall 2021
*Course taught:      **Gender and the Law**
Department of Politics and International Relations, Hendrix College, January 1994-December 2019
*Courses taught:     **Southern Politics**
                     **American State and Local Government**

Race and American Politics
Gender, Sexuality, and American Politics
American Constitutional Law: The Federal System
American Constitutional Law: Ind. Rights and Liberties
American Political Parties and Elections
*Bush* v. *Gore*
Arkansas Politics and Government: Seminar and Practicum
Political Psychology
Issues in Politics: The Politics of Education
Issues in Politics: Free Expression
U.S. Congress
Introduction to American National Government
Ancient and Medieval Political Thought
Modern Political Thought
American Political Thought
Methods in Political Analysis
Politics/International Relations Senior Seminar
The Engaged Citizen: Film, Memory, Political Change
The Engaged Citizen: Numbers in American Politics
Analyzing American Conservatism
Understanding (and Dismantling) the Cradle to Prison Pipeline: An
    Inside-Out Class

The University of Arkansas Clinton School of Public Service, 2003-2007
    *Courses taught:        **The Dynamics of Social Change**
                          **Public Service Practicum** (Co-director)

Faculty Director, Hendrix-in-London program, Winter 1999
    *Course taught:        **Free Expression: History and Theory**

Instructor, **Southern Politics**, University of North Carolina at Chapel Hill (Fall 1993, Spring 1993, Fall
    1992, Summer 1992, Spring 1992, Summer 1991, Spring 1991, Fall 1990)

Instructor, **American Constitutional Law: The Federal System**, University of North Carolina at Chapel
    Hill (Fall 1991)

PUBLICATIONS
    BOOK
    *Arkansas Politics and Government: Do the People Rule?*, Second edition. 2005. University of Nebraska
        Press (with Diane D. Blair).

    REPORTS
    *Helping Your Child Succeed in School: A Guide for Parents.* 2016.  Report developed for Arkansas
        Advocates for Children and Families, the Arkansas Public Policy Panel, and the Opportunity to
        Learn Campaign.

    *Governance in Little Rock, Arkansas: At-Large and District Elections and the Impact on
        Representation.* 2015.  Report published by Arkansas Policy Program, Hendrix College (with
        Kiril Kolev, Lora Adams '15, and Brett Hill).

*Our Common Journey: Linking the Education of Women and Girls and Arkansas's Economic Future.* 2014.  Report developed for the Arkansas Women's Foundation (with Sarah Beth Estes).

*Aspire Actions: Taking Action to Address Poverty and Make Arkansas a Land of Opportunity for All.* 2013.  Report developed for the Arkansas Community Foundation.

*Reading to Learn: The Importance of Reading by the End of Third Grade in Arkansas.* 2012.  Report developed for Arkansas Advocates for Children and Families.

*Ripe for Reform: Arkansas as a Model for Social Change.* 2012.  Report developed for the Arkansas Public Policy Panel and the Winthrop Rockefeller Foundation.

*Making Arkansas a Land of Opportunity for All: Understanding the Cradle to Prison Pipeline.* 2011.  Report developed for the Arkansas Cradle to Prison Pipeline Initiative.

*Rules of the Game: An Advocate's Guide to Arkansas's Tax and Budget System.* 2009.  Report developed for Arkansas Advocates for Children and Families (with Ginny Blankenship).

*Arkansas Education in the Post-*Lake View *Era: What Is Arkansas Doing to Close the Achievement Gap?* 2008.   Report developed for Arkansas Advocates for Children and Families and the Arkansas Public Policy Panel (with Keith A. Nitta).

## CHAPTERS IN EDITED WORKS

"Arkansas: Once More with Feeling for Trump," In *The 2020 Presidential Election in the South,* eds. Scott E. Buchanan and Branwell DuBose Kapeluck.  2021. Lexington Press. (with Janine Parry).

" The American South and LGBT Politics." In *Oxford Encyclopedia of LGBT Politics and Policy.* 2019. Oxford University Press. doi:10.1093/acrefore/9780190228637.013.1202.

"Arkansas's Electoral History."  In *The Historical Report of the Arkansas Secretary of State 2018.* 2018.  University of Arkansas Press.

"Arkansas: Trump Is a Natural for the Natural State," In *The Future Ain't What It Used to Be: The 2016 Presidential Election in the South,* eds. Scott E. Buchanan and Branwell DuBose Kapeluck. 2018. University of Arkansas Press. (with Janine Parry).

"An (Un)Exceptional Moment: The Politics of Reconstruction-Era Arkansas," In *A Confused and Confusing Affair : Arkansas and Reconstruction.* 2018. Butler Center Books.

"Liberal Arts Colleges: The Mothers of (Re)Invention." In *The Best Kind of College: An Insiders' Guide to America's Small Liberal Arts Colleges,* eds. John Seery and Susan MacWilliams. 2015.  SUNY Press.

"Sentiment Toward Same-Sex Divorce."  In *Handbook of Community Sentiment,* eds. Monica K. Miller, Jeremy A. Blumenthal, and Jared Chamberlain.  2015.  Springer.  (with Scott H. Huffmon).

"Arkansas: Another Anti-Obama Aftershock."  In *Second Verse, Same as the First: The 2012 Presidential Election in the South,* eds. Scott E. Buchanan and Branwell DuBose Kapeluck.  2014.  University of Arkansas Press. (with Janine Parry).

"Arkansas: He's Not One of (Most of) Us." In *A Paler Shade of Red: The 2008 Presidential Election in the South*, eds. Branwell DuBose Kapeluck, Laurence W. Moreland, and Robert P. Steed. 2009. University of Arkansas Press. (with Janine Parry and Todd Shields).

"Arkansas's Electoral History." In *The Historical Report of the Arkansas Secretary of State 2008*. 2008. University of Arkansas Press.

"The Continuing Role of Race in Southern Party Organizations." In *Southern Political Party Activists: Patterns of Conflict and Change, 1991-2001*, eds. John A. Clark and Charles L. Prysby. 2004. The University Press of Kentucky.

"Provincialism, Personalism, and Politics: Campaign Spending and the 2002 U.S. Senate Race in Arkansas." In *The Last Hurrah? Soft Money and Issue Advocacy in the 2002 Congressional Elections*, eds. David B. Magleby and J. Quin Monson. 2003. Center for the Study of Elections and Democracy (with Janine Parry).

"Arkansas: Nonstop Action in Post-Clinton Arkansas." In *The 2000 Presidential Election in the South*, eds. Robert P. Steed and Laurence W. Moreland. 2002. Praeger. (with Todd Shields and Janine Parry).

"Arkansas: Characters, Crises, and Partisan Change." In *Southern Politics in the 1990s*, ed. Alexander P. Lamis. 1999. The Louisiana State University Press. (with Diane D. Blair and Ernie Dumas).

"Arkansas: The Last Hurrah for a Native Son." In *The 1996 Presidential Election in the South: Southern Party Systems in the 1990s*, eds. Laurence Moreland and Robert Steed. 1997. Praeger.

"The Impact of Election Timing of Republican Trickle-Down in the South." In *Southern Parties and Elections: Studies in Regional Political Change*, eds. Robert Steed, Laurence Moreland, and Tod Baker. 1997. The University of Alabama Press.

"Arkansas." In *State Party Profiles: A 50-State Guide to Development, Organization, and Resources*, eds. Daniel S. Ward and Andrew Appleton. 1996. Congressional Quarterly Press. (with Diane D. Blair).

