IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

THE ARKANSAS STATE
CONFERENCE NAACP, *et al.*                                    PLAINTIFFS

v.                          Case No. 4:21-cv-1239-LPR

THE ARKANSAS BOARD OF
APPORTIONMENT, *et al.*                                      DEFENDANTS

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................... 1

STATEMENT OF FACTS ........................................................................ 1

LEGAL STANDARD ............................................................................... 6

ARGUMENT ............................................................................................. 7

    I.      Plaintiffs Are Likely to Succeed on the Merits of their Section 2 Claim ............ 7

           A.     The Voting Rights Act prohibits vote dilution. ........................................ 8

           B.     Plaintiffs satisfy the three *Gingles* preconditions .................................... 11

                  1.     Plaintiffs meet the first *Gingles* precondition because Arkansas's Black population is sufficiently numerous and geographically compact ............................................................ 11

                  2.     The second *Gingles* precondition is satisfied because Black voters in Arkansas are a politically cohesive group .................... 17

                  3.     The third *Gingles* requirement is met because the white majority population is usually able to defeat Black-preferred candidates ..................................................................... 18

           C.     The totality of the circumstances shows that the Board's redistricting plan would illegally dilute Black votes ............................... 18

                    Senate Factor 1: History of Official Discrimination ............................. 19

                    Senate Factor 2: Racially Polarized Voting ............................................ 23

                    Senate Factor 3: Election Procedures that Dilute Minority Voting Power .......................................................................................... 24

                    Senate Factor 5: Discrimination in Related Areas ................................. 26

                    Senate Factor 6: Racial Appeals in Political Campaigns ....................... 29

                    Senate Factor 7: Minority Success in Prior Elections ............................ 32

                    Proportionality ........................................................................................ 33

    II.     Plaintiffs Will Suffer Irreparable Harm—Dilution of Their Votes—if a Preliminary Injunction Is Not Granted and an Election is Held Based on the Adopted Map ................................................................................. 34

    III.    The Balance of Equities and Public Interest Weigh Heavily in Favor of Granting Plaintiffs' Motion for Preliminary Injunction ............................... 37

    IV.    A Bond is Not Necessary in this Case ............................................................... 39

    V.    Expedited Review of This Motion is Warranted ................................................ 40

CONCLUSION ........................................................................................ 40

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Johnson*,
521 U.S. 74 (1997).............................................................................................12, 13

*Allen v. State Bd. of Elections*,
393 U.S. 544 (1969)...................................................................................................9

*Bartlett v. Strickland*
556 U.S. 1, 12 (2009)...............................................................................................11

*Bixby v. Lifespace Communities, Inc.*,
Civ. No. 18-817, 2018 WL 3218697 (D. Minn. July 2, 2018) ...............................39

*Bone Shirt v. Hazeltine*,
336 F. Supp. 2d 976 (D.S.D. 2004) ..................................................................19, 30

*Bone Shirt v. Hazeltine*,
461 F.3d 1011 (8th Cir. 2006) ........................................................................ *passim*

*Brown v. Ky. Leg. Res. Comm.*,
966 F. Supp. 2d 709 (E.D. Ky. 2013) .....................................................................36

*Buckanaga v. Sisseton Indep. Sch. Dist., No. 54-5, S. Dakota*,
804 F.2d 469 (8th Cir. 1986) ...............................................................................9, 19

*Burton v. City of Belle Glade*,
178 F.3d 1175 (11th Cir. 1999) ...........................................................................8, 9

*Collins v. City of Norfolk, Va.*,
816 F.2d 932 (4th Cir. 1987) ...................................................................................23

*Craig v. Simon*,
493 F. Supp. 3d 773 (D. Minn. 2020).....................................................................35

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
640 F.2d 109 (8th Cir. 1981) (en banc) ...............................................................6, 37

*Day v. Robinwood W. Cmty. Improvement Dist.*,
No. 4:08CV01888 ERW, 2009 WL 1161655 (E.D. Mo. Apr. 29, 2009) ...............35

*Flores v. Town of Islip*,
382 F. Supp. 3d 197 (E.D.N.Y. 2019) .....................................................................35

*Georgia State Conf. of the NAACP v. Fayette Cty. Bd. of Comm'rs*,
    118 F. Supp. 3d 1338 (N.D. Ga. 2015) ............................................................35, 37

*Georgia v. Ashcroft*,
    539 U.S. 461 (2003)..................................................................................................2

*Giron v. City of Alexander*,
    693 F. Supp. 2d 904 (E.D. Ark. 2010)......................................................................2

*Harvell v. Blytheville Sch. Dist. No. 5*,
    71 F.3d 1382 (8th Cir. 1995) (en banc) ............................................10, 23, 24, 32

*Jeffers v. Clinton*,
    730 F. Supp. 196 (E.D. Ark. 1989), *aff'd*, 498 U.S. 1019 (1991).................... *passim*

*Johnson v. De Grandy*,
    512 U.S. 997 (1994)..........................................................................................11, 17

*League of Women Voters of Mo. v. Ashcroft*,
    336 F. Supp. 3d 998 (W.D. Mo. 2018) ..................................................................38

*League of Women Voters of N.C. v. N. Carolina*,
    769 F.3d 224, 247 (4th Cir. 2014)), *aff'd*, 980 F.3d 614 (8th Cir. 2020) ...............35

*LULAC v. Perry*,
    548 U.S. 399 (2006)....................................................................................11, 12, 34

*Minn. Citizens Concerned for Life, Inc. v. Swanson*,
    692 F.3d 864 (8th Cir. 2012) (en banc) ...................................................................6

*Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*,
    201 F. Supp. 3d 1006 (E.D. Mo. 2016)............................................................24, 25

*Mo. State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist.*,
    894 F.3d 924 (8th Cir. 2018) ........................................................................ *passim*

*NAACP, Spring Valley Branch v. E. Ramapo Central Sch. Dist.*,
    464 F. Supp. 3d 587 (S.D.N.Y. 2020)....................................................................35

*Obama for Am. v. Husted*,
    697 F.3d 423 (6th Cir. 2012) .................................................................................34

*Perfetti Van Melle USA, Inc. v. Midwest Processing, LLC*,
    135 F. Supp. 3d 1015 (D.S.D. 2015) .....................................................................39

*Planned Parenthood of Minn. v. Roedler*,
    558 F. 2d 861 (8th Cir. 1977) ................................................................................35

*Planned Parenthood v. Rounds*,
530 F.3d 724 (8th Cir. 2008) (en banc) ............................................................7

*Reynolds v. Sims*,
377 U.S. 533 (1964)...............................................................................35, 37

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*,
826 F.3d 1030 (8th Cir. 2016) ..................................................................39

*Rogers Grp., Inc. v. City of Fayetteville, Ark.*,
629 F.3d 784 (8th Cir. 2010) .....................................................................36

*Sanchez v. Cegavske*,
214 F. Supp. 3d 961 (D. Nev. 2016)...........................................................35

*Simmons v. Galvin*,
575 F.3d 24 (1st Cir. 2009).........................................................................9

*Smith v. Clinton*,
687 F. Supp. 1310 (E.D. Ark.) *aff'd* 488 U.S. 988 (1988) ..................20, 26, 27, 29

*Stabler v. Cty. of Thurston, Neb.*,
129 F.3d 1015 (8th Cir. 1995) .............................................................33, 34

*Thornburg v. Gingles*,
478 U.S. 30 (1986)................................................................................ *passim*

*United States v. Alamosa Cnty.*,
306 F. Supp. 2d 1016 (D. Colo. 2004)........................................................30

*United States v. Berks Cnty., Pa.*,
250 F. Supp. 2d 525 (E.D. Pa. 2003) .........................................................35

*United States v. Blaine Cty., Montana*,
363 F.3d 897 (9th Cir. 2004) .....................................................................23

*United States v. Georgia*,
892 F. Supp. 2d 1367 (N.D. Ga. 2018) .......................................................37

*Wesberry v. Sanders*
556 U.S. 1, 12 (2009)...............................................................................34

*Whitfield v. Democratic Party of Ark.*,
890 F.2d 1423 (8th Cir. 1989) ...................................................................24

**Statutes**

28 U.S.C. § 1657(a) ........................................................................................40

Ark. Code Ann. § 7-7-203 ...............................................................................6, 36

The Electoral Reform Act of 1891.....................................................................21, 22

52 U.S.C. § 10301 ......................................................................................... *passim*

## Other Authorities

2019 ACS 1-Year Estimates,
    https://data.census.gov/cedsci/table?q=S2901%3A%20CITIZEN,%20VOTIN
    G-
    AGE%20POPULATION%20BY%20SELECTED%20CHARACTERISTICS
    &g=0400000US05 .........................................................................................3

2020 Census Redistricting Data,
    https://data.census.gov/cedsci/table?g=0400000US05&y=2020&tid=DECEN
    NIALPL2020.P1; ..........................................................................................2

2020 Census Redistricting Data,
    https://data.census.gov/cedsci/table?g=0400000US05&y=2020&tid=DECEN
    NIALPL2020.P2 ...........................................................................................2

2020 Census Redistricting Data,
    https://data.census.gov/cedsci/table?g=0400000US05&y=2020&tid=DECEN
    NIALPL2020.P3; ..........................................................................................2

2020 Census Redistricting Data,
    https://data.census.gov/cedsci/table?g=0400000US05&y=2020&tid=DECEN
    NIALPL2020.P4 ...........................................................................................2

Ark. Const. art. 8, cl. 1 ......................................................................................1

Ark. Const. art. 8, cls. 2-3 .................................................................................1

Ark. Const. art. 8, cl. 4 ................................................................................1, 4, 6

Fed. R. Civ. P. 65............................................................................................39

Federal Rule of Evidence 201 ...............................................................................2

S. Rep. No. 97-417, *reprinted in* 1982 U.S.C.C.A.N. 177 ....................................10, 11

U.S. Const. art. I, § 2, cl. 3.................................................................................1

## INTRODUCTION

This is an action under Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301, challenging the newly adopted reapportionment plan for the Arkansas House of Representatives. The plaintiffs are the Arkansas NAACP and the Arkansas Public Policy Panel ("Plaintiffs"). The defendants are the Arkansas Board of Apportionment, which drew the plan, state officials who are members of the Board, and the State of Arkansas itself ("Defendants").

