IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**ARKANSAS STATE**
**CONFERENCE NAACP** *et al.*                                                                **PLAINTIFFS**

v.                              Case No.: 4:21-cv-01239-LPR

**THE ARKANSAS BOARD OF**
**APPORTIONMENT** *et al.*                                                                    **DEFENDANTS**

**ORDER**

  This is a Section 2 Voting Rights Act case. The Plaintiffs are the Arkansas State Conference NAACP and the Arkansas Public Policy Panel.[1] The Defendants are the Arkansas Board of Apportionment, the Board's three members, and the State of Arkansas. The Board's three members—who are sued in their official capacities only—are Governor Asa Hutchinson, Attorney General Leslie Rutledge, and Secretary of State John Thurston. The sole claim alleged in the Complaint is that the 2021 reapportionment plan for the Arkansas House of Representatives, which was approved by the Board of Apportionment, "dilutes Black voting strength in violation of Section 2 of the Voting Rights Act . . . ."[2]

  Section 2 of the Voting Rights Act provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political

---

[1] *See* Compl. (Doc. 1) at 0–2. The Complaint contains a page numbering error insofar as the second page of the Complaint is labeled 1, the third page of the Complaint is labeled 2, and so on. For consistency's sake, I refer to the Complaint's page numbers as they appear on the Complaint itself. Accordingly, I will refer to the first page of the Complaint (which is not numbered) as page 0.

[2] *Id*. at 9. When I use the term "reapportionment plan," I am referring to the redistricting for the Arkansas House of Representatives that has occurred as a result of the 2020 Census.

subdivision in a manner which results in a denial or abridgment of the right to vote on account of race or color . . . ."[3]  Section 2 further clarifies this prohibition as follows:

> A violation . . . is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected] class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.[4]

The Supreme Court has long held that the scope of Section 2's prohibition encompasses the alleged dilution of African-American votes.[5]

Plaintiffs do not allege or argue that anyone, including the three members of the Board of Apportionment, had the purpose, intent, or motivation to discriminate against Arkansans of color.[6] That is not surprising.  Since *Thornburg v. Gingles*, the Supreme Court has made clear that the language of Section 2 focuses on the results of a reapportionment plan, not the motivation behind the plan.[7]  As Plaintiffs' Motion for a Preliminary Injunction emphasizes, "[i]n 1982, 'Congress

---

[3] 52 U.S.C. § 10301(a).

[4] *Id.* § 10301(b).

[5] *See, e.g.*, *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2332–33 & 2333 n.5 (2021) (collecting cases). Over the years, several justices have concluded that the text of the Voting Rights Act is not broad enough to reach vote dilution cases.  *See, e.g.*, *Holder v. Hall*, 512 U.S. 874, 914 (1994) ("Properly understood, the terms 'standard, practice or procedure in [Section 2 of the Voting Rights Act] refer only to practices that affect minority citizens' access to the ballot.  Districting systems and electoral mechanisms that may affect the 'weight' given to a ballot duly cast and counted are simply beyond the purview of the Act.") (Thomas, J., concurring in judgment); *cf. Allen v. State Bd. of Elections*, 393 U.S. 544, 588 (1969) (suggesting that similar text in Section 5 of the Voting Rights Act did not reach vote dilution) (Harlan, J., concurring in part and dissenting in part).  Whatever I may think of the decades-long debate between the Justices, my obligation as a district court judge is to apply the Voting Rights Act as it has been authoritatively interpreted by Supreme Court precedent.

[6] *See generally* Compl. (Doc. 1); Br. in Supp. of Pls.' Mot. for Prelim. Inj. (Doc. 3).  In their Motion for Recusal—which is the ultimate subject of this Order—Plaintiffs passingly (and without further elaboration) refer to this case as "a claim of racial discrimination leveled against the state's highest elected officials . . . ."  Br. in Supp. of Pls.' Mot. for Recusal (Doc. 28) at 4.  Given the lack of any allegation in the Complaint (or argument in the Preliminary Injunction papers) that one or more Defendants engaged in *purposeful* discrimination or had a discriminatory motive, the Plaintiffs' point appears to be nothing more than the obvious fact that this case asks whether the reapportionment plan violates Section 2 of the Voting Rights Act.

