**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**THE ARKANSAS STATE CONFERENCE NAACP**, *et al.*,                    **PLAINTIFFS**,

**v.**                              **Case No. 4:21-cv-01239-LPR**

**THE ARKANSAS BOARD OF APPORTIONMENT**, *et al.*               **DEFENDANTS.**

RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

The Court should deny Plaintiffs' motion for a preliminary injunction because they are not likely to succeed on the merits of their claim that Arkansas's state House of Representatives districts violate Section 2 of the Voting Rights Act.  On the merits, Plaintiffs are unlikely to succeed because their claim ultimately rests on a mistaken assumption that the number of majority-minority districts must precisely mirror the state's population.  And while that alone is fatal to their argument, Plaintiffs are also unlikely to succeed because they cannot satisfy two of the three *Gingles* preconditions.  In particular, they have not shown—as required to prevail on a Section 2 claim—that the polarized voting they allege is caused by racial bias.  Instead, at most, they merely allege a pattern of defeat for one particular political party, and that's not a basis for relief.  Nor have Plaintiffs shown, as also required by *Gingles*, that it is possible to draw five additional compact majority-minority districts.  To the contrary, Plaintiffs' proposed districts consist of a three-tentacled tricorn (*see* DE 2-7 at 43) and a series of districts that split cities, divide counties, and bounce back-and-forth across highways.

Further, even if Plaintiffs could show they were likely to succeed on the merits, a preliminary injunction would still be inappropriate because it would inject chaos into Arkansas's already ongoing 2022 election cycle.  The candidate filing period is just weeks away, candidates have already begun their campaigns, and moving that deadline to redraw legislative districts will

undisputedly lead to a cascading effect on other deadlines that would leave voters confused and threaten to disenfranchise countless Arkansans.  Indeed, Plaintiffs' deliberate decision to wait until well after the challenged maps were finalized alone warrants denying their request for preliminary relief.   Plaintiffs' motion should be denied.

BACKGROUND

The Arkansas Constitution grants the Board of Apportionment the responsibility to reapportion State legislative districts after each decennial Census.  *See* Ark. Const. art. 8.  This year's reapportionment process was heavily impacted by the COVID-19 pandemic and the delayed release of 2020 redistricting data from the Census Bureau.[1]  The Board began preparing for the reapportionment process far in advance of the receipt of the Census data, but absent that data it could not complete its work.

Beginning in January, 2021, staff from the offices of the Attorney General, Governor, and Secretary of State began to review the previous reapportionment website hosted by the Secretary of State and update it.  Declaration of Andy Davis ("Davis Decl.") ¶ 3.[2]  This process involved reviewing the relevant legal standards and agreeing upon the criteria to be used in drawing district maps.  *Id.*  These discussions and meetings occurred in the lead-up to the first formal Board meeting, which took place on May 24, 2021.  *Id.* ¶ 4.  The Board would go on to hold a total of four public meetings at which the Board members were present, in addition to eight public hearings at which Board staff (but not Board members) attended to present to citizens information about the process, answer questions, and receive public comments.[3]  *Id.*

---

[1] https://www.census.gov/newsroom/press-releases/2021/statement-redistricting-data-timeline.html.

[2] The Davis Declaration is attached to this Response as Exhibit 1.

[3] https://arkansasredistricting.org/events-calendar/.

In consultation with the Board members, and with their approval, Board staff settled upon the following criteria and goals for the redistricting process:

1.  Draw districts with populations meeting the one person, one vote requirement;
2.  Comply with the Voting Rights Act;
3.  Comply with the limits of the Equal Protection Clause as to redrawing boundaries based on race;
4.  Compactness;
5.  Contiguous/continuity;
6.  Minimize splitting political subdivisions (cities, counties, and precincts);
7.  Maintain communities of interest;
8.  Continuity of representation (avoid pairing incumbents);
9.  Minimize partisanship.[4]

Davis Decl. ¶ 4.  Beginning around April 2021, staff members began gathering information relevant to the process, including the names and addresses of incumbents and which current legislators were planning to run for reelection.  *Id.*  This information in particular was necessary to further the goal of continuity of representation.

In August 2021, the Census Bureau released "Summary Files" in the "Legacy" format. *Id.* ¶ 5.  While staff members could use this data in order to familiarize themselves with the redistricting software purchased by the Board, the accuracy of the data had not yet been certified by the Census Bureau, so the Board could not actually start drawing districts.  *Id.*  The Census Bureau released the full redistricting toolkit containing certified data around September 16, 2021.[5]  Staff members began drawing district maps upon receiving the necessary data.  *Id.* ¶ 6.

Staff members began drawing Senate maps first because of the fewer number of districts and better information about incumbents.  *Id.*  The House districts were more challenging.  *Id.* Around October 14, 2021, staff members met to compare various map proposals and reach a

---

[4]  *See* https://arkansasredistricting.org/about-the-process/redistricting-criteria-and-goals/.

[5]  https://www.census.gov/programs-surveys/decennial-census/about/rdo/summary-files.html#:~:text=The%202020%20Census%20Redistricting%20Data%20(P.L.,only%20the%20format%20was%20different.

consensus by the October 29, 2021 planned date for the Board to publish maps for public comment. *Id.* ¶ 7. Around the week prior to October 29, staff members had finished initial map drafts. *Id.* At that point, staff members began to overlay race data from the Census Bureau onto the drafted maps to check for compliance with the VRA. *Id.* Staff determined that an additional majority-minority district was warranted in central Arkansas, as well as a majority-Hispanic district in Northwest Arkansas. *Id.* The Board considered whether an additional majority-minority district could be added in Northeast Arkansas and South Arkansas, but it determined that it could not be done without illegally gerrymandering on the basis of race. *Id.* Existing majority-minority districts were preserved, where possible.

Public comment on the proposed maps began on October 29 and ended on November 29. Board staff reviewed comments and made corrections and improvements to the proposed map where it was warranted. The Board adopted the final plan for legislative districts on November 29, and that plan became effective on December 29. Ark. Const. art. 8, sec. 4. Despite being on notice of the plans adopted by the Board since November 29, Plaintiffs waited to sue until the effective date of the Plan and seek a preliminary injunction barring the use of the Board's approved maps for the 2022 election. Given the looming election deadlines for the 2022 Preferential Primary, *see* Declaration of Josh Bridges ("Bridges Decl.") ¶¶ 5-10,[6] any preliminary injunctive relief risks significant chaos and voter confusion.

## STANDARD OF REVIEW

A preliminary injunction is an extraordinary, disfavored remedy, *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). Plaintiffs bear the burden of establishing the propriety of the requested relief, and they must make "a clear showing" they have carried that burden. *Winter*, 555

---

[6] The Bridges Declaration is attached to this Response as Exhibit 2.

U.S. at 22; *see Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).  Plaintiffs are only entitled to relief upon showing that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.  *Winter*, 555 U.S. at 24-25; *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc).  Additionally, Plaintiffs' burden here "is a heavy one" because "granting the [requested relief] will give [them] substantially the relief [they] would obtain after a trial on the merits."  *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir. 1991).  Plaintiffs do not—and cannot—make that showing.

**ARGUMENT**

## I.     Plaintiffs are unlikely to succeed on the merits

The first preliminary-injunction factor, of course, is likelihood of success on the merits.  In the Eighth Circuit, when a plaintiff seeks "a preliminary injunction of the implementation of a state statute," the plaintiff must show an actual likelihood of success, not just a fair chance of prevailing.  *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731-32 (8th Cir. 2008) (en banc); *see also Planned Parenthood of Ark & E. Okla. v. Jegley*, 864 F.3d 953, 957-58 (8th Cir. 2017).  Plaintiffs fleetingly suggest this standard does not apply to the Board of Apportionment's State House districting plan because it is drawn by the Board, not the state legislature. (DE 3 at 7 n.9.)

Plaintiffs are wrong.  The Board acts in a quintessentially legislative capacity when it apportions the State House, and its plans have the legal effect of statutes.  Plaintiffs suggest that the Eighth Circuit would only apply its rule to actions that run the gamut of "the full play of the democratic process" (*id.* (citing *Rounds*, 530 F.3d at 732 n.6)), but the precedent the Eighth Circuit drew on, and discussed in the footnote Plaintiffs cite, required a heightened showing of likelihood for any "action . . . taken pursuant to a statutory or regulatory scheme," excepting only agency

actions taken "altogether outside of a regulatory framework." *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995).  In fact, that precedent required that heightened showing for the Department of Defense's "Don't Ask, Don't Tell" regulations, observing that those regulations were the subject of "lengthy public debate." *Id.*  Here too, the Board's proposed plan was the subject of lengthy public debate and comment before being adopted, unlike the unilateral agency actions the Second Circuit carved out from its general rule.  A showing of actual likelihood of success is required here.

### A.     Plaintiffs apparently lack standing.

At the outset, the State notes that Plaintiffs have thus far failed to affirmatively establish they have standing to challenge Arkansas's legislative districts, as they must do in order to show a likelihood of success on the merits of their case.  To establish standing, a plaintiff must show a concrete injury that this Court can redress, that is "fairly traceable to the challenged action." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  They must also show "that a favorable judicial decision will prevent or redress the injury."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

Though the Court ordered Plaintiffs to provide factual support for their assertion that they have racial-minority members in each of the challenged districts, the deadline set by the Court has passed.  Defendants reserve the right to address standing in their surreply brief, depending on the state of Plaintiffs' evidence at that time.

### B.     Plaintiffs are unlikely to satisfy the *Gingles* preconditions.

Plaintiffs claim that the Board of Apportionment's State House districting plan violates Section 2 of the Voting Rights Act.  That provision prohibits voting practices that "result[] in a denial or abridgment of the right . . . to vote on account of race or color."  52 U.S.C. 10301(a).  Under Section 2, such a denial or abridgment is only established if the members "of a class of

citizens . . . have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* 10301(b).

To decide whether that standard is met, the Supreme Court has established three "necessary preconditions" for proving that an electoral structure "operate[s] to impair minority voters' ability to elect representatives of their choice." *Gingles*, 478 U.S. at 50.  These preconditions do not "standing alone, . . . prove dilution." *Johnson v. DeGrandy*, 512 U.S. 997, 1012 (1994).  But they are "necessary preconditions for a claim that the use of multimember districts constitute[s] actionable vote dilution under § 2." *Bartlett v. Strickland*, 556 U.S. 1, 11 (2009) (plurality op.).  Indeed, "unless *each* of the three *Gingles* prerequisites is established, 'there neither has been a wrong nor can be a remedy.'" *Cooper v. Harris*, 137 S. Ct. 1455, 1472 (2017) (quoting *Growe v. Emison*, 507 U.S. 25, 41 (1993)).  Thus, failure to prove any one of the preconditions is fatal on the merits, and accordingly, a failure to prove a likelihood of success on any one of the preconditions is fatal to Plaintiffs' request for a preliminary injunction.

Plaintiffs are unlikely to satisfy two of the three *Gingles* preconditions.  The first precondition requires Plaintiffs to show that black voters in Arkansas are a "sufficiently large and geographically compact" minority group "to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50.  As applied to Plaintiffs' claims, which seek five additional majority-black districts, that means they must show it is possible to draw five compact majority-black districts. It may be mathematically possible to draw an additional five majority-black districts, but it is not possible to draw an additional five *compact* majority-black districts in the sense that term is used in the doctrine.  Under Supreme Court and Eighth Circuit precedent, a compact *Gingles* 1 district must do two things: (1) not place significant numbers of voters within the district because of their race; and (2) not combine disparate communities of interest that only share race in common.

At least five of Plaintiffs' proposed majority-black districts suffer from one or both infirmities, meaning Plaintiffs are unlikely to satisfy *Gingles*'s first precondition.

Plaintiffs are also unlikely to satisfy *Gingles*'s third precondition, which asks whether "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51. They are likely to fail for two reasons. First, as three Circuits have held, Section 2 is only concerned with white bloc voting that is motivated by racial bias. That is the best reading of *Gingles* itself, where five Justices agreed in separate opinions that the motives of white voters mattered, and it is the best reading of the statute. Under that rule, Plaintiffs would certainly fail, because their own statistics show that the overwhelming cause of black voters' preferred candidates' defeats in State House races is their party, not their race.

Second, even if the Court should reject this reading of Section 2, Plaintiffs have failed to show white bloc-voting in most of the districts they claim must become majority-black to afford black voters electoral opportunity. Plaintiffs document a considerable amount of partisan polarization of white and black voters, and defeats for black voters' preferred Democratic candidates in majority-white districts and statewide elections. But in three of the five districts Plaintiffs would actually restructure from majority-white to majority-black, black voters' preferred candidates already hold office and stand a better than even chance of being reelected—in some cases, by Plaintiffs' own concession, and in all cases under Plaintiffs' own estimates of past electoral performance. So even if the Court rejects the State's interpretation of what the third precondition requires, Plaintiffs would at most have viable claims as to only two of the additional majority-black districts they seek.

**1.      Plaintiffs are unlikely to satisfy the first *Gingles* precondition.**

a.      **What Gingles's first precondition requires.**

The first *Gingles* precondition, again, requires Plaintiffs to show that black voters in Arkansas are a group that "is sufficiently large and geographically compact to constitute a majority in a single-member district."  478 U.S. at 50.  Here, because Plaintiffs seek an additional five majority-black districts, what that means is that Plaintiffs must show it is possible to draw an additional five compact majority-black districts.  If they can only show it is possible to draw four, or three, they can only proceed to the following preconditions on those four or three.  Likewise, if Plaintiffs can't prove it is possible to draw any more majority-black districts than the 11 in the Board's plan, their entire claim fails at the first precondition.

As Plaintiffs agree, to satisfy *Gingles*'s first precondition, they must show it is possible to draw majority-black districts that are "sufficiently compact."  (DE 3 at 12 (quoting *Abrams v. Johnson*, 521 U.S. 74, 92 (1997); *see also LULAC v. Perry*, 548 U.S. 399, 430 (2006) ("[T]here is no § 2 right to a district that is not reasonably compact.").)  Compactness, in this context, has a particular meaning, and it's one that Plaintiffs' proposed additional majority-black districts do not satisfy.  First, a district must be geographically compact.  In the Eighth Circuit, that means its boundaries may not be predominantly motivated by race, as opposed to other neutral districting principles.  Second, the district's minority population itself must be compact, and cannot combine distant populations of a racial group that share little in common but their race.

i.      *Geographical compactness.*

Beginning with geographical compactness, the Supreme Court has held that "the § 2 compactness inquiry should take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'"  *Abrams*, 521 U.S. at 92 (quoting *Bush*

*v. Vera*, 517 U.S. 952, 977 (1996)).  Thus, a "district that 'reaches out to grab small and apparently isolated minority communities' is not reasonably compact."  *LULAC*, 548 U.S. at 433 (quoting *Vera*, 517 U.S. at 979).

The Eighth Circuit has taken this guidance to heart.  After the Supreme Court announced a *constitutional* rule, subject to a possible Section 2-compliance defense, against drawing districts where "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," *Miller v. Johnson*, 515 U.S. 900, 916 (1995), the Eighth Circuit adopted that rule under Section 2, holding that "[a]ny remedy drawn in order to correct a § 2 violation should 'steer clear of the type of racial gerrymandering proscribed in *Miller*.'"  *Stabler v. Cnty. of Thurston*, 129 F.3d 1015, 1025 (8th Cir. 1997) (quoting *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1391 (8th Cir. 1995) (en banc) (so directing lower court on remand)).

Thus, in the Eighth Circuit, a district does not satisfy *Gingles*'s first precondition "if race is the predominant factor in placing voters within or outside of a particular district."  *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006).  The Eighth Circuit has so held a number of times.  In *Stabler*, it rejected the argument that "a districting plan adopted or imposed as a remedy for a § 2 violation necessarily uses race as part of its basis," 129 F.3d at 1024, and held that plaintiffs' proposed districts did not satisfy *Gingles*'s first precondition because "race was the predominant factor" motivating their composition, *id.* at 1025.  Then in *Cottier v. City of Martin*, applying *Gingles*'s first precondition, it held that proposed districts did satisfy that precondition because race wasn't "the predominant factor motivating the placement of a significant number of

voters within or without a particular district." 445 F.3d 1113, 1117 (8th Cir. 2006).[7] Finally, in *Bone Shirt*, the Eighth Circuit again held that proposed remedial districts satisfied *Gingles*'s first precondition for lack of a predominant racial motive, noting that they simply consisted of whole Indian reservations and neighboring counties, and thus were "not so irregularly shaped that it seems the primary principle in shaping the district was to include or exclude Native-Americans." *Bone Shirt*, 461 F.3d at 1019.

