**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**THE ARKANSAS STATE**
**CONFERENCE NAACP,** *et al.*                                             **PLAINTIFFS**

**v.**                              **Case No. 4:21-cv-1239-LPR**

**THE ARKANSAS BOARD OF**
**APPORTIONMENT,** *et al.*                                             **DEFENDANTS**

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR**
**PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. III

ARGUMENT .................................................................................................................... 1

I.    Plaintiffs Satisfy the *Gingles* Preconditions ...................................................... 1

    A.    Plaintiffs Have Satisfied the First *Gingles* Precondition by Establishing That Arkansas's Black Population Is Sufficiently Numerous and Geographically Compact So as to Draw Additional Majority-Black Districts ...................................................................................................... 1

        1.    Defendants Misstate the First *Gingles* Precondition Inquiry .................... 2

        2.    Plaintiffs' Illustrative Plan Satisfies the First *Gingles* Precondition Under the Correct Legal Standard ............................................................. 3

        3.    Plaintiffs' Illustrative Plan Satisfies the First *Gingles* Precondition Even if It Contains Minor Defects ............................................................. 8

    B.    The defendants' arguments on the third *Gingles* precondition lack support in law and fact. ...................................................................................... 9

        1.    The third *Gingles* precondition does not require a plaintiff to prove that racially polarized voting is caused by White racial bias. ................. 10

        2.    The record does not support the defendants' claim that race plays no role in Arkansas elections. ....................................................................... 15

        3.    The record does not support the defendants' claim that House Districts 34, 98, and 74 give Black voters a meaningful opportunity to elect candidates of their choice. ......................................................... 19

II.    Plaintiffs Should Prevail in the Totality of the Circumstances Inquiry ......................... 24

    A.    Plaintiffs Have Adequately Proven a Likelihood of Success on Six Senate Factors ............................................................................................................... 24

        1.    Senate Factor 2 ........................................................................................ 24

        2.    Senate Factor 7 ........................................................................................ 25

        3.    Senate Factor 6 ........................................................................................ 28

        4.    Senate Factor 3 ........................................................................................ 29

        5.    Senate Factors 1 and 5 ............................................................................ 31

    B.    Proportionality ............................................................................................... 33

        1.    Total population is a relevant metric in the proportionality analysis ....... 33

        2.    Plaintiffs prevail in the proportionality inquiry because Defendants have only 11 Black "opportunity districts." ......................................... 34

## TABLE OF CONTENTS
(continued)

**Page**

III.     Section 2 of the Voting Rights Act Contains a Private Right of Action.......................... 37

IV.     The Other Preliminary Injunction Factors Weigh Heavily in Favor of a
         Preliminary Injunction ..................................................................................... 41

         A.     Plaintiffs will suffer irreparable harm absent an injunction................................ 41

         B.     The equities and public interest weigh in favor of a preliminary injunction. ...... 42

CONCLUSION............................................................................................................... 46

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abrams v. Johnson*,
521 U.S. 74 (1997)................................................................................................33, 34

*African American Voting Rights Legal Defense Fund, Inc. v. Villa*,
54 F.3d 1345, 1352 (8th Cir. 1995) ...........................................................................33

*Ala. State Conf. of the NAACP v. Alabama*,
2:16-cv-731-WKW, __ F. Supp. 3d __, 2020 WL 583803 (M.D. Ala. Feb. 5,
2020) ....................................................................................................................12, 14

*Allen v. State Board of Elections*,
393 U.S. 544 (1969)....................................................................................................39

*Black Pol. Task Force v. Galvin*,
300 F. Supp. 2d 291 (D. Mass. 2004) (Selya, J.,) ....................................................14

*Bone Shirt v. Hazeltine*,
336 F. Supp. 2d 976 (D.S.D. 2004) .....................................................................10, 36

*Bone Shirt v. Hazeltine*,
461 F.3d 1011 (8th Cir. 2006) ........................................................................... *passim*

*Bone Shirt v. Hazeltine*,
No. 05-4010 (8th Cir. Jan. 30, 2006), *also available at* 2006 WL 357942 .............11

*Brnovich v. Democratic Nat'l Comm.*,
141 S. Ct. 2321 (2021)..........................................................................................38, 39

*Buckanaga v. Sisseton Indep. Sch. Dist., No. 54-5*,
804 F.2d 469 (8th Cir. 1986) .....................................................................................30

*Chisom v. Roemer*,
501 U.S. 380 (1991)....................................................................................................38

*City of Mobile v. Bolden*,
446 U.S. 55 (1980)......................................................................................................40

*Clark v. Calhoun Cnty., Miss.*,
88 F.3d 1393 (5th Cir. 1996) (Higginbotham, J.) .....................................................13

*Clerveaux v. E. Ramapo Cent. Sch. Dist.*,
984 F.3d 213 (2d Cir. 2021)..................................................................................14, 15

*Common Cause v. Rucho*,
    284 F. Supp. 3d 780 ..............................................................................................44

*Cottier v. City of Martin*,
    445 F.3d 1113 (8th Cir. 2006) ..........................................................................9, 10

*Cottier v. City of Martin*,
    604 F.3d 553 (8th Cir. 2010) (*en banc*) ...........................................................3, 10

*Flores v. Town of Islip*,
    382 F. Supp. 3d 197 (E.D.N.Y. 2019) ..................................................................41

*Georgia State Conf. of the NAACP*, 118 F. Supp. 3d 1338, 1347 (N.D. Ga. 2015) ....................42

*Goosby v. Town Bd. of Hempstead, N.Y.*,
    180 F.3d 476 (2d Cir. 1999)..................................................................................14

*Harding v. Cnty. of Dall., Tex.*,
    948 F.3d 302 (5th Cir. 2020) (Higginbotham, J.) ..................................................13

*Harvell v. Blytheville Sch. Dist. No. 5*,
    71 F.3d 1382 (8th Cir. 1995) (en banc) ................................................................18

*Houston Lawyers' Ass'n v. Att'y Gen.*,
    501 U.S. 419 (1991)...............................................................................................38

*Houston v. Lafayette Cnty., Miss.*,
    56 F.3d 606 (5th Cir. 1995) ...................................................................................13

*J.I. Case Co. v. Borak*,
    377 U.S. 426 (1964)...............................................................................................39

*Jeffers v. Clinton*,
    730 F. Supp. 196 (E.D. Ark. 1989)................................................26, 27, 30, 31

*Johnson v. De Grandy*,
    512 U.S. 997 (1994)........................................................................................33, 34

*Johnson v. De Soto Cty. Bd. of Comm'rs*,
    72 F.3d 1556 (11th Cir. 1996) ...............................................................................11

*Johnson v. Mortham*,
    926 F. Supp. 1540 (N.D. Fla. 1996).......................................................................42

*Larios v. Cox*,
    305 F. Supp. 2d (N.D. Ga. 2004) ....................................................................43, 44

*League of United Latin Am. Citizens #4552 v. Roscoe Indep. Sch. Dist.*,
    123 F.3d 843 (5th Cir. 1997) (Higginbotham, J.) ..................................................13

*League of United Latin Am. Citizens v. Perry*,
   548 U.S. 399 (2006)................................................................................... *passim*

*League of United Latin American Citizens v. Clements*,
   999 F.2d 831 (5th Cir. 1993) (en banc) ...............................................................13

*League of Women Voters of Mo. v. Ashcroft*,
   336 F. Supp. 3d 998 (W.D. Mo. 2018) ...............................................................45

*League of Women Voters of N. Carolina v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) ...............................................................................41

*Lewis v. Alamance Cnty, N.C.*,
   99 F.3d 600 (4th Cir. 1996) (Luttig, J.) ..............................................................14

*Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist. No. 1*,
   56 F.3d 904 (8th Cir. 1995) ...........................................................................26, 27

*Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist. No. 1 ("LRSD")*,
   831 F. Supp. 1453 (E.D. Ark. 1993) ..............................................................25, 26

*Lorillard v. Pons*,
   434 U.S. 575 (1978)..............................................................................................40

*LULAC v. Abbott*,
   No. 3:21-cv-259 (DCG-JES-JVB) (W.D. Tex. Nov. 30, 2021)....................2, 13, 41

*Milligan v. Merrill*,
   No. 2:21-cv-1291-AMM, slip op. (N.D. Ala. Jan. 24, 2022) ........................ *passim*

*Milwaukee Branch of the NAACP. v. Thompson*,
   116 F.3d 1194 (7th Cir. 1997) .............................................................................14

*Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*,
   894 F.3d 924 (8th Cir. 2018) ...................................................................1, 2, 9, 30

*Morse v. Republican Party of Virginia*,
   517 U.S. 186 (1996)........................................................................................38, 39

*NAACP v. Fordice*,
   252 F.3d 361 (5th Cir. 2001) ...............................................................................27

*NAACP, Inc. v. City of Niagara Falls, N.Y.*,
   65 F.3d 1002 (2d Cir. 1995)..................................................................................36

*NAACP, Spring Valley Branch v. E. Ramapo Central Sch. Dist.*,
   464 F. Supp. 3d 587 (S.D.N.Y. 2020)..................................................................41

*Nipper v. Smith*,
    39 F.3d 1494 (11th Cir. 1994) (en banc) ................................................................11, 12, 18

*North Carolina v. Covington*,
    138 S. Ct. 2548 (2018) ....................................................................................................44

*Pope v. City. of Albany*,
    94 F. Supp. 3d 302 (N.D.N.Y. 2015) ........................................................................36, 44

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) ......................................................................................................43, 45

*Reynolds v. Sims*,
    377 U.S. 533 (1964) .......................................................................................................45

*Smith v. Clinton*,
    687 F. Supp. 1310 (E.D. Ark.) *aff'd* 488 U.S. 988 (1988) ..............................................31

*Solomon v. Liberty Cnty., Fla.*,
    865 F.2d 1566 (11th Cir. 1988), *vacated*, 873 F.2d 248 (11th Cir. 1989) ..............................12

*Solomon v. Liberty County Commissioners*,
    221 F.3d 1218 (11th Cir. 2000) (en banc) ......................................................................12

*Solomon v. Liberty Cty. Comm'rs*,
    899 F.2d 1012 (11th Cir. 1990) (en banc) ......................................................................12

*Stabler v. Cty. of Thurston, Neb.*,
    129 F.3d 1015 (8th Cir. 1997) .................................................................................33, 34

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
    576 U.S. 519 (2015) .......................................................................................................40

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) .................................................................................................. *passim*

*Thomas v. Bryant*,
    919 F. 3d 298 (5th Cir. 2019) ................................................................................43, 44

*United States v. Berks Cnty., Pa.*,
    250 F. Supp. 2d 525 (E.D. Pa. 2003) ............................................................................41

*United States v. Charleston Cnty.*,
    365 F.3d 341 (4th Cir. 2004) (Wilkinson, J.) ................................................................15

*United States v. Georgia*,
    892 F. Supp. 2d 1367 (N.D. Ga. 2012) .........................................................................42

*United States v. Marengo Cnty. Comm'n,*
    731 F.2d 1546 (11th Cir. 1984) ................................................27

*Uno v. City of Holyoke,*
    72 F.3d 973 (1st Cir. 1995) (Selya, J.) ........................................13, 14, 18

*Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland,*
    535 U.S. 635 (2002) ...........................................................37

*Whitfield v. Dem. Party of State of Ark.,*
    890 F.2d 1423 (8th Cir. 1989) ...............................................31, 36

*Wright v. Sumter Cnty. Bd. of Elections and Registration,*
    979 F.3d 1282 (11th Cir. 2020) ................................................12

**Statutes**

52 U.S.C. § 10302(a), (c) ..........................................................40

52 U.S.C. § 10310(e) ..............................................................40

Voting Rights Act Section 2, 52 U.S.C. § 10301 ............................ *passim*

**Other Authorities**

H.R. Rep. No. 97-227 (1981) ......................................................39

S. Rep. No. 97-417 (1982) .......................................................31, 38

## INTRODUCTION

Defendants make no serious attempt to defend the House map adopted by the Arkansas Board of Apportionment (the "Board").  Instead, Defendants rely on misunderstandings of the law of Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301 (hereinafter "Section 2") and make arguments regarding the makeup of the Illustrative Plan promulgated by Plaintiffs.  *See* D.E. 53.  Defendants' arguments fall flat.  Plaintiffs have established that they are likely to succeed on the merits of their Section 2 claim and demonstrate that the newly adopted reapportionment plan for the Arkansas House of Representatives violates the VRA.