*JOURNAL ARTICLES*
"Do High-Profile Copartisans Help or Hurt? Obama, Beebe and Arkansas's 2012 Legislative Contests," Forthcoming. *Midsouth Political Science Review* (with Janine Parry and Craig Burnett).

"Five Questions State Boards Should Ask About Civics Education Reform." 2020. *Power of the Question, National Association of State Boards of Education* 4: 2.

"Direct Democracy, Educative Effects, and the (Mis)Measurement of Ballot Measure Awareness," 2020. *Political Behavior* 42:1015-1034 (with Craig Burnett and Janine Parry). https://doi.org/10.1007/s11109-019-09529-w

"Planting in Fertile Soil: The National Rifle Association and State Firearms Legislation." 2017. *Social Science Quarterly* 98: 485-499 (with Gary Reich).

"Arkansas's Fight for Real Equity." 2015. *The State Education Standard: The Journal of the National Association of State Boards of Education* 15 (2): 24-27.

"Immigration Restriction in the States: Contesting the Boundaries of Federalism?" 2012. *Publius: The Journal of Federalism* (with Gary Reich) 42: 422-448.

"Is False Imputation of Being Gay, Lesbian, or Bisexual Still Defamatory?  The Arkansas Case," 2012. *The University of Arkansas at Little Rock Law Review* 34: 527-549.

"Educating Citizens or Defying Federal Authority? A Comparative Study of In-State Tuition for Undocumented Students," 2010. *Policy Studies Journal* 38: 419-445 (with Gary Reich).

"The Media, the Medium, and Malaise: Assessing the Effects of Campaign Media Exposure with Panel Data," 2009. *Mass Communication and Society* 12: 271-290 (with L. Marvin Overby).

"Community Context, Personal Contact, and Support for an Anti–Gay Rights Referendum," 2009. *Political Research Quarterly* 62: 355-365. (with L. Marvin Overby and Scott H. Huffmon).

"Political Culture, Public Opinion, and Policy (Non)Diffusion: The Case of Gay- and Lesbian-Related Issues in Arkansas," 2009. *Social Science Quarterly* 90: 309-225 (with Janine Parry).

"2 > 1 +1?: The Impact of Contact with Gay and Lesbian Couples on Attitudes About Gays/Lesbians and Gay-Related Policies," 2009. *Politics and Policy* 37: 32-51 (with Janine Parry).

"Pursuing the Early Voter: Which Bird Gets the Worm?" 2008.  *Journal of Political Marketing* 7: 131-150 (with Martha Kropf, E. Terrence Jones, and Janine Parry).

"Post-Amendment 80 Judicial Politics in Arkansas: Have the Changes Undermined the Argument for Selection by Appointment?" 2008. *The University of Arkansas at Little Rock Law Review* 30: 753-769.

"Mobilizing the Seldom Voter: Campaign Contact and Effects in High-Profile Elections." 2008.  *Political Behavior* 30: 97-113 (with Janine Parry, E. Terrence Jones, and Martha Kropf).

"Radio Advertising in American Political Campaigns: The Persistence, Importance, and Effects of Narrowcasting."  2006. *American Politics Research* 34: 451-478 (with L. Marvin Overby).

"Numeracy About Minority Populations: Americans' Estimations of *Local* Gay Population Size." 2006. *Polity* 38: 194-210 (with L. Marvin Overby).

"Arkansas: Still Swingin' in 2004." 2005. *American Review of Politics* 26: 133-154 (with Janine Parry). [Reprinted in *Readings in Arkansas Politics and Government*, eds. Janine A. Parry and Richard P. Wang.  2009.  The University of Arkansas Press.]

"Bridge to Modernity: The Political Legacy of Sid McMath." 2004.  *The University of Arkansas at Little Rock Law Review* 26: 535-542.

"Arkansas: More Signs of Momentum for Republicanism in Post-`Big Three' Arkansas," 2003. *American Review of Political Science* 24: 111-126. [Reprinted in *Readings in Arkansas Politics and Government*, eds. Janine A. Parry and Richard P. Wang.  2009.  The University of Arkansas Press.]

"Are Gay Men and Lesbians in the South the New `Threat'?  Regional Comparisons of the Contact Theory." 2003. *Politics and Policy* 31 (3): 1-19 (with L. Marvin Overby).

"Provincialism, Personalism, and Politics: Campaign Spending and the 2002 U.S. Senate Race in Arkansas." 2003. *PS: Political Science and Politics E-Symposium* 36 (3) (with Janine Parry).

"Governors in the Legislative Arena: The Importance of Personality in Shaping Success." 2002. *Political Psychology* 23: 787-808 (with Margaret Ferguson).

"American Governors and their Constituents: The Relationship Between Gubernatorial Personality and Popularity." 2002. *State Politics and Policy Quarterly* 2: 268-282 (with Margaret Ferguson).

"Contact, Community Context, and Public Attitudes Toward Gay Men and Lesbians." 2002. *Polity* 34: 433-456 (with L. Marvin Overby).

"Gender and Gubernatorial Personality." 2002. *Women and Politics* 24: 63-81 (with Margaret Ferguson).

"Paper Ballots, Computers, and Everything Else in Between: The Impact of Voting Devices on Ballot Roll-off." 1997. *Midsouth Political Science Review* 1:1-12.

"Arkansas' Juvenile Crime Special Session: An Election Season Success with Forewarnings for Arkansas Politics." 1994. *Comparative State Politics* 15 (5): 19-27.

"Dual Partisanship in the South: Anachronism, or a Real Barrier to Republican Success in the Region?" 1992. *Midsouth Political Science Journal* 13: 487-500.

*EDITED WORKS*
Guest editor of special edition of *American Review of Politics*, "Gender and Sexuality in Southern Politics," Winter 2013, Vol. 34. Authored introduction to edition, Vol. 34: 243-4.

*OTHER PUBLICATIONS*
Columnist, *Arkansas Times*, 2012-2019 (See here for collection.)

"Education's COVID Generation," 2020. *Arkansas Business*. 30 November.

"Hillary in Arkansas," 2016. *Arkansas Times*, 3 November.

"Past, Future of Dual Seat Counties in Arkansas," Summer 2016. *County Lines* (with Barrett Goodwin).

"The Word of the Week in Philadelphia: Love," 2016. *Religion News Service*, http://religionnews.com/2016/07/29/the-word-of-the-week-in-philadelphia-love/

"DNC: The final event," 2016. *Harrison Daily Times*.

"In Arkansas, Dixie's Last Democratic Legislature Faces a Red Tide," 2012. *The New Republic*, http://www.newrepublic.com/authors/jay-barth

"The Conversation: Arkansas Talks About the Photograph That Shocked a Nation," 2011. *Arkansas Life* 4(2): 46-48.

"A Generation of Change, 1983 vs. 2009: Legislative Retrospective," 2009. *Talk Business Quarterly* 2 (1): 46-49.

"LR in Black and White." 2007. *Arkansas Times*, 20 September.

"The 2006 Governor's Race: Huge Ramifications for Party Politics in Arkansas," 2006. *The Arkansas Publisher* 78 (8): 9.

"Arkansas: A Moral Loss for Dems," 2005. *SouthNow* 8: 10.

"The Young and the Test List, Take 2." 1993. *Campaign* 7 (1) (with David Hughes).

"The Young and the Test List." 1992. *Campaign* 6 (10) (with David Hughes).

"Siting Hazardous Waste Facilities." 1990. *Inside Politics: North Carolina* 1 (13).