The challenged plan contains just eleven majority-Black House districts even though more than sixteen percent of the state's population is Black and it would be possible to draw sixteen (out of 100) geographically compact, majority-Black House districts. As a result, the challenged plan impermissibly dilutes Black voting strength in violation of Section 2. Accordingly, plaintiffs seek preliminary injunctive relief prohibiting the State from implementing the dilutive plan for the 2022 election cycle and from failing to implement a plan that complies with Section 2.

## STATEMENT OF FACTS

The United States Constitution requires the federal government to undertake an "actual Enumeration" of the population of the United States every ten years. U.S. Const. art. I, § 2, cl. 3. Under the Arkansas Constitution, the results of this Enumeration must be used to determine the legislative boundaries for both houses of the Arkansas General Assembly. *See* Ark. Const. art. 8, cls. 2-3 (as amended). The Arkansas Constitution creates a Board of Apportionment (the "Board") for this purpose, which consists of the Governor, Secretary of State, and Attorney General of Arkansas. Ark. Const. art. 8, cl. 1, 4 (as amended).

The most recent United States Census took place in 2020, and the United States Census Bureau released new population counts in April 2021. The total population of Arkansas reached

just over 3 million people in 2020, an increase of about 3.3% over the past decade.[1]  This increase was not uniform; the northwest and northeast sections of Arkansas and the areas around Pulaski County saw significant increases in population, while the population declined in some other areas. Notably, the Black population in the central and northern portions of the state saw significant increases in the last decade.

More specifically, according to the 2020 Census, the State of Arkansas has a total population of 3,011,524 persons, of whom 2,063,550 (68.5%) are non-Hispanic White and 495,968 (16.5%) are Black (alone or in combination with another racial group).[2]  Arkansas has a voting-age population of 2,312,273 persons, of whom 1,653,772 (71.5%) are non-Hispanic White and 351,878 (15.2%) are Black (alone or in combination with another racial group).[3]  According to the 2019 American Community Survey, which is the most recent data available, Arkansas has a citizen voting-age population of 2,235,415 persons, of whom 1,727,484 (77.3%) are non-Hispanic White

---

[1]  U.S. Census Bureau, *Arkansas Population Topped 3 Million in 2020*, August 25, 2021, https://www.census.gov/library/stories/state-by-state/arkansas-population-change-between-census-decade.html  (last accessed December 29, 2021). Courts routinely take judicial notice of Census data under Federal Rule of Evidence 201.  *See Giron v. City of Alexander*, 693 F. Supp. 2d 904, 931 (E.D. Ark. 2010) (judicially noticing Census data under Rule 201 as such data is "not subject to reasonable dispute" because it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").

[2]  U.S. Census Bureau, *P1:Race (Arkansas),* 2020 Census Redistricting Data, https://data.census.gov/cedsci/table?g=0400000US05&y=2020&tid=DECENNIALPL2020.P1; U.S. Census Bureau, *P2: Hispanic or Latino, and Not Hispanic Or Latino By Race (Arkansas),* 2020 Census Redistricting Data, https://data.census.gov/cedsci/table?g=0400000US05&y=2020&tid=DECENNIALPL2020.P2. The Supreme Court has indicated that "any part" racial data is appropriate when a voting-rights claim involves a single racial group. *See Georgia v. Ashcroft*, 539 U.S. 461, 473, n.1 (2003).

[3]  U.S. Census Bureau, *P3: Race for the Population 18 Years and Over (Arkansas)*, 2020 Census Redistricting Data, https://data.census.gov/cedsci/table?g=0400000US05&y=2020&tid=DECENNIALPL2020.P3; U.S. Census Bureau, *P4: Hispanic or Latino, And Not Hispanic Or Latino By Race for the Population 18 Years and Over (Arkansas)*, 2020 Census Redistricting Data, https://data.census.gov/cedsci/table?g=0400000US05&y=2020&tid=DECENNIALPL2020.P4.

and 345,456 (15.5%) are Black alone.[4]  In total, Arkansas's Black population has grown by 27,258 people since the previous census, representing a 0.4% increase relative to the total racial makeup of Arkansas.[5]  Arkansas's white population fell by 130,717 people since the previous census, representing a 5.8% decrease since 2010.[6]

The Board received these population numbers from the federal census and held an initial meeting on May 24, 2021.[7]  Beginning in July 2021, the Board held a series of public hearings across the state regarding the redistricting process.  At these meetings, the Board described a series of principles it claimed were underlying its process of drawing new district maps: balancing of district size, prohibition against discrimination based on race, color, or language minority under the Voting Rights Act, the Equal Protection Clause of the Fourteenth Amendment, compactness, continuity, minimizing the splitting of political subdivisions, maintaining communities of interest, continuity of representation, and minimizing partisanship.[8]

In addition, the Board repeatedly expressed a commitment to fairness and transparency throughout the redistricting process.  *See, e.g.*, Ex. 3, Transcript of BOA Public Hearing at 2 (Monticello, July 29, 2021) (Justice Dickey: The redistricting staff are "committed to transparency and fairness[.]"); Ex. 4, Transcript of BOA Public Hearing at 25 (Bentonville, Aug. 5, 2021)

---

[4] U.S. Census Bureau, *S2901: Citizen, Voting-Age Population by Selected Characteristics* (Arkansas), 2019 ACS 1-Year Estimates, https://data.census.gov/cedsci/table?q=S2901%3A%20CITIZEN,%20VOTING-AGE%20POPULATION%20BY%20SELECTED%20CHARACTERISTICS&g=0400000US05.

[5] U.S. Census Bureau, *Race and Ethnicity in the United States: 2010 Census and 2020 Census*, https://www.census.gov/library/visualizations/interactive/race-and-ethnicity-in-the-united-state-2010-and-2020-census.html

[6] *Id.*

[7] *Events Calendar*, Arkansas Board, https://arkansasredistricting.org/events-calendar/ (last accessed December 29, 2021).

[8] *See Redistricting Criteria and Goals*, Arkansas Board of Apportionment, https://arkansasredistricting.org/about-tArk.he-process/redistricting-criteria-and-goals/ (last accessed December 29, 2021).

(Justice Dickey: "[T]hat's our goal. Fairness [and] transparency."); Ex. 5, Transcript of BOA Public Hearing at 21 (Little Rock, Aug. 24, 2021) (Douglas House: The Board is "there to ensure that it's done, as Justice Dickey said, openly, fairly, comply with all federal and state laws, and is completely transparent."); Ex. 6, Transcript of BOA Meeting at 6, 24 (Little Rock, Oct. 29, 2021) (Attorney General Rutledge: "[U]ltimately, that's who we need to hear from, are the people that are impacted, and to make sure that we are doing our job and holding us accountable.") (Governor Hutchinson: There "might always be something we miss and that's the reason we want to be transparent.").   The Board's public hearings included statements from the public expressing concern that redrawn legislative maps may dilute Black voting across the state.  *See, e.g.*, Ex. 5, Transcript of August 24, 2021 Board Hearing in Little Rock, at 48:10-49:3.

The Board adopted its final plan for the state House ("Board Plan") on November 29, 2021. Ex. 1.  It filed the plan with the Secretary of State on the same day, and the plan became effective under Arkansas law thirty days later, on December 29, 2021.  *See* Ark. Const. art. 8, cl. 4

The Board Plan violates Section 2 because it substantially impairs the ability of Black Arkansans to elect candidates of choice.  The plan contains only 11 districts (out of 100 districts in the Arkansas House) in which Black voters have a meaningful opportunity to elect candidates of their choice.  Those are House Districts 35, 62, 63, 64, 65, 66, 72, 76, 77, 79, and 80.  But, as the enclosed illustrative map demonstrates (Ex. 2) (the "Illustrative Plan"), it is possible to draw sixteen reasonably compact majority-Black districts—a number that is perfectly in line with Black Arkansans' share of the state's 2020 population.  The Illustrative Plan shows that, compared to the Board Plan, additional majority-Black districts can be drawn in the following areas:

        a.   *Central Arkansas*: The Board Plan includes six majority-Black districts in the Central Arkansas region (House Districts 66, 72, 76, 77, 79, and 80).  One

additional majority-Black district can be drawn in the Central Arkansas region by "unpacking" the Black population in House Districts 76, 77, 79, and 80, and by "uncracking" the Black populations in House Districts 74 and 75. The Illustrative Plan includes seven reasonably compact majority-black districts in the Central Arkansas region (House Districts 29, 30, 33, 34, 36, 37, and 42).

b. *Upper Delta*: The Board Plan includes two majority-Black districts in the Upper Delta region (House Districts 35 and 63). One additional majority-Black district can be drawn in the Upper Delta by "uncracking" the Black population split between House Districts 34 and 37. The Illustrative Plan includes three reasonably compact majority-Black districts in the Upper Delta region (House Districts 50, 51, and 55) by restoring one of the three majority-Black districts in the Current Plan that the Board Plan impermissibly cracks.

c. *Lower Delta*: The Board Plan includes three majority-Black districts in the Lower Delta region (House Districts 62, 64, and 65). Two additional majority-Black districts can be drawn in the Lower Delta by "uncracking" the Black population split in the Board Plan between House Districts 94 and 95, by "unpacking" the Black population in House Districts 64 and 65, by reconfiguring House District 62, and by "uncracking" the Black population spread across House Districts 61, 90, 93, and 96. The Illustrative Plan includes five reasonably compact majority-Black districts in the Lower Delta region (House Districts 11, 12, 16, 17, and 48).

d. *Southwest Arkansas*: The Board Plan includes no majority-Black districts in the Southwest Arkansas region, even though it is clearly possible to maintain the majority-Black district that exists in the region under the Current Plan. That

additional majority-Black district can be drawn in the Southwest Arkansas region by "uncracking" the Black population split in the Board Plan among House Districts 97, 98, and 99.  The Illustrative Plan contains one reasonably compact majority-Black district in the Southwest Arkansas region (House District 5).