[7] *See* 478 U.S. 30, 35 (1986); *see also, e.g.*, *Voinovich v. Quilter*, 507 U.S. 146, 155 (1993) ("Only if the apportionment scheme has the *effect* of denying a protected class the equal opportunity to elect its candidate of choice does it violate [Section 2]; where such an effect has not been demonstrated, [Section 2] simply does not speak to the matter.").

substantially revised [Section] 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the results test.'"[8] The primary question is whether the plan "results in a denial or abridgment of the right to vote on account of race or color"[9]—regardless of the motivation any of the Defendants. Plaintiffs focus exclusively on this "results test" question. The nub of their argument is as follows:

> The challenged plan contains just eleven majority-Black House districts even though more than sixteen percent of the state's population is Black[,] and it would be possible to draw sixteen (out of 100) geographically compact, majority-Black House districts. As a result, the challenged plan impermissibly dilutes Black voting strength in violation of Section 2.[10]

Defendants have not yet had a chance to respond to Plaintiffs' allegations, so any discussion or analysis of the potential merit of the claim would be inappropriate at this time. The Court recounts the allegations above solely to provide some background and context for its resolution of the pending Motion for Recusal filed by Plaintiffs.[11]

### **Legal Standards Governing the Motion for Recusal**

Motions for recusal are serious business. They are rarely filed. And I well recall from private practice the care and thought that attorneys give to such matters. Accordingly, when such a motion is filed, a judge must undertake the deepest of reflection on the issues presented. I have done so here, thinking of and working on little else in the days since this motion was filed.

The question of recusal implicates two critically important judicial obligations. The first obligation is impartiality. This includes more than the avoidance of hearing cases in which a judge is actually partial to one side or the other. Just as important is the avoidance of hearing cases in

---

[8] Br. in Supp. of Pls.' Mot. for Prelim. Inj. (Doc. 3) at 8 (quoting *Gingles*, 478 U.S. at 35–36).

[9] 52 U.S.C. § 10301(a).

[10] Br. in Supp. of Pls.' Mot. for Prelim. Inj. (Doc. 3) at 1.

[11] Pls.' Mot. for Recusal (Doc. 27).

which a judge appears to the public to be partial.  As our founding generation well understood, the judiciary's ability to operate as a co-equal branch of government—and to protect individual rights against intrusion from the other branches—is dependent upon the public's confidence in our decisions being based on law instead of personal avarice, bias, or policy preferences.[12]  Such confidence would soon evaporate if judges sat on cases where, although in reality they could be impartial, the public thought otherwise.

The second obligation implicated by a recusal question is the obligation of a judge to hear cases to which he or she has been assigned.  This is known as the duty to sit.  "In making the recusal decision, it is axiomatic that 'a federal judge has a duty to sit where not disqualified which is equally as strong as the duty to not sit where disqualified.'"[13]  This duty to sit is just as much about fairness and even-handedness as is the duty to avoid partiality or the appearance of partiality.  Unless there is a true need for recusal, fairness dictates that litigants should get the judge randomly assigned to hear their case.  Recusal in situations where it is not required incentivizes and facilitates the unfair and unseemly tactic of judge shopping.  Judges in the Eighth Circuit (and other circuits) have recognized this for decades.[14]

The statutory law and judicial canons governing recusal seek to balance these two obligations.  A judge must follow these rules precisely, reading the rules neither more broadly nor

---

[12] *See The Federalist No. 78*, at 464 (Alexander Hamilton) (Clinton Rossiter ed., Signet Classic 2003) ("The executive not only dispenses the honors but holds the sword of the community.  The legislature not only commands the purse but prescribes the rules by which the duties and rights of every citizen are to be regulated.  The judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society, and can take no active resolution whatever.  It may truly be said to have neither FORCE nor WILL but merely judgment; and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments.").

[13] *Adams v. Rivera*, No. 11-3021, 2011 WL 355665, at *1 (W.D. Ark. Aug. 11, 2011) (quoting *Laird v. Tatum*, 409 U.S. 824, 837 (1972)).

[14] *See, e.g.*, *Sw. Tel. Co. v. F.C.C.*, 153 F.3d 520, 523 (8th Cir. 1998) (Hansen, J., Mem.) ("Judges have an obligation to litigants and their colleagues not to remove themselves needlessly, because a change of umpire in mid-contest may . . . facilitate judge-shopping.") (quoting *In re Nat'l Union Fire Ins. Co.*, 839 F.2d 1226, 1229 (7th Cir. 1988)).

more narrowly than they are written and interpreted by precedent.[15] As relevant to the pending motion, the statutory law and judicial canons of conduct direct a judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned."[16] But a judge "should hear and decide matters assigned, unless disqualified . . . ."[17] Accordingly, either I must recuse or I must hear the case. There is no in-between.