Plaintiffs are likely to resist this reading of Eighth Circuit precedent because it is fatal to their claims. Given that (and in the interest of speeding resolution of this matter), Defendants will rebut Plaintiffs' most obvious rejoinders. One probable rejoinder is that the Supreme Court has assumed (though it has never so held) that racially motivated districting of the kind described in *Miller* satisfies strict scrutiny if it is required by Section 2. *See Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017) (citing *Shaw v. Hunt*, 517 U.S. 899, 915 (1996)). But even if that assumption were accurate, the Eighth Circuit has long instructed lower courts in Section 2 cases "to steer clear of the type of racial gerrymandering proscribed in *Miller*," even if they find Section 2 is violated. *Harvell*, 71 F.3d at 1391. That's because the Eighth Circuit reads Section 2—as a statutory matter—as not requiring districts be drawn primarily based on race, whether or not requiring them would be constitutional.

Another likely rejoinder is that questions of racial gerrymandering are appropriately considered only at the remedial stage, not at the liability stage, and that at this stage Plaintiffs need not propose ultimately permissible districts. That is not right either. It's true that at this stage

---

[7] *Cottier*, which applied *Stabler* in this respect, was later overruled over how it addressed *Gingles*'s third precondition in plaintiffs' favor. *See Cottier v. City of Martin*, 604 F.3d 553, 562 (8th Cir. 2010) (en banc). Though it is no longer "binding circuit precedent," *id.*, its application of *Stabler* remains persuasive.

Plaintiffs need not prove that their proposed districts would be effective, or "present the final so-
lution to the problem." *Cottier*, 445 F.3d at 1117.  But "[t]o establish the first *Gingles* precondi-
tion," they must prove that at least "a *proper* and workable remedy exists." *Id.* (emphasis added)
(citing *Stabler*, 129 F.3d at 1025); *see also Bone Shirt*, 461 F.3d at 1025 (Gruender, J., concur-
ring in the judgment) ("If no 'proper and workable remedy exists,' then a plaintiff's claims fail
as a matter of law.") (quoting *Cottier*, 445 F.3d at 1117).  Part of proving the existence of a
"proper" remedy, of course, is proving that one exists that doesn't racially gerrymander—a ques-
tion both *Cottier* and *Stabler* addressed at the liability stage, in reviewing liability-stage judg-
ments for defendants.

### ii. *Minority-group compactness*

At another level, the "first *Gingles* condition refers to the compactness of the *minority
population*, not to the compactness of the contested district." *LULAC*, 548 U.S. at 433 (quotation
marks omitted) (emphasis added).  The minority population in a proposed district is not reasona-
bly compact—and the district thus does not satisfy *Gingles*'s first precondition—where that dis-
trict "combines two farflung segments of a racial group with disparate interests." *Id.*  In *LULAC*,
for example, the Court considered a Texas district that combined "the Latino community near the
Mexican border and the one in and around Austin." *Id.* at 434.  It highlighted "the different char-
acteristics, needs, and interests" of these two communities—differences that "should not be dis-
regarded in the interest of race." *Id.*  Based on these differences, *LULAC* held that this proposed
district was not reasonably compact. *Id.* at 435.

### b.   **Plaintiffs' maps don't satisfy Gingles one.**

At least five of Plaintiffs' illustrative districts flout these principles, whether by patently
including or excluding significant numbers of voters because of their race, combining farflung
black populations with disparate interests, or simply by splitting communities of interest.

District 55.  Plaintiffs' proposed District 55 in Blytheville and other parts of eastern Mississippi County (DE 2-7 at 93) is racially gerrymandered.  Its western boundary crosses back and forth across I-55 and for nearly its entire length is simply a narrow strip.  Davis Decl. ¶ 35.  At its northeastern point, it reaches into Blytheville, but then stops barely short of Mississippi County's (and the state's) northern border, leaving District 54 to 55's west to pick up the northeastern corner of the county through a 1.25-mile wide, literally unpopulated slice of land at the Missouri-Arkansas border.  *Id.* ¶ 36.  Thus, District 54 sits both east and west of District 55.  *Id.*  Plaintiffs' demographer's compactness scores confirm the district's extremely odd shape.  It has a Polsby-Popper score of .08 (DE 2-8 at 118), on a scale of 0 to 1 (*id.* at 122), and a Reock score of .19 (*id.* at 118), again on a scale of 0 to 1 (*id.* at 122).  These are a fraction of even Plaintiffs' plan's average compactness scores—.27 for Polsby-Popper and .40 for Reock.  (DE 2-7 at 17.)  And the Polsby-Popper score is less than half of that for the State's district in the same area, District 34.  (DE 2-8 at 125.)

The reason Plaintiffs' proposed District 55 is so oddly shaped, especially in its northeastern extremities, was to hit the 50% black voting-age population target of which the State's non-gerrymandered District 34 was just shy.  (DE 2-8 at 94 (listing 45.84% black voting-age population for District 34).)  Had Plaintiffs' mapmaker included the precincts to District 55's east that their proposed District 54 snakes around to grasp, District 55 would have been closer to the population mean—2.67% overpopulated, instead of 3.56% underpopulated.  Davis Decl. ¶ 37.  Likewise, District 54 would have been only 1.37% underpopulated, instead of 4.85% overpopulated.  *Id.*  But District 55 would not have met its population target; the black voting-age population of the district would have fallen approximately 2.5%, from the 51.41% black voting-age population

in District 55's proposed form.  *Id.* ¶ 38.  Thus, Plaintiffs' District 55 patently excludes a signifi-cant number of voters solely because of their race, at the cost of compactness and increased pop-ulation variance.

District 16.  Plaintiffs' proposed District 16 (DE 2-7 at 54) stitches together geograph-ically disparate black populations that share little in common but their race.  District 16 stretches at its westernmost extremity from rural Arkadelphia to, at its easternmost extremity, a populous, predominantly minority section of Pine Bluff—an hour and a half drive away within a single House district out of a hundred, in a state where the two farthest points are approximately only five hours away.  Davis Decl. ¶ 21.

Pine Bluff and Arkadelphia have little in common; "most any Arkansan would say that Arkadelphia and Pine Bluff are dissimilar communities."  *Id.*  Pine Bluff is considered the heav-ily urbanized metro capital of the Delta and Arkansas southeast.  *Id.*  Arkadelphia is a central town of the Arkansas southwest.  *Id.*  A college town with two small universities, it sits in timber country and is surrounded by lakes and rivers that attract anglers, boaters, and other tourists.  *Id.*  There is not even a highway connecting the two cities, or major east-west route that would ena-ble a resident of one city to easily drive to the other.  *Id.*  The most direct route between the two cities is outside the plaintiffs' proposed district.  *Id.*

District 5.  Plaintiffs' proposed District 5 (DE 2-7 at 43) is non-compact and racially ger-rymandered.  An odd, three-tentacled tricorn shape, at its northern apex it stretches into Ouachita County to snare parts of Camden; at its southwestern corner it reaches deep into Columbia County to grab parts of Magnolia; and it its southeastern corner it extends via a narrow slice of Union County to loop in parts of El Dorado (which is split three ways under Plaintiffs' illustra-

tive plan, into Districts 5, 6, and 7).  Thus, it includes portions of three major Southwest Arkansas cities, but not all of any of them.  This means that none of them will have a champion in the General Assembly; each will have multiple representatives who will have to balance their issues with the needs of constituents in other cities or more rural portions of the neighboring counties. Davis Decl. ¶ 13.

Again, Plaintiffs' own compactness metrics confirm that District 5 is not compact.  Its Polsby-Popper score, on a scale of 0 to 1, is .12, less than half of Plaintiffs' own plan's average score; its score on the more generous Convex Hull metric is .47, well below Plaintiffs' average score of .74.  (*Compare* DE 2-8 at 114 *with* DE 2-7 at 13.)  The State's version of the same district, by contrast, District 98, which encompasses all of Camden, parts of Magnolia, and none of El Dorado (DE 2-8 at 83), has a Polsby-Popper score of .28, over twice as high, and a Convex Hull score of .76 (*id.* at 130).

It appears that the reason for District 5's trio of complex city splits is race.  For example, the portion of El Dorado included in the district splits a precinct entirely within the El Dorado city lines.  Davis Decl. ¶ 16.  Absent this split, El Dorado would be split between two districts, not three, and splitting the half-precinct off wasn't necessary to keep the district within population limits.  *Id.*  However, if Plaintiffs' mapmaker had kept that portion of the precinct, the district's whisker-thin 50.01% black CVAP majority would have fallen below 50%.  *Id.*

Districts 12 and 48.  Plaintiffs' proposed Districts 12 (DE 2-7 at 50) and 48 (*id.* at 86) are non-compact.  District 48 splits Phillips County's population center, Helena-West Helena, from the rest of Phillips County, and connects it to a string of counties and portions of counties to the north and northwest that have no highway connection to Helena-West Helena.  Davis Decl. ¶ 31. For a representative of District 48 who lives in Helena to visit the rest of his district, he would

15

have to travel through District 12 (in which Helena naturally belongs), or trek through the St. Francis National Forest.  *Id.*

District 12, meanwhile, which is underpopulated by barely below 5%, stretches from the Mississippi River to the border of Pulaski County without following a major highway or navigation system.  *Id.* ¶ 26.  It assigns the unincorporated areas of Phillips County, which are split from its municipal center in District 12, to a district dominated by Pine Bluff, three counties to its west with little community connection.  *Id.*  It removes the incumbent representative of Helena-West Helena, who lives in Marvel, from his current district, and places him in District 12, a district that has a population center that's closer to Little Rock than to his home county.  *Id.* ¶ 33.  And it splits Pine Bluff.  *Id.* ¶ 27.  Unsurprisingly, it rates poorly on Plaintiffs' compactness metrics, with a Polsby-Popper score of .15, or about half the plan's average score.  (DE 2-8 at 115.)  Districts 12 and 48 are non-compact.

## 2.    Plaintiffs are unlikely to satisfy the third *Gingles* precondition.

The third *Gingles* precondition requires Plaintiffs to "demonstrate that the white majority votes sufficiently as a bloc to enable it . . . *usually* to defeat the minority's preferred candidate."  *Gingles*, 478 U.S. at 51.  Plaintiffs say they satisfy this precondition easily.  Black voters' preferred candidates, they claim, "[a]re usually Democrats" (DE 3 at 17), and outside of majority-black districts, they offer evidence that those Democrats usually lose (*id.* at 18).  What more need Plaintiffs prove?

The answer is a great deal.  The first shortcoming in Plaintiffs' evidence is that it merely establishes a pattern of partisan defeats.  But "[t]he Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates."  *Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992)

(Easterbrook, J.).  Nor does it guarantee that black Democrats will be elected, even if black voters support black Democrats.  Rather, as three Circuits have held and Judge Easterbrook argued in dicta in *Baird*, "§ 2 is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats." *LULAC, Council No. 4434 v. Clements*, 999 F.2d 831, 854 (5th Cir. 1993) (en banc) (Higginbotham, J.).  In other words, unless racially polarized voting is *caused by* white voters' racial bias, as opposed to mere partisan preferences, "plaintiffs' attempt to establish legally significant bloc voting, and thus their vote dilution claim under § 2, must fail."[8] *Id.* at 850.  Plaintiffs cannot satisfy that requirement.

As Defendants will explain, this reading of Section 2 is arguably mandated by *Gingles* itself, a fragmented opinion in which five of the Justices concurring in the judgment agreed causation was, at a minimum, "clearly relevant," *Gingles*, 478 U.S. at 100 (O'Connor, J., concurring in the judgment), and the Justice concurring in the judgment on the narrowest grounds, Justice White, proposed the causation requirement in his concurrence.  But even if the Court is free to reject the causation requirement as a matter of precedent, it should adopt it as a matter of interpretation.

Every tool of interpretation counsels in the causation requirement's favor.  It makes the most sense of Section 2's text, which requires plaintiffs to suffer a diminution of electoral opportunity "on account of race or color" and to "have less opportunity than other members of the electorate to participate in the political process"—requirements that can't be met if the reason

---

[8] As a purely formal matter, some courts ignore causation at the *Gingles* precondition stage, but then require proof of it in the totality of the circumstances.  The Eleventh Circuit, for example, though treating causation as mandatory, postpones its consideration to the totality.  *See Nipper v. Smith*, 39 F.3d 1494, 1524 (11th Cir. 1994) (en banc) (Tjoflat, C.J., plurality opinion); *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) (en banc) (adopting the *Nipper* plurality's rule).  So long as causation is a requirement and not just, as it is for some other courts, a relevant factor, it makes no difference at what stage of the analysis it's required.  This response will primarily argue for considering causation at the precondition stage, but all the same arguments as to why it's required and why Plaintiffs fail to satisfy that requirement apply with equal force at the totality stage.

plaintiffs' preferred candidates lose is that white voters simply prefer a different party than they do.  It avoids the profound constitutional questions that would be raised if Section 2 required race-conscious districting whenever white and minority voters preferred candidates of different parties.  And it's all but mandated by the statute's legislative history—legislative history the Supreme Court has treated as authoritative, and that says Section 2 was amended to restore the Supreme Court's 1970s vote-dilution test, a test that turned on whether minority electoral defeat was caused by racial discrimination or partisan preference.

Applying the causation requirement to Plaintiffs' evidence of racially polarized voting reveals that Plaintiffs can't satisfy *Gingles*'s third precondition.  Plaintiffs do offer statistical evidence of polarized voting, but that voting is polarized solely along party lines, with black voters supporting Democrats and white voters supporting Republicans.  The race of the candidates makes no difference.  Plaintiffs' expert shows that a black Democratic candidate for Lieutenant Governor outperformed his white gubernatorial running mate among white voters, and that black Democratic candidates for State House receive shares of white votes identical to their white peers.  The reason black voters' preferred candidates lose many contests outside of majority-black districts is simply that black voters prefer a party that has become very unpopular with the majority of Arkansans in the last decade.

However, even if this Court rejects the causation requirement, the third *Gingles* precondition is still fatal to the bulk of Plaintiffs' claims.  For Plaintiffs cannot prevail merely by showing that white bloc-voting will usually defeat black voters' preferred candidates in the bulk of majority-white State House districts.  Rather, they must show that in each of the majority-white districts they challenge as "cracked," black voters' preferred candidates will usually lose.  For if

black voters already enjoy electoral opportunity in a majority-white district, there's no need to replace it with a majority-black district.

A district-by-district review of Plaintiffs' claims reveals that three of the five districts they seek to redraw as majority-black have elected black voters' preferred candidates in the past, and are likely to continue to provide black voters with ample electoral opportunities in the future. More specifically, two of the districts Plaintiffs claim deny black voters electoral opportunity currently have black Democratic representatives, and as redrawn by the Board have black voting-age population of about 45%. Plaintiffs forecast that those districts would turn Republican in close races, but their only basis for that prediction is the performance of the defeated Democratic lieutenant gubernatorial candidate in the districts as redrawn—a poor predictor, given that he ran 6–11% behind the incumbents in question in their old districts. Adjusting Plaintiffs' forecast for these incumbents' outperformance of their up-ballot counterpart reveals that they would be favorites, and that black voters would continue, at the least, to have an equal shot at electing their preferred candidates. And in a third district Plaintiffs want to make majority-black, District 74 in downtown and central Little Rock, black voters' preferred candidates have invariably won easily in the past, and Plaintiffs' own expert forecasts they would in the future.

a.    **The causation test is the best reading of Section 2.**

Defendants believe an application of *Marks* to *Gingles* shows that *Gingles* mandates, through Justice White's opinion, the causation test. Moreover, even absent that precedent, Defendants believe that the causation test is most consistent reading of Section 2 because it is supported by text, principles of constitutional avoidance, the legislative history relied upon by the *Gingles* Court, and the precedent Congress intended to ratify in amending Section 2. And, at a bare minimum, that test is far better than one that is indifferent to the causes of white bloc voting.

19

<u>Precedent supports the causation test</u>.  The Eighth Circuit, unlike the three circuits that have adopted the causation test, the First, Fifth and Eleventh, has not addressed the causation question.  The Supreme Court has only addressed causation in a fractured opinion, in which five Justices, in separate opinions, agreed that causation was, at minimum, "clearly relevant."  *Gingles*, 478 U.S. at 100 (O'Connor, J., concurring in the judgment).  Thus, there is a strong argument that Supreme Court precedent requires that test and, if squarely presented with this issue, the Eighth Circuit is likely to require causation.

In *Gingles*, which was the Court's first and still most important attempt to interpret Section 2 of the Voting Rights Act as it had been amended in 1982, both the state and the United States advocated for the causation test.  *Id.* at 61 (Brennan, J., plurality opinion).  Justice Brennan, at that point in his opinion writing only for a four-Justice plurality of the Court—himself and Justices Marshall, Blackmun and Stevens—rejected it at length, *see id.* at 62-73, writing that "only the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters."  *Id.* at 63.  Justice Brennan's argument was involved and largely rested on a contested reading of the legislative history; generally, it reasoned that having abrogated the Court's former requirement of discriminatory intent on the part of the government, Congress necessarily dispensed with any requirement of discriminatory intent on the part of white voters as well.