Further, Defendants' efforts to hide behind purported administrative guidelines and delay justice for this violation are misguided.  The impact of a preliminary injunction at this time to the State's administrative deadlines would be minimal and is addressable by the parties and this Court, and any alleged voter confusion or deterrence is speculative at best.

## ARGUMENT

**I.**     **Plaintiffs Satisfy the *Gingles* Preconditions**

**A.**     **Plaintiffs Have Satisfied the First *Gingles* Precondition by Establishing That Arkansas's Black Population Is Sufficiently Numerous and Geographically Compact So as to Draw Additional Majority-Black Districts**

The first *Gingles* precondition requires that "the racial group is sufficiently large and geographically compact to constitute a majority in a single-member district."  *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 932 (8th Cir. 2018) ("*Missouri NAACP*") (quoting *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425 (2006) ("*LULAC*")); *see also Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1018 (8th Cir. 2006). Here, Defendants all but concede that it is "mathematically possible to draw an additional five majority-black districts…."  ECF 53 at 7.  Defendants instead argue that the additional districts drawn in the Illustrative Plan provided by expert Anthony Fairfax are not "sufficiently compact."  *Id*.  But

Defendants' focus on the shape of the districts is misguided, and their factual arguments regarding the Illustrative Plan miss the mark.[1]

1.       **Defendants Misstate the First *Gingles* Precondition Inquiry**

In *LULAC*, the Supreme Court explained that the compactness analysis in evaluating a Section 2 injury "embraces different considerations" than in other cases: "'The first Gingles condition refers to ***the compactness of the minority population, not to the compactness of the contested district***.'" 548 U.S. at 433 (emphasis added) (quoting *Bush v. Vera*, 517 U.S. 952, 977 (1996) (Kennedy, J., concurring)). In addition, the inquiry should "take into account traditional redistricting principles such as maintaining communities of interest and traditional boundaries." *Id*. (quoting *Abrams v. Johnson*, 521 U.S. 74, 92 (1997)). Defendants make two significant errors in their recitation of the legal standard. First, Defendants claim that, to satisfy the first *Gingles* precondition, "a district must be geographically compact." ECF 53 at 9. But this requirement was rejected by the Supreme Court in *LULAC*, which contrasted the equal protection analysis, which does consider geographic compactness, or the shape of the districts, and the Section 2 analysis, which requires only that the minority population be compact. *See LULAC*, 548 U.S. at 433. Thus, although Plaintiffs' illustrative districts are in fact compact, *see infra* I.A.2, Defendants' attempt to graft a geographic compactness requirement onto to the first *Gingles* precondition is not supported by the case law.

Second, Defendants seem to believe that it is impermissible to consider race when drawing districts to comport with Section 2. ECF 53 at 10-12. But such a principle conflicts with binding

---

[1] Defendants assert that if Plaintiffs "can only show that it is possible to draw four, or three [majority-minority districts], they can only proceed to the following preconditions on those four or three." ECF 53, Opp. Br. at 9. Defendants provide no support of any kind for this statement. In fact, at this stage of the proceedings, Plaintiffs are "not required to proffer the best option for remedying the asserted violation." *Missouri NAACP*, 894 F.3d at 934.

caselaw in this Circuit.   Indeed, the *en banc* Eighth Circuit recognized that such consideration is permissible when it upheld the panel's decision on the first *Gingles* precondition in *Cottier v. City of Martin*, 604 F.3d 553, 558 (8th Cir. 2010) (*en banc*) (quoting panel decision).   In doing so, the *en banc* Court noted with favor the panel's holding that "***some consideration of race*** in fashioning the plans ***did not make them impermissible remedies*** for a Section 2 violation."   *Id*. (emphasis added).   Defendants' efforts to fashion a rule that race cannot be considered in this process are thus foreclosed by *Cottier*.

### 2.   Plaintiffs' Illustrative Plan Satisfies the First *Gingles* Precondition Under the Correct Legal Standard

Defendants do not address Plaintiffs' criticisms of the Board's redistricting plan.   *See* ECF 3 ("Pl. Br.") at 13-17.   Indeed, Defendants cannot do so; the Illustrative Plan drawn by expert Tony Fairfax fares better than the Board's plan on numerous neutral redistricting criteria, including the number of voting district splits, city splits, landmark splits, and paired incumbents.   ECF 3, Pl. Br. Ex. 7 ("Fairfax Report") at ¶¶ 29-40.   Instead, Defendants argue that five of the districts in Plaintiffs' Illustrative Plan are not sufficiently compact and so cannot satisfy the first *Gingles* precondition.[2]   But a careful review finds that it is the Board's redistricting plan that flouts the Board's own redistricting principles.

District 55

District 55 in the Illustrative Plan runs along the Mississippi River in the Upper Delta from approximately Marion to Blytheville.   Fairfax Report at B-59.   As a result of running along the Mississippi River, the district has a curved eastern edge, which lowers the compactness score for the district.   Defendants assert that the resulting low compactness score indicates that this district

---

[2] Defendants offer no objection to the other eleven majority-minority districts in the Illustrative Plan.

is racially gerrymandered.  Defendants also argue that the inclusion of precincts to the east of District 55 in District 54 is a sign of racial gerrymandering the shape of District 55 ensuring that Blytheville is not split into separate districts.  Op. Br. at 13.  Neither argument holds water.

Defendants are correct that this district has one of the lowest compactness scores in the Illustrative Plan.  But the reason for this compactness score is immediately clear when one looks at the district map: the Mississippi River forms the eastern border of the district.  The river does not follow a straight line; it snakes back and forth forming the eastern border of the state, meaning that any district including a portion of the river will necessarily have a lower compactness score than a similar one that does not.  *See* Ex. 12 ("Fairfax Resp. Rep.") at 11 (noting that "Coastal or river-based districts that extend along the water usually have lower than standard compactness measures").  The same could be said of the Board's redistricting plan: District 34 in the Board's plan has the fourth lowest Reock and Polsby-Popper compactness measurements, and the worst Convex Hull measurement, of all the districts in the Board's map precisely because it borders the Mississippi River.  *Id.*.  Similarly, District 55 in the 2011 state House map had a similar configuration and similarly low compactness scores.  *Id.*  There is nothing suspicious or race-driven about District 55's low geographic compactness, which is entirely attributable to adjacency to the Mississippi River.

Defendants also argue that the Illustrative Plan excludes voters from District 55 on account of race, because it places precincts near the northern portion of District 55 into the eastern-adjacent District 54.  ECF 53 at 13.  But as Mr. Fairfax explains, the northern corner of District 55 is drawn to contain the whole city of Blytheville and to avoid splitting that community.   Ex. 12, Fairfax Resp. Rep. at 13.  In short, the district was drawn specifically to comport with the very redistricting criteria on which the Board relied: it seeks to avoid splitting the community of Blytheville merely

for the purposes of making a more compact district.  Defendants point to variations from the population mean, but both District 54 and District 55 are well within the Board's "acceptable margin" of +/-5% population deviation.  *See  Redistricting Criteria and Goals*, Ark. Bd. of Apportionment,      https://arkansasredistricting.org/about-the-process/redistricting-criteria-and-goals/ (last visited Jan. 26, 2022) (noting that "+/- 5% deviation is considered an acceptable margin").  There is no evidence that these decisions were primarily motivated by race.

District 16

Defendants next focus on District 16 in the Illustrative Plan, arguing that it "stitches together geographically disparate black populations" that "have little in common."  ECF 53 at 14. But a review of the socioeconomics of the two major communities in District 16, Pine Bluff and Arkadelphia, reveals many commonalities despite their differences in racial makeup:

- Both cities are younger than the rest of the state
- Both cities have a higher poverty rate than the rest of the state
- Both cities have a lower proportion of married couples with children than the rest of the state
- Both cities' median household incomes are lower than the state's
- Both cities have more renters than the rest of the state
- Both cities' median housing values are lower than rest of the state
- Both have lower percentages of homes built after 2010 than the rest of the state
- Both have higher percentages of households receiving food stamps and SNAP benefits than the rest of the state

*See* Ex. 12, Fairfax Resp. Rep. at 7.  These two cities are exactly the communities of interest that the Board's own redistricting criteria wish to maintain.  *See Redistricting Criteria and Goals*, Ark. Bd. of Apportionment, https://arkansasredistricting.org/about-the-process/redistricting-criteria-and-goals/ (last visited Jan. 26, 2022) (including maintaining "Communities of interest: commonalities of economical, social, political, cultural, ethnic, or religious interests").

Defendants do not consider any of these commonalities.  Instead, Defendants rely on Mr. Davis's declaration, which asserts that the two are dissimilar.  ECF 53 at 14.  However, none of

the criteria Mr. Davis relies upon are redistricting criteria considered by the Board, and their consideration is outweighed by the numerous economic indicators suggesting the strong similarity between the communities.  *Compare* Davis. Decl. at ¶ 21 *with* Ex. 12, Fairfax Resp. Rep. at 7.[3]

District 5

Defendants next attack District 5 of the Illustrative Plan as a racial gerrymander.   ECF 53 at 14-15.  Defendants have three bases for their claim: the district's inclusion of portions of three cities, the district's compactness scores, and an allegation that the reason for its shape is race.  But none of these have merit.

District 5 includes portions of each of Magnolia, El Dorado, and Camden.  As Mr. Fairfax explains, an unfortunate fact of any statewide legislative plan is that it will split some cities.   Ex 12, Fairfax Resp. Rep. at 3.  The Board's own redistricting plan is particularly egregious in this regard; the Board's plan splits multiple midsize and small cities into numerous districts, such as Fayetteville (portions of which are in *seven* of the Board's districts: 18, 19, 20, 21, 22, 23, and 25) and Fairfield Bay (split into three districts by the Board: 41, 42, and 43).[4]  *Id.*  And there are multiple districts within the Board's plan that contain portions of three or more cities, including districts 8 (four splits), 10 (three splits), 11 (three splits) and 16 (a whopping *seven* splits).  *Id.*

---

[3] Mr. Davis notes that the fastest driving route between Pine Bluff and Arkadelphia to be approximately an hour and a half.  Davis Decl. at ¶ 21.  This fact bears no relevance to the question of whether the minority community is sufficiently numerous and geographically compact  to satisfy the first *Gingles* precondition, and Defendants provide no argument to the contrary.  And driving time was not a consideration listed by the Board among its redistricting criteria.

[4] Fairfield Bay's population is only 2,108, making the Board's decision to split the community into three different state House districts particularly unusual.

Overall, Mr. Fairfax's Illustrative Plan splits *fewer* cities than the Board's plan.  *Id.*  Defendants' cherry-picking a single example of such splitting is not evidence of impropriety.

Defendants next rely on geographic compactness measurements and argue that District 5 is on the lower end of the Illustrative Plan's compactness scores.  ECF 53 at 15.  But again, this approach is fundamentally misguided, given that the first *Gingles* precondition does not require geographic compactness.  *See LULAC v. Perry*, 548 U.S. at 433; *see also supra* at I.A.1.

Defendants conclude that "the reason for District 5's trio of complex city splits is race." ECF 53 at 15.  But this is pure supposition.  In fact, the split in El Dorado follows a major road that, when split, makes the district *more* compact.  Ex. 12, Fairfax Resp. Rep. at 4.  As Mr. Fairfax explains, "[t]his is a common tradeoff when drawing legislative districts in compliance with traditional redistricting criteria."  *Id.*  Additionally, in Magnolia, a precinct was also split in order to follow a major road in order to make the district more compact.  *Id.*  However, in Magnolia, the split precinct left additional Black population *out* of District 5, contrary to Defendants' bald assertion that such choices were made for racial reasons.  *Id.*.[5]

There is no basis for Defendants' assertions, and District 5 is a compact majority-minority district that satisfies the first *Gingles* precondition.