"Republican U.S. Senate Election Returns." 1990. *Inside Politics: North Carolina* 1 (5).

*REVIEWS*
Regular reviewer for *CHOICE: Current Reviews for Academic Libraries*

Book Review of *Painting Dixie Red: When, Where, Why, and How the South Became Republican*, 2012. *Arkansas Historical Quarterly* 71: 453-454.

Book Review of *The Boy from Altheimer: From the Depression to the Boardroom* by William H. Bowen, 2006. *Arkansas Historical Quarterly* 65: 459-460.

Book Review of *Mighty Peculiar Elections: The New South Gubernatorial Elections of 1970 and the Changing Politics of Race*, by Randy Sanders. 2003. *Arkansas Historical Quarterly* 62: 344-346.

Book Review of *Reelection: William Jefferson Clinton as a Native-Son Presidential Candidate*, by Hanes Walton, Jr. 2002. *American Political Science Review* 96: 220-221.

Exhibit Review of The Central High Museum and Visitor Center. 2001. *The Public Historian* 23: 127-129.

Book Review of *Party Activists in Southern Politics: Mirrors and Makers of Change*, edited by Charles D. Hadley and Lewis Bowman and *Party Organization and Activism in the American South*, edited by Robert P. Steed, John A. Clark, Lewis Bowman, and Charles D. Hadley. 1999. *The Southern Quarterly* 37: 303-304.

Book Review of *The New Politics of the Old South*, edited by Charles S. Bullock III and Mark J. Rozell. 1999. *Journal of Politics*. 61: 226-227.

Book Review of *Arkansas Politics: A Reader*, edited by Richard P. Wang and Michael B. Dougan. 1998. *Arkansas Historical Quarterly* 57: 67-68.

Book Review of *The South* by B. C. Hall and C. T. Wood. 1996. *Arkansas Historical Quarterly* 55: 224-228

Book Review of *Tar Heel Politics: Myths and Realities* by Paul Luebke. 1990. *Inside Politics: North Carolina* 1 (16).

*ENCYCLOPEDIA ENTRIES*

"Arkansas"; "Gerrymandering"; "Recalls"; "Regionalism." In *Political Encyclopedia of U.S. States and Regions*, edited by Haider-Markel, Donald P. 2009. CQ Press.

"Political Advertising, Radio." In *Encyclopedia of Political Communication*, edited by Christina Holtz-Bacha and Lynda Kaid. 2008.  Sage Publications. (with L. Marvin Overby).

"Act 975 of 2015 (a.k.a. Religious Freedom Restoration Act)"; "Arkansas Ethics Commission"; "Arkansas Interfaith Alliance"; "Arkansas Plan"; "Beebe, Mike"; "Democratic Party"; "Campaign Finance Laws"; "Election Fraud"; "Hutchinson, Asa" (update); "Initiatives and Referenda"; "Interstate 630"; "Intrastate Commerce Improvement Act"; "Just Communities of Arkansas"; "*Marisa N. Pavan, et al.* v. *Nathaniel Smith*," "Pryor, David Hampton"; "Republican Party"; "Ross, Michael Avery (Mike)"; "White Flight." In *The Encyclopedia of Arkansas History and Culture*, www.encyclopediaofarkansas.net.

"Arkansas."  In *Supplement to the Encyclopedia of the Republican Party*, edited by George T. Kurian. 2001. Sharpe Reference.

"Arkansas"; "Family Values"; "Hillary Rodham Clinton"; "Women." In *Supplement to the Encyclopedia of the Democratic Party*, edited by George T. Kurian.  2001. Sharpe Reference.

"American Association of Retired Persons"; "Elementary and Secondary Education Act of 1965"; "Gay and Lesbian Rights"; "Internet, Censorship and the." In *Civil Rights in the United States*, edited by Waldo E. Martin, Jr. and Patricia Sullivan.  2000.  Macmillan Library Reference.

## *STUDENT REPORTS MENTORED*

With support from the Bill and Connie Bowen Odyssey Professorship, I developed the Arkansas Policy Program, an undergraduate think tank focused on developing nonpartisan, original analyses on key public policy issues facing Arkansas.  The Arkansas Policy Program continued to remain in operation through the assistance of Hendrix College. These published projects were mentored as part of that program:

- James Owen, "`A Problem Unpleasant to Mention, Easy to Postpone': Mental Health Access in Arkansas," 2016.
- Nigel Halliday, "Bridging the Map: The Geography of Legal Need and Aid in Arkansas," 2016 (in collaboration with the Arkansas Access to Justice Foundation).
- Sean Alexander, "Hope in the Hills: How Local Leaders and Compassionate Communities Can Feed Hungry Children in the Arkansas Ozarks," 2016 (in collaboration with the Arkansas Hunger Relief Alliance).
- Peter Butler, "Unfulfilled Promises: The Reality of FINS in Arkansas," 2016 (in   collaboration with Disability Rights Arkansas).
- Sami Sexton, "Getting the Best Teachers Where They are Needed Most: An Overview of Research on Teacher Quality, Recruitment, and Retention in Arkansas and the U.S.," 2017 (in collaboration with Arkansas Advocates for Children and Families).
- Wes Hance, "Creating A `Citizen-Friendly' Arkansas General Assembly: Fusing the Disconnect Between Citizens and their Legislature," 2018.
- Drew Coker, "Protecting Drinking Water in Arkansas Challenges and Opportunities in the `Natural' State," 2018.
- Cordell Campbell, "The Results Are In: Gauging Civic Health in the Natural State," 2018 (in collaboration with the Arkansas Community Foundation and the Arkansas Bar Foundation).
- Adam Williams, "Learning from Earle: Determining Best Practices for Rural Education Policy,"

2019 (in collaboration with ForwARd Arkansas and with support from the Rural Community Alliance).

## PROFESSIONAL PRESENTATIONS
### INVITED LECTURES

"The Rule of Law and the Little Rock School Crisis," Arkansas Bar Association Arkansas Teachers Law School, 2021.

"Arkansas's Present and Future: Polls and Polling," Keynote, Arkansas Boys State, 2021 (with Janine Parry).

"Policy 101," Arkansas Chapter, New Leaders Council, 2021.

"Arkansas and the 19th Amendment: Women and the Vote in Arkansas," Arkansas Bar Association Arkansas Teachers Law School, 2020.

"The Present and Future of Civics Education," Arkansas US Senate Youth Luncheon, 2019.

"Student Free Expression: Across the Nation and in Arkansas," Arkansas Bar Association Arkansas Teachers Law School, 2019.

"Can Love Win?", Unitarian Universalist Church of Little Rock, 2018.

"The South and the Battle Over LBGTQ Rights," Social Sciences Forum, University of Maryland-Baltimore County, 2018.

"Doing Politics in a Post-Trump World," Ready to Run Arkansas 2017, Women Lead Arkansas, 2017.

Gallery Talk, "Sign of the Times: The Great American Political Poster, 1844-2012," University of Arkansas—Pulaski Technical College, 2017.

"The Future of Arkansas Politics," Richard Atkinson Lecture Series, Clinton House Museum, 2017.

"An Exceptional Moment: The Politics of Reconstruction-Era Arkansas," Old State House Museum, as part of "A Confused and Confusing Affair: Arkansas and Reconstruction," 2017.

"Student Free Expression and the U.S. Constitution," Arkansas Bar Association Arkansas Teachers Law School, 2017.

"Democracy Goes to College: The Importance of On-Campus Voting Centers," presented at the University of Arkansas Clinton School of Public Service, 2016 (with Peter Butler).