In the absence of preliminary injunctive relief, the Board Plan will be in place for the 2022 election cycle in which elections will be held for all one hundred seats in the Arkansas House of Representatives.  By statute, the general primary election must be held on "the third Tuesday in June preceding the general election," which would be June 21, 2022.  Ark. Code Ann. § 7-7-203.  The candidate filing period for the primary election runs from February 22, 2022, to March 1, 2022.  *See id.* (party filing period begins "one (1) week prior to the first day in March" and ends "on the first day in March").  Plaintiffs filed the instant suit on December 29, 2021—the first day that the maps became effective, *see* Ark. Const. art. 8, cl. 4—to enjoin use of the dilutive Board Plan for the upcoming election cycle.

## LEGAL STANDARD

When ruling on a motion for a preliminary injunction, a court must consider: (1) the likelihood of success on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance between the harm to the movant and any injury that an injunction might inflict on other parties; and (4) the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).  In election cases such as this one, the likelihood of success is the most important factor, and "the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied."  *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d

864, 870 (8th Cir. 2012) (en banc) (quoting *Phelps-Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011) (per curiam)).[9]

## ARGUMENT

### I.       Plaintiffs Are Likely to Succeed on the Merits of their Section 2 Claim

This is not a close case.  The Plaintiffs are likely to prevail on their Section 2 claim because the Board Plan substantially underrepresents Black voters in Arkansas and thereby dilutes Black voting strength.  *See, e.g.*, *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1022 (8th Cir. 2006) (finding that South Dakota's legislative redistricting plan violated Section 2 because it diluted Native Americans' right to vote); *Mo. State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924 (8th Cir. 2018) ("*Missouri NAACP*") (holding that a Missouri school district's use of at-large, top-three-vote-getters election system that favored white candidates diluted Black citizens' voting strength in violation of Section 2).  Black Arkansans constitute more than sixteen percent of Arkansas's 2020 population, and it was possible for the Board to have drawn 16 (out of 100) House districts in which Black voters would have a meaningful opportunity to elect candidates of their choice.  But the Board Plan includes only eleven majority-Black districts—a deficit of *five* additional majority-Black House districts that could provide Black voters an opportunity to elect candidates of their choice.  Indeed, Plaintiffs' counsel made specific suggestions to include many of these additional districts during the public comment period — but the Board chose not to do so.

---

[9] Although it is true that, when a movant is challenging "a duly enacted statute," a court must "make a threshold finding that [the plaintiff] is likely to prevail on the merits," the Eighth Circuit has not directly addressed the question of what standard should apply when, as here, the plaintiffs challenge governmental action that is not embodied in a statute.  *See Planned Parenthood v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc).  Indeed, the Eighth Circuit has suggested that the level of success required depends on the extent to which the challenged action represents "the full play of the democratic process."  *Id.* at 732 n. 6 (quoting *Able v. United States*, 44 F.3d 128, 131-32 (2d Cir. 1995)).

For that reason alone, Plaintiffs are likely to succeed on this straightforward vote-dilution claim.

### A.     The Voting Rights Act prohibits vote dilution.

Section 2 of the VRA mandates that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . ."  52 U.S.C. § 10301(a).  A violation [of Section 2] . . . is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  *Id.* § 10301(b).

In 1982, "Congress substantially revised § 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the 'results test' . . . ."  *Thornburg v. Gingles*, 478 U.S. 30, 35-36 (1986).  "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."  *Id.* at 47.

Section 2 prohibits both vote denial and vote dilution.  *Bone Shirt*, 461 F.3d at 1017-18 (8th Cir. 2006) (explaining that vote dilution amounts to denial of the right to vote); *see also Burton v. City of Belle Glade*, 178 F.3d 1175, 1197-99 (11th Cir. 1999) ("two distinct types of discriminatory practices and procedures are covered under Section 2: those that result in 'vote denial' and those that result in 'vote dilution'"; though finding no Section 2 violation because remedy sought, court-ordered annexation of housing project into city limits, was inappropriate on

facts presented).  "The right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot."  *Allen v. State Bd. of Elections*, 393 U.S. 544, 569 (1969).

"In voting parlance" . . .  "vote dilution challenges involve 'practices that diminish minorities' political influence,' such as at-large elections and redistricting plans that either weaken or keep minorities' voting strength weak."  *Simmons v. Galvin*, 575 F.3d 24, 29 (1st Cir. 2009) (denying Section 2 claim because VRA did not limit states' ability to disenfranchise imprisoned felons) (internal quotation marks omitted); *Buckanaga v. Sisseton Indep. Sch. Dist., No. 54-5, S. Dakota*, 804 F.2d 469, 471 (8th Cir. 1986) (stating legislative history of 1982 amendments show Congress was primarily concerned about election systems that dilute minority voting strength). To prove a vote-dilution claim requires establishing that the challenged practice or procedure disproportionately impairs minority voters' ability to participate in the political process and to elect candidates of their choice and that there is an alternative election scheme that safeguards the equal electoral opportunities of all racial groups.  *Gingles*, 478 U.S. at 50-51; *Burton*, 178 F.3d at 1198-99 & n.24.  The focus of a vote-dilution claim is that a particular election practice "minimize[s] or cancel[s] out the voting strength of racial minorities in the voting population."  *Gingles*, 475 U.S. at 47-48 (internal alterations, citations, and quotation marks omitted).

In *Gingles*, the Supreme Court identified three preconditions for a vote-dilution claim under Section 2 (the "*Gingles* preconditions").  "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district."  *Gingles*, 478 U.S. at 50.  "Second, the minority group must be able to show that it is politically cohesive."  *Id.* at 51.  "Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the

minority's preferred candidate." *Id.* (internal citations omitted).  Satisfaction of the *Gingles* preconditions "carries a plaintiff a long way towards showing a Section 2 violation." *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1390 (8th Cir. 1995) (en banc).

If plaintiffs establish the three *Gingles* preconditions, a court must next determine, under the "the totality of the circumstances," whether minority voters have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," *Gingles*, 478 U.S. at 42 (quoting 52 U.S.C. § 10301(b)).  This inquiry requires "a searching practical evaluation of the past and present reality, and on a functional view of the political process." *Id.* at 45 (internal quotation marks omitted).  In enacting Section 2's results standard, Congress explained that "a variety of factors, depending upon the kind of rule, practice, or procedure called into question" can be relevant when determining whether a plan "results" in discrimination based on the totality of circumstances.  S. Rep. No. 97-417, at 28-29, *reprinted in* 1982 U.S.C.C.A.N. 177, 206-07 (the "Senate Report").

"The Supreme Court has . . .  instructed that, in applying this standard, we are to consider a list of factors that were included in the Senate Report . . . ." *Missouri NAACP*, 894 F.3d at 931. The Senate Report identifies seven factors that are typically relevant to a discriminatory-results claim.  These so-called "Senate Factors" are:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Senate Report at 28-29. In addition, the Senate Report identified two other factors that have had a "probative value" and that are often considered alongside the other factors, namely: (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and (9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *Id.* at 29.

"The cases demonstrate, and the committee intends that there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 29; *Gingles*, 478 U.S. at 45 (noting the list is "neither comprehensive nor exclusive").

**B.  Plaintiffs satisfy the three *Gingles* preconditions**

**1.  Plaintiffs meet the first *Gingles* precondition because Arkansas's Black population is sufficiently numerous and geographically compact**

When, as is the case here, a plaintiff challenges the failure to draw a sufficient number of majority-minority districts, *Gingles* first requires the plaintiff to show "the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994); *accord LULAC v. Perry*, 548 U.S. 399, 430 (2006). In *Bartlett v. Strickland*, the Supreme Court

explained that the minority group must establish that it would constitute more than 50 percent of the population in one or more additional districts. 556 U.S. 1, 12 (2009). But there is no need for a plaintiff to prove that a potential district would guarantee that it would always allow the minority group at issue to elect its preferred candidate. *LULAC*, 548 U.S. at 428-29; *see also Gingles*, 478 U.S. at 51 n.17 (explaining that a majority in a single-member district is sufficient to establish "the *potential* to elect representatives of choice"); *Bone Shirt*, 461 F.3d at 1019 (rejecting the argument that "the plaintiffs must prove that the minority group will enjoy sufficient super-majority status in the proposed remedial district").