Whether I must recuse or I must hear the case turns on whether my "impartiality might reasonably be questioned" in this matter.[18] In the Eighth Circuit, "[t]he test for disqualification or recusal is an objective one and asks whether, from the perspective of 'the average person on the street,' a reasonable man knowing all of the circumstances 'would harbor doubts about the judge's impartiality.'"[19] Of course, the reasonable person is and always has been a legal fiction—a hypothesized observer who inhabits the *Goldilocks* zone of life. The reasonable person is not too credulous, nor too incredulous. The reasonable person does not make unfounded assumptions, nor does he hide his or her head in the sand. The reasonable person uses logic to analyze situations but is not devoid of emotion and common sense. A publication from the Federal Judicial Center that analyzes the recusal case law is most helpful in identifying the characteristics of the hypothetical reasonable person in this area of the law:

> The Fourth Circuit has clarified that the hypothetical reasonable observer is not a judge, because judges, keenly aware of the obligation to decide matters impartially, "may regard asserted conflicts to be more innocuous than an outsider would." At

---

[15] *See In re Nat'l Union Fire Ins. Co.*, 839 F.2d at 1229 ("The judicial system has an interest in precise rules for disqualification . . . .")

[16] 28 U.S.C. § 455(a); Code of Conduct for United States Judges, Canon 3(C)(1). 28 U.S.C. § 455(b) lists specific instances that require recusal, but Plaintiffs do not rely on any of these instances as grounds for recusal.

[17] Code of Conduct for United States Judges, Canon 3(A)(2).

[18] *See supra* note 16.

[19] *Tyler v. Purkett*, 413 F.3d 696, 704 (8th Cir. 2005). A judge's "actual state of mind, purity of heart, incorruptibility, or lack of partiality are not the issue. . . . . The standard is purely objective. The inquiry is limited to outward manifestations and reasonable inferences drawn therefrom." *Higganbotham v. Oklahoma ex rel. Oklahoma Transp. Comm'n*, 328 F.3d 638, 644 (10th Cir. 2003) (quoting *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993)).

the same time, the hypothetical observer is "not a person unduly suspicious or concerned about a trivial risk that a judge may be biased." The Fifth and Seventh Circuits have noted that[,] while a judge must ask "how things appear to the well-informed, thoughtful observer rather than to a hypersensitive or unduly suspicious person," an outside observer is "less inclined to credit judges' impartiality and mental discipline than the judiciary . . . ."[20]

The Eighth Circuit has made clear that a party seeking recusal for either actual partiality or the appearance of partiality faces an uphill climb. "A party introducing a motion to recuse carries a heavy burden of proof; a judge is presumed to be impartial and the party seeking disqualification bears the substantial burden of proving otherwise."[21]

### Application of the Legal Standards

Plaintiffs do not suggest that I am actually biased or partial in this matter.[22] Plaintiffs' sole contention is that my sitting on this case raises an appearance of partiality.[23] Plaintiffs advance several arguments as to why a reasonable person would question my impartiality. I have carefully considered each of them, just as I have carefully considered Defendants' counterarguments. For the reasons set forth below, I have concluded that a reasonable person would not harbor doubts about my impartiality and thus that I am duty-bound to preside over this case.

Let me start with the argument by Plaintiffs that borders on the frivolous. Plaintiffs note that Governor Hutchinson is a Defendant in this case and is likely to be a key witness.[24] Plaintiffs also note that, in January of 2018, I donated $500 dollars to Governor Hutchinson's re-election

---

[20] Federal Judicial Center, *Recusal: Analysis of Case Law Under 28 U.S.C. §§ 455 & 144*, 16 (2002) (first quoting *United States v. DeTemple*, 162 F.3d 279, 287 (4th Cir. 1998), *cert denied*, 526 U.S. 1137 (1999); then quoting *id.*; then quoting *In re Mason*, 916 F.2d 384, 386 (7th Cir. 1990); and then quoting *id.*).

[21] *United States v. Delorme*, 964 F.3d 678, 681 (8th Cir. 2020) (quoting *United States v. Oaks*, 606 F.3d 530, 537 (8th Cir. 2010)); *see also Johnson v. Steele*, 999 F.3d 584, 587 (8th Cir. 2021) (same).

[22] *See generally* Pls.' Mot. for Recusal (Doc. 27) at 3–4; Br. in Supp. of Pls.' Mot for Recusal (Doc. 28) at 1.