Five Justices, however, disagreed with this part of Justice Brennan's opinion.  First, Justice White, in a solo concurring opinion, "disagree[d]."  *Id.* at 82 (White, J., concurring).  In his opinion, Justice White pointed out that under Justice Brennan's rule, if in a hypothetical jurisdiction black voters preferred Democratic candidates regardless of their race, white voters preferred

Republicans regardless of their race, and only Republicans won, there would be a Section 2 violation.  *See id.* at 83.  That, he flatly stated, was "interest-group politics rather than a rule hedging against racial discrimination," *id.*, and "seem[ed] quite at odds," *id.*, with the Court's decision in *Whitcomb v. Chavis*, 403 U.S. 124 (1971)—a constitutional decision, on which more later, that Justice White and the other Justices who disagreed with Justice Brennan believed Congress had intended to incorporate in amending Section 2.

Second, Justice O'Connor, writing for a plurality of herself, Chief Justice Burger, and Justices Powell and Rehnquist, also "d[id] not agree" that "evidence that the divergent racial voting patterns may be explained in part by causes other than race . . . can never affect the overall vote dilution inquiry."  *Id.* at 100 (O'Connor, J., concurring in the judgment).  In her view, "[e]vidence that a candidate preferred by the minority group in a particular election was rejected by white voters for reasons other than [racial ones] would seem *clearly relevant* in answering the question whether bloc voting by white voters will consistently defeat minority candidates."  *Id.* (emphasis added).  That is, racially motivated polarized voting, she believed, was more durable than polarized voting motivated by partisanship.  She also "agree[d] with Justice White" that Justice Brennan's indifference to whether candidate race or other factors motivated racially polarized voting "conflicts with *Whitcomb*."  *Id.* at 101.

Most courts that have addressed this dispute have simply assumed the lack of a majority opinion on the point leaves them free to adopt any of the several Justices' approaches, or one in between.  Some, however, have reasoned that because "five Justices expressly rejected a test that would permit § 2 liability to attach upon a showing that white and black citizens generally gave their votes to different candidates in favor of an inquiry into the possible explanations of these divergent voting patterns," their view "commands our allegiance."  *LULAC*, 999 F.2d at 857.

That argument has considerable force given the Eighth Circuit's approach to fragmented Supreme Court opinions.  As Judge Gruender has recently explained, even when a fragmented Supreme Court decision has no narrowest opinion under the *Marks* rule, the Eighth Circuit has "attempted to resolve the issue before us in the way that would have commanded the votes of any five justices of the Court." *Animal L. Def. Fund v. Reynolds*, 8 F.4th 781, 790 (8th Cir. 2021) (Gruender, J., concurring in part and dissenting in part) (citing *United States v. Bailey*, 571 F.3d 791, 799 (8th Cir. 2009)).  Indeed, the Eighth Circuit has gone so far as to deem a four-Justice *dissent* binding in cases where its rule reaches the same place as an opinion of a single Justice concurring in the judgment.  *See Bailey*, 571 F.3d at 799.  Under that count-to-five approach, the Court would at least be bound to reject Justice Brennan's view and treat causation as relevant—though precisely how relevant would remain unsettled, given the lack of definitive instructions from Justice O'Connor on that score.

Further, there is also a strong argument that *Gingles* in fact contains a *Marks* holding on this issue—Justice White's rule.  Courts historically have not applied *Marks* to *Gingles*, or even commented on whether *Marks* might apply, perhaps because on first blush the dueling opinions may not seem narrower or broader than each other, but simply different.

A closer look, however, suggests Justice White's opinion is the narrowest of the three. Where Justice Brennan would have recognized Section 2 liability in cases where race or partisanship motivated polarized voting alike, and Justice O'Connor would have held partisan motives for polarized voting counseled against liability to some degree, Justice White solely recognized liability where race, not partisanship, explained polarized voting.  His opinion, thus, is "a logical subset" of the other opinions, because it would only recognize liability in a subset of cases those opinions would (and no cases where their opinions would not), and the narrowest of the three.

*See Animal Legal Def. Fund*, 8 F.4th at 785 (holding an opinion is a *Marks* holding when it is a logical subset of other opinions concurring in the judgment).  And even if a logical-subset relationship were lacking, Justice White's opinion is the narrowest under another Eighth Circuit approach to *Marks*: "When a fractured Supreme Court sustains a constitutional challenge, we have followed the opinion that 'would hold the fewest statutes unconstitutional.'"  *Id.* at 790 (Gruender, J., concurring in part and dissenting in part) (quoting *Coe v. Melahn*, 958 F.2d 223, 225 (8th Cir. 1992)).  *Gingles* sustained a challenge to a State's redistricting statute under Section 2, and Justice White's opinion would hold the fewest statutes invalid.

The Eighth Circuit has never addressed the causation question.  The closest it has come is in *Cottier v. City of Martin*, 445 F.3d 1113 (8th Cir. 2006), an opinion that the Eighth Circuit, sitting en banc, "set aside in its entirety" and directed "should not be treated as binding circuit precedent."  *Cottier v. City of Martin*, 604 F.3d 553, 562 (8th Cir. 2010).  In that opinion, the court held that the cause of *minority* voters' political cohesion was irrelevant at the *Gingles* precondition stage, though "potentially relevant in the totality of circumstances analysis."  *Cottier*, 445 F.3d at 1119.  It did not comment on whether the cause of white voters' bloc voting was relevant.  Thus, the correct interpretation of *Gingles* on that score remains an open question in this Circuit and to the Court.

In sum, five Justices concurring in the judgment in *Gingles* agreed that the causes of white bloc voting were relevant and rejected Justice Brennan's view that they were not.  Even if *Gingles* lacks a *Marks* holding, that majority view is binding on the Court, though the appropriate weight to give to causation would remain an open question given the lack of a majority on the point.  However, the best view is that Justice White's opinion is the narrowest of the several opinions concurring in the judgment on this issue, because it would recognize liability in a subset

of the cases in which either of the two other opinions would, and because it would invalidate the fewest districting laws.  And under that opinion, Justice White was clear there is no Section 2 violation where partisan preference, not candidate race, motivates racially polarized voting patterns.

Text.  Section 2 of the Voting Rights Act, codified at 52 U.S.C. 10301, reads as follows:

> **(a)** No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

> **(b)** A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: ***Provided,*** That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Two features of this language support a causation requirement: the requirement that the denials and abridgements of the right to vote be "on account of race or color," and the requirement that a group have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."

*On account of race.*  Beginning with "on account of race and color," multiple "courts have found this language determinative of the [causation] question."  *Uno v. City of Holyoke*, 72 F.3d 973, 981 (1st Cir. 1995) (agreeing the causation test "draws sustenance from [this] language").  Judge Tjoflat, writing for a plurality of the Eleventh Circuit in an opinion later adopted by that court, argued that this language "explicitly retains racial bias as the gravamen of a vote dilution claim," and that "to be actionable, a deprivation of the minority group's right to equal

participation in the political process must be on account of a classification, decision, or practice that depends on race or color, not on account of some other racially neutral cause." *Nipper v. Smith*, 39 F.3d 1494, 1515 (11th Cir. 1994) (en banc) (Tjoflat, C.J., plurality opinion); *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) (en banc) (quoting *Nipper*, 39 F.3d at 1515).  The en banc Fifth Circuit reasoned that Section 2's "protections extend only to defeats experienced by voters 'on account of race or color,'" and that "[w]ithout an inquiry into the circumstances underlying unfavorable election returns, courts lack the tools to discern" which defeats are on account of race or color and which are "mere losses at the polls." *LULAC*, 999 F.2d at 850.  And the Seventh Circuit, in an opinion by Judge Easterbrook, relying on this language, concluded that Section 2 "is a balm for racial minorities, not political ones—though the two often coincide," and found no Section 2 violation where black voters' preferred candidates consistently lost to both white and black Republicans. *Baird*, 976 F.2d at 361.

To be sure, Section 2 speaks in terms of results, not just motives, requiring voting practices to be imposed "in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."  52 U.S.C. 10301(a).  And that language might seem to invite an intent-blind, disparate impact standard, the "on account of race or color" language notwithstanding. *See, e.g.*, *Smith v. City of Jackson*, 544 U.S. 228, 235-36 (2005) (plurality opinion) (reading a prohibition of actions that "adversely affect [an employee's status] as an employee because of such individual's age" to embody a disparate impact standard because of the language's focus on effects).

The fatal flaw in this rejoinder is that it reduces "on account of" to "in correlation with," a meaning it cannot bear.  "On account of" does not always mean "motivated by," but it at least means "caused by," and when a disparate impact flows from racially polarized voting, race does

not cause the disparate impact unless race motivates the racially polarized voting.  *Smith* aptly illustrates how disparate impact, in a statute that requires adverse effects "because" or "on account of" a protected trait, still requires causation.

In *Smith*, a city gave greater raises to police officers with less tenure than officers with more.  *Smith*, 544 U.S. at 231.  The force's older officers were mostly in the group with more tenure and lower raises.  *Id.*  A class of older officers with more tenure claimed that the city's policy of greater raises for lesser-tenured officers adversely affected them because of their age. *Id.*  The Court agreed.  It reasoned that "an employer who classifies his employees without respect to age may still be liable under the terms of this paragraph if such classification adversely affects the employee because of that employee's age."  *Id.* at 236 n.6.  That was literally true in *Smith*.  In *Smith*, the reason the plaintiffs weren't members of the favored lesser-tenured class was that they had aged out of it.  *But for their age*, they would have had less tenure.  Thus, but for their age, the classification wouldn't have adversely affected them.  Age wasn't merely coincidentally connected to the adverse impact, but a cause of it.

On the other hand, suppose a law firm prefers Republicans.  If a Democratic member of a racial minority that disproportionately favors Democrats claimed that this preference adversely affected him "because of such individual's race" and thus violated Title VII, 42 U.S.C. 2000e-2(a), he would obviously not have a disparate-impact claim.  That's because the cause of the adverse effect would have nothing to do with race; rather, the cause would be his voluntary choice to be a Democrat, which his race did not determine.

In short, then, for a practice to have an adverse effect "because" or "on account of" a protected trait, that trait must somehow cause the adverse effect—as age will generally cause an em-

ployee to have greater tenure.  It doesn't suffice that the trait coincidentally correlates with a disadvantaged group—especially if the disadvantaged group is defined by a voluntary preference, like partisanship.

This understanding of "on account of race" is supported by how courts interpret Section 2 in vote-denial suits: those suits that claim that time, place or manner voting rules disproportionately reduce minority enfranchisement or participation.  In those claims, it does not suffice to prove "just one circumstance—disproportionate impact."  *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2341 (2021).  Rather, a plaintiff must connect that disproportionate impact to racial inequalities in things like "employment, wealth, and education," which in turn interact with the challenged law to "result in some predictable disparities."  *Id.* at 2339; *see also* Jamelia N. Morgan, *Disparate Impact and Voting Rights: How Objections to Impact-Based Claims Prevent Plaintiffs from Prevailing in Cases Challenging New Forms of Race-Based Disenfranchisement*, 9 Ala. C.R. & C.L. L. Rev. 93, 145 (2018) ("Courts have required plaintiffs to demonstrate that the challenged policy caused the disparities in participation rates *and* show that the underlying historical and social conditions caused the disparities in participation rates." (citing *Gonzalez v. Arizona*, 677 F.3d 383, 406 (9th Cir. 2012) and *Ortiz v. City of Phila. Off. of City Comm'rs Voter Registration Div.*, 28 F.3d 306, 313 (3d Cir. 1994))).

It follows that when a plaintiff claims a set of districts intersect with racially polarized voting patterns to elect a disproportionately low number of minority-preferred candidates, the plaintiff must prove that race causes—which is to say, motivates—the racially polarized voting pattern in order to prove the results are "on account of race."  Otherwise, like the job applicant who claims an employer's partisan hiring preference adversely affects him because of his race,

27

the effects the plaintiff complains of aren't caused by race, but by partisan preferences that merely happen to coincide with race.

Logically, a plaintiff could prove that racially polarized voting is ultimately "on account of race" in one of two ways. He could show that the minority group's preferences are motivated by race. But as the Eighth Circuit said in *Cottier*, requiring plaintiffs to prove that "would have the effect of denying minority voters an equal opportunity to elect representatives of their choice regardless of the reason" for their choice. 445 F.3d at 1119. And it is unclear how a minority group would prove that race is a cause of their preferences, not just a correlate of them.

The other way, of course, to show that racially polarized voting is "on account of race" is the way three Circuits do it: to require plaintiffs to prove that white voters vote against minority-preferred candidates because of racial bias. If that is the case, it will show in the data; white voters will give less support to minority candidates than they do to white candidates of the same party. If white voters' low support for minority candidates is merely a function of the ticket they happen to run on, that will also show in the data; whites will vote the same way when presented with white candidates of that party.

*Less opportunity to participate in the political process.* The other piece of text that supports a causation requirement is Section 2(b)'s explanation that Section 2 is only violated where a group's "members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." This proviso, the Court said last term in *Brnovich*, was added to correct "a loose understanding that § 2 would prohibit all discriminatory 'effects' of voting practices." *Brnovich*, 141 S. Ct. at 2332. By "direct[ing] courts to look beyond mere 'results' to whether a State's 'political processes' are 'equally open,'" *id.* at

2341 n.14, it clarified that Section 2 "does not impose a standard disparate-impact regime," *id.* at 2343 n.17.

Those generalities are suggestive, but what is the precise upshot of this language for how courts should look at racially polarized voting?  It's this. When white voters discriminate against minorities, minorities "face[] an impediment that majority-group citizens do not equally share"— the majority's racial bias against their preferred candidates.  Christopher S. Elmendorf, *Making Sense of Section 2: Of Biased Votes, Unconstitutional Elections, and Common Law Statutes*, 160 U. Pa. L. Rev. 377, 420-21 (2012) (arguing for the causation test).  Strive though they might to sponsor broadly appealing candidates or moderate their politics, if their preferred candidates are minorities, they will lose.  *That* is unequal electoral opportunity.

However, if the reason minority-preferred candidates lose is simply partisanship (or other non-bias causes), "the defeat does not prove a lack of electoral opportunity but a lack of what-ever else it takes to be successful in politics."  *Uno*, 72 F.3d at 981.  In that scenario, minority voters are in the same position as any supporter of a temporarily defeated party, white or non-white, and have the same recourse:  working to make their preferred party more successful, or working to elect a preferred candidate from inside the party in power.  Such voters do not suffer from a lack of equal electoral opportunity; *their* "failure to elect representatives of their choice" is "a 'mere . . . political defeat at the polls'" that can be remedied at the polls.  *LULAC*, 999 F.2d at 895 (quoting *Whitcomb*, 403 U.S. at 153).  As the Supreme Court has said, even under Section 2 "minority voters are not immune from the obligation to pull, haul and trade to find common political ground," *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994), and absent the impediment of persistent racial bias nothing blocks them from doing so.

Case 4:21-cv-01239-LPR   Document 53   Filed 01/19/22   Page 30 of 78

The case for why evidence of racially polarized voting, absent voters' racial bias, doesn't show minority voters lack equal electoral opportunity was first made by Justice O'Connor in *Gingles*. There, writing for four Justices, she contended that evidence white voters' motives were non-racial was "clearly relevant" to "whether bloc voting by white voters will consistently defeat minority candidates" in the future, reasoning that if they were non-racial, that would "suggest that another candidate, equally preferred by the minority group, might be able to attract greater white support in future elections." *Gingles*, 478 U.S. at 100. Though terse, her argument gets at two important points: one about the durability of merely partisan voting patterns, the other about courts' competence to predict politics.

One of the reasons multiple Circuits hold that only white racial bias, not diverging partisan preferences, can produce unequal electoral opportunity is that the former is more durable. One only need to look to the body that's the subject of this case to see that partisan preferences can be transient. Just a decade ago, 54 of its 100 members were Democrats, compared to today's 22. (*See* Declaration of Finos Johnson ("Johnson Declaration") at ¶ 3.[9]) By contrast, "a tendency among whites to cast their votes on the basis of race presents a far more durable obstacle to the coalition-building upon which minority electoral success depends than disagreements over ideology for, as Professor Ely observes, 'prejudice blinds us to overlapping interests that in fact exist.'" *LULAC*, 999 F.2d at 858 (quoting John Hart Ely, *Democracy and Distrust* 153 (1980)). That is, absent prejudice, there is no reason to assume white voters' political preferences are intransient. Conversely, when disagreements about ideology rather than racial bias are the cause of minority-preferred candidates' defeats, "a minority-preferred candidate who embodies [white

---

[9] The Johnson Declaration is attached to this Response as Exhibit 3.

voters'] values might equally be able to engender majoritarian (white) support." *Uno*, 72 F.3d at 981.