Districts 12 and 48

Defendants only criticisms of Districts 12 and 48 of the Illustrative Plan are that they are not geographically compact, claiming that District 48 "splits Phillips County's population center, Helena-West Helena, from the rest of Phillips County," and that District 12 "assigns the unincorporated areas of Phillips County…to a district dominated by Pine Bluff."  ECF 53 at 15-

---

[5] Notably, Mr. Fairfax states that the split precinct in El Dorado could be made whole while having District 5 maintain its majority-minority status.  *Id.*.

16.  Once again, Defendants base their arguments on geographic compactness, despite that not being the proper standard by which the Court measures the first *Gingles* precondition.  *See LULAC v. Perry*, 548 U.S. at 433.  Further, Defendants' arguments ignore the realities of redistricting.  Ensuring that a county's major city is always contained within a district containing the remainder of that county is "practically an impossibility."   Ex. 12, Fairfax Resp. Rep. at 9.  Indeed, the Board's own plan demonstrates how difficult this is; the Board's District 98 contains all of Clark County except for the cities of Arkadelphia, the largest city and economic center of Clark County, and Caddo Valley.  *Id*.  Avoiding these kinds of splits is exceedingly difficult, and overall, the Illustrative Plan provided by Mr. Fairfax performs better than the Board's redistricting plan in satisfying this criteria.  *See* Fairfax Report at ¶¶ 29-40.  And both District 12 and 48 have a population variance within the Board's "acceptable margin" of +/-5%. *See Redistricting Criteria and Goals*, Ark. Bd. of Apportionment,  https://arkansasredistricting.org/about-the-process/redistricting-criteria-and-goals/ (last visited Jan. 26, 2022) (noting that "+/- 5% deviation is considered an acceptable margin").  There is no evidence that these decisions were primarily motivated by race.

    In short, none of Defendants' arguments against the districts in the Illustrative Plan hold water.  Nor do Defendants address any of Plaintiffs' criticisms of the Board's redistricting plan.  *See* ECF 3, Pl. Br. at 13-17.  Accordingly, Plaintiffs satisfy the first *Gingles* precondition, and this fulfillment supports a finding that Plaintiffs are likely to succeed on the merits.

### 3.    Plaintiffs' Illustrative Plan Satisfies the First *Gingles* Precondition Even if It Contains Minor Defects

    The Eighth Circuit has recognized numerous times that Plaintiffs, at this initial stage, need not produce a perfect map that fixes all problems, has no objections, and requires absolutely no

adjustments by the Court.  Such a requirement would be absurd, and is not the law.  Rather, as the

Court explained in *Bone Shirt*:

> [T]he *Gingles* preconditions are designed to establish liability, and not a remedy.
> Because ***the first Gingles precondition seeks to establish whether a workable
> solution is possible***, "the Supreme Court [at this stage] requires only a simple
> majority of eligible voters in the single-member district. The court may consider,
> at the remedial stage, what type of remedy is possible .... But ***this difficulty should
> not impede the judge at the liability stage of the proceedings***."

*Bone Shirt*, 461 F.3d at 1019 (quoting *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th

Cir. 1991) (emphasis added); *see also Cottier*, 445 F.3d at 1117 ("the ultimate end of the first

*Gingles* precondition is to prove that a solution is possible, and not necessarily to present the final

solution to the problem").  The Eighth Circuit expressly rejected Defendants' arguments in

*Missouri NAACP*, noting that "at this stage of the proceedings, [a plaintiff] is not required to proffer

the best option for remedying the asserted violation."  894 F.3d at 934.  In this case, Plaintiffs have

succeeded in demonstrating that it is possible to draw sixteen reasonably compact majority-

minority House districts in Arkansas, while the Board's plan only provides for eleven.

Accordingly, Plaintiffs have satisfied the first *Gingles* precondition.

### B.     The defendants' arguments on the third *Gingles* precondition lack support in law and fact. [7]

The defendants next argue that the plaintiffs are unlikely to satisfy the third Gingles

precondition.  (ECF 53 at 16-53.)  Their argument, however, rests on nothing but air.  The

defendants offer no substantive evidence to rebut the plaintiffs' extensive evidence of racially

polarized voting in Arkansas, and they rely instead on misstatements of the law and factual

claims that find no support in the record.

---

[7] Defendants do not contest that Plaintiffs have satisfied the second *Gingles* precondition.

1.     **The third *Gingles* precondition does not require a plaintiff to prove that racially polarized voting is caused by White racial bias.**

The crux of the defendants' legal argument is that the Court should read a causation requirement into the third *Gingles* precondition where none currently exists.  (ECF 53 at 16-38.) That is, the defendants invite this Court to rule that the plaintiffs have the burden of establishing, as a prerequisite for liability under Section 2, that "racially polarized voting is *caused by* white voters' racial bias."  *Id.* at 17.  But there is no such requirement under Section 2.

In the Eighth Circuit, the third *Gingles* precondition "is determined through three inquiries: (1) identifying the minority-preferred candidates; (2) assessing whether the white majority vote [sic] as a bloc to defeat the minority preferred candidate; and (3) resolving whether there were special circumstances such as the minority candidate running unopposed present when minority-preferred candidates won." *Bone Shirt v. Hazeltine,* 461 F.3d 1011, 1020 (8th Cir. 2006) (cleaned up).  The defendants urge a fourth inquiry— whether racially polarized voting "*is caused* by white voters' racial bias" (ECF 53 at 17) —that the circuit has never adopted.

The defendants claim that the Eighth Circuit "has never addressed the causation question," (ECF 52. at 23), but that isn't true.  The Eighth Circuit addressed the causation argument explicitly in *Cottier v. City of Martin*, 445 F.3d 1113, 1119 (8th Cir. 2006), and the court rejected it.  Though that decision was later vacated on other grounds, *see Cottier v. City of Martin*, 604 F.3d 553, 562 (8th Cir. 2010) (en banc), the en-banc court did not reject that part of the panel's ruling, and the panel's analysis of the issue remains persuasive. The Eighth Circuit also faced the issue in *Bone Shirt*, which affirmed a district court decision that addressed the issue explicitly.  *See Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1008 (D.S.D. 2004).  The Eighth Circuit's decision did not

10

discuss the causation argument explicitly, but the appellants raised it in their opening brief.[8] And the panel necessarily decided the issue when it expressly agreed with the district court's analysis of the third *Gingles* precondition.  461 F. 3d at 1020-21.  That ruling therefore represents an implicit holding of the case that is binding on this Court.[9]

The defendants also contend that "three circuits [] have adopted the causation test," (ECF 53 at 20 (mentioning the First, Fifth, and Eleventh circuits)), but that is inaccurate too.  None of those circuits require a plaintiff to establish that racially polarized voting is caused by white racial bias, either as part of the *Gingles* preconditions or as a prerequisite for liability under the totality-of-circumstances test.

As to the Eleventh Circuit, the defendants rely on portions of Judge Tjoflat's opinion in *Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994) (en banc), that did not attract a majority—or even a plurality—of the judges of the en-banc court.  The pages to which the defendants cite represent only the views of Judges Tjoflat and Anderson.[10]  The remaining six judges on the en-banc court did not share those views.  Although the defendants represent the cited portions as the "plurality opinion," (ECF 53 at 25), and suggest that they are part of the holding of the case, subsequent decisions have recognized that they are not. *See, e.g., Johnson v. De Soto Cty. Bd. of Comm'rs,* 72

---

[8] *See* Appellants' Br., *Bone Shirt v. Hazeltine*, No. 05-4010, (8th Cir. Jan. 30, 2006) at 63-64, *also available at* 2006 WL 357942.

[9] *See generally,* Bryan A. Garner et al., *The Law of Judicial Precedent* § 4 at 46 (2016) (describing the elements of a holding); *id.* § 10 at 120-22 (discussing implicit holdings).

[10] To support their argument, the defendants cite pages 1515, 1517, 1519, and 1524 of Judge Tjoflat's *Nipper* opinion. (ECF 53, Opp. Br. at 17 n.8, 25, 33, 34, 35, 37, and 63.) All of those pages are in Section II of the opinion, in which only Judge Anderson joined. Judge Edmondson, joined by Judges Cox, Birch, and Dubina, concurred only in parts III(A), III(B), and V of the opinion. 39 F.3d at 1547. Judge Hatchett, joined by Judge Kravitch, dissented. *Id.* Judges Black, Carnes, and Barkett recused themselves and did not participate in the decision. *Id.* at 1496 n.*.

F.3d 1556, 1564 n.8 (11th Cir. 1996) (noting that Section II of *Nipper* is "dictum" because it was joined by only two judges); *Ala. State Conf. of the NAACP v. Alabama*, 2:16-cv-731-WKW, __ F. Supp. 3d __, 2020 WL 583803, at *13 (M.D. Ala. Feb. 5, 2020) (recognizing that "only those portions of *Nipper* joined in by the four-judge concurrence" are "binding").

The defendants' assertion that the Eleventh Circuit's subsequent decision in *Solomon v. Liberty County Commissioners*, 221 F.3d 1218, 1225 (11th Cir. 2000) (en banc) ("*Solomon IV*"), adopted *Nipper's* causation requirement also misses its mark. That case says nothing about the third *Gingles* precondition, because the Eleventh Circuit sitting en banc had previously held that the plaintiffs had established all three preconditions as a matter of law. *See Solomon v. Liberty Cty. Comm'rs*, 899 F.2d 1012, 1013 (11th Cir. 1990) (en banc) ("*Solomon II*"). And, in fact, the evidence upon which the Eleventh Circuit concluded that the plaintiffs had satisfied the third *Gingles* preconditions—uncontroverted racial bloc voting analysis—is the same kind of evidence on which the plaintiffs rely here. *See id.* at 1019-21 (Kravitch, J., specially concurring). *Solomon IV* also says nothing about partisanship. Although the Liberty County elections at issue were held on a partisan basis, *see Solomon v. Liberty Cnty., Fla.*, 865 F.2d 1566, 1569 (11th Cir. 1988), *vacated*, 873 F.2d 248 (11th Cir. 1989), neither "partisanship" nor "partisan" appears anywhere in the *Solomon IV* opinion. *Solomon IV* merely affirms the district court's conclusion, based on the totality of circumstances, that the at-large elections at issue there did not violate Section 2. *Solomon IV*, 221 F.3d at 1220, 1224, 1235.  It is unsurprising, then, that the Eleventh Circuit's most recent vote-dilution decision explains the third *Gingles* precondition but does not require a showing that polarization is caused by racial bias.  *See Wright v. Sumter Cnty. Bd. of Elections and Registration*, 979 F.3d 1282, 1304 (11th Cir. 2020). Causation simply isn't required in the Eleventh Circuit at all.

Causation isn't required in the Fifth Circuit, either. The defendants rely on Judge Higginbotham's decision in *League of United Latin American Citizens v. Clements,* 999 F.2d 831 (5th Cir. 1993) (en banc) *("LULAC"),* but they once again overstate the holding. The Fifth Circuit held only that the district court erred when it refused to consider the nonracial causes of voting preferences offered by the defendants at trial. 999 F.2d at 850-51. It did not purport to change the third *Gingles* precondition, and that is evident in later decisions of the Fifth Circuit applying the standards in *Gingles. See, e.g.*, *Harding v. Cnty. of Dall., Tex.*, 948 F.3d 302, 308 (5th Cir. 2020) (Higginbotham, J.); *League of United Latin Am. Citizens #4552 v. Roscoe Indep. Sch. Dist.*, 123 F.3d 843, 847-48 (5th Cir. 1997) (Higginbotham, J.); *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1395 (5th Cir. 1996) (Higginbotham, J.); *Houston v. Lafayette Cnty., Miss.*, 56 F.3d 606, 611-12 (5th Cir. 1995). Thus, while *LULAC* means that courts in the Fifth Circuit must consider a defendant's causation evidence in its totality-of-circumstances analysis, it does not support the defendants' argument here that the plaintiffs must prove White racial bias to establish the third *Gingles* precondition.