"Discrimination and the US and Arkansas Constitutions," Arkansas Bar Association Arkansas Teachers Law School, 2016.

"The Challenges and Opportunities of an Academic in Public Life," Annual Meeting of the Arkansas Political Science Association, 2015.

"Why Same-Sex Marriage Is Important to Me," Second Presbyterian Church, Little Rock, 2015.

"A New Chapter Begins: Arkansas Election 2014," Arkansas Old State House, 2014.

"Barriers in Education for Women and Girls in Arkansas," presenter and panelist, University of Arkansas Clinton School of Public Service, 2014.

"Arkansas Politics 2014," Lunch Speaker, Arkansas Society of Professional Lobbyists, 2014.

"Discrimination and the U.S. Constitution," Arkansas Bar Association Arkansas Teachers Law School, 2013, 2014, and 2015.

"The Swings Swung: Arkansas Election 2012," Arkansas Old State House, 2012.

"Advertising in American Presidential Campaigns: Past, Present and Future," Osher Lifelong Learning Institute, University of Arkansas, 2012.

"2012: The End of the Progressive Reform Era in Arkansas Politics?" Robert B. Walz Lecture in Arkansas and Regional History, Southern Arkansas University, 2012.

"Why Invest in Arkansas," presenter and panelist, University of Arkansas Clinton School of Public Service, 2012.

"10 Years After Lake View: How Has Arkansas's Education System Changed?" Arkansas Old State House and Faulkner County Library, 2011.

"Student Free Speech and the U.S. Constitution," Arkansas Bar Association Arkansas Teachers Law School, 2011.

"The History and Future of the American Two-Party System," "The Mechanics of Running for Office in the United States," Being a Candidate for Office in the United States," and "President Obama and the Future of American Race Relations," all at Heilongjiang University, Harbin, China, 2011.

"Running for Political Office in the United States," Guangxi Normal University, Guilin, China, 2011.

"Corruption in Arkansas: A Short Political History," Honors College, University of Central Arkansas, 2010.

"What Is the Opportunity to Learn Gap?," Arkansas Opportunity to Learn Summit, 2010.

"The Legacy of the Brooks-Baxter Battle in Arkansas Politics and Government," The Brooks-Baxter War Old State House Museum Symposium, 2009

"The Arkansas Legislature in Historical Context," Arkansas State House of Representatives Orientation Session, 2008

"*Narrow*casting: What Explains the Effectiveness of Radio Advertising in American Political Campaigns?" Honors College, University of Central Arkansas, 2008.

"What is Arkansas Doing to Close the Achievement Gap?" presented at the University of Arkansas Clinton School of Public Service, 2008 (with Keith A. Nitta).

"Post-Amendment 80 Judicial Politics in Arkansas: Have the Changes Undermined the Argument for Selection by Appointment?" Ben J. Altheimer Symposium, University of Arkansas at Little Rock

Bowen School of Law, 2008.

"Election 2008 in the South: A Look Back and a Glance Ahead," Department of Political Science, Southern Methodist University, 2008.

"The Changing Face of Race in Little Rock: 1957-2007," Featured Speaker, Bishop Kenneth Hicks Peace Award Dinner, 2007.

"Aftermath: The Geography of Race and Politics Since the 1957 Little Rock Crisis," J.N. Heiskell Distinguished Lecture, The Butler Center for Arkansas Studies, 2007. (http://www.butlercenter.org/cdm-aftermath/index_aftermath.php?CISOROOT=/aftermath)

"After the Dust Settles:  The Future of Party Politics in Arkansas After Election 2006," Dinner Speaker, William R. Overton Inn of Court, Little Rock, AR, 2006.

"Bill Clinton and Arkansas Politics," presented at a number of Elderhostel and Road Scholar programs, 2005-present

"Arkansas Politics 2006," Lunch Speaker, Arkansas Society of Professional Lobbyists, 2006.

"The Hendrix Odyssey: Thinking Outside the Book," presented at the Villa Julie College National Career Conference, 2006 (with Mark Schantz).

*CONFERENCE PRESENTATIONS*
"In the Interests of Millennials? Exploring Generational Representation in U.S. State Legislatures," presented at the Annual Meeting of the Southern Political Science Association, 2020 (with Stella M. Rouse and Charles R. Hunt).

"Direct Democracy and Medical Marijuana: The Case of Arkansas's Issue 6," presented at the Annual State Politics and Policy Conference and the Annual Meeting of the American Political Science Association, 2018 (with Craig M. Burnett and Janine Parry).

"Developing Engaged Citizens Through the First Year, Interdisciplinary Seminar," presented at the AAC&U General Education and Assessment: Foundations for Democracy Conference, 2018 (with Peter Gess and Todd Tinsley).

"When Medical Marijuana Initiatives Compete: One Still Smoking, One Up in Smoke," presented at the Annual State Politics and Policy Conference and the Annual Meeting of the American Political Science Association, 2017 (with Craig M. Burnett and Janine Parry).

"Direct Democracy and Educative Effects: Yes, No, Maybe," presented at the Annual Meeting of the American Political Science Association, 2016 (with Craig M. Burnett and Janine Parry).

"Voter Recall of Ballot Measures," presented at the Annual State Politics and Policy Conference, 2016 (with Craig M. Burnett and Janine Parry).

"The Limitations of Direct Democracy's Educative Effects: A View from the Voters," presented at the Annual Meeting of the American Political Science Association, 2015 (with Craig M. Burnett and Janine Parry).

"Direct Democracy's Educative Effects: A View from the Voters," presented at the Annual State Politics

and Policy Conference, 2015 (with Craig M. Burnett and Janine Parry).

"Does Combining At-Large and District Representation Enhance or Undermine Minority Representation?: The Case of Little Rock, Arkansas," presented at the Annual Meeting of the Southern Political Science Association, 2015 (with Kiril Kolev).

"From Semi-Automatic Bans to Open Carry: Explaining State-Level Divergence in Gun Legislation," presented at the Annual Meeting of the American Political Science Association, 2014 (with Gary Reich).

"Scandal and Resurgence: Sanford, Spitzer, Weiner, and the Politics of Recovery," presented at The State of the Parties: 2012 & Beyond Conference, The University of Akron's Ray C. Bliss Institute of Applied Politics, 2013 (with Jeff Smith and David Nir).

"Where There is Pull, Can there be Push? A Popular Governor, an Unpopular President and a Coattail Experiment in State Legislative Elections," presented at the Annual State Politics and Policy Conference, 2013 (with Craig Burnett and Janine A. Parry).

"The Grassroots of State Immigration Policy: Explaining Legislative Activism Across the States," presented at the Annual Meeting of the Midwest Political Science Association, 2013 (with Gary Reich).

"Immigration Restriction in the States: Pushing the Boundaries of Federalism," presented at the Annual State Politics and Policy Conference, 2012 (with Gary Reich).

"Is False Imputation of Being Gay, Lesbian, or Bisexual Still Defamatory?  The Arkansas Case," presented at the Annual Meeting of the Southern Political Science Association, 2012.

"Explaining State Activism on Immigration Policy: A Comparative Analysis of the Power of the Initiative Process," presented at the Annual Meeting of the American Political Science Association, 2011 (with Gary Reich).

"Broadcasting vs. Narrowcasting: Television Ads, Radio Ads, and Niche Marketing in an American Political Campaign," presented at the Annual Meeting of the European Political Science Association, 2011 (with L. Marvin Overby).