To satisfy the first *Gingles* precondition here, expert cartographer Anthony Fairfax drew an alternative redistricting plan for the Arkansas House. The Illustrative Plan contains 16 districts where the Black Voting Age Population ("BVAP") is greater than 50%. Ex. 7, Fairfax Report at ¶ 27. All sixteen of those districts also have a Black Citizen Voting Age Population ("BCVAP") greater than 50%. *Id.* And as shown in the expert report of Dr. Lisa Handley, Black citizens in all 16 of these districts are expected to have a meaningful opportunity to elect the candidate of their choice. Ex. 8, Expert Report of Dr. Lisa Handley ("Handley Report") at 4-5. By contrast, the Board's adopted map contains only 11 districts where the BVAP is greater than 50%.[10] Ex. 7, Fairfax Report at ¶ 25; Ex. 8, Handley Report at 3-4. These analyses show that the Board had the ability to draw additional majority-Black districts in compliance with Section 2 of the VRA, but failed to do so.

The first *Gingles* precondition also requires that the proposed districts be "sufficiently compact." *Abrams v. Johnson*, 521 U.S. 74, 91 (1997). That "compactness inquiry should take into account traditional districting principles such as maintaining communities of interest and

---

[10] Only nine of those 11 districts in the Board Plan have a BCVAP greater than 50%. Ex. 7, Fairfax Report at ¶ 25.

traditional boundaries." *Id.* at 92 (internal quotation marks removed) (citing *Bush v. Vera*, 517 U.S. 952, 977 (1996)) (finding no Section 2 vote dilution because Black population was not sufficiently compact to create an additional majority-Black district).  The Illustrative Plan meets this standard.  The Illustrative Plan is statistically indistinguishable from the Board Plan in terms of compactness, and splits only 98 voting districts ("VTDs"), far fewer than the Board Plan, which splits 282.  *See* Ex. 7, Fairfax Report at ¶ 32.

Further, the Illustrative Plan better preserves communities of interest in the districts at issue in this litigation.  For example, in the Upper Delta region, the Board Plan divides the City of West Memphis into Districts 35 and 63, as shown below.



The Board Plan would have the effect of "wiping out the separate communities of interest in West Memphis and Forrest City," according to one comment from the public.  *See* Ex. 10.  In that same region, the Board Plan's District 37 bisects the small city of Marked Tree along the railroad tracks at the center of town, as shown below.



As one member of the public commented on the Board's proposed map, which similarly divided the city, "You had to split Marked Tree? Really?"  Ex. 10.  The Illustrative Plan maintains both the West Memphis and Marked Tree communities of interest in Districts 51 and 52, respectively, as shown in the below images.



Farther south in the Delta region, the Board's adopted House map splits Desha County, one of the

least populated counties in Arkansas, among three House Districts: 62, 64, and 94, as shown below.



Several public comments on the Board's proposed map, which split Desha County into an additional fourth district, noted how this small, rural county should be kept together as a community of interest. *See* Ex. 10 at 3-5. In the Illustrative Plan, Desha County is kept whole in District 11, as shown below.



The Fairfax Report shows that it is possible to draw "more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its

16

choice." *De Grandy*, 512 U.S. at 1008; Ex. 7, Fairfax Report at ¶ 41.  As a result, plaintiffs satisfy

the first *Gingles* factor.  The fulfillment of this first precondition supports a finding that Plaintiffs

are likely to succeed on the merits.

> **2.     The second *Gingles* precondition is satisfied because Black voters in Arkansas are a politically cohesive group**

The second *Gingles* factor requires a plaintiff to show that the minority group is "politically

cohesive."   *Gingles*, 478 U.S. at 50.  One such way to demonstrate this is by "showing that a

significant number of minority group members usually vote for the same candidates," which is

most often accomplished by examining statistical analysis of actual election results which estimate

the voting patterns of minority and non-minority voters.  *Id.* at 56.

The evidence here meets this standard.  Plaintiffs' expert, Dr. Lisa Handley, analyzed

voting patterns by race in the State of Arkansas to determine whether voting in Arkansas is racially

polarized. Ex. 8, Handley Report at 6.  It is.  Dr. Handley examined nine statewide general elections

between 2016 and 2020 and found that Black voters overwhelmingly supported their preferred

candidates in all nine.  *Id.* at 44.  The Black-preferred candidates were usually Democrats, but

Black voters preferred the Libertarian candidate in two of the nine elections.  *Id.*  In the only recent

statewide election that included an African-American major-party candidate — the 2018 race for

Lieutenant Governor — Black voters supported their preferred candidate with around 90 percent

of their votes.  *Id.*  Dr. Handley also analyzed 17 state house contests in districts that overlap with

the five new Black opportunity districts contained in Fairfax's Illustrative Plan.  *Id.* at 9-10.  In

those contests, Black voters also supported their preferred candidates with overwhelming margins.

*Id.* at 11-12.

This statistical evidence more than adequately demonstrates that African Americans in

Arkansas are a politically cohesive minority group for the purposes of a Section 2 challenge.

      **3.**     **The third *Gingles* requirement is met because the white majority population is usually able to defeat Black-preferred candidates**

      The third *Gingles* precondition requires plaintiffs "to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51.  Meeting this element involves a three-step process: "(1) identifying the minority-preferred candidates; (2) determining whether the white majority vote as a bloc to defeat the minority preferred candidate; and (3) determining whether there were special circumstances such as the minority candidate running unopposed present when minority-preferred candidates won." *Bone Shirt*, 461 F.3d at 1020 (citation and internal quotation marks omitted).

      Here, Dr. Handley's statistical analysis of voting patterns also establishes the third *Gingles* precondition.  She found that white voters successfully voted to defeat the Black-preferred candidate in all nine of the statewide elections she analyzed.  *Id.* at 11.  In the 2018 race for Lieutenant Governor, the Black-preferred candidate received less than 20 percent of white votes. *Id.*  Dr. Handley also found that — with just a single exception — white voters were able to defeat the Black-preferred candidates in polarized state House contests unless the district was majority-Black.  *Id.* at 11-12.  The one exception was the 2018 election in House District 11, when white voters split their votes between an African-American Republican and a white Independent, allowing a Black Democrat to win with a plurality of the vote.  *Id.*

      Taken together, these results show that white majorities are usually able to defeat the Black-preferred candidates in the absence of special circumstances.

      **C.**     **The totality of the circumstances shows that the Board's redistricting plan would illegally dilute Black votes**

      The evidence also demonstrates that the "totality of the circumstances" show that the Board's map is likely to amount to vote dilution that is prohibited by Section 2 of the VRA. *Missouri NAACP*, 894 F.3d at 930.  The Senate factors provide a guide for this analysis.  *See*

*Gingles*, 478 U.S. at 45.   "[T]here is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."   *Id.* (internal quotation marks omitted).  Plaintiffs' expert Dr. Jay Barth specializes in the history of politics and race in Arkansas and has conducted a thorough analysis of the Senate Factors at issue.  *See* Ex. 9, Expert Report of Dr. Jay Barth ("Barth Report").  As Dr. Barth concludes, "Arkansas clearly satisfies Senate Factors One, Three, Five, Six, and Seven when it comes to the status of Black residents in the state."  *Id.* at ¶ 123.

<u>Senate Factor 1: History of Official Discrimination</u>

The first Senate Factor is the extent of any history of discrimination "that touched the right of members of the minority group to register, to vote, or otherwise participate in the democratic process."  Senate Report at 28; *accord Gingles*, 478 U.S. at 37.  The Eighth Circuit has recognized that "a history of discrimination against a minority is important evidence of both discriminatory intent and discriminatory results."  *Buckanaga*, 804 F.2d at 474; *Missouri NAACP*, 894 F.3d at 940 (endorsing district court's "extensively recounted the history of official discrimination" in the relevant regions, "even where some [findings] are based on statewide data or expert testimony applying general data to the district.").

Courts have considered a broad range of discriminatory practices to be probative of the first senate factor.  *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1018-34 (D.S.D. 2004) (reviewing history of excluding Native Americans from voting, holding office, and serving as poll workers, and barriers to Native American voter registration, access to polling places, lack of bilingual voter services and education, prior failure of state lawmakers to seek preclearance for voting laws, prior discriminatory redistricting, and general history of official discrimination against Native Americans in South Dakota); *Gingles*, 478 U.S. at 38-39 (upholding district court's finding of official discrimination across seven decades based on a poll tax, literacy test, several complex

voting prohibitions aimed at requiring minorities to vote for white candidates, and overall low Black voter registration even after official barriers were removed).

As a preliminary matter, Defendants cannot realistically dispute that Arkansas has a long and extensive history of official discrimination in voting that has sharply limited the voting power of Black Arkansans.  *See Jeffers v. Clinton*, 730 F. Supp. 196, 210 (E.D. Ark. 1989), *aff'd*, 498 U.S. 1019 (1991) (describing Arkansas's "long history of official discrimination.  It has a present effect.  And some instances of it are still occurring.").  Indeed, that history of discrimination is so well-settled that courts in this District have recognized that the first Senate Factor need not "be proved anew in each case under the Voting Rights Act."  *Smith v. Clinton*, 687 F. Supp. 1310, 1317 (E.D. Ark.) (three-judge district court) ("The Court takes judicial notice that there is a history of racial discrimination in the electoral process in Arkansas. . . .  We do not believe that this history of discrimination, which affects the exercise of the right to vote in all elections under state law, must be proved anew in each case under the Voting Rights Act") *aff'd* 488 U.S. 988 (1988) (mem.).