[23] *See generally* Pls.' Mot. for Recusal (Doc. 27) at 3–4; Br. in Supp. of Pls.' Mot for Recusal (Doc. 28) at 1.

[24] Br. in Supp. of Pls.' Mot. for Recusal (Doc. 28) at 2–3, 6.

campaign.[25] As to Governor Hutchinson, that's the entire basis of their recusal request: one political contribution made approximately four years ago and (obviously) well before I took the bench in November of 2019. That is insufficient to trigger recusal under the objective reasonable-person standard.

A reasonable person would understand that a four-year-old political contribution connotes nothing more than the view that the donor (me) thought the candidate (Governor Hutchinson) would be better than his opponent for the contested position. It does not come close to the level of ties that would suggest an inability to fairly decide a case involving the Governor as a defendant or to fairly evaluate his potential testimony on the stand. This is particularly true where, as here, the Governor is sued only in his official capacity for official actions. As Justice Scalia has explained, even a current, ongoing friendship—a far closer tie than anything alleged here—does not require recusal in official-capacity cases:

> While friendship is a ground for recusal . . . where the personal fortune or the personal freedom of the friend is at issue, it has traditionally *not* been a ground for recusal where *official action* is at issue, no matter how important the official action was to the ambitions or the reputation of the Government officer.[26]

Governor Hutchinson is not at risk of personal liability in this matter. Moreover, he has no personal stake in the outcome of the case. The Plaintiffs do not suggest that he intends to run for the Arkansas House of Representatives. In any event, political consequences "are not my concern, and the possibility of them does not convert an official suit into a private one."[27]

> That possibility exists to a greater or lesser degree in virtually all suits involving agency action. To expect judges to take account of political consequences—and to assess the high or low degree of them—is to ask judges to do precisely what they should not do. It seems to me quite wrong (and quite impossible) to make recusal

---

[25] *Id.* at 3; Ex. 2 to Pls.' Mot. for Recusal (Doc. 27-2) at 4.

[26] *Cheney v. U. S. Dist. Court for Dist. of Columbia*, 541 U.S. 913, 916 (2004) (Scalia, J., sitting as a single justice).

[27] *Id.* at 920.

depend upon what degree of political damage a particular case can be expected to inflict.[28]

Plaintiffs suggest (without case law support) that this case is different from other official-capacity cases because Governor Hutchinson voted for the 2021 reapportionment plan. But it is unclear why or how voting for a reapportionment plan is legally different from signing a piece of legislation or enforcing the legislation by way of executive action. Suits based on any of these activities strike me as official-capacity suits to which the traditional rules would apply. Plaintiffs also suggest (without case law support) that this case is different from other official-capacity cases because the Governor might be called as a key witness. It may be rare that Governors testify in official-capacity cases. But it does happen. And it does not somehow convert an official action into a private one. Where, as here, a reasonable person could not question my ability to fairly evaluate the Governor's testimony, the fact that the Governor might testify does not change the calculus.[29]

Unlike the cases provided by Plaintiffs, *In re Mason* from the Seventh Circuit seems fairly on point here. In that Section 2 Voting Rights Act case concerning allegations of vote dilution based on race, the venerable Judge Frank Easterbrook addressed a recusal argument that was quite similar to the one made here by Plaintiffs:

---

[28] *Id.*; *see also In re Mason*, 916 F.2d at 387 ("Reasonable, well-informed observers of the federal judiciary understand that judges with political friends or supporters regularly cast partisan interests aside and resolve cases on the facts and law.").

[29] Although the foregoing is quite sufficient on its own, there is yet another data point for a reasonable person to consider. Months before this case hit my desk, I formally ended my affiliation with the Republican Party. I did so by converting my voter registration from Republican Party to Optional, which, as I understand it, is the principal way in Arkansas to signal independence from either party. While many reasonable jurists have a different view, I have come to the personal conclusion that impartiality and the appearance of impartiality are best advanced by the formal removal of oneself from membership in a political party. It is not enough, in my view, to ignore the red or blue shirt in your closet while you are judging. Instead, you must throw out the red or blue shirt from your closet entirely. All this is to say that my voter-registration change from Republican Party to Optional would further reduce the reasonableness of any concern created by a one-time donation to Governor Hutchinson approximately four years ago.