The other reason a court presented with a purely partisan pattern of racially polarized voting cannot say that the minority voters currently at the short end of the stick lack equal electoral opportunity is the judicial competence—or lack thereof—to forecast how race and partisanship will interact in the years to come.  When a plaintiff claims—as Plaintiffs here do—that black voters vote for Democrats, white voters vote for Republicans, and that Democrats are typically defeated, and argues it follows that black voters lack equal electoral opportunity, he is asking a court to predict that that trend will continue over the next decade.  But the Supreme Court has cautioned against that very kind of prediction, calling it "a perilous enterprise" to issue "judicial predictions, as a matter of law, that race and party would hold together . . . over time—at least for the decennial apportionment cycles and likely beyond." *Bartlett*, 556 U.S. at 22-23.  Indeed, the Court went so far in *Bartlett* as to reject an interpretation of Section 2 because, in part, it would have required courts to make such predictions.  *See id.*

Besides binding this Court, *Bartlett*'s caution is wise.  It is one thing to predict that a pattern of long-held racial bias will not dissipate in a mere ten years.  It is entirely another to predict which party will hold the upper hand in a decade, and still another to predict that large majorities of white and black voters will continue to support the same parties they currently do.  Predictions of that kind will often be proved wrong.  As the history of the Arkansas House of Representatives itself shows, ten years is a long time in politics, and like any lay political prognosticator, courts will tend to overrate the predictive value of current trends.  *See id.* at 17 (noting that "even experienced polling analysts and political experts could not assess with certainty" the racial-political future).  And they will easily lapse into "race-based assumptions" and stereotypes.  *Id.*

31

In sum, merely partisan disagreements between minority and white voters do not mean that minority voters lack equal electoral opportunity, any more than it would be apt to say that the electoral system deprives white supporters of a minority party of equal electoral opportunity. For a pattern of electoral defeats to amount to a deprivation of equal opportunity, more is needed:  the structural impediment of racial bias against minority candidates.  And last, even if a court disagrees and believes partisan differences are intransigent, the Supreme Court has cautioned lower courts, for good reason, against hazarding that kind of prediction.

Constitutional Avoidance.  The causation test is the best reading of Section 2's text, absent any presumption one way or the other.  But to the extent the text is ambiguous, constitutional avoidance counsels for causation.  A reading of Section 2 that required race-conscious districting when polarized voting is motivated by merely partisan differences would pose extremely serious constitutional questions at best, and likely be unconstitutional.  A reading of Section 2 that narrows the obligation to create majority-minority districts to those cases where racial bias is the cause of minority voters' defeats would, at least, alleviate those questions.  So the Court is obligated to adopt that reading so long as it is available, which it undoubtedly is.

Absent the causation test, Section 2 would mean roughly this: if minority and white voters prefer candidates of different parties, whatever the reason, and as a result the minority-preferred party usually loses in majority-white districts, States must draw, where possible, reasonably compact majority-minority districts in rough proportion to minority voters' numbers in the population.  Such an interpretation would run into two likely-insurmountable constitutional difficulties.

The first is that the Fifteenth Amendment, like the Fourteenth Amendment, only prohibits intentional state discrimination.  Indeed, that was the constitutional holding of *City of Mobile v.*

*Bolden*, which Congress sought to abrogate as a statutory matter by amending Section 2 to prohibit certain kinds of discriminatory effects.  446 U.S. 55, 61-65 (1980) (plurality opinion).[10]  A nationwide requirement that States draw majority-minority districts whenever minority voters and whites prefer different parties would not bear the slightest logical relationship to combating intentional discrimination, much less be "grounded in" and "based on current conditions" of intentional discrimination, as exercising Fifteenth Amendment enforcement power requires. *Shelby Cnty. v. Holder*, 570 U.S. 529, 554, 557 (2013) (striking down the Voting Rights Act's Section 5 coverage formula).  For this reason alone, multiple Circuits have concluded that rejecting the causation test "might well render Section 2 outside the limits of Congress' legislative powers and therefore unconstitutional."  *Nipper*, 39 F.3d at 1515; *see also LULAC*, 999 F.2d at 854 (stating that Section 2's limitation to cases of racial bias "was not so much the product of legislative discretion as constitutional imperative, given that the scope of Congress' remedial power under the Civil War Amendments is defined in large part by the wrongs they prohibit.").

The second constitutional difficulty the causation test avoids are the "serious constitutional concerns under the Equal Protection Clause" posed by requiring race-conscious districting wherever white and minority voters have diverging partisan preferences.  *Bartlett*, 556 U.S. at 21 (rejecting reading of Section 2 that would require excessive race-conscious districting).  The Supreme Court has "long assumed," without ever deciding, that complying with Section 2 is a compelling interest that justifies racially motivated districting—an exercise that otherwise violates the Equal Protection Clause.  *Cooper*, 137 S. Ct. at 1464.  But that assumption would be strained

---

[10] *See also City of Rome v. United States*, 446 U.S. 156, 177 (1980) (holding that the Voting Rights Act as it then stood "was an appropriate method of pursuing the purposes of the Fifteenth Amendment," i.e., "prohibit[ing] only intentional discrimination in voting").

to the breaking point if compliance with Section 2 meant that so long as white and minority voters prefer different parties, States must draw districts to hit racial population targets.  Given how often race and party are correlated, doing so "would unnecessarily infuse race into virtually every districting, raising serious constitutional questions."  *Bartlett*, 556 U.S. at 21.  And with such a broad mandate to district on the basis of race, untethered to any actual discrimination, public or private, it's hard to see how Section 2 compliance could be deemed a compelling interest any longer.  Thus, not only would Section 2 likely be unconstitutional, districting plans across the country, drawn to comply with it, would likely be as well.

       <u>Legislative History and pre-Section-2-Amendments Doctrine</u>.  Finally, the legislative history of the amended Section 2 emphatically supports the causation test.  Legislative history should be used cautiously.  But here, the Supreme Court long ago mandated courts not just consider but follow Section 2's legislative history, and the history is unusually clear.  Congress explicitly amended Section 2 to restore and codify the vote-dilution test that preceded the Supreme Court's decision in *City of Mobile v. Bolden*.  Under that test, plaintiffs lost when they only proved that minority and white voters preferred candidates of different parties and minority-preferred candidates regularly lost.  Plaintiffs won, by contrast, when they showed that "racial bias in the political community" caused their preferred candidates to lose.  *Nipper*, 39 F.3d at 1519.

       In *Gingles*, Justice Brennan, at that point in his opinion writing for a majority of the Court, held that the Senate Report on the 1982 amendments to the Voting Rights Act was an "authoritative source" on the meaning of the cryptically amended Section 2.  *Gingles*, 478 U.S. at 43 n.7.  Indeed, the so-called Senate factors the Court directed lower courts to apply were simply a list of relevant factors in the Senate Report, not the statute, *see id.* at 36-37, and Justice O'Con-

nor drew on the Senate Report just as heavily.  Like it or not, courts in Section 2 cases work under the Senate Report's shadow.  *See Brnovich*, 141 S. Ct at 2336 ("In *Gingles*, our seminal § 2 vote-dilution case, the Court . . .  jumped right to the Senate Judiciary Committee Report, which focused on the issue of vote dilution.  Our many subsequent vote-dilution cases have largely followed the path that *Gingles* charted." (citations omitted)).

Though hardly free of ambiguity, the Senate Report emphatically and repeatedly stated the amendments to Section 2 were meant to "restore[] the legal standards, based on the controlling Supreme Court precedents, which applied in voting discrimination claims prior to . . . *Mobile v. Bolden*."  S. Rep. No. 97-417, at 2 (1982); *see also id.* at 15, 27 (similar declarations of restorative intent).  Specifically, as both Justices Brennan and O'Connor recognized, Congress sought to "codif[y] the 'results' test this Court had employed, as an interpretation of the Fourteenth Amendment, in *White* [*v. Regester*] and *Whitcomb* [*v. Chavis*]"—cases the Report glosses at length and mentions dozens of times.  478 U.S. at 97 (O'Connor, J., concurring in the judgment).[11]  Consequently, Justice O'Connor reasoned, "it is to *Whitcomb* and *White* that we should look in the first instance in determining how great an impairment of minority voting strength is required to establish vote dilution in violation of § 2."  *Id.*; *see also Uno*, 72 F.3d at 982; *Nipper*, 39 F.3d at 1517; *LULAC*, 999 F.2d at 851 (all following the same path).

*Whitcomb* and *White* were written just two years apart, both by Justice White, who later claimed in *Gingles* that Justice Brennan's rejection of the causation test was "quite at odds" with *Whitcomb*.  *Gingles*, 478 U.S. at 83.  In *Whitcomb*, faced with a pattern of party polarization between black residents of Indianapolis and white residents of Indianapolis and its suburbs, the

---

[11] Justice Brennan, though placing less emphasis on *Whitcomb*, a decision from which he dissented in relevant part, agreed that Congress had sought "to establish as the relevant legal standard the 'results test,' as applied by this Court in *White v. Regester*," which applied *Whitcomb*.  *Id.* at 35.

Court rejected a vote-dilution claim, stating that black voters' preferred Democrats' persistent defeats to white-preferred Republicans in a multi-member, county-wide district were simply "a function of losing elections" and "political defeat at the polls," not "built-in bias" in the system against black voters.  403 U.S. at 153.  The Senate Report, in turn, quoted this reasoning approvingly, as an exemplar of the test Congress intended to restore.  S. Rep. No. 97-417, at 21.

Two years later, the Court, again per Justice White, reached a different result in *White v. Regester*.  Like *Whitcomb*, *White* involved a claim that multimember districts diluted minority votes,  412 U.S. 755, 765-69 (1973), and a persistent pattern of polarized voting, *id.* at 766.  As in *Whitcomb*, those facts alone were "not enough"; it didn't suffice that "the racial group allegedly discriminated against has not had legislative seats in proportion to its voting potential."  *Id.* at 765-66.

Rather, in language copied verbatim in the amended Section 2, *see* 52 U.S.C. 10301(b), the Court held the plaintiffs had to prove they "had less opportunity than did other residents in the district to participate in the political processes."  412 U.S. at 766.  And it held they made that showing.  What made the difference was racial discrimination in the political process, both private and public.  In the case of one set of plaintiffs, a private organization that controlled the dominant party's slate refused to slate minority candidates and used "racial campaign tactics" to defeat them.  *Id.* at 766-67.  As a result of that private discrimination, they were "generally not permitted to enter into the political process."  *Id.* at 767.  In the case of another set, recently dismantled *de jure* discrimination—specifically, "the poll tax and the most restrictive voter registration procedures in the nation"—continued to manifest in "very poor" rates of minority voter registration.  *Id.* at 768.  The result of that still fresh discrimination was that minority voters were "effectively removed from the political processes" and "excluded . . . from effective participation

in political life." *Id.* at 769.  These findings were recited by the Senate Report as exemplars of the kind of case where vote dilution would violate Section 2.  S. Rep. No. 97-417, at 21-22.

Thankfully, few if any Section 2 plaintiffs today will be able to prove structural impediments to political participation as appalling as those faced by the plaintiffs in *White*.  But plaintiffs can show impediments of the *kind* the Court found in *White*:  what Justice White, later summarizing what his opinions in *White* and *Whitcomb* had required, called "discrimination in the polity," *Shaw v. Reno*, 509 U.S. 630, 661 (1993) (White, J., dissenting), or what the Eleventh Circuit, summarizing the evidence in *White*, described as "racial bias in the political community."  *Nipper*, 39 F.3d at 1519; *see also* S. Rep. No. 97-417 at 33 (defending amended Section 2 against charges of proportional representation by arguing *White* and its progeny only found illicit vote dilution where "racial politics play an excessive role in the electoral process").

To put a finer point on it, when white voters routinely vote against a minority group's preferred candidates because of their race, that group is similarly situated to the plaintiffs in *White*, who were unable to elect candidates of their race because racially biased, non-state political actors worked to keep them off the ballot.  In both cases, minority voters aren't just defeated at the polls; they are effectively excluded from the political process.

But when white voters, as here, routinely vote against a minority group's preferred candidates because of their *party*, that group has merely suffered "political defeat at the polls" and cannot prevail on a claim like that here.  *Whitcomb*, 403 U.S. at 153.  And though everyone agrees the amendments to Section 2 abrogated *Mobile v. Bolden*'s requirement of *state* discriminatory intent, no one has ever claimed that the amendments were intended to abrogate *Whitcomb*, or *White*; rather, the amendments were intended to codify them.  Thus, Congress's amendments

to Section 2 require courts to reject Section 2 claims where minority-preferred candidates' defeats are caused by partisanship alone.

b.   **Plaintiffs cannot prove racial causation.**

The reason black voters' preferred candidates tend to lose partisan elections outside of majority-black districts in Arkansas is unmistakably partisanship.  As Plaintiffs and their expert observe, "Black voters overwhelmingly support[] their preferred candidates," and "[t]he Black-preferred candidates [a]re usually Democrats."  (DE 3 at 17; *see also* DE 2-9 at 12.)  In the 27 general elections Dr. Handley analyzed, black voters only supported a non-Democratic candidate in two instances: in both, the candidate was a Libertarian opponent of a Republican, in a race with no Democrat.  (*Id.*; DE 2-9 at 25-26.)  Thus, black Arkansans' voting behavior in the last few election cycles, by Plaintiffs' account, is characterized by support for Democrats and opposition to Republicans.

By contrast, white Arkansans' voting behavior in the last few election cycles, again by Plaintiffs' own account, is characterized by support for Republicans and opposition to Democrats.  Not long ago, Democrats dominated Arkansas politics.  In 2008, they won a 72-28 majority in the State House, Johnson Decl. ¶ 3; in 2010 they retained a narrower, 54-seat majority, *id.*, and held the Governor's Mansion in a landslide reelection.  Yet since 2016, Democrats have won just 22 to 24 seats in the State House, *id.*, and lost every statewide election at landslide margins—even as they competed under a plan drawn by the Democratic Governor and Attorney General in 2010, over the Republican Secretary of State's opposition.  *See Jeffers v. Beebe*, 895 F. Supp. 2d 920, 927 (E.D. Ark. 2012).

The cause, as Dr. Handley documents, is a collapse in white support.  Between 2016 and 2020, she finds, Democratic statewide candidates have received white support in a narrow and extremely low range: between, at the low end, 16.7% of the white vote for the Democratic 2018

38

gubernatorial candidate to, at the high end, 22.7% of the white vote for the Democratic 2016 sen-

atorial candidate.  (DE 2-9 at 25-26.)[12]  Democratic candidates for State House have fared little

better since 2016.  With one notable exception, State House Democratic candidates opposed by

Republicans have received precious little white support, ranging at the low end from an esti-

mated 5.8% (*id.* at 29) to, in 2016, 29% (*id.* at 30).  The one exception: Monte Hodges, a suc-

cessful black candidate whom Plaintiffs estimate received 42.7% of the white vote in 2018 (*id.*),

yet whom they forecast would lose reelection because his district's black voting-age population

has fallen under the State's plan to 45.84% (*id.* at 6).

All this alone would not doom the Plaintiffs' claims if there were some differential be-

tween white voters' support for black Democrats and their support for white Democrats.  But

there's not—none whatsoever.  Beginning with statewide races, Dr. Handley makes much of An-

thony Bland's unsuccessful 2018 race for Lieutenant Governor against Tim Griffin, the Republi-

can incumbent.  Because he is the only recent black Democratic general-election candidate for

statewide office, she says his contest is the "best" one to use "to ascertain whether the Black-pre-

ferred candidate would carry draft districts," and forecasts House election results in the State's

new districts by "recompil[ing]" his 2018 vote into them.  (DE 2-9 at 3.)  In fact, Bland's perfor-

mance in the proposed districts is a poor predictor of State House results.  Yet for purposes of the

causation test what matters is that, notwithstanding his race, his performance mirrored every

other statewide Democratic candidate's.

According to Dr. Handley, Bland received 17.5% of the white vote.  (*Id.* at 25.)  That is

exactly what Hillary Clinton, the former First Lady of Arkansas, received from white voters in

---

[12] All estimated percentages of white and black support cited here from Dr. Handley's report are EI RxC fig-
ures, which Dr. Handley explains are most accurate because EI RxC takes into account differences in turnout (*id.* at
9), except where Dr. Handley does not state an EI RxC estimate, in which case EI 2x2 figures are used, which Dr.
Handley explains is more accurate than the other methodologies she used (*id.* at 8).

the 2016 presidential election.  (*Id.* at 26.)  And it is 0.8% *more* than what his white gubernatorial running mate, Jared Henderson, is estimated to have received—an estimate that seems credible, given that we know Bland received 1.2% more of the total statewide vote than Henderson.  (*Id.* at 25.)[13]  On Plaintiffs' own expert's view, then, white voters are so indifferent to candidates' race that 1% of them split their gubernatorial ballots between Asa Hutchinson, a white Republican, and Anthony Bland, a black Democrat and the incumbent Lieutenant Governor's opponent.