The First Circuit's decision in *Uno v. City of Holyoke*, 72 F.3d 973, 980 (1st Cir. 1995) (Selya, J.), likewise stands only for the unremarkable proposition that a defendant may offer causation evidence for a court to consider in its totality-of-circumstances analysis. The First Circuit said so explicitly: "One road that we believe remains open to a court called

upon to examine the totality of the circumstances in a vote dilution case is to mull other factors, apart from racial bias, that may have caused the white bloc voting identified in the third Gingles precondition." *Id.*; *see also id.* at 983 (the inference of racial vote-dilution created by satisfaction of the *Gingles* preconditions "will endure *unless and until* the defendant adduces credible evidence tending to prove that detected voting patterns can most logically be explained by factors

13

unconnected to the intersection of race with the electoral system").[11] Subsequent decisions in the First Circuit reflect this understanding. *See Black Pol. Task Force v. Galvin*, 300 F. Supp. 2d 291, 298 (D. Mass. 2004) (three-judge district court) (Selya, J.,). The defendants' statement that the First Circuit "require[s] plaintiffs to prove that white voters vote against minority-preferred candidates because of racial bias," (ECF 53 at 28), finds no support in *Uno*.

The defendants' causation argument also finds no support in decisions of the Second, Fourth, and Seventh circuits, all of which have expressly addressed the issue. *See Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 230-32 (2d Cir. 2021) (Section 2 claims do not require a showing of racial bias but a district court may consider causation evidence in its totality-of-circumstances analysis); *Goosby v. Town Bd. of Hempstead, N.Y.*, 180 F.3d 476, 492-93 (2d Cir. 1999) (same); *Lewis v. Alamance Cnty, N.C.*, 99 F.3d 600, 615 n.12 (4th Cir. 1996) (Luttig, J.) (same); *Milwaukee Branch of the NAACP. v. Thompson*, 116 F.3d 1194, 1199 (7th Cir. 1997) (same).

As one court in the Eleventh Circuit recently put it, "Plaintiffs are not required to prove the causes of any racially polarized outcomes as part of their burden of proof on the *Gingles* preconditions," because "[w]hy black-preferred candidates lost is not part of their burden at this juncture." *Ala. State Conf. of NAACP*, 2020 WL 583803, at *49. "Rather, the State's evidence that factors other than race are driving election results will be considered at the totality-of-circumstances stage." *Id.*

This distinction between a plaintiff's burden under *Gingles* and a defendant's opportunity to offer contrary evidence to be considered in the totality-of-circumstances analysis is well-settled

---

[11] The First Circuit stated that such factors "might include, for example, organizational disarray, lack of funds, want of campaign experience, the unattractiveness of particular candidates, or the universal popularity of an opponent." 72 F.3d at 983 n.4.

and necessary to avoid "convert[ing] the threshold test into precisely the wide-ranging, fact-intensive examination it is meant to precede." *United States v. Charleston Cnty.*, 365 F.3d 341, 348 (4th Cir. 2004) (Wilkinson, J.) (declining to "expand[] … the third *Gingles* precondition to ask not merely whether, but also why, voters are racially polarized"); *see also, e.g.*, *Clerveaux*, 984 F.3d at 230 (2d Cir. 2021) (same).

For all of these reasons, the Court should decline the defendants' invitation to graft a new threshold requirement onto the now well-established *Gingles* preconditions.  Rather, the Court should follow binding and persuasive precedent from the Eighth Circuit and elsewhere, all of which says the same thing: the third *Gingles* factor only requires a plaintiff "to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51.

>        2.      **The record does not support the defendants' claim that race plays no role in Arkansas elections.**

Even if the role of partisanship were properly considered in assessing the third *Gingles* precondition, the record here does not support the defendants' assertion that "[t]he reason black voters' preferred candidates tend to lose partisan elections outside of majority-black districts . . . is unmistakably partisanship." (ECF 53 at 38.) Indeed, the only way to arrive at that conclusion is by misstating the facts or ignoring the ones that don't fit the defendants' narrative.

The record here shows, for example, that Black-preferred candidates lose not only when those candidates are Democrats, *but also when Black voters prefer non-Democrats*. In two of the nine statewide general elections analyzed by the plaintiffs' expert witness, Dr. Lisa Handley, Black voters supported Libertarian candidates by overwhelming margins. In the 2020 contest for U.S. Senate, over 85 percent of Black voters supported Ricky Dale Harrington, a Black Libertarian, over incumbent Tom Cotton. (ECF 2-9 at 25.) In the 2018 contest for State Treasurer, more than

80 percent of Black voters supported the White Libertarian candidate. (*Id.* at 26.) This support is plainly not based on party, as Black voters in Arkansas do not generally support Libertarian candidates. And yet white voters still voted sufficiently as a bloc to defeat those two Black-preferred candidates. The defendant fails to explain these losses.

Another inconvenient fact for the defendants is the result of the 2018 Democratic gubernatorial primary. White Democrat Jared Henderson received 73 percent of the White vote and defeated Black Democrat Leticia Sanders, who was supported by a majority of the Black vote. (*Id.* at 26.) Voting patterns there can't be explained by partisanship because all voters chose the same party. And yet white voters still voted sufficiently as a bloc to defeat the Black-preferred candidate.

The defendants try to explain that result away by claiming that Sanders was a weak candidate. (ECF 53 at 38-42.) Their only evidence, however, is a news story that fails to support their claim. The story does say that Henderson outraised Sanders by more than fifty-fold.[12]  But the fact that a candidate who was outraised by that much still won a majority of the ballots cast by Black voters only underscores the degree of racial polarization here.  And the fact that Sanders, despite facing such a massive fundraising disadvantage, still won more than a third of all votes indicates that she was anything but a weak candidate. (ECF 2-9 at 26.) If cash were the measure of candidate quality, Hillary Clinton would have won the presidency by a landslide in 2016.[13] And

[12] See KUAR, *Democratic Primary For Governor: Jared Henderson and Leticia Sanders,* NPR, May 18, 2020, https://www.ualrpublicradio.org/2018-05-18/democratic-primary-for-governor-jared-henderson-and-leticia-sanders.

[13] *See* Isaac Arnsdorf, *Trump won with half as much money as Clinton raised*, Politico, Dec. 8, 2016, *available at https://www.politico.com/story/2016/12/trump-clinton-campaign-fundraising-totals-232400.*

the defendants don't explain why, if Sanders were so weak, that weakness was apparent to far more White Democrats than Black ones.

The defendants place a lot of emphasis on White voters' support for Black and White Democrats. (ECF 53 at 39-42.) They say that they might be persuaded that race was at play "if there were some differential between white voters' support for black Democrats and their support for white Democrats. But there's not—none whatsoever." (ECF 53 at 39.) Not so fast. Dr. Handley explains why the absence of a differential is not evidence that party alone explains the vote, but, as she also points out, there is indeed a differential here. (Ex. 13 (Handley Rebuttal) at 3, 7.)

The defendants compare the estimated White vote share received by one 2018 Black Democrat, Anthony Bland, with the estimated White vote share received by one 2018 White Democrat, Jared Henderson, and note that Bland received a slightly greater share of the White vote than Bland did. (ECF 53 at 39-40.) The defendants also compare the estimated White vote share of one 2020 Black Libertarian, Ricky Dale Harrington, with one 2018 White Libertarian, Ashley Ewald, and note that Harrington received a slightly greater share of the White vote than Ewald did. (*Id*. at 40)

This is cherry-picking at its worst. As Dr. Handley points out, these comparisons don't hold up if one looks more broadly. (Ex. 13(Handley Rebuttal) at 3-4.) The *average* share of the White vote received by all of the statewide White Democrats, according to her analysis, is 19.9 percent. (*Id.*) That is, in fact, *higher* than the White vote share received by Bland, the only statewide Black Democrat in recent years. (*Id.* at 4.) In addition, the *degree* of racial polarization, *i.e.,* the difference between Black and White support for the Black-preferred candidate, was higher for Bland (approximately 73 points) than for any White Democrat in 2018, including Henderson. (*Id.* at. 4 n.9.) As the defendants concede, moreover, a similar differential exists in the state

legislative contests that Dr. Handley analyzed. (ECF 53 at 41.) The average White support for White Democratic legislative candidates is higher than the average White support for Black Democratic legislative candidates.

The defendants also overlook the differential in White support for White-preferred candidates. In state legislative contests, the average White vote for White Republicans was 81.4 percent. (Ex. 13(Handley Rebuttal) at 4.) But the average White support for Black Republicans was *more than 30 points lower*: 51.2 percent, barely a majority of white voters. (*Id.*) And when a White independent candidate is a third option alongside Black candidates from both major parties, White voters chose the White candidate over the Black Republican and Black Democrat. (*Id.*) So if a differential tells the tale—and the plaintiffs don't think it does—then the defendants are telling a fib. Voting patterns in Arkansas are *not* unconnected to race.

As Dr. Handley explains, race and party are "highly correlated explanations for the voting patterns found in recent Arkansas elections" that cannot be untangled by eyeballing election results. (*Id*. at 4.) Indeed, the interrelatedness of race and party is nothing new. It is well studied in the social sciences. And there are statistical techniques available for teasing the two apart under some conditions. But the defendants haven't done any of that.  (*Id*. at 4-7.)

The Plaintiffs, on the other hand, have shown that voting in Arkansas is highly polarized along racial lines. That racial polarization "give[s] rise to an inference that racial bias is operating through the medium of the targeted electoral structure to impair minority political opportunities." *Uno*, 72 F.3d at 983. *See also Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1387 (8th Cir. 1995) (en banc) ("The surest indication of race-conscious politics is a pattern of racially polarized voting." (quoting *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984)); *Nipper*, 39 F.3d at 1525 (opinion of Tjoflat, J., joined by one other judge) (stating that "proof of

the second and third Gingles factors will ordinarily create a sufficient inference that racial bias is at work").

So even if the role of partisanship were properly considered at the preconditions stage, the record before the Court does not support an inference that voting is Arkansas is unconnected to race. It shows just the opposite.

> **3.      The record does not support the defendants' claim that House Districts 34, 98, and 74 give Black voters a meaningful opportunity to elect candidates of their choice.**

The defendants' final argument is that, even under the well-settled understanding of the third *Gingles* precondition, the Plaintiffs can only satisfy the third *Gingles* precondition as to two of the five additional districts at issue. (ECF 53 at 44-53.) That is, while  the Defendants contest the third *Gingles* precondition with respect to the three additional opportunity districts that the Plaintiffs allege can be drawn in the Upper Delta, Southwest Arkansas, and Central Arkansas, respectively (i*d.* at 45-53.), the defendants do not dispute that the Plaintiffs have satisfied the third *Gingles* precondition with respect to the two additional districts that they have drawn in the Lower Delta region. (*See* ECF 3 at 4-6.) The Plaintiffs address the three disputed regions below.

> **i.      Upper Delta**

The dispute in the Upper Delta region centers on House District 34. The Plaintiffs claim that the Board Plan contains two opportunity districts in the Upper Delta-—House Districts 35 and 63—and that an additional opportunity district can be created by "uncracking" the Black population that is split between House Districts 34 and 37. (ECF 3 at 5.) The defendants do not dispute the that plaintiffs can satisfy the third *Gingles* precondition with respect to House District 37, but they argue that House District 34 is a "toss-up" district that precludes the plaintiffs' claim in this region. (ECF 53 at 48.)

House District 34 has a Black voting-age population of 45.8 percent. (ECF 2-8 at 94.) It is made up of portions of two districts in the Current Plan: House Districts 55 (74.1 percent), and 54 (25.9 percent). (Ex. 15(Core Constituency Report) at 7.) It has one longtime incumbent, Monte Hodges, who is a Black Democrat elected from former House District 55, which had a Black voting-age population of 51.9 percent. (ECF 2-8 at 100, 576.) The new District 34 has an "effectiveness score" of 46.2%, which means that, according to Dr. Handley's analysis, Black-preferred candidates are unlikely to win in that district. (ECF 2-9 at 18.)