"Mobilizing Voters: Evaluating the Type, Timing, and Target of Campaign Contact," presented at the Annual State Politics and Policy Conference, 2011 (with Janine A. Parry, William D. Schreckhise, Martha Kropf, and Terry Jones).

"Explaining State Activism on Immigration Policy: Restrictive vs. Accommodating Policies in Four States," presented at the Annual Meeting of the Midwest Political Science Association, 2011 (with Gary Reich).

"The Roots of State Activism on Immigration: Explaining the Adoption of Restrictive versus Accommodating Policies." presented at the Annual Meeting of the Western Political Science Association, 2009 (with Gary Reich).

"The 2008 Presidential Election in Arkansas: He's Not One of (Most of) Us," presented at the Annual Meeting of the Arkansas Political Science Association, 2009 (with Janine A. Parry and Todd G. Shields).

"The Framing of Policy Making: A Comparative Analysis of State-Level Immigration Policies in the United States," presented at the Annual Scientific Meeting of the International Society of Political Psychology, 2008 (with Gary Reich).

"One Nation, Fifty Immigration Policies? The Roots of State Activism on Immigration," presented at the Annual Conference on State Politics and Policy, 2008 (with Gary Reich).

"Will Adequate School Facilities Create a More *Equitable* Education in Arkansas?" presented at the Annual Meeting of the Arkansas Political Science Association, 2008 (with Russ Montgomery and Keith A. Nitta).

"Is There Inherent Tension Between the Search for State Educational Adequacy and Addressing the Achievement Gap?: The Arkansas Case," presented at the Annual Meeting of the Southern Political Science Association, 2008 (with Keith A. Nitta).

"Here, There, and Everywhere: Local, State, and National Estimates of Gay Population Size," presented at the Annual Meeting of the American Political Science Association, 2007 (with L. Marvin Overby and Scott Huffmon).

"Explicit and Implicit: The Persistence of Group-Based Appeals in Radio Campaign Advertising," presented at the Annual Scientific Meeting of the International Society of Political Psychology, 2007 (with L. Marvin Overby).

"Personal Contact, Community Context, and Support for an Anti-Gay Rights Referendum," presented at the Annual Meeting of the Midwest Political Science Association and at the Annual Meeting of the Political Studies Association, 2007 (with L. Marvin Overby and Scott Huffmon).

"2 > 1 + 1?: The Impact of Contact with Gay and Lesbian Couples on Attitudes About Gays/Lesbians and Gay-Related Policies," presented at the Annual Meeting of the Western Political Science Association, 2007 (with Janine Parry).

"Framing the DREAM: A Comparative Analysis of State Legislative Issue Framing on Tuition Rates for Undocumented Students," presented at the Annual Conference on State Politics and Policy, 2007 (with Gary Reich).

"The Media, the Medium, and Malaise: Assessing the Effects of Campaign Media Exposure with Panel Data," presented at the Annual Meeting of the Southern Political Science Association, 2007 (with L. Marvin Overby).

"Attitudes towards GLBT Issues in Arkansas: Libertarian, But Not Libertine," presented at the Annual Meeting of the Midwest Political Science Association, 2006 (with Janine Parry).

"Radio Advertising in American Political Campaigns: The Persistence, Importance, and Effects of *Narrow*casting," presented at the Annual Meeting of the Midwest Political Science Association, 2005 (with L. Marvin Overby).

"Still Swingin': Arkansas and the 2004 Presidential Race," presented the Annual Meeting of the Arkansas Political Science Association, 2005 (with Janine Parry).

"Mobilizing Voters: A Closer Look at Campaign Contact and Effects," presented at the Annual Meeting

of the Southern Political Science Association, 2005 (with Janine Parry).

"Going Negative in Competitive U.S. Senate Elections: Who Notices and So What?," presented at the Annual Meeting of the American Political Science Association, 2004 (with E. Terrence Jones, Martha Kropf, and Janine Parry).

"Giving the People What They Want: Is Synchronicity Between Desired Political Communication and Campaign Activity Important in Shaping Voter Turnout?," presented at the Annual Scientific Meeting of the International Society of Political Psychology, 2004 (with E. Terrence Jones, Martha Kropf, and Janine Parry).

"Numeracy About Minority Populations: Americans' Estimations of *Local* Gay Population Size," presented at the Annual Scientific Meeting of the International Society of Political Psychology, 2004 (with L. Marvin Overby).

"Floating Voters in Competitive U.S. Senate Elections," presented at the Annual Meeting of the Western Political Science Association, 2004 (with E. Terrence Jones, Martha Kropf, and Janine Parry).

"Enlivening Undergraduate Research Methods: A Cross-Campus Thematic Approach," presented at the American Political Science Association Conference on Teaching and Learning in Political Science, 2004 (with Gary Reich).

"Mobilizing Voters: A Dynamic Model of Campaign Effects," presented at the Annual Meeting of the Southern Political Science Association, 2004 (with Janine Parry, E. Terrence Jones, and Martha Kropf).

"Pursuing the Early Voter: Which Bird Gets the Worm?," presented at the Annual Meeting of the Northeastern Political Science Association, 2003 (with Martha Kropf, E. Terrence Jones, and Janine Parry).

"*Narrow*casting: Radio Advertising in American Political Campaigns," presented at the Annual Meeting of the Midwest Political Science Association, 2003 (with L. Marvin Overby).

"Provincialism, Personalism, and Politics Campaign Spending and the 2002 U.S. Senate Race in Arkansas," presented at the Annual Meeting of the Midwest Political Science Association, 2003 (with Janine Parry).

"The Perfect Storm: Campaign Spending and the 2002 U.S. Senate Race in Arkansas," presented at the Annual Meeting of the Arkansas Political Science Association, 2003 (with Janine Parry).

"Gender and Southern Party Activists: Evidence from the 2001 Southern Grassroots Party Activists Project," presented at the Annual Meeting of the Southern Political Science Association, 2002.

"Arkansas: More Signs of Momentum for Republicanism in Post-Clinton Arkansas," presented at the Citadel Symposium on Southern Politics, 2002.

"Gubernatorial Personality and Campaign Fund Raising Success," presented at the Research Conference on Gubernatorial, Senatorial, and Presidential Approval, Texas A&M University, 2001 (with Margaret Ferguson).

"State Variation in the Presidential Gender Gap: Unraveling a Puzzle," presented at the Annual Meeting of the American Political Science Association, 2000 (with Zoe Oxley).

"American Governors and their Constituents: The Relationship Between Gubernatorial Personality and Popularity," presented at the Annual Meeting of the International Society of Political Psychology, 2000 (with Margaret Ferguson).

"Gubernatorial Personality and the Scope of Legislative Agendas," presented at the Annual Meeting of the American Political Science Association, 2000 (with Margaret Ferguson).

"Gender and Gubernatorial Personality," presented at the Annual Meeting of the American Political Science Association, 1999 (with Margaret Ferguson).

"Party, Personality, and Gubernatorial Success," presented at the Annual Meeting of the Midwest Political Science Association, 1999 (with Margaret Ferguson).

"Are Southern Governors Still a Different Breed?  Examining Gubernatorial Personality in the South and Non-South," presented at the Annual Meeting of the Southern Political Science Association, 1998 (with Margaret Ferguson).

"An Examination of the Role of Gubernatorial Personality in Explaining Leadership Success," presented at the Annual Meeting of the Midwest Political Science Association, 1998 (with Margaret Ferguson).