Dr. Barth's report further confirms that Arkansas has had a long history of official discrimination grounded in race that continues to affect voting today.  Even before it was admitted as a state, slavery and white supremacy defined Arkansas's political identity.  Indeed, leaders of the future state pushed for its hasty (and arguably premature) admission to the Union to cement its status as a slave state before the practice was outlawed.  *See* Ex. 9, Barth Report, at ¶¶ 7-8.  A hugely disproportionate percentage of Arkansas's elected officials were white men who owned at least twenty slaves.  *Id*. at ¶ 9.  These slave owners were determined to maintain slavery in Arkansas and voted overwhelmingly to secede shortly before the Civil War.  *Id*.

Some progress was made in the state during Reconstruction, particularly in the late 1860s to early 1870s, when Black Arkansans received some measure of civil rights, the Ku Klux Klan's

influence was thwarted by government forces, and educational and economic advances were made. *Id*. at ¶ 10.  This progress was short lived.  After Reconstruction ended in 1874, the same white elites, the so-called "Redeemers," returned to power championing "the Lost Cause of the Confederacy" in political campaigns.  *Id*. at ¶ 11.  Ultimately, alarmed by the electoral threat posed by a biracial coalition of Republican populists, in the early 1890s these white Democrats passed a series of anti-democratic reforms aimed at entrenching their own power at the expense of Black Arkansans.  The Electoral Reform Act of 1891 essentially turned over Arkansas's election machinery to the Democratic Party, providing only the possibility of token representation to Republicans on county election commissions.  *Id.* at ¶¶ 12-13.  That same bill significantly disenfranchised illiterate citizens, a majority of whom were Black.  *Id*.  A year later, the legislature passed a poll tax.  *Id.* at ¶ 14.  Heavy gerrymandering similarly preserved the political power of white Democrats at the expense of Black Arkansans, who constituted at least a third of the Republican vote at the time.  *Id*.  These measures had the effect, and likely the intent, of excluding Blacks from the political process in Arkansas, with voting rates dropping from 71% to 38% in just two years. This period also marked the total disappearance of Black legislators, from at least 87 Black members serving between 1868 and 1893 to zero Black members in 1895.  *Id*. at ¶¶ 14-15.

Arkansas's embrace of Jim Crow segregation resulted in consistently inferior public services for Black Arkansans, such as inequitable schools.  White segregationists fiercely resisted integration as long as possible, most famously with the crisis at Little Rock Central High, in which Governor Faubus ordered the National Guard to seize the school to prevent the Little Rock Nine from entering and white rioters threatened physical violence.  *Id.* at ¶ 28.  Desegregation litigation persisted in Little Rock and other school districts for decades because of education officials' inability or unwillingness to remedy the effects of segregation.  *Id*. at ¶ 30.  These measures further

allowed white supremacy to flourish in Arkansas's electoral politics, with members of the KKK capturing effective control over the state legislature, as well as Arkansas's largest county, Pulaski, in the 1920s. *Id.* at ¶ 25. The Arkansas Klan had tens of thousands of members across 150 chapters, and the group wielded its power across all aspects of Arkansas life during this time. *Id.* The KKK-dominated legislature took many actions to promote the Klan's goals, including altering the public school curriculum; changing firearms laws; and adding the fourth star on the state's flag representing Arkansas's identity as a former Confederate state, which remains to this day. *Id.* at ¶ 26. Clearly discriminatory election laws persisted through the 1960s, with plantation owners even using poll-tax receipts to cast proxy votes on behalf of sharecroppers on their land, effectively stealing Black votes. *Id.* at ¶ 31. The poll tax was not eliminated until 1964.

Arkansas also has a well-documented history of official support for racial violence. Examples abound of white mobs and militias committing extreme acts of race-based violence against Black Arkansans and their communities. *See id.* at ¶¶ 17, 22-24 (discussing the 1919 Elaine Race Massacre, likely the deadliest event of racial violence in U.S. history, and the 1927 lynching of John Carter in Little Rock). Threats of further violence continued into the 1970s in "sundown towns" around northwest and western Arkansas, where Black Arkansans were forced out of their homes and cities in dramatic examples of racial cleansing of entire communities. *Id.* at ¶ 21. While many of these acts were carried out by private citizens, state officials either outright supported the violence and intimidation or did little to intervene. *See id.* This history of official discrimination in Arkansas still casts a shadow over Black participation in state politics. Arkansas has one of the lowest voting rates in the nation and, after a century of racist voting prohibitions, less than 50% of eligible Black Arkansans have voted in recent elections. *Id.* at ¶ 33.

<u>Senate Factor 2: Racially Polarized Voting</u>

The second Senate Factor is the extent to which voting is racially polarized.  Senate Report at 29.  This factor is one of the most important considerations in the totality of the circumstances analysis.  *Gingles*, 478 U.S. at 48-49.  Indeed, racial polarization in voting is one of two "primary factors considered in our totality analysis."  *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1390 (8th Cir. 1995)(en banc); *see also United States v. Blaine Cty., Montana*, 363 F.3d 897, 903 (9th Cir. 2004); *Collins v. City of Norfolk, Va.*, 816 F.2d 932, 935 (4th Cir. 1987).  Racially polarized voting can be shown by comparing a regression analysis that identifies the minority's preferred candidates with a history of majority-preferred candidates prevailing.  *See Harvell*, 71 F.3d at 1386-87.

Here, Dr. Handley's analysis of voting patterns shows that voting in Arkansas is highly polarized along racial lines.  Voting was racially polarized in all nine of the recent statewide elections she analyzed.  Ex. 8, Handley Report at 11.  In the most recent statewide election to feature an African-American candidate—the 2018 contest for Lieutenant Governor—Black voters supported the Black candidate with around 90 percent of their votes, while white voters cast less than 20 percent of their votes for the Black candidate.  *Id.*  Voting was also polarized in at least 13 of the 17 state House contests she analyzed.  *Id.* at 11-12.  In the four contests that were not clearly polarized, moreover, either both candidates were Black, both candidates were white, or the Black candidate faced a minor-party opponent.  *Id.*

This expert evidence clearly establishes that voting is racially polarized in the districts at issue and in Arkansas more generally.  Given the importance of racially polarized voting as a "primary factor" in the totality of the circumstances analysis, *Harvell*, 71 F.3d at 1390, Plaintiffs are likely to succeed on the merits of their vote dilution claim.

<u>Senate Factor 3: Election Procedures that Dilute Minority Voting Power</u>

The third Senate Factor is the extent to which the state has used voting procedures that may "enhance the opportunity for discrimination against the minority group."  Senate Report at 29. This factor can be shown by examining "voting procedures that may operate to lessen the opportunity of black voters to elect candidates of their choice."  *Gingles*, 478 U.S. at 40-41 (endorsing district court's examination of North Carolina's majority-vote requirement for primary elections); *Harvell*, 71 F.3d 1382 at 1390 (finding that the "majority vote requirement, staggered terms, and at-large structure also tend to suppress minority voters' influence.").

Arkansas has a long and continuing history of using voting procedures that limit the electoral influence of Black Arkansans.  Arkansas has majority-vote requirements for its primary elections for federal office and all state and county-level executive, judicial, and legislative offices. *See* Ex. 9, Barth Report at ¶ 38.  Majority-vote requirements inherently limit the political influence of Black communities where—as is the case in Arkansas—racially polarized voting exists.  *Id.* at ¶ 37; *see Whitfield v. Democratic Party of Ark.*, 890 F.2d 1423, 1428 (8th Cir. 1989) (noting that "[t]he [Supreme] Court has specifically recognized majority vote requirements as 'potentially dilutive electoral devices.'") (quoting *Gingles*, 478 U.S. at 56); *Harvell*, 71 F.3d at 1390 ("The majority vote requirement . . . tend[s] to suppress minority voters' influence.").

Arkansas state law also explicitly permits all municipalities to use at-large elections for municipal elections.  Ex. 9, Barth Report at ¶ 54.  Consequently, Arkansas's school districts and municipal elections commonly use at-large elections—including in Little Rock, where several city directors are elected in at-large elections.  *See id.* at ¶¶ 52-54.  "As the Supreme Court has long recognized, at-large voting schemes can 'minimize or cancel out the voting strength of racial [minorities in] the voting population.'"  *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1079 (E.D. Mo. 2016) ), *aff'd* 894 F.3d 924 (8th Cir. 2018)

(quoting *Gingles*, 478 U.S. at 47).  Data indicate that 1) Black and Black-preferred candidates are less likely to win at-large elections than ward based elections, 2) ward elections are less costly for candidates than at-large elections, making it easier for members of historically disenfranchised groups to run and win, and 3) ward elections bring about more Black-preferred policy outcomes. Ex. 9, Barth Report at ¶¶ 49-50.  The evidence in Arkansas bears this out.  In Little Rock, those elected by ward election are much more likely to be Black, likelier to be female, and likelier to be elected with lower campaign spending.  *Id.* at ¶ 56.

The vast majority of statewide elections in Arkansas also take place in non-presidential years.  *Id.* at ¶ 47.  "Off-cycle elections also enhance the opportunity for discrimination" because they "generate unusually low voter turnout generally and disproportionately low turnout among African American voters," and "increase the relative influence of well-organized interest groups in maintaining the status quo."  *Missouri NAACP*, 201 F. Supp. 3d at 1079-80.  Indeed, data show that voters of color are more likely to participate in presidential election cycles than are their white peers, and that Black voters' share of the electorate in Arkansas decreases in midterm elections as compared to presidential elections.  Ex. 9, Barth Report at ¶ 45.