> Judge Tinder [before taking the bench] aided [the named defendants'] campaigns for office . . . . Although donations show that Judge Tinder supported the general political approach of these candidates, this adds little to the knowledge that [the two candidates who received donations from Judge Tinder] are Republicans, as Judge Tinder was. Any doubts about the judge's impartiality are especially weak because the complaint names [the defendants] in their official rather than personal capacities.[30]

In sum, no reasonable person could harbor doubts about my impartiality as to Governor Hutchinson, including my ability to fairly judge any testimony he might give.[31]

What about Attorney General Rutledge? As with Governor Hutchinson, Plaintiffs note that I made a single monetary donation to her campaign—nearly five years ago in March of 2017. Plaintiffs also note that I hosted a fundraiser for her at my home sometime in 2018. I cannot recall the month of that fundraiser, but logically it would have been well in advance of her November 2018 election. That's over three years ago. I do not see these two campaign-related contributions any differently than I see the contribution to Governor Hutchinson. And I do not believe a reasonable person could see them any differently either. The contributions mean only that I thought Ms. Rutledge would be a better Attorney General than her opponent. No reasonable person could question my impartiality, or my ability to fairly evaluate the Attorney General's testimony on the stand, based on these two political contributions.

---

[30] *In re Mason*, 916 F.2d at 387.

[31] For purposes of full disclosure, in my capacity as Solicitor General of Arkansas (July 2015–July 2018), I sometimes represented Governor Hutchinson in his official capacity. I never represented him in a reapportionment matter. I never discussed reapportionment with him, either generally or as it relates to the 2021 plan. Since July 2018, I have seen and communicated with Governor Hutchinson on an infrequent basis. To the best of my recollection, most of those interactions (and certainly all interactions since I have taken the bench) did not involve legal or political substance. They were the equivalent of passing the time of day, exchanging pleasantries around the holidays, and life updates. On one occasion in 2020, I took my law clerks to meet Governor Hutchinson as part of an informal program I have created to introduce my law clerks to state leaders. On one occasion in 2021, I hosted, at the Court, interns from the Governor's Office and spoke to them about the work of a federal judge. On one occasion, I reached out to the Governor to see if I could be of assistance with respect to the COVID crisis. I have never vacationed with the Governor. We have never broken bread together, except at large public events. Our families do not meet socially.

Plaintiffs also note that I worked for Attorney General Rutledge in the Office of the Attorney General from 2015–2018.  Although I had multiple duties, my principal role as Solicitor General was to represent the State of Arkansas in litigation at the United States Supreme Court, the Eighth Circuit, and the Arkansas Supreme Court.  At various times during my tenure, I reported to the Chief Deputy Attorney General, the Chief of Staff, and Attorney General Rutledge.  My job required—on average—daily written communication (emails) with the Office's leadership team, including the Attorney General herself.  In-person contact with the Attorney General was frequent but not daily—perhaps, on average, twice a week for forty-five-minute increments (usually group meetings).  On a few limited occasions, I served as the Attorney General's staff aide at out-of-state conferences with other Attorneys General.  Along with numerous other senior staff members of the Office, I was invited to and attended the Attorney General's large wedding.

Neither during the time I was Solicitor General, nor at any time thereafter, have I discussed anything directly related to the 2021 reapportionment plan with the Attorney General.  Neither during the time I was Solicitor General, nor at any time thereafter, have I ever worked on anything directly related to the 2021 reapportionment plan.  None of this should be a surprise.  I left the Attorney General's Office well before the 2021 reapportionment process began.[32]

I left the Attorney General's Office in July of 2018 to serve as a Senior Director of Anti-Corruption Compliance with Walmart.  Since leaving the Attorney General's Office, I have had very limited in-person contact with the Attorney General.  Aside from the fundraiser I hosted—I cannot recall if that took place before or after I left the Office—I probably have seen her on a

---

[32] As Solicitor General, I may have been involved with the consideration of joining amicus briefs written by other states in gerrymandering cases at the U.S. Supreme Court.  I do not remember whether I reviewed any amicus briefs of that nature or whether I made any recommendations about joining one or more of them.  As Solicitor General, I may have been involved in considering the sufficiency of ballot language on one or more independent redistricting commission amendments proposed by members of the public.  I do not recall my level of involvement, if any.

handful of occasions. But none stand out in my mind. We have communicated in writing infrequently, and the large bulk of those communications have been non-substantive exchanges of pleasantries, well wishes, and updates on our lives. Since I took the bench in November of 2019, all communications with the Attorney General (which have been extremely infrequent) have been non-substantive. I do not vacation with the Attorney General. I do not break bread with her, except at large public gatherings. I do not visit her home. She does not visit my home. Our families do not socialize together.