A similar story repeats itself with the other recent black general-election candidate for statewide office, Ricky Dale Harrington, the Libertarian candidate for Senate in 2020.  Tom Cotton's sole opponent, Harrington received 19.6% of the white vote, according to Dr. Handley. (*Id.*)  One other Libertarian has run in a two-way statewide race in the past few election cycles: Ashley Ewald, a white candidate for Treasurer in 2018.  Ewald, according to Dr. Handley, only received 15.1% of the white vote (*id.* at 26)—4.5% *less* than Harrington, a black Libertarian candidate, two years later.  Here too, a candidate's race appears to have played no role in determining white support.

Most importantly, there is no indication of a differential between white support of black Democratic State House candidates and white Democratic State House candidates.  Here, Dr. Handley analyzed 18 State House general elections between 2016 and 2020, 10 with black State House candidates and 8 with white State House candidates (*id.* at 28-31)[14]—enough to arrive at meaningful averages of white support for candidates of each race, instead of relying on one-to-

---

[13] Dr. John Alford, a political scientist at Rice University testifying for the State in *Christian Ministerial Alliance v. Arkansas*, recently reached identical conclusions about Bland's, Hutchinson's, and Clinton's relative levels of white support, though he found about 7% more white support for all three candidates than Dr. Handley has. *Christian Ministerial Alliance v. Arkansas*, No. 4:19-cv-00402-JM, DE 91-6 at 21 (Sept. 16, 2021).

[14] The only Democrat whose race Dr. Handley did not identify, Austin Jones (*id.* at 29), is white.  *See* Expert Report of Brad Lockerbie, Ph.D. ("Lockerbie Report") ¶ 9.  The Lockerbie Report is attached to this Response as Exhibit 4.

one comparisons, as above.[15]  On average, black Democratic candidates for State House received

31.93% of the white vote.  White Democratic candidates received 26.65% of the white vote—

over 5% *less* than black Democratic candidates' share.

To be sure, these numbers arguably overstate white support for Democratic candidates,

black and white alike, because they include elections where Democrats only faced a third-party

or independent opponent.  Four of the elections featuring a black Democrat, and one of the elec-

tions featuring a white Democrat, fall into this category.  Yet removing those elections, and look-

ing only at the elections featuring a Republican opponent, there still is no discernible difference

between how black and white Democrats fare among white voters.  By that metric, black Demo-

cratic candidates received 18.3% of the white vote over six elections between major-party candi-

dates.  Lockerbie Report ¶ 9.  White Democratic candidates received 19.0% of the white vote

over seven elections between major-party candidates—just 0.7% more, a statistically meaning-

less difference between averages of what are themselves statistical estimates of white support

over just half a dozen elections.  *Id.*

Dr. Handley's only attempt to show any discrepancy between levels of white support for

black and white Democratic candidates is her discussion of the 2018 Democratic gubernatorial

primary.  There, she observes that 51.2%, a bare majority, of black voters, supported the black

candidate, Leticia Sanders, but only 21% of white voters did.  (DE 2-9 at 12, 26.)  Yet this one

election does not suggest that candidate race is at the root of black voters' preferred State House

candidates' defeats for at least two primary reasons.

---

[15] One-to-one comparisons between black and white Democrats within the same district are also unavailable. With one exception, in the period Dr. Handley analyzed, a district's Democratic candidates were either always white or always black.

To start, as a general matter, black candidates have been extremely successful in Democratic primaries.  As Dr. Handley shows, the candidates nominated by the Democratic Party in Arkansas at the State House level are black as often as not, and that includes majority-white districts.  (*See* DE 2-9 at 15 (noting current Districts 7's and 11's minority-black populations; *id.* at 28-29 (listing their black Democratic nominees); *see also* Lockerbie Report ¶ 14 (noting two consecutive Democratic representatives' election in a district that is less than 15% black).)  Racially polarized voting, whatever else it does in Arkansas, does not prevent black candidates from winning the Democratic nomination.

Second, Sanders was an extremely weak candidate.  She barely garnered a majority of the black vote, raised only $2,700 to her opponent's $171,000, and held extremely unorthodox positions for a Democrat, both maintaining that the income tax was unconstitutional and that abortion was murder.  KUAR, *Democratic Primary for Governor: Jared Henderson and Letitia Sanders*, May 18, 2018, available at https://www.ualrpublicradio.org/2018-05-18/democratic-primary-for-governor-jared-henderson-and-leticia-sanders.  Her failure to receive much white support hardly suggests that white Democratic primary voters are generally opposed to black candidates.

In circuits that apply the causation test, courts that are faced with facts like these find plaintiffs haven't proven racially polarized voting.  For example, in *Lopez v. Abbott*, white-preferred candidates for the office at issue consistently defeated Hispanic-preferred candidates.  339 F. Supp. 3d 589, 611 (S.D. Tex. 2018).  However, in the relevant area, the former were invariably Republicans and the latter invariably Democrats.  *Id.*  Moreover, "the data show[ed] a highly consistent correlation . . . between racial group voting and political parties," *id.* at 612, and "the distribution of votes between political parties remained at comparable levels even when the race

of the candidate varied," *id.* at 612-13.  The court concluded that "partisanship is a better expla-

nation for defeats of Hispanic-preferred candidates than racial vote dilution," *id.* at 613, and ulti-

mately ruled for the state because plaintiffs failed to "demonstrate that race rather than partisan-

ship better explains their preferred candidates' lack of success at the polls," *id.* at 619.

   *Alabama State Conference of the NAACP v. Alabama* is another case with similar facts.

There, not a single black candidate had won the office in question, or any other statewide office,

since 2000.  — F. Supp. 3d —, No. 2:16-CV-731-WKW, 2020 WL 583803, at *42 (M.D. Ala.

Feb. 5, 2020).  But there was little evidence their losses were a result of their race.  All of the

black candidates for statewide office since 2000 were Democrats, and only one white Democrat

had won statewide office since 2008 (Doug Jones, in a special election against Roy Moore).  *Id.*

Democrats had lost thirty-nine consecutive contests for the office in question, *id.* at *45, and wit-

nesses agreed that the state Democratic Party was organizationally "in very rough shape," *id.* at

*43.  Most tellingly of all, there was no statistical disparity between how black and white Demo-

cratic candidates performed; a regression analysis suggested black Democratic candidates actu-

ally performed 1.4% better than white Democratic candidates.  *Id.* at *42.

   In light of this evidence, the court concluded that "African Americans are not losing . . .

elections 'on account of race or color,'" *id.* at *53, and that the true cause of their defeats was in-

stead "[t]he recent collapse of the Alabama Democratic Party," *id.* at *76.  Accordingly, it re-

jected the plaintiffs' claims, concluding that "blaming [minority] election losses in Alabama . . .

on vote dilution is merely a 'euphemism for political defeat at the polls.'"  *Id.* at 77 (quoting

*Whitcomb*, 403 U.S. at 153).

   As in those cases, the cause of minority-preferred candidates' defeats isn't their race.  Ra-

ther, it's merely that they're the nominees of an extremely weak and unpopular state Democratic

Party.  That means that black voters' preferred candidates in Arkansas are not losing elections "on account of race or color," and don't have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  Rather, they have the same opportunity that any voter, of any race, whose preferred party is currently in the minority has: the opportunity to work to return their party to the majority, as minority parties often do, or the opportunity to work within the majority party.  As Judge Easterbrook wrote in *Baird*, Section 2 "is a balm for racial minorities, not political ones."  976 F.2d at 361.  Recognizing racially polarized voting here would give a merely political minority Section 2 rights.  The Court should decline that invitation and hold Plaintiffs are unlikely to satisfy the third *Gingles* precondition.

> **c.      Plaintiffs cannot prove white bloc-voting, racially motivated or otherwise, for three of the five additional majority-black districts they seek.**

Even if the Court rejects the causation test, Plaintiffs would still fall short of proving racially polarized voting for many of their claims.  At a minimum, to prove racially polarized voting, Plaintiffs must show that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."  *Gingles*, 478 U.S. at 51.  And that showing must be district-specific.  In *Gingles* itself, for example, the Court reviewed challenges to five state legislative districts.  *Id.* at 42.  It found black voters' preferred candidates were usually defeated in four of the five, *id.* at 60, but won a third of elections in the fifth, proportionate to their numbers in the population, *id.* at 77 (Brennan, J., plurality opinion), 104 (O'Connor, J., concurring in the judgment).  Rather than holding that black voters' preferred candidates usually lost in the districts overall and striking down all five, the Court upheld the district where black voters' preferred candidates won in numbers proportionate to black voters' share of the population.  *Id.* at 77 (Brennan, J., plurality opinion); *id.* at 104 (O'Connor, J., concurring in the judgment).

What that means in this case is that when Plaintiffs argue, for example, that a region of the State with three majority-white districts should instead have two majority-white districts and one majority-black district (*see* DE 3 at 5-6), they must show that white bloc voting will usually defeat black voters' preferred candidates in each of the three majority-white districts, not just two of them.   Likewise, when Plaintiffs argue a region with two majority-black and two majority-white districts should instead have three majority-black districts and one majority-white district (*see id.* at 5), they must show white bloc voting will usually defeat black voters' preferred candidates in both majority-white districts, not just one of them.   Otherwise, the electoral opportunities Plaintiffs claim the State must create already exist, and there is no need to district on the basis of race in order to create them.   *See Cooper*, 137 S. Ct. at 1470-72 (holding Section 2 did not require increasing black population in a majority-white district that already elected black voters' preferred candidates, and that it was therefore unconstitutional to do so intentionally).

That principle dooms many of Plaintiffs' challenges here, even on a minimal definition of racially polarized voting.   For while Plaintiffs might show—only in that minimal sense—racially polarized voting occurs in many of the majority-white districts they challenge, they've failed to show it would occur in all of them.   To the contrary, three of the majority-white districts they claim don't provide black voters with an opportunity to elect their candidates of choice patently do, on Plaintiffs' own evidence, provide black voters with *that* opportunity.   So at best, even assuming the Court were to reject the causation requirement, Plaintiffs can only satisfy the third *Gingles* precondition as to two of the additional five majority-black districts they seek.

       i.      *Plaintiffs fail to show white bloc-voting would defeat black voters' preferred candidates in the Upper Delta.*

The State's plan includes two majority-black districts in the Upper Delta.   Plaintiffs say the number should be three.   (DE3 at 5.)   They claim that of the two majority-white districts in

the region, neither provides black voters an opportunity to elect a candidate of choice.  (*Id.*)  Of these two districts, one, District 34, was formerly a barely majority-black district, and elected a black Democrat, Monte Hodges.  (DE 2-9 at 4, 6.)  Under the State's plan, it has a black voting-age population of 45.84%.  (*Id.* at 6.)  To predict that this district will no longer provide black voters a reasonable opportunity to elect a candidate of choice, Dr. Handley and the Plaintiffs rely on just one piece of data: how voters in the new District 34 voted on Anthony Bland, the defeated black Democratic candidate for Lieutenant Governor.  (*Id.* at 3, 6.)  According to Dr. Handley, 46.2% of voters in the new District 34 voted for Bland in 2018, or almost exactly the black voting-age population in the new district.  (*Id.* at 6.)  So she forecasts that Hodges or another black Democratic candidate for State House would now receive only 46.2% of the vote.

Relying on Bland's performance in a House district to predict State House candidates' performance in that district isn't terribly problematic when it's confirmed by past House candidates' performance there.  But when a Democrat previously carried the district in only a modestly different form, using Bland alone to predict the future becomes hazardous.  That's because Bland ran well behind Democratic House candidates.  According to Dr. Handley, whose report also calculates effectiveness scores on the *existing* districts from Bland's performance, Bland carried just 16 of the 100 State House districts in 2018.  (DE 2-9 at 15-17.[16])  Yet Democrats actually won 24 of those districts.  Johnson Decl. at ¶ 3.  That is, Bland failed to carry a third of the districts that Democratic State House candidates won.

Plaintiffs might suggest the reason for this underperformance is Bland's race, and that Bland is still a serviceable predictor of *black* Democratic success in a State House district.  But Bland's underperformance relative to Democratic State House candidates was not a result of his

---

[16] These are Districts 5, 12, 16, 17, 29, 30, 33, 34, 36, 37, 48, 50, 55, 78, 85 and 86.

race, or of theirs.  As has been discussed, Bland actually ran ahead of his white gubernatorial running mate, and in line with white candidates for other statewide positions.  And, as shown below, Bland ran well behind several black Democratic State House candidates.  Rather, the more likely explanation is that Bland was running in a statewide race against an incumbent Lieutenant Governor, while Democratic State House candidates were running in somewhat less polarized down-ballot races, and often were incumbents.

If the Bland vote in a redrawn district tends to underestimate likely support for a Democratic State House candidate there, how should the Court estimate an incumbent black House Democrat's likely vote share in his new district?  The answer is that because Dr. Handley provides Bland's vote share in the existing districts as well as the proposed ones, the Court can see exactly how much an individual House Democrat ran ahead of Bland in 2018.  It can then add that difference to Dr. Handley's estimate of Bland's vote share in a House Democrat's redrawn district to estimate the House Democrat's likely vote share far more reliably than relying on Bland's estimated vote share alone.  *See* Lockerbie Report ¶¶ 10-13.

Turning, then, to District 34 and its black Democratic representative, Monte Hodges, Dr. Handley finds that in District 34's former incarnation, District 55, Bland carried the district in 2018 by a whisker-close margin, winning just 50.2% of the vote.  (DE 2-9 at 4.)  If Bland's performance were especially predictive of black Democratic State House candidates' performance, we would expect a similarly narrow win in 2018 for Representative Hodges.  But that isn't what happened.  Instead, Hodges trounced his Republican opponent with 61.7% of the vote, and, in Dr. Handley's estimate, received 42.7% of the white vote.  (*Id.* at 30.)  Today, despite that substantial white support, Dr. Handley counterintuitively predicts Hodges would receive just 46.2%

of the vote in District 34, or just a few tenths of a percentage point higher than the 45.84% black voting-age population in his new district.  (*Id.* at 6.)

Adjusting Dr. Handley's estimate by Hodges's outperformance of Bland in 2018 reveals a more likely estimate.  Hodges outperformed Bland by 11.5% in 2018 (61.7% – 50.2%).  Lockerbie Report ¶ 12.  If he continued to win a similar share of voters for Bland's opponent in the future, he would win 57.7% of the vote in his new district (46.2% + 11.5%).  Lockerbie Report ¶ 13. That isn't just an electoral opportunity; it translates into a highly likely win.  In fact, 57.7% of the vote is better than Dr. Handley's effectiveness scores for six of Plaintiffs' sixteen proposed majority-black districts.  (DE 2-9 at 6.)

Plaintiffs may point out that in 2020, a year with higher Republican turnout than 2018, Hodges ran a much closer race, winning just 52.2% of the vote.  (*Id.* at 28.)  Even so, that is 2% higher than what Bland received in the district in 2018, and suggests that Hodges would receive 48.2% of the vote in his new district (46.2% + 2%).  With one of Hodges's recent elections predicting a solid win in his new district (57.7%), and the other a very narrow defeat (48.8%), the new District 34 is at very worst a toss-up.  And Plaintiffs don't claim—nor could they—that a toss-up district deprives them of equal electoral opportunity.  To the contrary, Dr. Handley's own definition of an opportunity district is one where black voters' preferred candidate is projected to receive at least 50% of the vote, "the minimum required to be deemed effective."  (DE 2-9 at 4.) Plaintiffs even ask the Court to draw a district where black voters' preferred candidate would receive only a projected 51.2% of the vote—hardly safe.  (*Id.* at 6.)  As a three-judge court recently observed, there is no "law to suggest that the Voting Rights Act guarantees [plaintiffs] anything beyond a 'toss-up.'"  *McConchie v. Scholz*, — F. Supp. 3d —, No. 21-cv-3091, 2021 WL 6197318, at *14 (N.D. Ill. Dec. 30, 2021).  To the contrary, "the ultimate right of § 2 is equality

of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *De Grandy*, 512 U.S. at 1014 n.11.

Viewing the Upper Delta as a whole, then, black voters have three clear opportunities to elect a candidate of choice: the two majority-black districts in the region, and District 34. There is no need, as Plaintiffs propose, to draw a third majority-black district by racially gerrymandering in order to inflate the black population in Hodges's district. (*See* DE 3 at 11 (proposing to draw a third majority-black district by "restor[ing]" District 55; DE 2-9 at 6 (confirming this is Hodges's district).) Doing so not only isn't required by Section 2, but it would be unconstitutional.

      ii.      *Plaintiffs fail to show white bloc-voting would defeat black voters' preferred candidates in Southwest Arkansas.*

Plaintiffs' claims in Southwest Arkansas fail in identical fashion. The State's plan includes three majority-white and no majority-black districts in Southwest Arkansas. (DE 3 at 5-6.) Plaintiffs say the State should make one of the three districts majority-black. One of the three districts they target, District 98, was formerly District 5, a 52% black voting-age population district that elected a black Democrat, David Fielding. (DE 2-9 at 4, 6.) Under the State's plan, it has a black voting-age population of 44.15%. (*Id.* at 6.) Because of this small shift, Plaintiffs say it will no longer elect Representative Fielding or any other black Democrat. Instead, Dr. Handley predicts, it will give just 44.8% of its vote, or just half a percent higher than its black share of the electorate, to black voters' preferred candidate. (*Id.*) And again, Plaintiffs' sole basis for this baleful prediction, which presumes essentially zero white support for black voters' preferred candidate, is Bland's share of the vote in the district as redrawn.