The defendants argue, however, that the effectiveness score of new House District 34 should be adjusted upward based on Hodges' performance in 2018 in the old House District 55. (ECF 53 at 46-49.) But as Dr. Handley points out, this kind of adjustment rests on several faulty assumptions. First, it assumes that voters in the new district will continue to face an incumbent. Second, it assumes that the new voters in the district will support the incumbent at the same rate as his or her old constituents. And third, it assumes that the racial composition of the new district is the same as the old district.  (Ex. 13(Handley Rebuttal) at 9-10.) It is telling that the defendants have failed to cite a single case in which a court has found this kind of adjustment based on such faulty assumptions to be reliable.

And, of course, these assumptions don't hold here. First, Hodges has already announced that he isn't running for re-election,[14] and the defendants cite no evidence to suggest than the district would be as effective for a new Black-preferred candidate as it has been for Hodges (as an incumbent). Second, even if Hodges were running, there is no reason to think that the new voters

---

[14] *See* George Jared*, State Rep. Monte Hodges to seek First Congressional District Seat,* Talk *See* George Jared*, State Rep. Monte Hodges to seek First Congressional District Seat,* TALK BUSINESS AND POLITICS, Jan. 4, 2022, *available at* https://talkbusiness.net/2022/01/state-rep-monte-hodges-to-seek-first-congressional-district-seat/.

in House District 34 would vote for him at the same rate as the voters in old House District 55. The effectiveness scores and racial demographics are different between new 34 and old 55, which suggests that the voters swapped in and out vote differently. (ECF 2-9 at 18-19).  Given that Hodges only got 52.2 percent of the vote in 2020 in a district that had a Black voting-age population of 51.9 percent, the defendants' prediction, based on their adjusted effectiveness score, that the new House District 37 would even be a "toss-up" is unlikely under these circumstances.

The Court should reject the defendants' unprecedented adjustment as the junk science that it is and conclude, based on Dr. Handley's analysis, that House District 34 is not an opportunity district.

### ii.    Southwest Arkansas

The dispute in Southwest Arkansas focuses on House District 98. The plaintiffs claim that the Board Plan has no opportunity districts in that region and that one can be created by "uncracking" the Black population split among House Districts 97, 98, and 99. (ECF 3 at 5-6.) The defendants do not dispute that the plaintiffs can satisfy the third *Gingles* precondition with respect to House Districts 97 and 99, but they argue that House District 98, while not safe, would not result in a pattern of usual defeat for Black preferred candidates. (ECF 53 at 49-50.)

House District 98 has a Black voting-age population of 44.2 percent. (ECF 2-8 at 96.) It is made up of portions of five districts from the Current Plan: House Districts 5 (64.0 percent), 6 (22.6 percent), 7 (8.8 percent), 2 (3.6 percent), and 3 (1.0 percent). (Ex. *TK (Core Constituency Report) at 19.) It has one longtime incumbent, David Fielding, who is a Black Democrat elected from current House District 5, which has a Black voting-age population of 52.0 percent. (ECF 2-8 at 98, 578.) The new district has an "effectiveness score" of .448, which means that, according

to Dr. Handley's analysis, Black-preferred candidates are unlikely to win in that district. (ECF 2-9 at 20.)

The defendants argue, again, that the effectiveness score of new House District 98 should be adjusted upward from .448 to .508 or .509 based on Fielding's performance in 2018 in the old House District 5. (ECF 53 at 50.) But this again assumes that new-to-Fielding voters, who make up 36.0 percent of the population in the new House District 98, will give him every ounce of the incumbency advantage that he had in his former district. That is unlikely, given that more than a third of the district is new and that the voting patterns and racial demographics of new House District 98 are different than those in old House District 5.

Here, too, the Court should reject the defendants' adjusted effectiveness score and conclude, based on Dr. Handley's analysis, that House District 98 is not an opportunity district.

### iii.      Central Arkansas

The dispute in Central Arkansas is all about House District 74. The plaintiffs claim that the Board Plan contains six opportunity districts in the Central Arkansas region—House Districts 66, 72, 76, 77, 79, and 80—and that an additional opportunity district can be created by "unpacking" some of those and "uncracking" the Black population split between House Districts 74 and 75. (ECF 3 at 4-5.) The defendants do not dispute that the plaintiffs can satisfy the third *Gingles* precondition with respect to House District 75, but they argue that House District 74 is "already an opportunity district" for Black voters. (ECF 53 at 52.)

House District 74, located in Pulaski County, has a Black voting-age population of 21.2 percent and a White voting-age population of 69.3 percent. (ECF 2-8 at 95.) It is currently represented by Tippi McCulloch, a White Democrat who also happens to be the House Minority

Leader. (*Id.* at 577.) According to Dr. Handley, House District 74 has an effectiveness score of 63.2%. (ECF 2-9 at 19.)

The defendants argue that, notwithstanding its relatively low Black voting-age population, House District 74 is an opportunity district based on its effectiveness score alone. (ECF 53 at 51-52.) They offer no evidence or argument that Black voters would *actually* be able to control the district. They simply argue that it's an opportunity district because of its score.

But that's not enough to show that Black voters in House District 74 will be able to elect candidates of their choice. The defendants identify no instance in which Black voters in Arkansas with a similar share of the population have been able to elect a candidate of their choice in a contested election, and they don't identify any districts where Black voters have been able to do so with the regularity required to establish that House District 74 will give Black voters a real opportunity to elect candidates of their choice. Nor do they identify any cases in which a court has found a district of similar composition to be an opportunity district. Taken to its logical end, the defendants' argument that opportunity can be assessed solely on a district's effectiveness score alone would mean that a district with a single Black voter, whose preferred candidate tends to win, would qualify as an opportunity district. Such a rule would be absurd.

The record shows that without a substantial Black population, the White majority will control the district. As Dr. Handley points out, the only districts in which Black voters in Arkansas have consistently been able to elect candidates of their choice in contested elections have been majority-Black.  (Ex. 13 (Handley Rebuttal) at 7-9.) "While this does not necessarily mean that only majority Black districts will provide this opportunity—or that all majority Black districts will provide Black voters an opportunity to elect their candidates of choice—it does suggest that a sizeable Black population is required." (*Id.* at 8.)) Dr. Handley's analysis suggests that the Black

voting-age population in House District 74 "is too low for Black voters to make up a significant portion of the voters in the general election." (*Id.*) As a result, the White majority in the district will be able to elect candidates of its choice "with or without Black support." (*Id.* at 9.)

Under these circumstances, the Court should conclude that House District 74 is not an opportunity district.  (ECF 2-9 at 28).

## II.     Plaintiffs Should Prevail in the Totality of the Circumstances Inquiry

### A.     Plaintiffs Have Adequately Proven a Likelihood of Success on Six Senate Factors

Defendants barely contest any of the detailed and voluminous factual findings laid out in the preliminary report of Plaintiffs' expert Dr. Jay Barth assessing the Senate factors.  Nor have they attempted to put forth a competing expert who could try to rebut Dr. Barth's comprehensive and well-established findings.  Instead, Defendants have resorted either to mischaracterizing Dr. Barth's report or claiming that large swaths of it are irrelevant based on a misreading of what the Senate factors analysis entails.  This Court should not credit Defendants' attempts at misdirection.

#### 1.     Senate Factor 2

The defendants argue that the plaintiffs can't establish the second Senate Factor because "[t]he cause of black and white voters' divergent preferences is partisanship, not race." (ECF 53 at 62-63.)  But this argument is beside the point.  In *Gingles*, the Supreme Court defined racially polarized voting as existing when the election outcome "would have been different depending on whether it had been held among only the white voters or only the black voters," 478 U.S. at 58, and when "black voters and white voters vote differently." *Id.* at 53.  That definition is binding on this Court.

Dr. Handley's analysis applies the Supreme Court's definition of racially polarized voting and found that voting in Arkansas was polarized in every statewide election she analyzed and in

13 of the 17 state legislative elections she alanyzed.  (ECF 2-9 at 12.)  That is clear evidence of racially polarized voting sufficient to satisfy the second Senate Factor.

To the extent that the defendants present non-racial explanations for election results in Arkansas, the Court may consider those separately among the totality of circumstances.  However, the defendants' evidence is unpersuasive for the reasons discussed above.

### 2.   Senate Factor 7

#### a.   *Representation in State House of Representatives*

As Dr. Barth acknowledges in a correction, there are twelve Black members out of 100 total in the Arkansans House of Representatives, and not ten as he had previously stated in his initial report.  Ex. 14, Barth Suppl. Report at ¶ 1.  Still, as Defendants acknowledge, *see* ECF 53 at 66, Black Arkansans are underrepresented in the state House, given that they make up 12% of the chamber but 16.5% of the state's total population, 15.2% of the state's BVAP, and 15.5% of the state's BCVAP.  Both parties agree on the facts: Black Arkansans are underrepresented in the state House.

In arguing that this Black representation gap in the state House is somehow insufficiently large to satisfy Senate Factor 7, Defendants cite only one case, in which the district court noted in its findings of fact that Black people made up 28.5% of the Boards of Directors but 34% of the city-wide total population.  *Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist. No. 1 ("LRSD")*, 831 F. Supp. 1453, 1460 (E.D. Ark. 1993).  *LRSD* is unavailing for three different reasons.

First, Defendants neglect to disclose that, in *LRSD*, there was essentially no gap at all between the percentage of Black members on the Boards of Directors (28.5%) and the city-wide BVAP (28%).  *See id.*  If anything, when using BVAP—which Defendants themselves argue is the correct metric for assessing adequate representation levels in this case, *see* ECF 53 at 56-57—

Black residents in *LRSD* were overrepresented on the boards.  Here, by contrast, Black Arkansans are significantly underrepresented when comparing the percentage of Black state House members (12%) and the statewide BVAP (15.2%).

Second, the district court in *LRSD* did not even arrive at a decision as it pertains to Senate Factor 7.  *See* 831 F. Supp. 1453, 1467 (E.D. Ark. 1993).  Defendants' citation is to the Court's findings of fact in that case; the Court made no legal determination as to Senate Factor 7 in the case.  *Id.* at 1460.  Third, when the Eighth Circuit affirmed the district court's decision, the Court never mentioned any comparison between the Black city-wide population and the percentage of Black representation on the Boards.  *Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist. No. 1*, 56 F.3d 904, 911 (8th Cir. 1995).  Instead, in its discussion of Senate Factor 7, the panel relied on the fact that both Black candidates that ran against white candidates in Little Rock School District races had won and that Black candidates won most of the exogenous elections at issue—facts that are not at issue here.  *Id.*  As such, Defendants' lone authority to contest the state House representation gap is plainly distinguishable from the case here.

Finally, as Dr. Barth notes in his supplemental report, only two Black candidates have ever won election in non-majority-Black state House districts since at least the late 19th Century.  Ex. 14, Barth Suppl. Report at ¶ 2.  This Court has previously found that Senate Factor 7 "points strongly in plaintiffs' favor" in a case where "[o]nly in majority-black districts have black candidates been elected to the Arkansas General Assembly."  *Jeffers v. Clinton*, 730 F. Supp. 196, 213 (E.D. Ark. 1989).  Given that the record here is substantially similar to the record in 1989, and that "the overwhelming majority of African-American representatives in the [Arkansas] Legislature come from majority-minority districts," *Milligan v. Merrill* ("*Milligan*")*, No. 2:21-cv-1291-AMM, slip op. at 181 (N.D. Ala. Jan. 24, 2022), the minimal representation of Black

candidates in non-majority-Black state House districts further weighs in favor of Plaintiffs' Senate Factor 7 argument.

### b. *Representation in other offices*

Defendants do not contest the glaring fact that Black Arkansans are severely underrepresented in statewide office, all levels of the state judiciary, the United States Senate, the United States House of Representatives, mayorships, and other local offices. *See* Barth Rep ort at ¶¶ 112-22. Defendants instead argue only that all that data is irrelevant because this Court must consider only "the office in question" under Senate Factor 7. ECF 53 at 64.