"Are Gay Men and Lesbians in the South the New ``Threat'?  Regional Comparisons of the Contact Theory," presented at the Citadel Symposium on Southern Politics, 1998 (with L. Marvin Overby).

"Arkansas: Characters, Crises, and Partisan Change," presented at the Annual Meeting of the American Political Science Association, 1997 (with Diane D. Blair and Ernie Dumas).

"Contact, Context, and Citizen Attitudes Toward Gay Men and Lesbians: Results from a Recent National Survey," presented at the Annual Meeting of the International Society of Political Psychology, 1997 (with L. Marvin Overby).

"Sports, Society, and Politics: A Study of the 1994 Oklahoma Elections," presented at the Annual Meeting of the Midwest Political Science Association, 1996 (with Matthew House).

"A Review of the 1996 Elections in the South," The Center for the Study of Southern Culture, The University of Mississippi, 1996 (with L. Marvin Overby).

"A Post Mortem on the November '95 Elections and a Glimpse at '96," The Center for the Study of Southern Culture, The University of Mississippi, 1996 (with L. Marvin Overby).

"Are They Really Amateurs?  The Backgrounds of the 1994 Republican Class and Implications for Their Congressional Careers," presented at the Annual Meeting of the Southern Political Science Association, 1995 (with Jim Cox).

"Paper Ballots, Computers, and Everything In Between: The Impact of Different Voting Devices on Ballot Roll-Off," presented at the Annual Meeting of the Midwest Political Science Association, 1995.

"Campaign Messages of the Two Parties' Gubernatorial Candidates in the Contemporary South," presented at the Annual Meeting of the Southern Political Science Association, 1994.

"Race and Down-Ticket Voting in the South," presented at the Annual Meeting of the Midwest Political Science Association, 1994 (with John Haskell).

"The Impact of Election Timing on Republican Trickle-Down in the South," presented at the Citadel Symposium on Southern Politics, 1994.

"`Opportunity Ladders' in the Contemporary South: Differences in the Quality of the `Products' Offered by the Two Parties," presented at the Annual Meeting of the Southern Political Science Association, 1993.

"Dual Partisanship in the South: A Thing of the Past or a Real Barrier to Republican Success in the Region?," presented at the Annual Meeting of the Southern Political Science Association, 1992.

"Testing for Realigning Trends in State Treasurer and Attorney General Races in the South," presented at the Annual Meeting of the Southern Political Science Association, 1990 (with John Haskell).

## *ROUNDTABLES and PANELS*

Panel Chair, "Transforming Civics Education in an Era of Polarized Politics," National Association of State Boards of Education Annual Meeting, 2019.

Panel Chair and Discussant, Annual Meeting of the Arkansas Political Science Association, 2019.

Roundtable Participant, "Roundtable on Arkansas Politics," Annual Meeting of the Arkansas Political Science Association, 2019.

Panel Participant, "The Well-Being Bridge: Connecting the Curriculum and Cocurriculum through Holistic High-Impact Practices." Annual Meeting of the Association of American Colleges and Universities, 2019.

Roundtable Participant, "Arkansas and the 2018 Elections: A Look Forward," Annual Meeting of the Arkansas Political Science Association, 2018.

Graduate Student Poster Session Discussant, Annual State Politics and Policy Conference, 2017.

Roundtable Participant, "The 2016 Elections in Arkansas: What Happened and What is Next?", Annual Meeting of the Arkansas Political Science Association, 2017.

Roundtable Participant, "Queer Arkansas," Annual Meeting of the Southern Historical Association, 2015.

Roundtable Participant, "Political Scientists as Political Actors: The Case of School Boards," Annual Meeting of the American Political Science Association, 2015.

Panel Participant, "Developing a First-Semester Course with a Required Civic Engagement Component," the Gulf-South Summit on Service-Learning and Civic Engagement through Higher Education, 2015.

Roundtable Participant, "The Meaning of the 2014 Arkansas Elections," Annual Meeting of the Arkansas Political Science Association, 2015.

Roundtable Participant, "The Life and Legacy of Wilbur Mills," Annual Meeting of the Arkansas Political Science Association, 2015.

Panel Participant, "Creating Cohesive Paths to Civic Engagement: Sharing the Curricular and Cocurricular Offerings on 26 Campuses," AAC&U Annual Meeting, 2015.

Panel Participant, "Cultivating for Change: How Transformative Planning Can Take Root and Succeed in Liberal Learning Environments," AAC&U Annual Meeting, 2015.

Roundtable Participant, "The 2014 Midterm Elections in the Rim South," Annual Meeting of the Southern Political Science Association, 2015.

Panel Discussant, Annual Meeting of the American Political Science Association, 2014.

Roundtable Participant, "2014 Elections in Arkansas," Annual Meeting of the Arkansas Political Science Association, 2014.

Roundtable Chair, Roundrable, "The Life and Legacy of Diane Blair," Annual Meeting of the Arkansas Political Science Association, 2014.

Roundtable Participant, "The Current State of Same-Sex Marriage," Annual Meeting of the Southern Political Science Association, 2014.

Panel Discussant, Annual Meeting of the Southern Political Science Association, 2014.

Roundtable Chair/Participant, "The 2012 Elections in Arkansas," Annual Meeting of the Arkansas Political Science Association, 2013.

Panel Moderator, "Winthrop Rockefeller's Legacy to Arkansas Politics," Winthrop Rockefeller Institute Conference on Political Reform, 2012.

Roundtable participant, "The 2012 Presidential and Congressional Elections," Annual Meeting of the Arkansas Political Science Association, 2012.

Panel Discussant, Annual Meeting of the Southern Political Science Association, 2012.

Roundtable Participant, "Arkansas and the 2010 Elections," Annual Meeting of the Arkansas Political Science Association, 2011.

Panel Participant, "An Education for Global Citizenship: The Best Form of Career Education" Annual Meeting of the Association of American Colleges and Universities, 2011.

Panel Moderator, "The Future of Southern Culture and Identity," The Future of the South Symposium presented by *Oxford American*, 2010.

Roundtable Participant, "The Future of LGBT Politics and Policies in the South," Annual Meeting of the Southern Political Science Association, 2010.

Panel Discussant, Annual Meeting of the Southern Political Science Association, 2010.

Roundtable Participant, "Arkansas Politics: What Happened in 2008 and Where
Is the State Headed Politically?," Annual Meeting of the Arkansas Political Science Association,
2009

Roundtable Participant, "The 2008 Presidential Election in the South," Annual Meeting of the
Southern Political Science Association, 2009

Roundtable Participant, "Making the Southern Safe for LGBTs in the Profession," Annual Meeting
of the Southern Political Science Association, 2009

Roundtable Participant, "Arkansas and the 2008 Presidential Election Contest," Annual Meeting of
the Arkansas Political Science Association, 2008

Roundtable Moderator, "Arkansas Politics Roundtable," Annual Meeting of the Arkansas Political
Science Association, 2008.

Panel Discussant, Annual Meeting of the Southern Political Science Association, 2008.

Panel Discussant,  Annual Scientific Meeting of the International Society of Political Psychology, 2007

Roundtable Participant, "Arkansas Politics Roundtable: What Did the 2006 Election Mean for the
Future of Arkansas Politics?," Annual Meeting of the Arkansas Political Science Association,
2007.

Panel Chair and Discussant, Annual Meeting of the Western Political Science Association, 2007.

Roundtable Participant, "The South After the Midterm Elections," Annual Meeting of the Southern
Political Science Association, 2007.

Panel Discussant, Annual Meeting of the Southern Political Science Association, 2007.