Further, other existing voting laws disproportionately burden Black Arkansans.  Arkansas disenfranchises individuals convicted of a felony—even if they have completed probation or parole—if they have not repaid all legal financial obligations associated with their sentences.  Ex. 9, Barth Report at ¶¶ 57-58.  Black Arkansans are disenfranchised for a felony conviction at more than double the rate (9%) of the rest of the state's population (4%).  *Id*.  More than three-quarters of disenfranchised Black Arkansans are no longer in prison.  *Id*.  Further, prison gerrymandering also reduces the political power of Black communities in Arkansas, given that a disproportionate

number of prisoners are Black and a disproportionate number of prisons are located in white, rural areas. *Id.* at ¶ 59.

There is no question that Arkansas has a slew of election procedures and practices that dilute Black voting power. Plaintiffs' proof on this issue supports a finding of illegal vote dilution.

<u>Senate Factor 5: Discrimination in Related Areas</u>

The totality of circumstances inquiry evaluates evidence of minority political access as well as social, economic, and historical background for that participation. Senate Report at 29. Relevant evidence includes "the legacy of official discrimination in voting matters, education, housing, employment, and health services." *Gingles*, 478 U.S. at 80; *see also Missouri NAACP*, 894 F.3d at 940 (upholding district court's reliance on expert testimony linking history of discrimination to continued impacts on African Americans' political power). As to this fifth factor, census and American Community Survey (ACS) data confirm the existence of significant income and educational disparities between Black and white residents of Arkansas.

As with the first Senate Factor, Defendant cannot meaningfully contest the applicability of the fifth Senate factor in Arkansas because this Court has already "taken judicial notice" of it. *Jeffers*, 730 F. Supp. at 210. As this Court has found, Arkansas's "history of discrimination has adversely affected opportunities for black citizens in health, education, and employment" in a way that "necessarily inhibits full participation in the political process" for Black Arkansans. *Smith*, 687 F. Supp. at 1317.

"Political participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes." *Bone Shirt*, 461 F.3d at 1037 (8th Cir. 2006) (quoting *Gingles*, 478 U.S. at 69) (alterations omitted). Black Arkansans continue to bear the effects of the State's long history of racial discrimination across a wide array of core metrics in a way that impedes their political

participation. Black Arkansans are far less wealthy, and more likely to live in precarious financial situations, than their white counterparts in the state. Ex. 9, Barth Report at ¶ 61. Black Arkansans are more than twice as likely to live in poverty than white Arkansans—a disparity that is larger than in many other parts of the country. *Id.*; *see Jeffers*, 730 F. Supp. at 211 (noting disparity in poverty rates between Black and white population); *Smith*, 687 F. Supp. at 1317 n.7 (similar). Just under 45% of Black children in Arkansas live in poverty, the highest Black child poverty rate in the country and far higher than the state's total child poverty rate of 24.7%. Ex. 9, Barth Report at ¶ 61. The poverty rate of Black Arkansans (27.6%) is also higher than the poverty rate of Black Americans nationwide (18.8%). *Id.* Black Arkansans also disproportionately make up Asset Limited, Income Constrained, Employed ("ALICE") families—"working poor" families that are not technically in poverty but who do not earn "enough to afford a bare-bones household budget."[11] *Id.* at ¶ 62. About 60% of Black Arkansan families—which are larger than white families, meaning that there are more mouths to feed—make less than $40,000 a year; most white Arkansan families make more than $60,000 a year. *Id.*; *see Jeffers*, 730 F. Supp. at 211 (noting disparity in per capita income between white and Black Arkansans). There are also similar disparities in housing. White Arkansans are nearly thirty percentage points likelier to own a home than Black Arkansans— significant particularly given that home ownership is a marker of wealth. Ex. 9, Barth Report at ¶ 63. Homes owned by Black Arkansans are also worth less, on average, than the homes owned by white Arkansans. *Id.*; *see Smith*, 687 F. Supp. at 1317 n.7 (noting median value of homes for Black population less than median value of homes for white population). Arkansas is also the twelfth-most segregated state in the U.S. in terms of residential segregation. Ex. 9, Barth Report at ¶ 63.

---

[11] United for ALICE, https://www.unitedforalice.org/ (last visited Dec. 15, 2021).

All this economic scarcity—the clear result of centuries of past discrimination—*id.* at ¶ 61—makes it much harder for Black Arkansans to participate effectively in the political process.

At least part of the wealth gap between white and Black Arkansans can be explained by the employment gap. Black Arkansans are eight percentage points less likely to be employed than white Arkansans. *Id.* at ¶ 77. Black Arkansans are five percentage points likelier to be disabled, about ten percentage points less likely to have access to a computer with Internet access, and four times less likely to have access to a vehicle, than their white counterparts—three strong indicators of employment. *Id.* at ¶¶ 75, 78-79; *see Jeffers*, 730 F. Supp. at 211 (noting Black population less likely to have access to vehicle or phone than white population).

High-poverty areas, on average, also have poorer health outcomes than wealthier communities. Ex. 9, Barth Report at ¶ 72. White Arkansans lived 2.7 years longer than Black Arkansans, and white males in Arkansas live almost four years longer, on average, than Black males in the state. *Id.* Black Arkansans are more than twice as likely to die from diabetes and nearly six times as likely to die from HIV/AIDS than their white counterparts, and have higher levels of infant mortality, low birth weights, and cardiovascular disease. *Id.* Black children in Arkansas are far likelier than white children to have untreated tooth decay, likely in part due to the fact that orthodontists and pediatric dentists are sparse in the Delta counties with large Black populations. *Id.* at ¶ 74. Black Arkansans are also much more likely to report facing discrimination in the health care system, and both rural and urban Black Arkansans report health problems at higher rates than white Arkansans. *Id.* at ¶ 73.

There are massive racial disparities within Arkansas's educational system, as well. Black fourth and eighth graders, for example, are more than twenty percentage points more likely to perform below grade level on both reading and math scores. *Id.* at ¶ 67. Black students are about

four times likelier to be suspended from school, and school suspensions are correlated with students dropping out before graduating high school. *Id*. at ¶ 68. Black eleventh graders in Arkansas perform more than four points worse, on average, than their white counterparts on the ACT, a standardized test that is used to determine admissions to many colleges. *Id*. at ¶ 67. As of 2019, white Arkansans were more than ten percentage points likelier than Black Arkansans to have a high school diploma and about eight percentage points likelier to have obtained at least a bachelor's degree. *Id*. at ¶ 70; *see Jeffers*, 730 F. Supp. at 211 (noting white population had higher high school graduation rates than Black population); *Smith*, 687 F. Supp. at 1317 n.7 (similar). Black Arkansans are also nearly forty percentage points likelier to have to remediate a subject in college than white Arkansans. Ex. 9, Barth Report at ¶ 70. All these educational disparities make it much harder for Black Arkansans to achieve the education necessary to hold steady employment.

Finally, Black Arkansans are far likelier to be involved in the criminal justice system—harming their long-term prospects for employment, wealth, and political participation. Black juveniles are nearly three times likelier to be incarcerated than their white counterparts. *Id*. at ¶ 81. Similar racial disparities in incarceration rates exist for adults. *Id*. at ¶ 83. Given Arkansas's felon disenfranchisement law, Black Arkansans are twice as likely to be disenfranchised on account of a felony conviction than their white counterparts, even though the vast majority of disenfranchised Black Arkansans have already been released from confinement. *Id*. at ¶¶ 57, 83.

The history of severe discrimination against Black Arkansans and its continued effects further support a finding of vote dilution.

<u>Senate Factor 6: Racial Appeals in Political Campaigns</u>

The sixth Senate Factor invites the Court to consider whether the jurisdiction's political campaigns have been characterized by overt or subtle racial appeals. Senate Report at 29; *Gingles*, 478 U.S. at 40 (repeating district court's finding that the "record is replete with specific examples

of racial appeals, ranging in style from overt and blatant to subtle and furtive, and in date from the 1890's to the 1984 campaign for a seat in the United States Senate"); *see also Jeffers*, 730 F. Supp. at 212 (noting history of racial appeals in Arkansas politics, ranging from subtle statements where "simply informing the voters that one's opponent is black seems to be enough to do the trick," to more overt racism such as a Black candidate being "run off the road by a group of individuals wearing hoods.").

It is not necessary to prove that racial appeals are a permanent or exceedingly pervasive feature of a jurisdiction's elections; instead, courts have found the existence of this factor based on a handful of salient incidents.  *See, e.g.*, *Bone Shirt*, 336 F. Supp. 2d at 1041 (D.S.D. 2004) (finding racial appeals based mostly on two newspaper articles, in 1978 and 2002, focusing on allegations of voter fraud by American Indians); *United States v. Alamosa Cnty.*, 306 F. Supp. 2d 1016, 1025-26 (D. Colo. 2004) (finding racial appeals based on three elections where candidates identified own ethnicity).

Arkansas has a long history of racial appeals in campaigns.  During the Jim Crow era, openly racist campaign rhetoric was commonplace.  *See* Ex. 9, Barth Report at ¶ 90.  Former Governor, Senator, and Attorney General Jeff Davis stated that Black people were an "ever present eating, cankerous sore" on democracy and that giving Black Arkansans the right to vote was "the most cruel blow that was ever struck a helpful and defenceless [*sic*] people."  *Id*.  Davis successfully relied on gruesome campaign imagery, justifying lynching in a meeting with President Theodore Roosevelt and once vowing that he "would rather tear, screaming from her mother's arms, my little daughter and bury her alive than to see her arm in arm with the best n***er on earth."  *Id*.  Many other prominent elected officials during this time also employed racist rhetoric in their campaigns.  For example, Governor Homer Adkins, running for the Senate in 1944, turned

down offers of support from Black people, saying, "If I cannot be nominated by the white voters of Arkansas, I do not want the office." *Id.* at ¶ 92. At the centerpiece of Adkins' campaign was support of the "white primary," which banned non-white voters from the party primary elections across the South. *Id.*

In the aftermath of the *Brown v. Board of Education* decision ending *de jure* school segregation, candidates for elective office in Arkansas began to run on militant segregationist appeals. *Id.* at ¶ 93. In response to pressure from the White Citizens' Council—a prominent white supremacist and segregationist organization—Governor Orval Faubus campaigned as a hardline segregationist. *Id.* at ¶ 94. In 1966, then-state Supreme Court Justice James Johnson, the segregationist Democratic nominee for Governor, refused to shake Black voters' hands on the campaign trail and vowed to oppose implementation of federal civil rights laws. *Id.* at ¶ 96.