When I first took the bench, I considered whether to place the Attorney General on my recusal list. For the reasons discussed above on pp. 7–9, I did not need to do so for official-capacity cases. Additionally, at that time, it had been nearly a year and a half since I left the Attorney General's Office. Any partiality and appearance-of-partiality concerns based on our professional relationship as colleagues from July 2015 to July 2018 had likely dissipated by November of 2019. Nonetheless, out of an abundance of caution that someone, somehow, could still question my impartiality, I decided that an additional cooling-off year was the wisest course and placed the Attorney General on my recusal list. In September of 2020, I removed the Attorney General from my recusal list. At that time, it had been over two years since I left the Attorney General's Office. After two years, in my view, no reasonable person could possibly consider our past professional relationship to affect my ability to be impartial.

Today, we are even further removed from my tenure as Solicitor General and my past professional relationship with the Attorney General. It has been approximately three-and-a-half years since I left the Office of the Attorney General. To put that into context, I have been out of that Office for more time than I worked there. This type of past professional relationship does not trigger a need for appearance-of-partiality recusal under the reasonable-person standard. As I have

already explained above, it is far less than the type of ongoing personal friendship that Justice Scalia concluded did not require recusal in cases where the friend was a defendant in an official capacity only. Like Governor Hutchinson, Attorney General Rutledge does not face any personal liability here. Nor is she in any way directly impacted by the outcome of this case. No one suggests she is running for the Arkansas House of Representatives, either now or in the future. Moreover, as I also explained above, the Plaintiffs' suggestion (unsupported by case law) that this case meaningfully differs from other official-capacity cases is unpersuasive.

Judges frequently come to the bench having served as high-level government lawyers. That often means coming to the bench having had professional relationships with high-level government officials. For one high profile example—an example that highlights a far closer relationship than what is involved in the instant case—consider Justice Byron White and United States Attorney General Robert Kennedy:

> Justice White was close friends with Attorney General Robert Kennedy from the days when White had served as Kennedy's Deputy Attorney General. In January 1963, the Justice went on a skiing vacation in Colorado with Robert Kennedy and his family, Secretary of Defense Robert McNamara and his family, and other members of the Kennedy family. . . . At the time of this skiing vacation there were pending before the Court at least two cases in which Robert Kennedy, in his official capacity as Attorney General, was a party. . . . In the first of these, moreover, the press might have said . . . that the reputation and integrity of the Attorney General were at issue. There the Department of Justice had decreed deportation of a resident alien on grounds that he had been a member of the Communist Party. (The Court found that the evidence adduced by the Department was inadequate.)
>
> Besides these cases naming Kennedy, another case pending at the time of the skiing vacation was argued to the Court by Kennedy about two weeks later. *See Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). That case was important to the Kennedy administration, because by the time of its argument everybody knew that the apportionment cases were not far behind, and *Gray* was a significant step in the march toward *Reynolds v. Sims*, 377 U.S. 533 (1964). When the decision was announced, it was front-page news. . . . Attorney General Kennedy argued for affirmance of a three-judge District Court's ruling that the Georgia Democratic Party's county-unit voting system violated the one-person,

one-vote principle. This was Kennedy's only argument before the Court, and it certainly put "on the line" his reputation as a lawyer, as well as an important policy of his brother's administration.[33]

Justice White did not recuse in those cases and no one suggested he should have.[34] The basic rule for former government lawyers is that recusal is required "[w]here [a judge] has served in governmental employment and in such capacity participated as counsel, adviser, or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy."[35] I have not done these things. No one suggests I have. And, while this rule does not strictly limit the situations in which a past professional relationship based on government employment could give rise to a reasonable concern about a judge's impartiality, it certainly suggests that more than normal high-level government service is necessary to trigger a reasonable appearance-of-partiality concern.

As to the dissipation of any potential taint from my past professional relationship with the Attorney General, it is worth considering the recommended cooling-off period before former law clerks may appear before the judge for whom they clerked. The judge-former law clerk relationship is generally far more substantial than (or at least as substantial as) a judge's relationship with an old boss. Moreover, the importance of prevailing in a case to the former law clerk is more substantial than is the importance of prevailing in a case to a government official sued in his or her official capacity. The young lawyer has far more riding on it.

The general consensus appears to be that a year cooling-off period is enough to preclude a reasonable person from harboring doubts about a judge's impartiality as to a former law clerk.