As with Representative Hodges, looking to Bland's 2018 performance to forecast Representative Fielding's political future is hazardous. According to Dr. Handley, Bland barely carried Fielding's majority-black district in 2018, winning 50.8% of the vote—less than the black share of voting-age population. (DE 2-9 at 6.) Fielding, however, performed quite a bit better, winning 56.9% of the vote that year (*id.* at 29), and 56.8% of the vote in the following election (*id.* at 28), or almost exactly what he received in the election before. Part of the reason was his performance among white voters; though they heavily favored his Republican opponents, Fielding still received a respectable 20 to 24 percent of their votes. (*Id.* at 28, 29.) The bottom line is that Fielding outperformed Bland by 6.1% in 2018 and 6% in 2020. Lockerbie Report ¶ 10.

Adding that consistent measure of outperformance to Dr. Handley's estimate of Bland's share of the vote in the new District 98, Fielding would be expected to receive between 50.8% and 50.9% of the vote (44.8 + 6; 44.8 + 6.1). Lockerbie Report ¶ 11. That isn't safe, but it certainly isn't the pattern of usual defeat Plaintiffs must prove. Rather, it's the epitome of the equality of opportunity Section 2 requires. Plaintiffs, by contrast, would racially gerrymander Fielding's district into a three-tentacled tricorn (*see* DE 2-7 at 43) to get black voting-age population up to 54.4% and his likely vote share up to an estimated 55% (DE 2-9 at 6)—or, as more realistically adjusted for his outperformance of Bland, 61%. The Voting Rights Act doesn't require that, and the Constitution forbids it.

> iii.     *Plaintiffs fail to show white bloc-voting would defeat black voters'*
> *preferred candidates in Pulaski County.*

Plaintiffs' attack on the districts in eastern Pulaski County is even more puzzling. Plaintiffs say there are six majority-black districts in eastern Pulaski County, plus two majority-white districts that they believe "crack" the black voter population. (DE3 at 4-5 (describing districts in

"Central Arkansas").)  They think Section 2 requires the State to draw seven majority-black districts and one majority-white district instead.  (*Id.*)  They propose to achieve this by dramatically reshaping the State's proposed District 74, a 21.2% black voting-age district that extends westward from downtown Little Rock through Hillcrest to Nob Hill, to their proposed District 34, a 50.6% black voting-age district that combines downtown Little Rock and Hillcrest with largely minority neighborhoods to the south of I-630.  (DE 3 at 5; DE 2-7 at 17, 72; DE 2-8 at 59, 95.)

One would assume, given this request, that Plaintiffs believe District 74 denies black voters equal electoral opportunity.  But Plaintiffs don't make that claim.  In fact, their own expert predicts that District 74 will be a quite safe seat for black voters' preferred candidates.  According to Dr. Handley, District 74 has an effectiveness score of .632; that is, she projects a candidate preferred by black voters would receive 63.2% of the vote there, on the basis of the 63.2% of the vote Anthony Bland won there in 2018.  (DE 2-9 at 19.)

State House election results in the district bear its friendliness to black voters' preferred candidates out.  In the district's former configuration, District 33, where black voters were 25.5% of the voting-age population (*id.* at 15), only 4.3% more than in the new configuration, Dr. Handley finds that black voters' preferred candidate, Warwick Sabin, won in 2016 with 77.9% of the vote, defeating a Libertarian.  (*Id.* at 30 (listing vote share of "Sabin Warwick").)  In the following two elections, a Democrat, Tippi McCullough, who now serves as House minority leader, won unopposed in the general election.  Lockerbie Report ¶ 15.

Nonetheless, Plaintiffs claim Section 2 requires the State to increase the minority population in this of all districts to over 50%, at which point the district would have an outlandish "effectiveness score" of 81%.  (DE 2-9 at 6.)  Stranger still, their expert, though finding a near certainty of success for a candidate preferred by black voters in both the district's past and present

configurations, implies that as previously and presently configured, it wasn't and isn't an "opportunity district," and would only become one once the minority population was artificially boosted over 50%. (Compare *id.* at 4, 5 (omitting District 74 from lists of opportunity districts in the State's past and present plans), *with id.* at 6 (listing Plaintiffs' proposed District 34 as one).)

Plaintiffs' failure to acknowledge that District 74 is already an opportunity district is inexplicable. They do not argue, as some Section 2 plaintiffs have theorized in the past, that Representative McCullough and her predecessor were not "true" preferred candidates of black voters because they are white. Nor could they. The Eighth Circuit has made it quite clear that the successes of minority-preferred white candidates count every bit as much as the successes of minority-preferred minority candidates. *See Cottier v. City of Martin*, 604 F.3d 553, 560 (8th Cir. 2010) (en banc) (holding voting wasn't racially polarized where Native American candidates supported by Native Americans always lost, but Native American-preferred white candidates won often enough that in total, Native American-preferred candidates won half of all elections).

Rather, Plaintiffs appear to simply reason that District 74 isn't an opportunity district because it isn't majority-black. (*See* DE 3 at 4, 7 (using "opportunity district" and "majority-black district" interchangeably in quantifying opportunity districts in the State's plan); DE 2-9 at 5 (defining an opportunity district as one with an effectiveness score above .500 and "significant Black VAP," but not defining "significant"). Like North Carolina in *Cooper v. Harris*, they apparently reason that because Section 2 only requires States to draw majority-minority opportunity districts, not majority-white opportunity districts, it follows that "whenever a legislature *can* draw a majority-minority district, it *must* do so—even if a crossover district would also allow the minority group to elect its favored candidates." *Cooper*, 137 S. Ct. at 1472. But as the Court explained, it's a fallacy to reason that because "§ 2 does not *require* crossover districts . . .

then § 2 also cannot be *satisfied* by crossover districts." *Id.*  If a majority-white district regularly elects minority-preferred candidates, the third *Gingles* precondition isn't met and the State isn't required to make the district majority-black—and is constitutionally prohibited from intentionally doing so.  *See id.*

\* \* \*

In sum, if the Court adopts the causation test, the only possible conclusion is that Plaintiffs are unlikely to succeed on the third *Gingles* precondition as to all their claims, and are therefore unlikely to succeed as to all their claims.  If it rejects the causation test and holds that mere disparities in partisan preferences suffice to show legally significant polarized voting, Plaintiffs are still unlikely to succeed the third *Gingles* precondition as to their claims in the Upper Delta, Southwest Arkansas, and Central Arkansas/Pulaski County, and can only—at most—satisfy the third *Gingles* precondition as to their request for additional majority-black districts in the Lower Delta.[17]

### C.   Even if Plaintiffs were likely to satisfy the *Gingles* preconditions, they would likely fail the totality-of-the-circumstances inquiry.

Even if Section 2 plaintiffs satisfy each of the *Gingles* preconditions, they still do not automatically win.  Rather, "plaintiffs must still show that the 'totality of the circumstances'

---

[17] This is <u>not</u> to say that Plaintiffs would likely succeed on the third *Gingles* precondition in the Lower Delta. One of the majority-white districts whose black population they seek to "uncrack," District 95 (DE 3 at 5), has a 34.05% black voting-age population and an effectiveness score of .397, or 39.7%, according to Dr. Handley (DE 2-9 at 20).  That appears to underestimate likely Democratic vote share in the district by as much as 15%, given that in the district's former configuration, District 9, with just a 28.41% black voting-age population and a .328 (or 32.8%) effectiveness score (*id.* at 15), the Democratic candidate won 47.7% of the vote in the last election.  However, Dr. Handley did not analyze elections in this district, though it appears to meet her criterion of overlap with the additional majority-black districts Plaintiffs propose to draw.  And Defendants' political scientist was unable to analyze elections in it within the time to respond.  Thus, little can be said with confidence at this time about black and white preferences in the district, and accordingly, about black voters' opportunity to elect a preferred candidate there.  The best view, in light of this want of evidence, is that Plaintiffs have failed to offer evidence satisfying the third *Gingles* precondition as to at least one of the two additional majority-black districts they seek in the Lower Delta.

demonstrates a section 2 violation." *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 937-38 (8th Cir. 2018).  That is, they must "prove that the totality of the circumstances indicates minority voters ha[ve] less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice." *Bone Shirt*, 461 F.3d at 1021.  To decide if that is the case, a court performs "a searching practical evaluation of the past and present reality," typically reviewing a number of nonexhaustive factors derived from the Senate Report accompanying the passage of the 1982 amendments to Section 2.  *Gingles*, 478 U.S. at 45, *see id.* at 44-45; *Mo. State Conf. of the NAACP*, 894 F.3d at 931.

Under that standard, there are a handful of hard-and-fast rules.  The first is that an all but necessary condition for success in the totality is proving disproportionality: that is, that a group's share of opportunity districts is meaningfully less than their share of the electorate.  If plaintiffs fail to make that showing, they cannot succeed absent serious evidence, if not outright proof, of intentional discrimination.  *See De Grandy*, 512 U.S. at 1018-19 (enumerating limited circumstances in which proportionality is not a safe harbor); *Afr. Am. Voting Rts. Legal Def. Fund, Inc. v. Villa*, 54 F.3d 1345, 1356 (8th Cir. 1995) (absent proof of those circumstances, proportionality controls).

The second rule is that plaintiffs can't succeed without a strong showing on the other two predominant totality factors: Factor 2, the extent to which voting in the jurisdiction is racially polarized, and Factor 7, the extent to which members of the minority group have been elected to office under the challenged scheme.  *Mo. State Conf. of the NAACP*, 894 F.3d at 938 (holding these "factors 'predominate the totality-of-the circumstances analysis'" (quoting *Bone Shirt*, 461

F.3d at 1022)).  Absent a strong showing on these factors, a plaintiff cannot succeed.  *See Gingles*, 478 U.S. at 48-49 n.15 ("recognizing the primacy" of these factors and deeming them "*essential to*" a Section 2 claim (emphasis added)).

Here, Plaintiffs' difficulties with the polarized voting inquiry return with full—and indeed even greater—force.  For where some courts only inquire into the fact of polarized voting preferences under *Gingles*, many of them require proof of causation of polarized voting at the totality stage, and others at least place heavy weight on causation there.

Plaintiffs also have a weak case on the numbers of black State House members relative to Arkansas's black population.  Their Senate factors expert claims there are only 10 black members of the House, but their polarized-voting expert, Dr. Handley, accurately counts 11 in majority-black districts alone, and a twelfth representative outside those districts is black.  Plaintiffs are unlikely to succeed on any of the mandatory totality factors in this case.

### 1.    Plaintiffs have no chance of success on the proportionality inquiry.

Plaintiffs agree that proportionality is a particularly "important element of the totality of the circumstances analysis."  (DE 3 at 33.)  Indeed, that's a significant understatement.  The Supreme Court begins its totality inquiry with proportionality, *see LULAC*, 548 U.S. at 436, and places immense weight on it.  True, the Court has held that proportionality isn't an absolute safe harbor, *id.*, and has once found that arguably rough proportionality was overcome by districting that bore "the mark of intentional discrimination," *id.* at 440.  But absent such confounding factors,[18] it's held that "no violation of § 2 can be found . . . where, *in spite of continuing discrimination and racial bloc voting*, minority voters form effective voting majorities in a number of

---

[18] Other circumstances in which the Court has indicated proportionality can be overcome include substantial *de jure* impediments to minority voting, *see De Grandy*, 512 U.S. at 1018-19, and "blatant racial gerrymandering" in one part of a jurisdiction that is offset by majority-minority districts elsewhere, *id.* at 1019.  *LULAC* itself essentially fell into this category.

districts roughly proportional to the minority voters' respective shares in the voting-age population." *De Grandy*, 512 U.S. at 1000 (emphasis added).  The Eighth Circuit has held, in turn, that absent "the scenarios that led the [*De Grandy*] Court to reject a per se rule" (set forth in the footnote below), district courts should reject Section 2 claims on the basis of proportionality alone. *Villa*, 54 F.3d at 1356.  And a study of all published Section 2 decisions between 1982 and 2006 found that in every decision where a court found proportionality, it denied relief.  Ellen Katz et al., *Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982*, 39 U. Mich. J. L. Ref. 643, 730-31 (2006).

While Plaintiffs appreciate the significance of proportionality, they misinterpret what the proportionality inquiry asks, and, by doing so and undercounting the opportunity districts Arkansas has drawn, arrive at the wrong conclusion.  Plaintiffs' submission on proportionality is simply that Arkansas's plan underrepresents black voters because black people make up 16.5% of the total population, but voting-age majorities in only 11% of Arkansas's State House districts.  (DE 3 at 34.)  A proportionate plan, they conclude, would create 16 voting-age majority-black districts.  (*Id.*)  This gets both sides of the relevant fraction wrong, and therefore conceals the fact that Arkansas's plan already affords black voters a proportionate number of electoral opportunities.  The correct comparison is between opportunity districts (not just majority-black districts) and voting-age population (not total population).

a.   **Proportionality compares the percentage of opportunity districts to the percentage of voting-age population, not the percentage of majority-minority districts to the percentage of total population.**

Voting-age population is the denominator.  Beginning with Plaintiffs' denominator error, courts do not compare districts to "either the total population or voting-age population of the minority group statewide" at their discretion.  (*Id.*)  They only compare them to voting-age, or citizen voting-age, population.  In *De Grandy*, which created the proportionality inquiry, the Court

compared districts to voting-age population, not total population, and found proportionality on that basis, notwithstanding that total Hispanic population may have been higher.  *See* 512 U.S. at 1023 & n.19.  In *LULAC*, the Court compared districts to Texas's Hispanic citizen voting age population, and assumed without deciding that there was proportionality on that basis, notwithstanding the much larger numbers of Hispanic voting-age population or Hispanic total population.  *See* 548 U.S. at 438.

Finally, and putting a nail in the coffin of total population's relevance here, in *Villa*, the Eighth Circuit "assume[d] arguendo that blacks have been underrepresented in terms of total population." 54 F.3d at 1352.  It then held that *De Grandy* "instructs us to look to voting age population to perform proportionality analysis," *id.*, and, solely on that basis, held that black voters were proportionally represented in St. Louis, *id.* at 1353.  Plaintiffs point to the Eighth Circuit's subsequent mention of both total population and voting-age population in the proportionality analysis in *Stabler*. (DE 3 at 34).  But the discussion of total population there was dicta, since in that case there was substantial disproportionality by either metric.  129 F.3d at 1022.  The correct denominator is Arkansas's 15.2% black voting-age population or 15.45% citizen voting-age population (DE 2-7 at 11), not its 16.5% total black population.

<u>The percentage of opportunity districts is the numerator</u>.  Plaintiffs' second and more consequential error is in how they describe the numerator.  The correct numerator is not, as Plaintiffs say, "the percentage of majority-minority districts" (DE 3 at 34), but as *LULAC* held, "the percentage of total districts that are [black] *opportunity districts*." 548 U.S. at 436 (emphasis added).  Indeed, both the majority and dissent reaffirmed that proposition in *Bartlett*.  *See Bartlett*, 556 U.S. at 24 (stating that so-called "crossover districts," majority-white districts where sufficient numbers of whites cross over to elect the minority-preferred candidate, "can be

evidence . . . of equal political opportunity under the § 2 totality-of-the-circumstances analysis");
*id.* at 29 (Souter, J., dissenting) ("[I] in assessing § 2 claims under a totality of the circumstances
. . . the starting point is a comparison of *the number of districts where minority voters can elect
their chosen candidate* with the group's population percentage.") (emphasis added); *id.* at 29 n.2
("§ 2 simply provides that, subject to qualifications based on a totality of circumstances, minority
voters are entitled to a practical chance to compete in a roughly proportionate number of dis-
tricts.").[19]

 This definition of the numerator protects both plaintiffs and defendants.  On the one hand,
even "a citizen voting-age majority [can] lack real electoral opportunity," *LULAC*, 548 U.S. at
428, and a voting-age majority may only be a majority "in a hollow sense" due to non-citizen-
ship, *id.* at 429.  It would be unfair to plaintiffs to count districts where they lack electoral oppor-
tunity towards proportionality.

 On the other hand, if minority voters can elect their preferred candidates in non-majority-
minority districts, it would make no sense to discount those districts in the proportionality analy-
sis.  A State with 15 districts that provide black voters with electoral opportunities, some of
which are majority-white, provides black voters no less electoral opportunity than a State with 15
districts that provide black voters with electoral opportunities, all of which are majority-black;
the former State simply suffers from less racially polarized voting than the latter.   Discounting
electoral opportunities in majority-white districts would place a thumb on the scale in favor of
drawing additional majority-minority districts even when minority voters have proportionate

---

[19] Justice Souter authored *De Grandy* and, in this passage, was both interpreting it and *LULAC*'s subsequent
gloss.  Though these statements were in service of his argument that Section 2 sometimes requires drawing non-ma-
jority opportunity districts, a view the majority in *Bartlett* rejected, the Court took no issue with his argument that
non-majority opportunity districts *satisfy* Section 2.

numbers of electoral opportunities, and largely nullify the Court's assurance that States can comply with Section 2 by drawing non-majority opportunity districts, *see Bartlett*, 556 U.S. at 23.