Defendants ignore multiple cases in this Circuit that, in fact, look at the rates of election of the minority population to other offices across the state in evaluating Senate Factor 7. *See, e.g.*, *See Little Rock School Dist.*, 56 F.3d at 911 (evaluating "'exogenous' elections"— those not concerning the challenged school board at issue—in assessment of Senate Factor 7); *Jeffers*, 730 F. Supp. at 213 (evaluating, in assessing Senate Factor 7 in challenge to redistricting plan for Arkansas General Assembly, the extent to which Black people have been elected to "county-wide constitutional offices . . . city councils, school boards, and quorum courts"). The same is true in other federal courts of appeals. *See, e.g.*, *NAACP v. Fordice,* 252 F.3d 361, 370 (5th Cir. 2001) (noting "the critical evidentiary reality that the exogenous character of . . . elections does not render them nonprobative"); *U.S. v. Marengo County Commission*, 731 F.2d 1546, 1551-52, 1572 (11th Cir. 1984). And in a decision that came down just days ago enjoining Alabama's newly passed congressional map on Section 2 grounds, the unanimous three-judge panel similarly relied on elections to statewide and other offices in Alabama in making its finding on Factor 7. *See Milligan*, slip op. at 181 (stating that Black underrepresentation in statewide office and in the state legislature was significant in evaluating Senate Factor 7 for congressional map). The significant

27

underrepresentation of Black Arkansans in all levels of elected office in the State is thus plainly relevant and strongly weighs in favor of Plaintiffs' case for Senate Factor 7.

### 3.      Senate Factor 6

Defendants' Senate Factor 6 argument rests principally on several mischaracterizations of Dr. Barth's findings related to racial appeals in the modern era.  First, Defendants claim that the "only" examples of "anti-black racial appeal[s]" in Dr. Barth's report are the examples related to former President Obama and Representative Hill's "Congressional Black Caucus" remark.  ECF 53 at 70.  Defendants miss several others.  Dr. Barth detailed how a radio advertisement targeting Black stations attacked Hill's opponent by playing dialogue of Black women claiming that "white Democrats will be lynching Black folks again"—an explicit racial appeal.  ECF. 3 at 31-32; Barth Report at ¶ 107.  Dr. Barth further identified three elected officials and/or candidates for public office in Arkansas who, between 2015 and 2020, used racial epithets in communications that were either public or released to the public, as well as a current candidate for Lieutenant Governor who regularly employs racialized rhetoric on social media.  ECF 3 at 32; Barth Report at ¶ 109.  Dr. Barth also noted the "Oprah" radio ad on behalf of Mike Huckabee's 1996 campaign for U.S. Senate, which received criticism for triggering racial stereotypes.   Barth Report at ¶ 102. Defendants simply ignored these many other examples of anti-Black racial appeals in recent campaigns.

Second, Defendants try to cast Hill's explicit racial appeal as to his Black opponent in his 2020 congressional race, Joyce Elliott, as an "anodyne remark" that "did not emphasize his opponent's race."  ECF 53 at 70.  In the statement in question, Hill emphasized that Elliott, if elected, would "be a member of the Congressional Black Caucus."  ECF 3 at 31.  Defendants seem to suggest that—because Hill in that same statement also mentioned that Elliott would vote for Nancy Pelosi for Speaker of the House—his comment had nothing to do with race, and that he was

instead trying to emphasize the Congressional Black Caucus' "relatively liberal positions."  ECF 53 at 70.  Yet as Dr. Barth notes in his supplemental report, the Congressional Black Caucus is neither partisan nor particularly liberal; the Caucus has had four Republican members, including one as recently as 2019.  Ex. 14, Barth Suppl. Report at ¶ 4.  If Hill had wanted to state that Elliott was too far-left, he could have said just that, and/or referenced the Congressional Progressive Caucus, which is Congress' caucus dedicated to liberal policies.  *See id.*  Hill instead chose specifically to mention Elliot's race—an explicit racial appeal.  Indeed, Hill's statement came under fire from several Republicans at the time for its racialized rhetoric.  *See id.*

Third, Defendants suggest that the several ads related to President Obama are not racial appeals because they contain no racialized rhetoric.  ECF 53 at 70.  Yet Defendants divorce these advertisements from their necessary context; Dr. Barth's report makes clear that there is both quantitative and qualitative data indicating "that Arkansas voters were race-conscious in their attitudes regarding Obama."  Barth Report at ¶¶ 103-04.  In his supplemental report, Dr. Barth includes another piece of quantitative data: an American National Election Studies empirical study that determined that Arkansas "showed exceptionally high levels of racial resentment compared to other states for the entire Obama [presidency]—2008, 2012, and 2016."  Barth. Suppl. Report at ¶ 5.  In this context, the advertisements at issue constitute racial appeals.

### 4.    Senate Factor 3

Defendants do not contest that Arkansas has majority-vote requirements in its state House primary races or that Arkansas's state House races take place just as often in non-presidential years as they do in presidential years, which disproportionately depresses Black turnout.  ECF 53 at 66-67; *see also* Barth Rep. ¶ 45.  Instead Defendants, as they did with Senate Factor 7, argue that Senate Factor 3 should pertain only to electoral procedures that affect state House elections, such

that Plaintiffs' evidence about at-large elections, and majority-vote requirements and off-cycle elections for other offices in Arkansas, is irrelevant.  ECF 53 at 66-68.

In doing so, Defendants ignore the plain text of the Senate Report, which requires that movants demonstrate "the extent to which *the State or political subdivision* has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group." *Gingles*, 478 U.S. at 45 (emphasis added).  Defendants similarly ignore the fact that courts in this Circuit analyzing Senate Factor 3 have often examined voting practices and procedures that affect other types of elections. *See, e.g.*, *Jeffers*, 730 F. Supp. at 212 (noting, in assessing Senate Factor 3 in challenge to redistricting plan for Arkansas General Assembly, that "many other public offices in Arkansas" other than General Assembly have majority-vote requirements); *Buckanaga v. Sisseton Indep. Sch. Dist., No. 54-5*, 804 F.2d 469, (8th Cir. 1986) (evaluating, in Section 2 challenge to South Dakota local public school district, voting practices and procedures across the state).  Indeed, the Eighth Circuit recently rejected Defendants' argument in explicit terms, upholding the district court's decision to evaluate "statewide data or expert testimony applying general data to the district" being challenged as it pertains to Senate Factor 3.  *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 940 (8th Cir. 2018).

Finally, Defendants suggest that because some Black candidates do well in state House primaries, therefore the majority-vote requirement in those primaries does not have a discriminatory effect.  ECF 53 at 67.  Regardless of whether or not Defendants are correct about the primary success of Black candidates, it is irrelevant.  The key question as it pertains to Senate Factor 3 is whether or not Black-preferred candidates would perform better without majority-vote requirements than they do with majority-vote requirements.  As Dr. Barth's supplemental report makes clear, Little Rock's decision to move away from majority-vote requirements "has enhanced

Black representation in the city's government," and that there is "empirical evidence that eliminating majority-vote requirements can benefit Black candidates in Arkansas." Ex. 14, Barth Suppl. Report at ¶ 9. With this proper frame, there is no question that majority-vote requirements have a dilutive impact in Arkansas.

### 5.   Senate Factors 1 and 5

Defendants do not challenge any of Dr. Barth's detailed factual findings in Senate Factors 1 and 5. They appear to acknowledge Arkansas's "long and sordid history of official discrimination against African Americans" as it pertains to the first Senate factor. ECF 53 at 71. Defendants also concede, as it pertains to Senate Factor 5, that Plaintiffs adequately "addressed" the fact that Black Arkansans bear the effects of discrimination across many core areas of life. *Id*. Defendants could not meaningfully contest these things, given that this Court on multiple occasions has taken judicial notice of the first and fifth Senate factors as they pertain to Black people in Arkansas. *See Jeffers*, 730 F. Supp. at 210; *Smith v. Clinton*, 687 F. Supp. 1310, 1317 (E.D. Ark.) (three-judge district court) *aff'd* 488 U.S. 988 (1988) (mem.); *see* ECF 3 at 19, 26.

Instead, Defendants argue that, for each factor, Plaintiffs have failed to show "some kind of nexus" between official discrimination or "depressed socioeconomic status and the ability to participate in the political process." ECF 53 at 71. Defendants ignore the Eighth Circuit's clear finding that "once lower socio-economic status of blacks has been shown, there is no need to show the causal link of this lower status on political participation." *Whitfield v. Dem. Party of State of Ark.*, 890 F.2d 1423, 1431 (8th Cir. 1989) (internal quotation marks and alterations omitted); *see also* S. Rep. No. 97-417, at 29 n.114 (1982) (finding that where disparities from past discrimination are met, "and where the level of black participation in politics is depressed, plaintiffs need not

prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation.").[15]

Even if this binding Eighth Circuit precedent did not apply, Dr. Barth's report documents the precise nexus Defendants describe. In his discussion of Senate Factor 1, Dr. Barth notes how the official discrimination in voting procedures led to "consistently inferior public services for African Americans such as inequitable segregated schools." Barth Report at ¶¶ 16, 30. In his supplemental report, Dr. Barth makes clear that school segregation remains a substantial problem in Arkansas. As of 2014, there were still 14 school districts that remained under involuntary oversight by federal courts because of inadequate desegregation, as well as two districts that remained in voluntary federal court orders for purposes of desegregation. Ex. 14, Barth Suppl. Report at ¶ 6. School segregation in Arkansas has actually gotten much worse in recent years. *Id.* ¶ 7.

In his discussion of Senate Factor 5, Dr. Barth repeatedly makes clear that "the well-educated, the healthy, and the economically vibrant [are] more likely to participate in elections and in other democratic activities"; by contrast, those who have fewer educational opportunities, poorer health, less wealth, and more interaction with the criminal justice system face significant "voter costs" that make it much harder to engage in the political process. Barth Report at ¶¶ 65-66, 71, 76, 83-87; Ex. 14, Barth Suppl. Report at ¶ 8.

---

[15] Strangely, Defendants also claim that Dr. Barth's report does not contain evidence that Black "turnout [] is lower than that of whites." ECF 53, Opp. Br. at 72. In fact, Dr. Barth's report makes plain that "Black Arkansans have even lower rates of voting" than the statewide average, and that the "low participation rates by Black Arkansas is a clear legacy of the long history of official state-sanctioned attempts to limit Black political power." Barth Report at ¶ 33.

The nexus, in other words, is quite clear: centuries of official discrimination against Black Arkansans resulted in significant socioeconomic disparities among the Black population, which in turn has a direct negative impact on political participation and voter turnout.  This nexus, made plain in Dr. Barth's initial and supplemental reports, is more than sufficient to satisfy Senate Factors 1 and 5.

### B.    Proportionality

#### 1.    Total population is a relevant metric in the proportionality analysis.

First, Defendants are incorrect that there is clear guidance—either from the Supreme Court or Eighth Circuit—as to whether total population, BVAP, or BCVAP must guide the proportionality inquiry.  Defendants rely heavily on *Johnson v. De Grandy*, 512 U.S. 997 (1994), for the proposition that courts must use "voting-age population, not total population" for the proportionality analysis.  ECF 53 at 56-57.  Yet in *Johnson*, the Supreme Court explicitly said that it "need not choose" between using total population or voting-age population in conducting the proportionality analysis.  512 U.S. at 1021 n.18.  The other case on which Defendants principally rely, *African American Voting Rights Legal Defense Fund, Inc. v. Villa*, acknowledges that "*Johnson* refuses to resolve the issue of what is the relevant population in a vote dilution claim" and "refus[es] to hold that it [voting-age population] is *the only* relevant population" for the proportionality analysis.  54 F.3d 1345, 1352 (8th Cir. 1995).  While *Villa* states that "*Johnson* instructs us to look to voting age population" for the proportionality analysis, it never states that it is improper also to look at total population or citizen voting-age population.  *Id.*  To wit, two years later, the Eighth Circuit—consistent with *Villa*'s finding that voting-age population is *a* relevant but not necessarily the *only* relevant metric for proportionality purposes—evaluated proportionality by using both total population and voting-age population.  *Stabler v. Cty. of Thurston, Neb.*, 129 F.3d 1015, 1022 (8th Cir. 1997).  Later, the Supreme Court in *LULAC v. Perry*

used citizen voting-age population data to evaluate proportionality—without any indication that it was foreclosed from looking at total population or required to use voting-age population. 548 U.S. at 438.