Panel Moderator, "Economic Development in Communities," A Future of the South Conference,
William J. Clinton Presidential Library, 2006.

Panel Participant, "Arkansas Politics 2006," Saline County (Ark.) Library, 2006.

Panel Participant, "Bridge to the Future: Building a Caring Community and Nation," William J. Clinton
Presidential Center, 2006

Panel Chair and Discussant, Annual Meeting of the Southern Political Science Association, 2006

Panel Chair and Discussant, Annual Meeting of the Southern Political Science Association, 2005

Panel Chair, the Annual Scientific Meeting of the International Society of Political Psychology, 2004

Panel Chair and Discussant, Annual Meeting of the Midwest Political Science Association, 2004

Roundtable Participant, "Thinking About Teaching, Doing Research and/or Being Gay, Lesbian, Bisexual or Transgendered in Political Science," Annual Meeting of the Southern Political Science Association, 2002

Panel Chair and Discussant, Annual Meeting of the Southern Political Science Association, 2002

Panel Discussant, Annual Meeting of the Midwest Political Science Association, 2002

Panel Discussant, Annual Meeting of the Southern Political Science Association, 2001

Panel Discussant, Annual Meeting of the Midwest Political Science Association, 2001

Roundtable Participant, "The 2000 Elections in the South," Annual Meeting of the Southern Political Science Association, 2000

Roundtable Participant, "Constitutional Issues for the New Millennium," Annual Meeting of the Arkansas Political Science Association, 2000

Roundtable Participant, "The Year 2000 Elections in the South," Annual Meeting of the Southern Political Science Association, 1999

Panel Chair, Annual Meeting of the Southern Political Science Association, 1998

Panel Chair, Annual Meeting of the International Society of Political Psychology, 1997

Panel Discussant, Annual Meeting of the Midwest Political Science Association, 1997

Panel Discussant, Annual Meeting of the Arkansas Political Science Association, 1997

Panel Discussant, Annual Meeting of the Southern Political Science Association, 1996

Panel Discussant, Annual Meeting of the Arkansas Political Science Association, 1996

Panel Discussant, Annual Meeting of the Arkansas Political Science Association, 1995

## *OTHER PROFESSIONAL ACTIVITIES*

Regular Panel Participant, *Arkansas Week* (Arkansas Educational Television Network), 2002-2012, 2019-present.

Manuscript Reviewer: *American Political Science Review, American Journal of Political Science, American Politics Quarterly, American Politics Research, American Review of Politics, Arkansas Historical Quarterly, Ethnic and Racial Studies, Journal of Community Engagement and Higher Education, Journal of Homosexuality, Journal of Political Science Education, Journal of Politics, Midsouth Political Science Review, Political Behavior, Political Research Quarterly, Publius, Southeastern Political Review, State and Local Government Review, State Politics and Policy Quarterly, The Sociological Quarterly, Social Science Quarterly, Journal of Public Policy*

Member, Governing Council, Shepherd Higher Education Consortium on Poverty, 2015-2018
+Chair, 2016
+Vice-Chair, 2015

Judge, U.S. Professors of the Year program, Council for Advancement and Support of Education, 2013, `
      2014

Member, Advisory Board, Jim Guy Tucker Papers Project, University of Arkansas at Little Rock
      Center for Arkansas History and Culture

Guest curator, "*A Circus Hitched to a Tornado": Arkansas Politics in the 20th Century*, Arkansas Old
      State House Museum, open 2008-2009 (with Ernest Dumas).

Affiliate Graduate Faculty Status, The University of Arkansas at Little Rock, 2014-present.
      +Member, Master's Thesis Committee, Mary Murray, "Christ Church Parochial School, Christ
          Church Parish, and the Mission to African Americans in the Arkansas Diocese of the
          Episcopal Church"

Affiliate Graduate Faculty Status, Arkansas Tech University, 2016-present.
      +Member, EdD Committee, Ivy Pfeffer, "An Investigation of the Variables that Impact the
          Strength of Arkansas Public Schools' Educator Workforce"

Affiliate Graduate Faculty Status, University of Central Arkansas, 2016-present.
      +Member, PhD Committee, Sarah Argue

President, Arkansas Political Science Association, 2007-2008

Chair, Southern Political Science Association Committee on the Status of Lesbians, Gays, Bisexuals and
      the Transgendered (LGBT), 2008-2010

Member, Distinguished Scholar Award, Arkansas Political Science Association, 2015-2016, 2019-2020.

Member, Diane Blair Award Committee, Southern Political Science Association, 2014-2015

Member, Virginia Gray Book Award Committee, State Politics and Policy Section of the American
      Political Science Association, 2013-2014

Member, American Political Science Association Distinguished Teaching Award Committee, 2012-2013

Member, American Political Science Association Committee on the Status of Lesbians, Gays, Bisexuals
      and the Transgendered (LGBT) in the Profession, 2007-2010

Section Chair, Arkansas Politics/State Politics, Annual Meeting of the Arkansas Political Science
      Association, 2015

Section Chair, Arkansas Politics/State Politics, Annual Meeting of the Arkansas Political Science
      Association, 2013

Section Chair, Southern Politics, Annual Meeting of the Southern Political Science Association, 2009

Program Chair, Annual Meeting of the Arkansas Political Science Association, 2007

Member, Southern Political Science Association Executive Council, 2007-2010

External Reviewer, Department of History and Politics, Catawba College, 2008

External Reviewer, Center for Interdisciplinary Studies, Davidson College, 2007

External Reviewer, Department of Political Science, Rollins College, 2004, 2006

Participant, Outside Money in the 2002 Congressional Elections project
+ Part of a team, directed by the Center for the Study of Elections and Democracy at Brigham Young University and funded by the Pew Charitable Trust, examining non-candidate campaign spending in Arkansas in the 2002 election cycle.

Participant, Southern Grassroots Party Activists II Project, 2000
+ Part of a team that has received NSF funding for completion of Phase II of this study of party activists in the South.

Member, Advisory Board, State Key Vote Program, Project Vote Smart

Member, Advisory Board, *Arkansas Journal of Social Change and Public Service*

Moderator, Experiential Learning Section, American Political Science Association Conference on Teaching and Learning in Political Science, 2005

Member, Hubert H. Humphrey Award Committee, 2005-2006, American Political Science Association

Member, Sophonisba Breckinridge Award Committee, 2003, Midwest Political Science Association

Member, Malcolm Jewell Best Graduate Student Paper Award Committee, 2005, Southern Political Science Association

Member, Diane Blair Award Committee, 2001-2003, Southern Political Science Association

American Political Science Association Short Course Participation:
- State Politics Data Resources (2001)
- Teaching About Campaigns and Elections II (2001)
- Teaching Political Philosophy Through Film (2000)
- Teaching About Campaigns and Elections (2000)

Section Chair, Teaching Politics, Annual Meeting of the Southwestern Political Science Association, 2004

Section Chair, Arkansas Politics, Annual Meeting of the Arkansas Political Science Association, 2003 2004, and 2009

Member, *Status of Women in Arkansas Report* Advisory Committee

Member, Curricular Review Committee, Arkansas School for Mathematics and Sciences, 1999

Section Chair, Southern Politics, Annual Meeting of the Southern Political Science Association, 1998

Executive Board Member, Arkansas Political Science Association, 1996-1998

*SELECTED CAMPUS SERVICE (all at Hendrix College)*

Faculty Representative, Hendrix College Board of Trustees, 2012-2015
+ Served as the first elected representative on the Board of Trustees.  During my term, transitions occurred in both the Presidency and Chief Academic Officer positions.  While in this role, served on the Academic Affairs and Information Resources Committee of the Board.