While perhaps no longer as overt, racial appeals in Arkansas have persisted. Empirical data indicate that Arkansas voters were race-conscious in their attitudes toward President Barack Obama, and candidates often used racialized rhetoric toward Democrats and the President during the Obama Administration. *Id.* at ¶¶ 103-106. Direct mailers advocating against Obamacare showed an image of a Black doctor and thanked Republicans for defending "health care freedom." *Id.* at ¶ 106.

Political campaigns in Arkansas still regularly use racialized rhetoric. In a 2018 congressional race, U.S. Representative French Hill and a supporting super PAC ran advertisements depicting heavily tattooed men of color, claiming that those men were members of the "MS-13" gang and asserting that the policies of his Democratic opponent, Clarke Tucker, would lead to an increase in violent crime among immigrants. *Id.* at ¶ 107. A radio advertisement attacking Tucker, targeted at Black stations, played dialogue of Black women claiming that "white

Democrats will be lynching Black folks again." *Id.* In his most recent election, Hill gave an interview in which he emphasized that his opponent at the time, Joyce Elliott, who is Black, would "be a member of the Congressional Black Caucus." *Id.* Dark money ads in multiple judicial elections in Arkansas in 2018 targeted candidates for lenient sentences against "violent convicts." *Id.* at ¶ 108. At least one of those ads highlighted the case of a Hispanic man who was given a new trial after being convicted in a rape case. *Id.* Finally, many recent elected officials and/or candidates for public office in Arkansas have either used racist epithets or used otherwise racist rhetoric during their campaigns. *Id.* at ¶ 109.

The record indicates that racial appeals have been used in Arkansas politics for more than a century, and these appeals remain widespread today. This factor also strongly favors a finding that Plaintiffs are likely to succeed on the merits.

<u>Senate Factor 7: Minority Success in Prior Elections</u>

This factor requires the Court to examine "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Bone Shirt*, 461 F.3d at 1022 (8th Cir. 2006). This is the other "primary factor[] considered in our totality analysis." *Harvell*, 71 F.3d at 1390. "The core question posed in Factor 7 is whether black candidates have historically been successful in the district, not whether individual black candidates were more attractive candidates or could have run better campaigns." *Missouri NAACP*, 894 F.3d at 939.

The evidence on this issue is clear: Black candidates in Arkansas have had very limited success in elections at all levels of public office. Arkansas has never had a Black United States Senator or Black member of the United States House of Representatives. Ex. 9, Barth Report at ¶ 113. Arkansas is the only southern state to fail to send a Black member to Congress or the Senate. Arkansas has never elected a Black governor, nor has it ever elected any Black justices to the state

supreme court.  *Id.* at ¶ 114.  Only one Black person has ever been elected to statewide office in Arkansas history, and none in nearly 150 years.  *Id.*

Black judicial candidates were so underrepresented at the Arkansas trial court level that a federal court in 1992 issued an order, pursuant to the Voting Rights Act, to require that judicial "subdistricts" be created within existing general court jurisdictions to try to allow Black voters to elect the candidates of their choice.  *Id.* at ¶¶ 115-117.  To this day, however, Black judges continue to be underrepresented in the Arkansas judiciary.  *Id.* at ¶ 118.

The Arkansas Legislature had no Black members at any time between 1893 and 1972, and to this day Black Arkansans remain substantially underrepresented in the state legislature.  *Id.* at ¶ 119.  Despite making up more than 16% of the state population, Black Arkansans represent only 10% of the state House of Representatives and less than 9% of the state Senate.  *Id.* at ¶ 119.  By contrast, white legislators today comprise 89% of the state legislature, even though less than 70% of the state's population is white.  At the local level, fewer than 5% of all cities in Arkansas are led by Black mayors, despite the fact that Black people make up more than 16% of the state's population.  *Id.* at ¶ 121.  Black Arkansans are also significantly underrepresented on school boards, municipal boards, and county quorum courts.  *Id.* at ¶ 122.  In other words, at all levels of government, Black Arkansans are profoundly underrepresented.

Thus, Plaintiffs clearly meet this "predominating" requirement to show a vote dilution claim and are likely to succeed on the merits.

<u>Proportionality</u>

Another important element of the totality of the circumstances analysis is whether there is rough "proportionality" between "the number of majority-minority voting districts [and the] minority members' share of the relevant population."  *Missouri NAACP*, 894 F.3d at 940 n.12; *see also Stabler v. Cty. of Thurston, Neb.*, 129 F.3d 1015, 1021 (8th Cir. 1995).  While it is not

dispositive, "proportionality is a relevant fact in the totality of circumstances" analysis. *LULAC v. Perry*, 548 U.S. 399, 436 (2006) (internal quotation marks omitted).   Courts assess "proportionality statewide," *id.* at 437; that is, they assess whether the percentage of majority-minority districts statewide are roughly proportional to either the total population or voting-age population of the minority group statewide, *see Stabler*, 129 F.3d at 1022.

As noted above*,* according to the 2020 Census, Black people in Arkansas make up 16.5% of the total population, 15.2% of the voting-age population, and 15.5% of the citizen voting-age population.   The Board's adopted House map, however, creates only 11 majority-Black districts out of 100 total statewide, meaning it substantially underrepresents Black Arkansans.   Plaintiffs' Illustrative Plan, by contrast, creates 16 reasonably compact majority-Black districts out of 100 total statewide, thereby achieving rough proportionality.   The Illustrative Plan clearly "results in less disparity than the [Board's adopted] plan and more closely approximates rough, or substantial, proportionality."   *Id.*   This is especially true in light of Arkansas's long history of official discrimination against its Black citizens in voting, noted above; Black Arkansans should not "continue to bear the burden of under-representation under the [adopted] scheme while the white majority enjoys over-representation."   *Id.*

## II.     Plaintiffs Will Suffer Irreparable Harm—Dilution of Their Votes—if a Preliminary Injunction Is Not Granted and an Election is Held Based on the Adopted Map

If any election is allowed to take place using the Board-approved map, Plaintiffs will suffer serious and irreparable harm for which there is no adequate remedy at law.

The Supreme Court has repeatedly recognized the foundational and fundamental importance of voting rights.   Indeed, in *Wesberry v. Sanders*, the Court declared that "[o]ther rights, even the most basic, are illusory if the right to vote is undermined."   376 U.S. 1, 17 (1964). When voting rights "are threatened or impaired, irreparable injury is presumed."   *Obama for Am.*

34

*v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *see also Craig v. Simon*, 493 F. Supp. 3d 773, 786 (D. Minn. 2020) ("Courts routinely recognize that restrictions on voting rights constitute irreparable injury") (citing *League of Women Voters of N.C. v. N. Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)), *aff'd*, 980 F.3d 614 (8th Cir. 2020); *Planned Parenthood of Minn. v. Roedler*, 558 F. 2d 861, 867 (8th Cir. 1977).

As federal courts across the country have concluded, restrictions on voting rights constitute irreparable injury regardless of whether those restrictions come in the form of vote dilution or vote denial.  *See, e.g.*, *Georgia State Conf. of the NAACP v. Fayette Cty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1347 (N.D. Ga. 2015) ("[T]he right of suffrage can be denied by means of dilution just as effectively as by wholly prohibiting the free exercise of the franchise.") (citing *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)) (internal alterations omitted); *NAACP, Spring Valley Branch v. E. Ramapo Central Sch. Dist.*, 464 F. Supp. 3d 587, 593 (S.D.N.Y. 2020) ("In a vote dilution case, '[a] restriction on the fundamental right to vote ... constitutes irreparable injury.'") (quoting *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016)); *Flores v. Town of Islip*, 382 F. Supp. 3d 197, 228 (E.D.N.Y. 2019) ("An abridgement or dilution of the right to vote constitutes irreparable harm.") (internal quotation marks and alterations omitted); *Sanchez v. Cegavske*, 214 F. Supp. 3d 961, 976 (D. Nev. 2016) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury.") (internal quotation marks omitted); *Day v. Robinwood W. Cmty. Improvement Dist.*, No. 4:08CV01888 ERW, 2009 WL 1161655, at *3 (E.D. Mo. Apr. 29, 2009) ("An abridgement or dilution of the right to vote constitutes irreparable harm.") (internal quotation marks omitted).  As such, "there would be irreparable harm if the upcoming elections [in 2022] were permitted to proceed under a framework that violated the VRA."  *Flores*, 382 F. Supp. 3d at 228; *see also United States v. Berks Cnty., Pa.*, 250 F. Supp. 2d

525, 540 (E.D. Pa. 2003) (collecting cases) ("[T]he holding of an upcoming election in a manner that will violate the Voting Rights Act constitutes irreparable harm to voters.").  And a preliminary injunction is the only viable remedy in this case because damages cannot compensate the dilution of an individual's right to vote.  *See Rogers Grp., Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 789 (8th Cir. 2010) ("Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages.") (quotations omitted); *Brown v. Ky. Leg. Res. Comm.*, 966 F. Supp. 2d 709, 724 (E.D. Ky. 2013) (finding "there is no remedy at law" for "irreparable injury in the form of vote dilution").