---

[33] *Cheney*, 541 U.S. at 925 (internal citations omitted).

[34] *Id.* at 924–25.

[35] 28 U.S.C. § 455(b)(3); Code of Conduct for United States Judges, Canon 3(C)(e).

Consider an Advisory Opinion from the Advisory Committee on Judicial Conduct of the District of Columbia Courts:

> A recurring issue for judges involves whether they should disqualify themselves when former law clerks appear before them. Rule 2.11(A) of the Code of Judicial Conduct requires judges to disqualify themselves in any proceeding in which their impartiality might reasonably be questioned. Judges are not automatically required to disqualify themselves whenever a former law clerk appears before them. However, an appearance within a short period of time after the end of the clerkship could, in some circumstances cause a reasonable person to question a judge's impartiality, and a waiting period may alleviate this concern. How long that period of repose should be is a matter of judgment. The Advisory Committee on Judicial Conduct advises as a general rule of thumb that law clerks should not appear before the judges for whom they clerked within a year after the end of the clerkship. A longer period may be appropriate depending on the relationship between the judge and the former law clerk. Judges should also ensure that their former law clerks understand that they may not participate in matters in which they were involved during their clerkships, and that they may not use or disclose confidential information obtained in the course of their duties.[36]

In this case, far more than a year has elapsed since my government service. It has been three-and-a-half years. This cooling-off period—more than triple the recommended cooling-off period for former law clerks—is enough. No reasonable person can harbor doubts about my impartiality as to the Attorney General, including my ability to fairly evaluate any testimony she might give.[37]

---

[36] Advisory Committee on Judicial Conduct of the Dist. of Columbia Courts, Advisory Opinion No. 13 (July 9, 2014), https://www.dccourts.gov/sites/default/files/divisionspdfs/Disqualification-When-Former-Law-Clerks-Appear-Before-Judges-7-9-14.pdf. There might be a fair argument that a two-year cooling-off period is better. Advisory Opinion Number 24 from the *Guide to Judicial Policies and Procedures* "recommends recusal from cases involving the judge's former employer for the first two years after a judge leaves that employer." *Molette v. Title Max*, No. 1:13-cv-1615, 2013 WL 11327699, at *4 (N.D. Ga. June 11, 2013). Again, I left the Office of the Attorney General over three-and-a-half years ago.

[37] I have also considered whether the whole is greater than the sum of its parts. That is, even if no reasonable observer could harbor doubts about my impartiality based on any of the relationships or acts discussed above, does the combination of them somehow multiply their significance or effect in a way that changes the analysis? In this case, given the passage of time involved and the official-capacity nature of the suit, I conclude that the whole equals but does not exceed the sum of its parts. I donated to the Governor's re-election campaign in January of 2018 (nearly four years ago). I donated to Attorney General Rutledge's campaign even earlier, in March of 2017 (nearly five years ago). And while I cannot recall the month in which I hosted the fundraiser for the Attorney General, it logically would have been before the November 2018 election—that's over three years ago. My employment for the Office of the Attorney General ended in July 2018 (nearly three-and-a-half years ago). Temporal distance alone is sufficient to assuage all but the unreasonable person's doubts about my impartiality in this official-capacity case, including my ability to fairly

The two cases Plaintiffs focus on miss the mark. Plaintiffs liken the case at bar to *United States v. Bobo*.[38] As another judge in the Eastern District of Arkansas stated, "[*Bobo*] is a non-controlling case with appreciably different facts."[39] *Bobo* was a criminal case in which three defendants, including a former governor, were indicted for corruption.[40] *Bobo*, with its personal criminal implications, is a far cry from the civil official-capacity claims lodged here against the Governor and the Attorney General. To repeat, neither the Governor nor the Attorney General faces personal liability. This distinction is incredibly important and always has been in recusal precedent. In any event, the judge in *Bobo* unequivocally said that nothing in the case compelled him to step aside.[41] It is true that the judge ultimately recused, but his decision to do so seems to ignore the concomitant duty a judge has to sit in cases where recusal is not *required*.[42] I cannot ignore that duty.[43]

Plaintiffs also point to Judge Baker's decision on a recusal motion in *Burton v. Arkansas Secretary of State*.[44] For starters, Judge Baker denied the motion.[45] Plaintiffs know that, but find significance in the length of time that Judge Baker says she listed Pat O'Brien on her recusal list.[46] In 2010, prior to her judicial appointment, Judge Baker hosted a fundraiser for and donated money

---

evaluate any testimony that might be given. There's just no fire to the recusal grounds urged by the Plaintiffs, and any smoke that might have existed cleared years before this case was filed.