### b.    Arkansas's plan is proportional.

Counting, then, the number of opportunity districts (not just majority-black districts) that Arkansas's plan creates, it turns out that the plan includes at least 15, in perfect proportion to black voters' share of the voting-age population.  The count begins, of course, with the 11 majority-black districts the plan creates, which Plaintiffs concede and the State agrees provide black voters with effective electoral opportunities.  (*See* DE 2-9 at 5 (finding that each of the districts has an "effectiveness score" of at least .538, which as seen above generally understates black electoral opportunity).)

Next, as explained above, three more districts, Districts 74, 34, and 98, all provide black voters electoral opportunities.  Plaintiffs agree that District 74, which has a significant black voting-age population, is highly likely to elect a black-preferred candidate, and only ignore it in their discussion of proportionality because it is not majority-black.  Districts 34 and 98, which are barely majority-white, have black Democratic incumbents.  And though Plaintiffs claim those incumbents are likely to suffer narrow defeats in their new districts, adjusting Dr. Handley's Bland-based forecasts for those incumbents' outperformance of Bland reveals that District 34's representative, Monte Hodges, would be favored to win with over 57% of the vote—while District 98's representative, David Fielding, would likely receive about 51% of the vote.  At worst, these districts are toss-ups, and provide black voters the "equality of opportunity," *De Grandy*, 512 U.S. at 1014 n.11, and "practical chance to compete," *Bartlett*, 556 U.S. at 29 n.2 (Souter, J., dissenting), that the proportionality inquiry looks to.

Finally, there is a fifteenth opportunity district that was not mentioned above in the context of racially polarized voting—because Plaintiffs do not challenge it, or the districts in the area

of the State where it sits.  Nevertheless, for purposes of proportionality, the Supreme Court has held that in a statewide challenge to a state legislative map, "the answer . . . is to look at proportionality statewide," *LULAC*, 548 U.S. at 437, and Plaintiffs themselves analyze proportionality statewide (*see* DE 3 at 34 (faulting the State's map for creating "only 11 majority-Black districts out of 100 total statewide")).  Thus, this district is properly considered for purposes of proportionality and the totality inquiry.

The district in question is District 49, formerly District 78, based in Sebastian County, with a population center of Fort Smith.  (DE 2-8 at 34 (mapping district).)  It is barely modified in Plaintiffs' illustrative plan.  (DE 2-7 at 116 (mapping illustrative District 78).)  According to Plaintiffs' demographer, it is barely majority-white, with a white citizen voting-age population of 54.71%; has a black voting-age population of 14.57% and a black citizen voting-age population of 17.61%; and has an Hispanic voting-age population of 32.99% and Hispanic citizen voting-age population of 17.81%.  (DE 2-8 at 94.)  Since 2012, it has elected a pair of black Democrats—George McGill and in the last two elections Jay Richardson—unopposed.  (Lockerbie__.)  And Dr. Handley gives it an effectiveness score of .530 (DE 2-9 at 19), only marginally lower than its former effectiveness score of .549 (*id.* at 16)—which suggests House Democratic candidates are a great deal safer in the district than Dr. Handley's effectiveness scores give them credit for, given that no Republican even ran in District 78 in the last decade.

Plaintiffs presumably will dispute that this district qualifies as an opportunity district, though they can't dispute that the district gives its black voters an excellent opportunity to elect their preferred candidate.  But Plaintiffs have no basis to dispute it.  As shown above, the Supreme Court has held that opportunity districts, majority-minority or not, count toward the proportionality inquiry.

60

The only thing unusual about District 49 in this respect is its substantial Hispanic population, which in tandem with the district's black population amounts to a near-majority of its voting-age and citizen voting-age population.  But that counts in District 49's favor, not against it.  For while the Court held in *Bartlett* that Section 2 doesn't require drawing opportunity districts where minorities depend on white crossover votes, it left open whether it might require drawing opportunity districts where "two minority groups form a coalition to elect the candidate of the coalition's choice." *Bartlett*, 556 U.S. at 13.  And some circuits have held Section 2 *does* require drawing such black/Hispanic coalition districts.  *See, e.g.*, *Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988).  *But see, e.g.*, *Nixon v. Kern Cnty.*, 76 F.3d 1381, 1393 (6th Cir. 1996) (en banc).  Such districts, therefore, are at least closer to the heartland of what Section 2 protects than majority-white crossover districts, and it would make no sense to count the latter toward proportionality—as the Court has held courts must—while disregarding the former.

In total, then, the State's plan contains at least 15 black opportunity districts out of 100, in perfect proportion to black voters' 15% share of the voting-age or citizen voting-age population.  And that means that absent unusual circumstances like evidence of "intentional discrimination," *LULAC*, 548 U.S. at 440, or "blatant racial gerrymandering," *De Grandy*, 512 U.S. at 1019—none of which Plaintiffs have alleged—Plaintiffs cannot prevail.

Moreover, that is true even if the Court disagrees about one or two of the districts Defendants contend are opportunity districts.  For example, suppose the Court agrees with Plaintiffs' dire prediction that the two districts with 44–46% black voting-age population, Districts 34 and 98, do not even afford black voters "a practical chance to compete," *Bartlett*, 556 U.S. at 29 n.2.  That would mean the State had drawn (at minimum) 13 opportunity districts, compared to

black voters' 15% share of the electorate.  Even in that case, *De Grandy* says there's proportionality.

In *De Grandy*, Hispanics "predominate[d] in 42.9 percent of the districts," but were "44.8 percent" of the voting-age population.  512 U.S. at 1023.  The Court described this as "rough proportionality" that was "just short of perfect proportionality," *id.*, and ultimately held the Hispanic plaintiffs' claim failed because they constituted "effective voting majorities in a number of state Senate districts substantially proportional to their share in the population," *id.* at 1025.  That is, a mere 2% deficit below perfect proportionality *was* proportionality that was fatal to plaintiffs' claims.[20]  That is precisely the deficit the Court would find were it to conclude that only the State's plan's 11 majority-black districts, plus the two districts Dr. Handley concedes are likely to elect black voters' preferred candidates, Districts 49 and 74, counted as opportunity districts.  So on any possible view of the evidence, the State's plan provides black voters with a proportionate share of electoral opportunities, which bars Plaintiffs' claims absent special circumstances that haven't even been alleged, much less proven.

> **2.      Plaintiffs have no chance of success on Senate Factor 2, the extent of racially polarized voting.**

Plaintiffs agree that Senate Factor 2 is, after proportionality, one of the two primary totality factors in this Circuit.  (DE 3 at 23 (quoting *Harvell*, 71 F.3d at 1390).)  They err, however, in maintaining they are likely to satisfy it.  The reasons why have already been given above and Defendants won't belabor them again.  The cause of black and white voters' divergent preferences

---

[20] In *LULAC*, the Court went further.  Before holding that indicia of intentional discrimination made deciding the question unnecessary, the Court assumed that a "two-district deficit" below proportional representation, which translated in percentages to a 6% shortfall, was "insubstantial" and roughly proportionate.  548 U.S. at 438.  There is no need to decide here whether a shortfall of that degree would satisfy proportionality.

is partisanship, not race, and persistent white-bloc voting is unlikely to defeat black voters' pre-ferred candidates in most of the districts Plaintiffs seek to reshape.  Defendants will only note here that their arguments about causation are even better-placed, and more dispositive, at this stage than under the preconditions.

For whatever reason, some courts resist considering causation at the precondition thresh-old.  They argue, for example, that doing so would convert the preconditions into "the wide-ranging, fact-intensive examination" that they believe should only happen at the totality, while the preconditions should be more mechanical (if not truly less fact-intensive).  *United States v. Charleston Cnty.*, 365 F.3d 341, 348 (4th Cir. 2004).  Even some of the courts that deem racial causation's absence dispositive conceptualize causation as a totality-stage rebuttal of a plaintiff's prima facie *Gingles* preconditions case.  *See, e.g.*, *Nipper*, 39 F.3d at 1524 & n.60.

However, the courts that disregard causation at the totality are quite rare.  Some Circuits deem its absence fatal at the totality, like the Eleventh.  Others, like the Fourth, hold that "the reason for polarized voting is a critical factor in the totality analysis," if not absolutely disposi-tive.  *Charleston Cnty.*, 365 F.3d at 349.  And to one degree or another, "[c]ourts in nine judicial circuits now expressly or implicitly incorporate causation when they assess racial bloc voting." Katz, *supra*, at 671.

Thus, whether at the preconditions stage or the totality, Plaintiffs cannot escape the rele-vance of causation, and the glaring evidence that partisanship, not race, is the cause of whatever polarized voting exists in State House elections.  And because they cannot, they cannot satisfy what they agree is one of the two primary totality factors they must prove in order to succeed in this case.

### 3.    Senate Factor 7, the extent to which members of the minority group have been elected in the jurisdiction, is not helpful to Plaintiffs.

The other of "[t]he two primary factors" in the totality after proportionality, *Harvell*, 71 F.3d at 1390, is "the extent to which minorities have been elected under the challenged scheme." *Id.* Plaintiffs' treatment of this question is an exercise in misdirection. They spend most of their discussion on the extent to which black candidates have been elected to a variety of other offices in Arkansas. (*See* DE 3 at 32-33 (addressing Congress, statewide offices, and trial courts).)

But that's not the question. The question is the extent to which black candidates have been elected "under the challenged scheme"—that is, in State House districts. The Eighth Circuit has always exclusively considered the office in question under this factor. *See Bone Shirt*, 461 F.3d at 1021 & n.10 (considering Native American success under the challenged state-legislative scheme and disregarding "county posts, posts not at issue in this case"); *see also Mo. State Conf. of the NAACP*, 894 F.3d at 939 ("The core question posed in Factor 7 is whether black candidates have historically been successful in the [challenged school] district."); *Harvell*, 71 F.3d at 1390 (only addressing black candidates' election to the challenged school board). The same is true of this Court's decisions, including ones involving the very body at issue in this case. *See Smith v. Clinton*, 687 F. Supp. 1310, 1317 (E.D. Ark. 1988) (three-judge court) (R. Arnold, C.J.) (considering only success in Arkansas State House elections where that was the office at issue, reasoning that "[t]his case is about a particular electoral structure" and "the electoral structure at issue here has no effect on th[o]se candidates" elected to other offices).

Turning to the number of black representatives who have been elected under the scheme actually at issue, Plaintiffs' own experts are at odds about how many there are. Their Senate factors expert avers "there [a]re only ten." (DE 2-10 at 56 ¶ 119.) Who these ten are, he does not

say, but notes that "[o]ne majority-Black House district . . . was represented by a white repre-sentative." (*Id.*)  This suggests an undercount, as Plaintiffs' other experts, Mr. Fairfax and Dr. Handley, agree that Arkansas's current plan has 12 majority-black districts.  (DE 2-7 at 13 ¶ 22; DE 2-9 at 4.)  Further, Dr. Handley lists the representatives of those 12 districts, and finds that 11 are black and one is white.  (DE 2-9 at 4.)  Defendants agree that each of the 11 she lists are black.

Even 11, however, is an undercount.  For Dr. Handley does not purport to offer a full count of black representatives, but only representatives of those districts she deems opportunity districts (which is to say, majority-black ones).  As already discussed, Representative Jay Rich-ardson of District 49, formerly District 78, is black, even though his district is not majority-black.[21]  The upshot of all this is that Plaintiffs haven't offered evidence that they're likely to succeed on this factor.  Their Senate factors expert offers a bare, unsubstantiated count of black representatives that's contradicted by even their polarized-voting expert's partial list of black representatives.  Dr. Handley's count, in turn, doesn't purport to be complete, and patently isn't; she only gives the races of representatives in majority-black districts, and doesn't count Repre-sentative Richardson.

Moreover, even if there were only the 11 black representatives Dr. Handley lists, plus Representative Richardson, this factor wouldn't support Plaintiffs.  Courts have held larger defi-cits relative to minority population support *defendants*.  For example, in *Little Rock School Dis-trict v. Pulaski County Special School District No. 1*, Judge Webber Wright thought it supported defendants' case, not plaintiffs', that "[t]he percentage of black representation for at least the last

---

[21] *See* Max Bryan, *City leaders discuss racism in different areas of Fort Smith*, Southwest Times-Record, June 4, 2020, available at https://www.swtimes.com/story/news/2020/06/04/city-leaders-discuss-racism-in-different-ar-eas-of-fort-smith/113376352/ (recounting Rep. Richardson's own struggles with racism).

ten years on both the LRSD Board of Directors and the City of Little Rock Board of Directors has been 28.5% compared with a city-wide black population of 34%." 831 F. Supp. 1453, 1460 (E.D. Ark. 1993), *aff'd*, 56 F.3d 904, 911 (8th Cir. 1995) (also finding this factor supported defendants). Here, at worst, there are 12 black representatives compared to a 15% black voting-age population and 16% total black population.

In sum, Plaintiffs haven't offered evidence that supports them on this factor; the only count of black representatives they offer is patently inaccurate and exceeded by one of their own experts' partial count. And even putting evidentiary failings and the uncertainty over the exact number aside and assuming the number most favorable to Plaintiffs, the 12 black representatives we know of for certain, the extent of black electoral success supports Defendants, not Plaintiffs. That is yet another powerful reason Plaintiffs are likely to lose, given the centrality of this factor to the totality analysis.

### 4.     Senate Factor 3 cuts decisively against Plaintiffs.

The third Senate factor concerns "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." *Gingles*, 478 U.S. at 37. Plaintiffs' failure of proof here is fundamental. The procedures they identify as enhancing the opportunity for discrimination either have nothing to do with the offices in question, or have no impact on black voters' electoral success.

Plaintiffs largely rely, in their discussion of Senate Factor 3, on at-large municipal elections, which they argue dilutes minority votes, and Arkansas's choice to hold most of its statewide elections in non-presidential years, which they say suppresses turnout. (DE 3 at 24-25.) Whether or not that is true, it has no bearing on whether black voters have less opportunity

66

to elect State House candidates of their choice than white voters—unless Plaintiffs are suggest-

ing the State amend its constitution to elect House representatives on four-year terms that coin-

cide with presidential election years, a practice that no State has adopted.  Three-judge courts

that have specifically addressed Section 2 attacks on Arkansas House redistricting haven't seen

any relevance in these non-State-House procedures, exclusively discussing, under Senate Factor

3, procedures applicable to the State House.  *See Smith*, 687 F. Supp. at 1317-18; *Jeffers v. Clin-

ton*, 730 F. Supp. 196, 212 (E.D. Ark. 1989).

The one State House electoral procedure Plaintiffs discuss is Arkansas's majority-vote

requirement in State House *primaries* (DE 3 at 24), a requirement that does not apply in the gen-

eral (*see, e.g.*, DE 2-9 at 29 (documenting a black candidate of choice's winning a State House

seat with only 44% of the vote)).  This requirement is patently not an impediment to black vot-

ers' candidates of choice's success.  As Plaintiffs document, black voters overwhelmingly sup-

port Democratic candidates in State House elections.  Plaintiffs do not offer any instance of a

Democratic primary that a candidate preferred by black voters has lost, whether due to the major-

ity-vote requirement or otherwise.  The only State House primaries their expert analyzed, and

could find in the relevant districts, were contests between two black candidates, one of whom

was supported decisively by black voters and won without going to a runoff.  (*See* DE 2-9 at

13, 31.)

Finally, Plaintiffs argue that Arkansas's disenfranchisement of felons, subject to restora-

tion, disproportionately reduces the number of black voters (DE 3 at 25), while counting prison-

ers as residents of the districts where they currently reside disproportionately enhances represen-

tation of "white, rural areas" (DE 3 at 26).  Plaintiffs offer no accounting, other than their Senate

factors expert's unadorned say-so, of the predominantly white and rural composition of the areas

where state prisons are located.  (DE 2-10 at 30 ¶ 59.)  But even if the factual premises of their argument were accurate, Plaintiffs don't cite a single case where courts have ever considered felon disenfranchisement or so-called "prison gerrymandering" under Senate Factor 3, a factor which concerns electoral procedure, not the composition of the electorate.  In sum, Plaintiffs offer no voting practices or procedures in State House elections that enhance the opportunities for discrimination against black voters.