Try as they might, Defendants cannot find any binding authority mandating that a court use any one of these metrics. As such, Plaintiffs in their initial brief suggested that all three metrics—Black total population (16.5% Black statewide), BVAP (15.2%), and BCVAP (15.5%)—were all relevant for the proportionality analysis. ECF 3 at 34. The holdings in *Johnson*, *Villa*, and *LULAC v. Perry* only make that clearer. *See also Milligan*, slip op. at 194 (using total population in its proportionality analysis).

### 2. Plaintiffs prevail in the proportionality inquiry because Defendants have only 11 Black "opportunity districts."

Plaintiffs do not disagree with Defendants that, in the proportionality analysis, this Court may consider districts that will actually perform for Black-preferred candidates even if those districts are not majority-Black. *See* ECF 53 at 57-59. Plaintiffs note only that binding precedent relies on majority-Black districts for this analysis and courts must conduct a rigorous analysis for determining the effectiveness of non-majority-Black districts. *See Johnson*, 512 U.S. at 1014 n.11 ("'Proportionality' as the term is used here links the number of *majority-minority voting districts* to minority members' share of the relevant population.") (emphasis added); *Stabler*, 129 F.3d at 1021 (same); Ellen Katz et al., *Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982*, 39 U. Mich. J. L. Ref. 643, 730-31 (2006) ("*De Grandy* spoke of proportionality as involving districts with a 'clear majority' of minority voters. Some courts assessing proportionality have consequently refused to consider the presence of 'opportunity' or 'coalition' districts, or districts with a majority minority population where low voter turnout or other factors are *not effective*.") (emphasis added).

The Board Plan has only 11 majority-Black districts.  However, Defendants claim that four other non-majority-Black districts—House Districts 34, 49, 74, and 98—are sufficiently effective for Black voters to elect the candidates of their choice.  ECF 53 at 59-62.  As such, Defendants claim that the House plan has 15 opportunity districts for purposes of the proportionality analysis.

Plaintiffs discussed three of these districts—House Districts 34, 74, and 98—in Section B.I.3 and re-incorporate their arguments above.  House District 34 has a 45.8% BVAP, and Dr. Handley estimates that it has an effectiveness score of 46.2%, meaning that Black-preferred candidates are unlikely to win in the district.  Pl. Br. Ex. 8 ("Handley Report") at 18.  In arguing that House District 34 is in fact an opportunity district, Defendants note that its representative, Monte Hodges is a Black incumbent who won in the former House District 55.  ECF 53 at 59.  Yet Hodges is not running for re-election in the district, meaning that the district's Black voters will not benefit from his incumbent advantage.[16]  *See* Ex. 13, Handley Suppl. Report at 10.  The BVAP in the new House District 34 is more than six points lower than the BVAP in old House District 55, meaning that the new district is much less friendly for Black-preferred candidates.  *See id.* Further, Hodges won the old House District 55 by just 4% in 2020.  *See id.*  Given the tight 2020 margin, Hodges' decision not to run for re-election, and the sizeable drop in BVAP, House District in the Board's plan is unlikely to perform for Black-preferred candidates

House District 74 has a 21.2% BVAP, and Dr. Handley estimates that it has an effectiveness score of 63.2%.  Handley Report at 19.  A relatively high effectiveness score alone cannot create an opportunity district.  House District 74 has a very low BVAP, with white voters

---

[16] *See* Ryan Tarinelli, *Democrat Hodges announces plan to run for 1st Congressional District*, Arkansas Democrat-Gazette, (Jan. 4, 2022) https://www.arkansasonline.com/news/2022/jan/04/democrat-hodges-announces-plans-to-run-for-1st-con/.

vastly outnumbering Black voters, meaning that Black voters will have little to no chance to nominate their candidate of choice in a primary election, and thus have a preferred candidate win in a general election.   Section 2 requires that Black voters have an opportunity to elect their preferred candidate of choice in primary elections as well as general elections.  *See, e.g.*, *Whitfield*, 890 F.2d at 1427-84; *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1034 (D.S.D. 2004) (evaluating racial polarization evidence in "interracial primary house elections"); *NAACP, Inc. v. City of Niagara Falls, N.Y.*, 65 F.3d 1002, 1010-11 (2d Cir. 1995); *Pope v.  City. of Albany*, 94 F. Supp. 3d 302, 337 (N.D.N.Y. 2015).  House District 74's White majority will be able to elect candidates of its choice "with or without Black support," which is antithetical to the very foundation of a Black opportunity district.  Ex. 13, Handley Suppl Report at 9.

House District 98 has a 44.2% BVAP, and Dr. Handley estimates that it has an effectiveness score of 45%, meaning that Black-preferred candidates are unlikely to win in the district. Handley Report at 20. Even if Representative Fielding, the Black incumbent in this district, runs for reelection, this new district will include only 64% of the population of his old district, dramatically reducing his incumbency advantage.  *See* Ex. 13, Handley Suppl. Report at 11.  House District 98 also has a much lower BVAP than Fielding's previous district.  *See id.*  If Fielding does not run, this district is almost unwinnable for Black-preferred candidates, with a Black vote share well below 50%.

Finally, House District 49 has a 14.6% BVAP and Dr. Handley estimates that it has an effectiveness score of 53.1%.  Handley Report at 19.  As Defendants make clear, House District 49 is not a majority-minority district even when combining the BCVAP and Hispanic citizen voting-age population percentages.  ECF 53 at 60-61.  As Dr. Handley's analysis makes clear, similar to House District 74, the BVAP in this district is so small such that if White voters support

any candidate not preferred by Black voters, that candidate will win, "regardless of which candidate Black residents in the district support." Ex. 13, Handley Supple. Report at 8.

## III.    Section 2 of the Voting Rights Act Contains a Private Right of Action

In its January 20, 2022 order, ECF 55, this court requested that the parties address whether private right of action questions are considered jurisdictional in the Eighth Circuit and whether Section 2 of the VRA contains such a private right of action. The Supreme Court has established that whether a statute contains a private right of action is not jurisdictional. *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 642–43 (2002) ("[I]t is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.,* the courts' statutory or constitutional *power* to adjudicate the case.") (quoting *Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 89 (1998)). As such, by failing to raise it, Defendants have waived any potential argument and the Court need not reach whether Section 2 contains a private right of action.

Even if this Court were to find that the question implicates its subject matter jurisdiction, decades of Supreme Court case law, Congressional intent, the structure of the VRA and the position of the U.S. Department of Justice all confirm that there is a private right of action under Section 2 of the VRA.

If this Court were to hold that Section 2 does not allow cases brought by private litigants it would go against decades of binding jurisprudence and be the first court in the nation to do so. *See e.g., Milligan,* slip op. at 208-209 (recognizing a private right of action because "no federal court anywhere ever has held that Section Two does not provide a private right of action" and doing so "would work a major upheaval in the law"). Defendants will be able to cite no cases in which a court has dismissed a challenge under Section 2 because it was brought by a private party, because no such case exists. Instead, there have been hundreds of cases brought by private litigants under

Section 2, including before the Supreme Court. *See, e.g., LULAC v. Perry*, 548 U.S. at 399; *Houston Lawyers' Ass'n v. Att'y Gen.*, 501 U.S. 419 (1991); *Gingles*, 478 U.S. at 30; *Chisom v. Roemer*, 501 U.S. 380 (1991). *See also Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2333 n.5 (2021) (collecting the "steady stream" of Section 2 cases the Court has heard, including those brought by private plaintiffs); *Milligan*, slip op. at 207-208 (listing "numerous Section Two cases brought by private plaintiffs").

Furthermore, while the Supreme Court has not addressed an express challenge to Section 2's private right of action, it has decided a "close cousin" to this issue in *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996). *Milligan*, slip op. at 208. In *Morse*, the Court found that Section 10 of the VRA provides a private right of action in part based on its reasoning that Section 2 of the VRA provides such a right. 517 U.S. at 232; *see also Milligan*, slip op. at 208-209 (noting that five justices on the Court concurred in that reasoning and that a "ruling that Section Two does not provide a private right of action would badly undermine the rationale offered by the Court in *Morse*"). The Court's longstanding precedent recognizing that private parties may enforce Section 2 permits no other outcome here.

In addition to decades of precedent, Congressional intent clearly points to a private right of action under Section 2. In *Morse*, the Supreme Court specifically concluded that "*the existence of the private right of action under Section 2 ... has been clearly intended by Congress since 1965.*" 517 U.S. at 232 (emphasis added). The Report of the Senate Judiciary Committee accompanying the 1982 Amendments to the Voting Rights Act expressly "reiterate[s] the existence of the private right of action under Section 2, as has been clearly intended by Congress since 1965." S. Rep. No. 97-417, at 30 (1982). The 1982 Senate Report is "oft-cited" by the Supreme Court when interpreting the VRA. *Brnovich*, 141 S. Ct. at 2332-33. In fact, Defendants admit both that it is the

"'authoritative source' on the meaning of the cryptically amended Section 2," ECF 53at 34 (citing *Gingles*, 478 U.S. at 43 n.7), and that the "Supreme Court long ago mandated courts not just consider but follow Section 2's legislative history." *Id*. As the Defendants note, "[l]ike it or not, courts in Section 2 cases work under the Senate Report's shadow." ECF 53 at 34 (citing *Brnovich*, 141 S. Ct at 2336).  The House Committee Report accompanying the 1982 Amendments similarly recognizes the existence of a private cause of action under Section 2 and is similarly frequently relied upon by the Supreme Court. H.R. Rep. No. 97-227, at 32 (1981) ("It is intended that citizens have a private cause of action to enforce their rights under Section 2"); *see also, e.g., Brnovich*, 141 S. Ct. at 2332 (relying on the 1981 House Report).

When holding that Section 10 of the VRA contains an implied private right of action, the *Morse* Court noted that such a determination of whether a provision of the VRA authorizes a private right of action "must take into account" the legal context in which the statute was enacted. 517 U.S. at 230-31 (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 689-99 (1979)). "[D]uring the 1960's"—when Congress enacted the VRA—the Supreme Court had "consistently found" that statutes contained a private right of action "notwithstanding the absence of an express direction from Congress." *Id.* Indeed, "[t]he Voting Rights Act itself was passed one year after [the] Court's decision in *J.I. Case Co. v. Borak*, 377 U.S. 426, (1964), which applied a highly liberal standard for finding private remedies." *Id*. Given this legal context, it is not surprising that Congress did not contain an express grant of a private right of action for Section 2. *See also Allen v. State Board of Elections*, 393 U.S. 544, 555-557 (1969) (holding that Section 5 of the VRA was privately enforceable without an express grant). Nor it is surprising that Congress did not add an express grant of a private right of action to Section 2 when the VRA was amended in 1982. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that

interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). Because there has never been a case denying a private right of action under Section 2, Congress is assumed to have been "aware of this unanimous precedent" at the time it adopted the amendments. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 536 (2015).

While the text of the VRA does not expressly provide for private enforcement of Section 2, the structure of the Act also makes clear that it permits actions by private plaintiffs. For example, Section 14(c) allows for "the prevailing party, other than the United States" to seek attorney's fees "[i]n any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10310(e). This availability of attorney's fees necessarily presupposes that a private right of action is available to enforce the provisions of the VRA, including Section 2, whose original language "elaborates upon that of the Fifteenth Amendment." *City of Mobile v. Bolden*, 446 U.S. 55, 60 (1980). Moreover, Section 3 provides for certain remedies in actions brought by "the Attorney General *or an aggrieved person* . . . under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10302(a), (c) (emphasis added). It is clear that Congress did not intend Section 3 provide a remedy for aggrieved persons to enforce the voting guarantees of the Reconstruction Amendments if the same plaintiffs could not also bring actions under Section 2.