Director of Civic Engagement Projects, 2006-2018
+ Oversaw programs tied to enhancing students' roles in political and social change work.  Led consortial work in national organizations such as Project Pericles.  Shepherded Hendrix's engagement in Peace Corps Prep and the Shepherd Higher Education Consortium on Poverty (SHECP). Coordinated election activities on campus biennially.  Informally, advised student engagement through voluntarism and internships with civic engagement organizations off-campus.

Director, Crossings Program, 2008-2015
+ This program, established by a $600,000 Mellon Foundation grant, piloted a program that tied interdisciplinary coursework to engaged learning experiences for students.  Was part of a team that authored the original grant proposal and saw the program through its implementation, operation, and assessment. The structure of the program was transferred into The Engaged Citizen first-year seminar course for all students.

Director, Odyssey Program, 2016-2019
+ Directed the College's hallmark engaged learning program. Participation in the program through the completion of three significant engaged learning experiences across different categories is required of all students.  Over $300,000 annually was awarded competitively to students, faculty, and staff for student projects.

*DEPARTMENT AND PROGRAMMATIC*

Project Pericles, Hendrix Program Director, 2005-2013, 2015-2019

Distinguished Scholarships Advisor, 2003-2006, 2011-2014

Chair, Department of Politics, 1999-2000; 2001-2004; 2010-2013

Gender Studies Program Oversight Committee, 1995-2019
Chair, 1997-2000

American Studies Program Oversight Committee, 2003-2015

Chair, Challenges of the Contemporary World Oversight Committee, 2007-2008

Pre-Law Advisor, 1997-2019

Campus Coordinator, Washington Semester Program, 1995-2009

*COMMITTEES/TASK FORCES*

The Engaged Citizen Leadership Group, 2012-2019
--Convener, 2012-2015
+ This team oversaw the implementation of a new first-semester seminar at Hendrix and continues to oversee its operation.

Chair, Strategic Planning Working Group on Owning Little Rock and Arkansas, 2014-2015

Co-Convener, Credentialing Task Force, 2013-2014
> +This group developed a proposal for a new program establishing skills-based and interdisciplinary credentials for Hendrix students.

Chair, Guiding Coalition Strategic Planning Subcommittee on Interdisciplinary, Curricular, and Certificate Initiatives, 2011-2013

Co-Chair, Provost Search Committee, 2012-2013 and 2013-2014

Committee on Engaged Learning, 2006-2019
> Committee Chair, 2008-2009

Elected member of Academic Policy Council, 1997-2000, 2003-2006, 2011-2012, 2018-2019

Honors Committee, 2003-2006, 2011-2014

Member, Galileo/Odyssey Task Force, 2003-2005 (Chair: Spring 2005)
> +The committee developed the proposal for Hendrix Odyssey, a new engaged learning program for the College, ultimately approved by the Faculty.

Co-Chair, Engaging With Democracy Task Force, 2004
> +The committee planned a six-week series of events centered on the celebration of democracy, including Rock the Vote, leading up to the dedication of the Hendrix Odyssey program.

Student Life Committee, 1994-1997, 2001-2003
> Committee Chair, 2002-2003
> Chair, Diversity Concerns Subcommittee, 1995-1997
> Chair, Residence Life Subcommittee, 1994-1995, 2001-2002

Campus Alcohol Policy Review Committee, 1995-1997

Politics and International Department Search Committee, 1996-1997, 1999, 2001, 2003, 2004-2005, 2005-2006, 2008-2009, 2010-2011, 2011, 2012, 2016-17, 2019

History Department Search Committee, 2006-2007

Sociology/Anthropology Department Search Committee, 2003, 2007

Chemistry Department Search Committee, 1995, 1997, 2007

Library Search Committee, 1995-1996, 2002

Council on New Student Advisors, 1994-1995, 1999-2000, 2001-2002, 2006-2007, 2009-2010

Library and Learning Resources Committee, 1994

*STUDENT ORGANIZATIONS*
> Secretary, Omega Psi chapter of Pi Sigma Alpha (Political Science Honor Society), 2001-2019

Faculty Advisor, Student Senate, 1994-1997

Faculty Advisor, Young Democrats, 1994-2019

Faculty Advisor, UNITY (Lesbian, Gay, Bisexual, and Straight Alliance), 1999-2019

Faculty Advisor, Pre-Law Society, 2002-2019

Faculty Advisor, Roosevelt Institute, 2011-2013

Faculty Advisor, The Franklin Literary Society, 2003-2005

Faculty Advisor, Alpha Chi Honor Society, 1995-1997

## *SELECTED COMMUNITY SERVICE*
### *GOVERNMENTAL*
Chief Education Officer, City of Little Rock, 2020-present

Member, Board of Commissioners, Central Arkansas Water, 2019-present

Member, Arkansas State Board of Education, 2012-2019
+Chair, 2017-2019
+Vice Chair, 2016-2017
+Committee Chair, Pulaski County District Boundaries Committee, 2015
+Liaison, ForwARd Arkansas, 2015-2018

Member, City of Little Rock Mayor-Elect Frank Scott Jr. Transition Board of Directors, 2018-2019

Member, Blue Ribbon Commission, MOVE Central Arkansas, Central Arkansas Transit, 2015-2016

Member, Arkansas Quality Digital Learning Study Committee, 2013

Member, Arkansas Non-Legislative Commission on the Study of Landlord-Tenant Laws, 2011-2012

Member, Arkansas Governor's Task Force on Best Practices for After-School and Summer Programs, 2008

### *NONPROFIT*
<u>Current</u>
Past Chair, Arkansas Single Parent Scholarship Fund

Member, Board of Directors, American Civil Liberties Union, Arkansas Affiliate

Member, Board of Directors, Arkansas Advocates for Children and Families
+President, 2016-2017

Vice-Chair, Board of Directors, Downtown Little Rock Community Development Corporation

Member, Arkansas Trans/Queer Collaborative Steering Committee

<u>Past Leadership Roles</u>
Co-Chair, Arkansas Repertory Theatre, Saints and Sinners Annual Gala, 2017

Member, American Civil Liberties Union National Board (Arkansas Affiliate Representative), 2004-2016

Chair, Board of Directors, National Association of State Boards of Education, 2017

Chair, Board of Directors, Just Communities of Arkansas, 2010-2011

Chair, Arkansas Out of School Network, 2010-2012

Chair, Board of Directors, Single Parent Scholarship Fund of Pulaski County, 2013

*POLITICAL*
Member, Democratic National Committee, 2020-present

Delegate, Democratic National Convention, 2012, 2020

Candidate for Arkansas State Senate, District 34, 2010

Democratic Party of Arkansas
+ Member, State Committee
+ Chair, Party Rules Committee, 2015-preent
+ Member, State Executive Committee, 2007-2011, 2013-2016
+ Chair, State Platform Committee, 2006, 2016, 2018
+ Member, Blue Ribbon Committee on Party Rules, 2008
+ Secretary, Special State Convention, 2008
+ Parliamentarian, State Convention, 2008

First Vice-Chair, Pulaski County (Ark.) Democratic Party Central Committee, 2007-2009

*OTHER*
Member, Class XXII, Leadership Greater Little Rock

Listee, "Arkansas 250," 2018, *Arkansas Business*'s "annual look at the people who are shaping the way we live, learn and do business in the state."