That is the case here.  Plaintiffs will be irreparably harmed if a primary or general election is conducted based on the Board's facially illegal map.  Because the map dilutes the weight of Plaintiffs' members' votes in violation of Section 2 of the Voting Rights Act, it constitutes a restriction on their voting rights that will harm Plaintiffs and their members at each election over the next 10 years.  And, as set forth above, no monetary value can be assigned to this injury.

At minimum, a preliminary injunction provides the only effective means for protecting Plaintiffs' members' and many other Arkansans' right to vote in the 2022 elections.  The candidate filing period for the 2022 elections begins on February 22 and ends on March 1, 2022.  *See* Ark. Code Ann. § 7-7-203 (party filing period begins "one week prior to the first day in March" and ends "on the first day in March").  As a result of on the late release of the census data, the Board's map did not go into effect until December 29, 2021.  In light of the rapidly approaching candidate filing deadline, there is no way for Plaintiffs to vindicate their rights under the VRA absent judicial relief in the form of a preliminary injunction.  For all these reasons, Plaintiffs have satisfied the irreparable injury element of the preliminary injunction test.

III.    **The Balance of Equities and Public Interest Weigh Heavily in Favor of Granting Plaintiffs' Motion for Preliminary Injunction**

Where, as here, Defendants will not be burdened by an injunction while the absence of an injunction causes the dilution of Plaintiffs' members' fundamental voting rights, the balance of harms lies squarely against the State.  *Dataphase Sys., Inc.*, 640 F.2d at 113 (a request for preliminary relief also involves an inquiry into "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined").   Without preliminary injunctive relief, voting-eligible citizens' votes—those guaranteed by the Constitution and protected by the VRA—will be diluted.  The inability of Plaintiffs' members in the districts described above to elect candidates of their choice is a particularly grave injury, given that the map will be in effect for ten years.  On the other hand, the only possible harm to Defendants is the prospect that certain deadlines, such as the candidate filing deadline, may need to be delayed.  Especially given that the State started the redistricting process later than usual because of the delayed release of the census data, this speculative injury is not of great significance when compared to Plaintiffs' members' voting rights, which are fundamental. *See United States v. Georgia*, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2018) (finding that administrative, time, and financial burdens on the state are "minor when balanced against the right to vote, a right that is essential to an effective democracy"); *Georgia State Conf. of the NAACP*, 118 F. Supp. 3d at 1347 (granting injunction under Section 2 of VRA, even though county board of commissioners ("BOC") would face administrative burdens from an injunction, because "the harm [plaintiffs] would suffer by way of vote dilution outweighs the harm to the BOC.").

Preliminary injunctive relief will also serve the public interest.  First, the public interest is exceptionally strong here because voting is "the essence of a democratic society."  *Reynolds*, 377 U.S. at 555.  All Arkansans have an interest in ensuring all votes have equal weight and that

minorities have an opportunity to elect candidates of their choice.  Second, "the public has an interest in ensuring federal laws are followed, particularly when those interests relate to voting rights." *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1006 (W.D. Mo. 2018); *see also id.* at 1006-07 (finding public interest of "ensuring that state processes follow federal law" justifies preliminary injunction).  Given that the adopted House map violates the VRA, it is in the public interest to remedy this violation of federal law at the earliest practicable time.

Third, the available evidence from the public—namely, the hundreds of public comments submitted to the Board during the 30-day public comment period—suggests that Arkansans are unhappy with how the Board's maps dilute the political power of Black Arkansans.  *See*, *e.g.*, Ex. 10, Public Comments submitted from Shunqetta Cunningham of Jonesboro, Craighead County ("Your proposal for the Jonesboro community places the Minority Community into an arbitrary divide into 4 districts, an obvious attempt to dilute the voting power of our groups."), Kymara H. Seals of Pine Bluff, Jefferson County ("I'm sure you are unaware, but you have marginalized the political power of racial and ethnic groups which creates racial equity challenges for us, the Black population."), Myra Cingolani of McGehee, Desha County ("Because the redistricting will affect the minority community in our area, the proposal to divide [Desha County into four districts] seems discriminatory."), James N. Moore of Magnolia, Columbia County ("I as a minority voter do not appreciate the fact that you have minimized our voice in the political arena of the state of Arkansas."), and Dan Bell  ("Little Rock has been dissected inappropriately losing all sense of a diverse community."); *see also* Ex. 6, Transcript of BOA Meeting at 6:12 (Little Rock, Oct. 29, 2021) (Attorney General Rutledge: "[U]ltimately, that's who we need to hear from, are the people that are impacted, and to make sure that we are doing our job and holding us accountable.").  This

sample of public comments shows that the public has registered its disapproval of the Board's adopted map.

The balance of equities and public interest thus heavily favors injunctive relief.

## IV.   A Bond is Not Necessary in this Case

Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Importantly, "the amount of the bond rests within the sound discretion of the trial court." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016) (quotation marks and citations omitted).

This Court has discretion to "waive the bond requirement based on its evaluation of public interest in this specific case." *Id.* (upholding district court's waiver of bond requirement based on its characterization of the suit as public interest litigation).  Indeed, courts often find a bond unnecessary where Plaintiffs have demonstrated a strong likelihood of success, as here, where Defendants have clearly violated the VRA. *Perfetti Van Melle USA, Inc. v. Midwest Processing, LLC*, 135 F. Supp. 3d 1015, 1021 (D.S.D. 2015) (holding there was "little risk" to enjoining defendants because of plaintiffs' likelihood of success); *Bixby v. Lifespace Communities, Inc.*, Civ. No. 18-817 (JRT/KMM), 2018 WL 3218697, at *7 (D. Minn. July 2, 2018) ("[A] bond is not necessary in this case because Plaintiffs have demonstrated a high likelihood of success on the merits.").  Here, too, Plaintiffs have a high likelihood of success, as shown above.

Finally, Plaintiffs are non-profit organizations.  Taken together, these facts suggest a bond would be unnecessary and burdensome.  Plaintiffs respectfully request that the Court waive Rule 65's security requirement, should it grant Plaintiffs' Motion.

## V.      Expedited Review of This Motion is Warranted

Plaintiffs respectfully request that this Court grant expedited briefing and an expedited hearing on the instant application for a preliminary injunction.

Federal courts "shall expedite" civil actions for good cause, which "is shown if a right under . . . a Federal Statute . . . would be maintained in a factual context that indicates that a request for expedited consideration has merit." 28 U.S.C. § 1657(a). Absent expedited review, Plaintiffs and their members will be unable to vindicate their rights under the VRA with regard to the upcoming 2022 elections. Because the 2020 Census data was delayed, Plaintiffs were unable to file suit in this case until December 29, 2021, when the Board's adopted map went into effect. There are only 63 days between the map's effective date and March 1, 2022, the last day of the candidate filing period for the 2022 elections. With that extraordinarily brief window, Plaintiffs cannot meaningfully obtain relief before the March 1, 2022 deadline without an expedited schedule. Particularly given the vital importance of Plaintiffs' members' rights under federal law at issue in this case, Plaintiffs believe expedited review is necessary in this case.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their motion for preliminary injunction and order the following relief: (1) enjoin Defendants from using the Board Plan for elections for the Arkansas House in 2022; and (2) enjoin Defendants from failing to hold elections for the Arkansas House in 2022 using a plan that complies with Section 2. Plaintiffs request a hearing on this motion on an expedited basis. Defendants are being served with the motion papers immediately.

Dated:  December 29, 2021

Respectfully submitted,

Gary Sullivan (AR Bar: 92051)
Email:  gary@acluarkansas.org
ARKANSAS CIVIL LIBERTIES UNION
FOUNDATION, INC.
904 West 2nd Street
Little Rock, AR 72201
Tel: (501) 374-2842

Ceridwen Cherry (*PHV* Pending)
Email:  ccherry@aclu.org
AMERICAN CIVIL LIBERTIES UNION,
VOTING RIGHTS PROJECT
915 15th St NW
Washington, DC 20015
Tel: (202) 457-0800

Jonathan Topaz (*PHV* Pending)
Email:  jtopaz@aclu.org
Sophia Lin Lakin (*PHV Pending*)
Email: slakin@aclu.org
AMERICAN CIVIL LIBERTIES UNION,
VOTING RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500

Neil Steiner (*PHV* Pending)
Email:  neil.steiner@dechert.com
DECHERT LLP
Three Bryant Park
1095 Avenue of The Americas
New York, NY 10036 – 6797
(212) 698-3500 | (212) 698-3599

Angela Liu (*PHV* Pending)
Email:  angela.liu@dechert.com
DECHERT LLP
35 West Wacker Drive, Suite 3400
Chicago, IL 60601
(312) 646-5800 | (312) 646-5858

Luke Reilly (*PHV* Pending)
Email:  luke.reilly@dechert.com
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-4000 | (215) 994-2222

Matthew F. Williams (*PHV* Pending)
Email:  matthew.williams@dechert.com
DECHERT LLP
One Bush Street, Suite 1600
San Francisco, CA 94104-4446
(415) 262-4500 | (415) 262-4555

Bryan Sells (*PHV* Pending)
Email:  bryan@bryansellslaw.com
THE LAW OFFICE OF
BRYAN L. SELLS, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
Tel: (404) 480-4212 (voice and fax)

*Attorneys for Plaintiffs*