[38] Br. in Supp. of Pls.' Mot. for Recusal (Doc. 28) at 6; *see also Bobo*, 323 F. Supp. 2d 1238 (N.D. Ala. 2004).

[39] *Burton v. Arkansas Sec'y of State*, No. 4:11-cv-00710-KGB, 2015 WL 11090414, at *8 (E.D. Ark. Feb. 26, 2015).

[40] *Id.*

[41] *Bobo*, 323 F. Supp. 2d at 1241.

[42] *Id.* at 1242–43.

[43] Plaintiffs say that the judge in *Bobo* "recused himself because he determined that a reasonable observer could question his impartiality." Br. in Supp. of Pls.' Mot. for Recusal (Doc. 28) at 6. Not so. Under the reasonable-observer standard, the judge said that recusal was not required. *Bobo*, 323 F. Supp. 2d at 1241.

[44] Br. in Supp. of Pls.' Mot. for Recusal (Doc. 28) at 7–8.

[45] *Burton*, 2015 WL 11090414, at *8.

[46] Br. in Supp. of Pls.' Mot. for Recusal (Doc. 28) at 8.

to Mr. O'Brien, who was then running for Secretary of State.[47] He lost.[48] In 2012, Judge Baker took the bench and placed Mr. O'Brien on her recusal list.[49] Mr. O'Brien remained on that list at the time Judge Baker decided the recusal motion (February of 2015).[50] Plaintiffs appear to suggest that I should similarly apply a five-year cooling-off period.[51]

Judge Baker did not expound on her reasons why Mr. O'Brien was on her recusal list in 2015. She certainly did not say that her pre-appointment political activity alone led her to make that decision. To the contrary, Judge Baker specifically said that such activity could not suggest bias.[52] Judge Baker is in good company; "[c]ourts that have considered whether pre-judicial political activity is . . . prejudicial regularly conclude that it is not."[53]

## Conclusion

Some members of the public might be under the impression that judges relish sitting on cases like the one at bar. Let me remedy that misconception. Cases like the one at bar are thankless tasks. Generally, they take an inordinate amount of time, involve incredibly complicated and nuanced fact-finding, are highly emotional for the litigants, lawyers, and public, and end with

---

[47] *Burton*, 2015 WL 11090414, at *1.

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] Br. in Supp. of Pls.' Mot. for Recusal (Doc. 28) at 8.

[52] *See Burton*, 2015 WL 11090414, at *8 ("Even if the pre-appointment political activity could suggest bias—*which it does not*—that conduct has no relationship to [one of the Defendants].") (emphasis added).

[53] *In re Mason*, 916 F.2d at 386 (collecting cases); *see also Higganbotham*, 328 F.3d at 645 (10th Cir. 2003) ("It is, of course, an inescapable part of our system of government that judges are drawn primarily from lawyers who have participated in public and political affairs. The fact of past political activity alone will rarely require recusal.") (internal quotations omitted). Whatever reason Judge Baker had for keeping Mr. O'Brien on her recusal list, my review of the case law makes clear that pre-appointment political activity like the contributions and the hosting of a fundraiser in the case at bar are not enough to trigger the need for recusal based on appearance-of-partiality concerns.

16

conclusions that satisfy no one. Judges dutifully preside over these cases not because we want to, but because we have taken a sacred oath to serve the public by administering justice in all cases.

Recusing when it is not necessary under the law is the easy choice. It allows a judge to avoid cases he or she does not want to decide. It allows a judge to avoid cases with hard calls, cases that are high-profile, cases where there will be public controversy no matter how the issue is decided, cases that are a lot of work, and so on. It foists those cases onto colleagues who already have large dockets and hard cases of their own. This sort of duck-and-cover maneuver is an abdication of the judicial role and an insult to one's colleagues in the district. Because I have concluded that my impartiality cannot reasonably be questioned in this case and that I can fairly evaluate the testimony of any witness likely to be called in this case, I cannot recuse.[54] Plaintiffs' Motion for Recusal is therefore DENIED.

IT IS SO ORDERED this 5th day of January 2022.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[54] Although Plaintiffs only argue the existence of an appearance of partiality, I have taken it upon myself to consider whether actual prejudice, bias, or conflict exists. *See* 28 U.S.C. § 455(b). They do not.