### 5.    Plaintiffs tacitly concede Senate Factor 4 does not support them.

Senate Factor 4 asks, "if there is a candidate slating process, whether the members of th[e] minority group have been denied access to that process."  *Gingles*, 478 U.S. at 37.  Plaintiffs don't allege there is a candidate slating process.  As this Court wrote of Arkansas State House elections decades ago, "the process of slating plays no part in races for the Arkansas Legislature.  Nominations are made by primary, not (except in rare instances) by committee or convention."  *Jeffers*, 730 F. Supp. at 212.  There is no racial exclusion from the candidate nomination process in Arkansas.

### 6.    Senate Factor 6 does not support Plaintiffs.

The sixth Senate factor asks whether political campaigns in the jurisdiction "have been characterized by overt or subtle racial appeals."  *Gingles*, 478 U.S. at 37.  This is a factor with a pedigree in pre-1982 vote-dilution doctrine; the Court relied on racial appeals in *White*, in part, to find that private racial bias interacted with the multimember districting scheme there to keep black candidates out of office.  Though it cannot save a case if defendants prove that minority electoral defeats are caused by factors other than race, it can help prove that racial animus causes minority electoral defeats.

Arkansas has a long history of Section 2 litigation, and the racial-appeals question has been litigated numerous times, including in cases of quite old vintage.  With rare exception, the

finding of courts to consider the issue, again and again, is that there aren't significant racial appeals in elections in Arkansas.  As early as 1988, Judge Arnold concluded for a three-judge court that racial appeals weren't made in Arkansas state-legislative elections.  *Smith*, 687 F. Supp. at 1318.  Around the same time, Judge Eisele found no evidence of racial appeals in Phillips County elections.  *See Whitfield v. Democratic Party of Ark.*, 890 F.2d 1423, 1430 (8th Cir. 1989) (discussing his finding).  In 1992, Judge Hendren found no racial appeals and "a spirit of mutual cooperation and respect" in Texarkana.  *Williams v. City of Texarkana*, 861 F. Supp. 756, 767 (W.D. Ark. 1992).  Judge Webber Wright found in 1993 that there were no racial appeals in Little Rock School District elections—a remarkable fact given that district's checkered history. *Little Rock Sch. Dist.*, 831 F. Supp. at 1460.  The Eighth Circuit found no evidence of racial appeals in Blytheville in 1995, in spite of that city's racial divisions and polarized voting.  *Harvell*, 71 F.3d at 1390.  A court has only found racial appeals in Arkansas elections once, 33 years ago in *Jeffers v. Clinton*, over a spirited dissent, and there the court relied solely on two appeals in 1975 and 1976.  730 F. Supp. 196, 212 (E.D. Ark. 1989) (three-judge court).  As Judge Eisele said in dissent, even then this evidence was stale.  *Id.* at 259 (Eisele, C.J., concurring and dissenting).

Notwithstanding this series of findings, Plaintiffs claim racial appeals persist in Arkansas elections in 2022, 30 years after they were made.  Like the *Jeffers* court, their accounting of racial appeals is mostly decades old; in fact, the bulk of it concludes even earlier, in 1966 toward the end of the civil rights era.  (DE 2-10 at 42-45; DE 3 at 30-31.)  Thereafter, they say, racial appeals in Arkansas became "more implicit" (DE 2-10 at 45), Plaintiffs' way of saying that extremely uncharitable interpretation is required to deem the statements on which they rely racial appeals.

Plaintiffs' more modern history of racial appeals in Arkansas begins with "racialized rhetoric" toward President Obama.  (DE 3 at 31.)  Plaintiffs, however, don't actually cite any racialized rhetoric.  Their two examples are (a) a billboard that instructed voters to "Vote Republican" because "Every Democrat Elected Helps Obama," then the President (DE 2-10 at 49 ¶ 105), and (b) a mailer that asked recipients to "thank [Republicans] for protecting our health care freedom" from Obamacare, accompanied by an image of a black doctor (*id.* at 50 ¶ 106).  Plaintiffs do not explain how positively associating health care freedom with a black doctor is a racial appeal.  Plaintiffs' only other example of what they consider an anti-black racial appeal is Representative French Hill's anodyne remark that if elected, his opponent would "be a member of the Democratic conference and she'd be a member of the Congressional Black Caucus"—a caucus known, within the Democratic conference, for relatively liberal positions.  (*Id.* at 51 ¶ 107.)  In the part of Representative Hill's remark Plaintiffs don't quote, he added, "and her first vote would be for Speaker Pelosi to be the speaker of the House."  Frank Lockwood, *Hill, Elliott in Tight Race for U.S. House Seat*, Arkansas Democrat-Gazette, Oct. 18, 2020.  Taken in context, this remark did not "emphasize[] his opponent's race" (DE 2-10 at 51 ¶ 107), but merely how she would conference and vote.

Plaintiffs then turn to what they deem racialized rhetoric about, in their words, "Salvadoran" and "Latinx" people (DE 50-51 ¶¶ 107-08), particularly flyers warning of immigration by members of the Salvadoran MS-13 gang under an opponent's preferred immigration policies, and campaign ads attacking state-court judges for reversing convictions of Hispanic defendants. (*Id.*)  Neither is a racial appeal; the former addresses a serious policy question and, as to the latter, Plaintiffs don't even claim that the ads in question identified or made apparent the defendants' race.  But even if they were racial appeals, they do not show that black voters, whom these

70

advertisements did not target, have less opportunity than others to participate in the political process.  Campaigns in Arkansas elections are not characterized by overt or subtle racial appeals.

>    **7.    The remaining Senate factors do not enhance Plaintiffs' likelihood of success.**

Plaintiffs brief Senate Factor 1, regarding the history of voting-rights discrimination that "touched the right of the members of the minority group to register, to vote, or otherwise participate in the democratic process," *Gingles*, 478 U.S. at 36-37, extensively.  (DE 3 at 19-22.)  As one district court recently wrote of Alabama, a "long and sordid history of official discrimination against African Americans weighs in favor of Senate factor 1 because that history will never change."  *Ala. State Conf. of NAACP*, 2020 WL 583803, at *41.  But to give this factor much weight, courts require plaintiffs "to establish that the identified history 'touched' the present-day ability of members of the minority group to participate in the political process."  Katz, *supra*, at 675 & n.173 (collecting 30 cases).  Otherwise, it would have no bearing on the question Section 2 asks.  Plaintiffs make no attempt to show that here; they merely and implausibly assert in a sentence that prohibitions like a poll tax that was eliminated in 1964 are the cause of low black turnout, not even claiming that potential black voters are registered at a low rate.  (DE 3 at 22.)

Plaintiffs also extensively brief (DE 3 at 26-29) Senate Factor 5, which calls for courts to evaluate "the extent to which members of the minority group bear the effects of discrimination in such areas as education, employment and health, which *hinder their ability to participate effectively in the political process*."  *Gingles*, 478 U.S. at 37 (emphasis added).  Plaintiffs address the first part of that inquiry.  But they neglect to show what "[m]ost courts require[]" at Senate Factor 5:  "some kind of nexus not only between a history of discrimination and lowered socioeconomic status, but also between depressed socioeconomic status and the ability to participate in the political process."  Katz, *supra*, at 703.  As the Fifth Circuit has held, "[a]bsent an indication

that [socioeconomic disparities] actually hamper the ability of minorities to participate, they are

. . . insufficient to support a finding that minorities suffer from unequal access to [the] political

process." *NAACP v. Fordice*, 252 F.3d 361, 368 (5th Cir. 2001) (internal quotation marks omit-

ted).

Instead of attempting to prove a nexus between socioeconomic disparities and depressed

political participation, Plaintiffs simply assert that socioeconomic disparities inevitably tend to

depress political participation, attributing this claim to page 1037 of the Eighth Circuit's opinion

in *Bone Shirt*.  (DE 3 at 26.)  Page 1037 doesn't exist, and the language Plaintiffs quote appears

nowhere on any other page of *Bone Shirt*.  The language does appear, however, in the portions of

Justice Brennan's opinion in *Gingles* that a majority of the Court rejected.  *See Gingles*, 478 U.S.

at 69 (arguing, obscurely, that "political participation by minorities tends to be depressed where

minority group members suffer effects of prior discrimination" and that Section 2 claims should

therefore lie even when white bloc voting is not motivated by racial animus).  Shorn of this ques-

tion-begging argument, what Plaintiffs' case on Senate Factor 5 is missing is (1) evidence of de-

pressed political participation, such as turnout that is lower than that of whites; (2) evidence that

socioeconomic disparities caused that depressed political participation.  *See, e.g.*, *Clay v. Bd. of

Ed. of St. Louis*, 896 F. Supp. 929, 943 (E.D. Mo. 1995) (finding both socioeconomic disparities

and depressed turnout, but concluding that Senate Factor 5 didn't support plaintiffs because low

turnout may merely be the result of "voter apathy"), *aff'd*, 90 F.3d 1357 (8th Cir. 1996).  Senate

Factor 5 does not support Plaintiffs.

## II.   The other preliminary-injunction factors favor the State.

As explained above, Plaintiffs are unlikely to succeed in showing that Arkansas's duly

enacted House districts violate Section 2 of the VRA.  But even if they could make that showing,

the other injunction factors would justify denying an injunction that would inject chaos into Arkansas's 2022 Preferential Primary and beyond.

Plaintiffs would not suffer irreparable harm in the absence of an injunction because Arkansas complied with its obligations under the VRA in approving its House districts.  And "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018).  In addition to that harm, the timing of any injunction and its impact on Arkansas's election deadlines weigh against granting injunction here. *Nken v. Holder*, 556 U.S. 418, 435 2009 (when the government is a party, the "harm to the opposing party and the public interest" equitable factors "merge").

The Supreme Court has repeatedly cautioned lower courts against awarding injunctive relief in the period before an election.  *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam). Prior to the 2020 election, the Court issued a slew of orders blocking lower-court decisions altering state election laws and procedures in the weeks and months leading up to the election.  *See Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28 (2020); *Merrill v. People First of Ala.*, 141 S. Ct. 25 (2020); *Andino v. Middleton*, 141 S. Ct. 9, (2020); *Merrill v. People First of Ala.*, 141 S. Ct. 190, (2020); *Clarno v. People Not Politicians*, 141 S. Ct. 206 (2020); *Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020) (per curiam).  Courts have also cited the *Purcell* principle in staying injunctions under the VRA.  *See Veasey v. Perry*, 769 F.3d 890, 893 (5th Cir. 2014) (staying an order striking down Texas voter identification laws prior to 2014 election), *application to vacate stay denied*, 574 U.S. 951 (2014).

The Supreme Court has held in the context of apportionment that, "[i]n awarding or with-holding immediate relief, a court is entitled to and should consider the proximity of a forthcom-ing election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). Thus, "under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, *even though the existing apportionment scheme was found invalid.*" *Id.* (emphasis added).

Impending election deadlines, the first of which are just weeks away, justify the denial of an injunction, irrespective of the merits of Plaintiffs' case. The party filing period, during which candidates for partisan office must file certain paperwork, begins on February 22, 2022, and ends on March 1, and in order to file candidates for the State House must know the district in which they reside. *See* Ark. Code Ann. 7-7-203(c)(1)(A) (party filing period begins one "week prior to the first day in March" and ends "on the first day in March"); *id.* 7-7-301(a) (requiring candi-dates to file during party filing period). Of course, decisions regarding candidacy are made much earlier than the party filing period. Both challengers and incumbents for many legislative positions began announcing their candidacies within a week of the district maps being ap-proved.[22] Thus, campaigning has already been going on for over six weeks, and an injunction barring the use of the approved maps upon which candidates and the public have been relying would cause massive amounts of confusion.

Shortly after the party filing period ends, other state-law election deadlines loom near, all of which depend on candidates filing their paperwork during the party filing period. By March

---

[22] https://www.arkansasonline.com/news/2021/dec/05/new-maps-pave-way-for-legislative-contests/.

10, the Secretary of State must "certify to the various" county-level election officials "a list of the names of all candidates who have filed party certificates" as required by law.  Ark. Code Ann. 7-7-2-3(d)(1) (setting the deadline at 75 days before the election).  That information is paramount because counties are responsible for printing ballots, and they must have the official list of candidates before they can begin.

By March 14, the county boards of election commissioners must hold a public meaning to "determine[] by lot" the "order in which the names of the respective candidates are to appear on the ballots" of the primary election.  Ark. Code Ann. 7-7-305(b)(1); *id.* at 305(b)(1)(A) (setting he deadline at 72 days before the election); *see also* Ark. Code Ann. 7-1-108 ("If an election law deadline occurs on a Saturday, Sunday, or legal holiday, the deadline shall be the next day which is not a Saturday, Sunday, or legal holiday.").  At least three days prior to such meeting, notice must be published in a local newspaper.  *See* Ark. Code Ann. 7-7-305(b)(2).

From there, county election officials have less than four weeks before absentee ballots must be prepared and delivered to the county clerks for mailing on April 7.  Ark. Code Ann. 7-5-407(a)(1) (setting the deadline at 47 days before the election).  That is to ensure that Arkansas complies with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), requires states to transmit absentee ballots to uniformed services or oversees voters "not later than 45 days before the election."  52 U.S.C. 20302(a)(8)(A).  But before those absentee ballots can be mailed, they must be prepared and printed.  The county boards of election commissioners for each of Arkansas's 75 counties, which are responsible for the preparation of ballots, typically rely on private vendors for printing.  Bridges Decl. ¶ 9.  The time required for ballots to be printed varies from county to county and vendor to vendor.  *Id.*  Some counties may take as long as three weeks to finalize ballots before they can be sent out.  *Id.*  Thus, the weeks between

March 14 and April 7 provide little to no cushion for county election officials to carry out their duties under State and federal law.

An injunction barring the use of the approved House district maps, even if entered by the beginning of February, risks State election officials running headlong into—and even past—these deadlines.  Any injunction entered by the Court in early February would reach only preliminary conclusions as to liability; it would not settle the district maps to be used in the 2022 election.  The Court could not, for example, simply order Plaintiffs' Illustrative Plan to be used for the 2022 election, even if that plan were legally sufficient (and as explained above, it is not).  That is because the Supreme Court has held that "[w]here a State's plan faces challenges under . . . [Section] 2 of the Voting Rights Act, a district court should still be guided by that plan, except to the extent those legal challenges are shown to have a likelihood of success on the merits." *Perry v. Perez*, 565 U.S. 388, 394 (2012).  Thus, even if the Court were to find a likelihood of success as to liability under Section 2, more work would remain before the Court could impose a remedy.

New district maps cannot be drawn overnight.  As explained above, the process of creating even *initial* maps took *weeks*.  Davis Decl. ¶¶ 6-7.  The Board published its first maps on October 29, 2021, over six weeks after the Census Bureau released its certified data.  *Id.* A month-long public comment period followed, which resulted in further improvements to the district maps.  And technical corrections continued to be made until the maps were made official on December 29, 2021.  Thus, from the time the Board was able to begin work in earnest on the district maps after receiving the 2020 Census data, the process took several months.

In addition to the amount of time required to draw new maps based on any shortcomings identified by the Court, another round of briefing by the parties and perhaps further evidentiary

presentation would presumably follow before the Court could issue a ruling as to a proper remedy.  Even if the Court issued an order regarding liability and further proceedings on February 1, that would leave less than three weeks for (1) further map drawing; (2) briefing by the parties; (3) any necessary evidentiary presentation; and (4) the Court preparing and issuing an opinion before the party filing period begins on February 24.  And any injunction issued upsetting the filing period would, as explained above, risk a cascading effect of unable-to-be-met deadlines moving closer toward the election.  *See NAACP v. Hampton Cty. Election Comm'n*, 470 U.S. 166, 177 (1985) ("[A] filing period cannot be considered in isolation from the election of which it forms a part."); *Thompson v. Dewine*, 959 F.3d 804, 813 (6th Cir. 2020) (noting in May 2020 that, while "the November election itself may be months away[,] . . . important, interim deadlines . . . are imminent.  And moving or changing a deadline or procedure now will have inevitable, other consequences").

An injunction thus risks causing the "voter confusion and consequent incentive to remain away from the polls" that *Purcell* cautions federal courts to avoid.  549 U.S. at 4-5.  Candidates must be afforded sufficient time in order to decide whether to run before the party filing period begins, and moving the party filing period risks election officials being unable to meet their obligations under State and federal law.  Voters residing in House districts for whom candidates have already announced may find themselves confused to find different candidates on their Preferential Primary ballot if a different map is ordered.  Or they may not realize they've been drawn into a different district than the one they'd been expecting to be in since November of last year.

For these reasons, the equitable factors weigh against granting an injunction that would require the use of different House district maps for the 2022 election.

## CONCLUSION

The Court should deny the motion for a preliminary injunction.

Dated: January 19, 2022

Respectfully submitted,

LESLIE RUTLEDGE
Arkansas Attorney General

Nicholas J. Bronni  (2016097)
  Solicitor General
Asher L. Steinberg (2019058)
Dylan L. Jacobs (2016167)
  Assistant Solicitors General
Jennifer L. Merritt (2002148)
  Senior Assistant Attorney General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Tel: (501) 682-1051
Fax: (501) 682-2591
*Counsel for Defendants*