Finally, the Department of Justice, which if there were no private right of action would be the only entity able to bring cases under Section 2, also holds the view that the Section 2 creates a private remedy for any "aggrieved person," not merely for the federal government. Statement of

Interest of the United States, *LULAC v. Abbott*, No. 3:21-cv-259 (DCG-JES-JVB) (W.D. Tex. Nov. 30, 2021).

## IV.   The Other Preliminary Injunction Factors Weigh Heavily in Favor of a Preliminary Injunction

### A.   Plaintiffs will suffer irreparable harm absent an injunction.

The Arkansas Board of Apportionment approved maps that fail to comply with the Voting Rights Act.  Without preliminary relief, Plaintiffs and their members face an election cycle where their votes will be diluted.  "And once the election occurs, there can be no do-over and no redress." *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *see also Milligan*, slip op.  at 197. There is no question that the "holding of an upcoming election in a manner that will violate the Voting Rights Act constitutes irreparable harm" to Plaintiffs and their members. *United States v. Berks Cnty., Pa.*, 250 F. Supp. 2d 525, 540 (E.D. Pa. 2003); *see also, e.g.*, *Flores v. Town of Islip*, 382 F. Supp. 3d 197, 228 (E.D.N.Y. 2019) ("An abridgement or dilution of the right to vote constitutes irreparable harm.") (internal quotation marks and alterations omitted); *NAACP, Spring Valley Branch v. E. Ramapo Central Sch. Dist.*, 464 F. Supp. 3d 587, 593 (S.D.N.Y. 2020) ("In a vote dilution case, '[a] restriction on the fundamental right to vote … constitutes irreparable injury.'"); *League of Women Voters*, 769 F. 3d at 247 ("Courts routinely deem restrictions on fundamental voting rights irreparable injury. ... And discriminatory voting procedures in particular are 'the kind of serious violation of the Constitution and the Voting Rights Act for which courts have granted immediate relief.') (citing *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir.2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir.1986); *Alternative Political Parties v. Hooks*, 121 F.3d 876 (3d Cir.1997); *United States v. City of Cambridge*, 799 F.2d 137, 140 (4th Cir. 1986)); ECF 3at 34-36.

Defendants do not contest this fact, arguing only that Plaintiffs have not suffered irreparable harm here because the Board plan complies with the VRA.  ECF 53 at 73. Defendants' argument on irreparable harm thus necessarily depends on Defendants prevailing on the merits arguments.  Both parties appear to agree that if the Board plan is likely to violate Section 2—as Plaintiffs have clearly shown—then Plaintiffs will suffer irreparable harm absent a preliminary injunction.

### B. The equities and public interest weigh in favor of a preliminary injunction.

Instead, Defendants argue that potential administrative inconveniences they might incur due to issuance of a preliminary injunction means that the balance of the equities and public interest weighs in their favor.  Put simply, administrative burdens are "minor when balanced against the right to vote, a right that is essential to an effective democracy."  *United States v. Georgia*, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012); *see also Georgia State Conf. of the NAACP*, 118 F. Supp. 3d 1338, 1347 (N.D. Ga. 2015) (granting injunction under Section 2 because "the harm [plaintiffs] would suffer by way of vote dilution outweighs" administrative harm); *Johnson v. Mortham*, 926 F. Supp. 1540, 1542 (N.D. Fla. 1996) ("[T]he mere administrative inconvenience the [state Legislature and] elections officials will face in redistricting simply cannot justify denial of Plaintiffs' fundamental rights.").

As explained above, Plaintiffs are likely to succeed on the merits to show that the Board's map will cause vote dilution in violation of Section 2. Defendants spend much of their brief claiming that this exceedingly strong public interest is outweighed by the "impact on Arkansas's election deadlines." *See* ECF 53 at 73-77. They also briefly mention the risks of voter confusion and deterrence and the reliance interests of candidates. ECF 53 at 77. However, as explained below, the impact of a preliminary injunction at this time to the State's administrative deadlines is minimal, and those deadlines are insufficient to justify the denial of Plaintiffs' fundamental rights.

Furthermore, any voter confusion or deterrence is highly speculative given the timeliness of Plaintiffs' challenge, the fact that a preliminary injunction will not affect all districts, and the weak reliance interests of candidates who may still be able to continue with their candidacies. Indeed, later remediation for elections based on unlawful House districts would cause far worse voter confusion, candidate inconvenience, and disruption to the State's election administration.

Defendants rely on the Supreme Court's decision in *Purcell v. Gonzalez*, 549 U.S. 1 (2006), to claim that the administrative deadlines they list justify holding the upcoming House elections using an unlawful and dilutive map. *See* ECF 53 at 73. However, the factual circumstances at issue in *Purcell* are absent here for two main reasons.

First, the 2022 elections in Arkansas are much farther away in time than the election at issue in *Purcell*. In *Purcell*, the Supreme Court vacated the mid-October Court of Appeals ruling "given the imminence of the [November] election." 549 U.S. at 5.  Here, however, the 2022 primary and general elections are still many months away.  Indeed, Defendants appear to contemplate that a preliminary injunction remedy would not prevent it from properly administering the 2022 election.  Defendants have expressly stated that this Court has "the power to modify [the filing period] if necessary to accommodate a change in the districting map" for state House elections. ECF 48 at 16:13-16.[17] And Defendants also concede that finalizing absentee ballots may take *up to* three weeks, which the existing period between March 10 and April 7 can accommodate. *See* ECF 53 at 75.  As such, contrary to the Defendants' claims, no "impending election is

---

[17] Courts have "broad equitable power to delay certain aspects of the electoral process if necessary." *Larios v. Cox*, 305 F. Supp. 2d, 1335, 1342 (N.D. Ga. 2004) (quoting *Minn. State Senate v. Beens*, 406 U.S. 187, 201 (1972)) ("[T]he district court has the power appropriately to extend the time limitations imposed by state law."); *see also Thomas v. Bryant*, 919 F. 3d 298, 316 (5th Cir. 2019) (extending the candidate filing deadline for any districts where lines are redrawn).

imminent," nor is the State's "election machinery already in progress." ECF 60, Defs.' Br. Supp. Mot. Quash at 74 (citing *Reynolds v. Sims*, 377 U.S. 533, 585 (1964); *see also Milligan*, slip op. at 200 (finding, on January 25, 2022, that Alabama's 2022 primary and general elections "are not imminent" and that, even if they were, "it is not necessary that we allow those elections to proceed on the basis of an unlawful plan."). The several weeks, and in some cases months, before these deadlines provide a buffer during which the Board can re-draw the House map and allow for the completion of these administrative tasks.

Defendants also underestimate the abilities of this Court and the Board's staff. While Plaintiffs agree that a remedial plan cannot be drawn "overnight," it is not uncommon for States to re-draw maps in considerably less time than that required for initial maps. *See* ECF 53 at 76; *see Common Cause v. Rucho*, 284 F. Supp. 3d 780, 783 (noting the prior grant of 15 days between the date of the order and the day to submit new plans); *Milligan*, slip op. at 6 (14 days); *Thomas v. Bryant*, 919 F. 3d 298, 312-13 (5th Cir. 2019) (19 days); *Larios v. Cox*, 305 F. Supp. 2d 1335, 1336 (N.D. Ga. 2004) (20 days); *Pope v. Cnty. of Albany*, 94 F. Supp. 3d 302, 352 (N.D.N.Y. 2015) (21 days); *North Carolina v. Covington*, 138 S. Ct. 2548, 2550 (2018) (one month). The Board and its staff are already well-versed in the intricacies of the State's current population and geography; their software is primed and ready to create a new map that complies with Section 2. And while Defendants state that the initial map-drawing process took weeks, this included a month-long public comment period and technical corrections.  ECF 60 at 76. Armed with this experience and knowledge, the Board can more readily implement the changes required for the remedial map to comply with federal law.

This Court has already demonstrated that it is prepared to give this case careful consideration and decide appropriate relief on an expedited schedule. Plaintiffs have submitted

substantial expert analysis, and the Court will hear discussion of both Plaintiffs' and Defendants' evidence during a multi-day hearing next week. There is no reason to expect that this Court will not be able to meaningfully consider the evidence presented to it and rule on this motion with sufficient time for the Board to re-draw, candidates to campaign, and voters to exercise their rights. *See Milligan*, slip op. at 204 ("We have proceeded with all deliberate speed so as not to deprive plaintiffs of an opportunity for a timely remedy, and now the state must do the same.").

Second, Plaintiffs in this litigation moved much more quickly than the movants in *Purcell*. The *Purcell* plaintiffs waited a full year after preclearance to file their lawsuit. *Purcell*, 549 U.S. at 5. Here, by contrast, Plaintiffs filed their complaint and motion for a preliminary injunction on the same day that the House map became effective, December 29, 2021. *See* Docs. 1-3. Defendants admit that corrections were made to the map up until that date, when the maps "were made official." ECF 60 at 76. Unlike the *Purcell* plaintiffs who waited a full year to file a lawsuit, Plaintiffs here filed, quite literally, as soon as possible. Defendants' position that this timing bars Plaintiffs from seeking relief for the 2022 election would permit the state to draw and employ *any* redistricting plan—lawful or not—with impunity for at least one election cycle. Such a position is antithetical to the public interest. Defendants cannot invoke *Purcell* in order to place the redistricting process out of judicial oversight altogether. *See Milligan*, slip op. at 201 (agreeing that "[i]t can't always be too late or too soon" to challenge the redistricting process).

In short, Defendants cannot hide behind purported administrative deadlines and doubtful claims of inconvenience to candidates and voters. The public interest lies squarely in protecting the right to vote, *see Reynolds*, 377 U.S. at 555, and complying with federal law, *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1006-07 (W.D. Mo. 2018). The balance of the

equities and public interest thus weigh heavily against Defendants and in favor of enjoining the unlawful map for election to the Arkansas House of Representatives.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their motion for preliminary injunction and order the following relief: (1) enjoin Defendants from using the Board Plan for elections for the Arkansas House in 2022; and (2) enjoin Defendants from failing to hold elections for the Arkansas House in 2022 using a plan that complies with Section 2.

Dated:  January 26, 2022

Respectfully submitted,

_____

Gary Sullivan (AR Bar: 92051)
Email:  gary@acluarkansas.org
ARKANSAS CIVIL LIBERTIES UNION
FOUNDATION, INC.
904 West 2nd Street
Little Rock, AR 72201
Tel: (501) 374-2842

Ceridwen Cherry
Email:  ccherry@aclu.org
AMERICAN CIVIL LIBERTIES UNION,
VOTING RIGHTS PROJECT
915 15th St NW
Washington, DC 20015
Tel: (202) 457-0800

Jonathan Topaz
Email:  jtopaz@aclu.org
Sophia Lin Lakin
Email: slakin@aclu.org
AMERICAN CIVIL LIBERTIES UNION,
VOTING RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500

Neil Steiner
Email:  neil.steiner@dechert.com
DECHERT LLP
Three Bryant Park
1095 Avenue of The Americas
New York, NY 10036 – 6797
(212) 698-3500 | (212) 698-3599

Angela Liu
Email:  angela.liu@dechert.com
DECHERT LLP
35 West Wacker Drive, Suite 3400
Chicago, IL 60601
(312) 646-5800 | (312) 646-5858

Luke M. Reilly
Email:  luke.reilly@dechert.com
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-4000 | (215) 994-2222

Bryan Sells
Email:  bryan@bryansellslaw.com
THE LAW OFFICE OF
BRYAN L. SELLS, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
Tel: (404) 480-4212 (voice and fax)

Matthew F. Williams
Email:  matthew.williams@dechert.com
DECHERT LLP
One Bush Street, Suite 1600
San Francisco, CA 94104-4446
(415) 262-4500 | (415) 262-4555

*Attorneys for Plaintiffs*