## Rebuttal Report of Dr. Lisa Handley

### I.      Definition of racially polarized voting

In *Thornburg v. Gingles* the U.S. Supreme Court defined voting as racially polarized when the election outcome "would have been different depending on whether it had been held among only the white voters or only the black voters,"[1] and when "black voters and white voters vote differently."[2] Evidence relating to the degree of racial polarization is the foundation of two of the three *Gingles* preconditions: it is required to determine whether the minority group is politically cohesive and whether whites are voting sufficiently as a bloc to usually defeat minority-preferred candidates. Estimating the percentage of Black and white voters supporting competing candidates is essential for determining who the Black-preferred candidates are, how cohesive Black voters are in support of these candidates, and whether whites are voting as a bloc against Black-preferred candidates in recent Arkansas elections.

Contrary to Dr. Lockerbie's contention that I "assumed" voting was racially polarized, I conducted a statistical analysis of voting patterns using the three standard statistical techniques applied by experts in voting rights cases to estimate voting patterns by race.[3] My analysis demonstrates that Black voters are cohesive and that white voters do not support the candidates preferred by Black voters. The evidence is clear that Black voters and white voters vote differently and that the winners of recent elections would have been different depending on whether they were held among only the white voters or only the Black voters.

### II.      Lack of evidence to support Dr. Lockerbie's argument

Dr. Lockerbie does not conduct any analyses to support his claim that voting patterns are the result of party rather than race. Instead of carrying out an analysis to demonstrate whether

---

[1] *Thornburg v. Gingles*, 478 U.S. 30, 58 (1986).

[2] *Thornburg v. Gingles*, 478 U.S. 30, 53 (1986).

[3] Justin de Benedictis-Kessner, "Evidence in Voting Rights Litigation: Producing Accurate Estimates of Racial Voting Patterns," *Election Law Journal*, vol.14 (4), 2015, 361-382, page 363. This article includes a comprehensive listing of Voting Rights Act cases (1985-2014) and the statistical methods used in these cases to estimate voting patterns by race. (Table A1 of the Appendix).

party is playing a mediating role between race and voting behavior (and therefore explains partisan choices), Dr. Lockerbie assumes that the difference in party preference can be explained by party alone simply because Black voters usually support Democrats and white voters usually support Republicans in general elections. He makes the additional assumption that because white voters are no more likely to support white Democrats than Black Democrats, this means that party explains the vote rather than race. Dr. Lockerbie's "eyeballing the data approach" ignores:

(1)    in several recent Arkansas general elections, Black voters supported Libertarian candidates;

(2)    the only recent statewide Democratic primary that included a Black candidate was racially polarized;

(3)    similar support levels among white voters for Black and White Democrats does not mean that party rather than race explains voting patterns, especially in a state where no Democrat is likely to win statewide office;

(4)    the role played by race in a voter's choice of which party to support.

### III.    Role of race and party in explaining vote choice

Dr. Lockerbie contends that the very divergent voting pattern of Blacks and whites is not "racially driven" but a consequence of the partisan choices of Black and white voters.[4] His argument in support of this assertion is that Black voters support Democrats and white voters support Republicans, regardless of the race of the candidates.

***Black support for candidates who are not Democrats***  In two of the nine general elections I examined, the vast majority of Black voters supported Libertarian candidates: in the 2020 race against incumbent US. Senator Tom Cotton, more than 85% of Black voters cast their votes for Ricky Dale Harrington, the Black Libertarian candidate; in the 2018 contest for State Treasurer, more than 80% of Black voters supported the white Libertarian candidate, Ashley Ewald. This support cannot be based on party as Black voters do not generally support Libertarian candidates

---

[4] Section 2 of the Voting Rights Act was amended in 1982 to remove intent from a vote dilution or vote denial investigation. Arguing that the divergent voting patterns of Black and white voters is explained by party and not race is bringing intent into the inquiry. Positing race or party as an either-or proposition ignores the connection between attitudes about race and partisan vote choice.

(e.g., Black support for Libertarian candidates was very low in 2018 election contests for Governor, Lieutenant Governor, Attorney General, Secretary of State; and in the 2016 election contest for U.S. Senate). These two Black-preferred Libertarian candidates were not supported by a majority of white voters and lost both their elections to the white-preferred white candidates.

*Polarized voting in the Democratic primary*  Voting patterns in primary elections cannot be explained by party because all of the voters have chosen to participate in the same party primary. There was only one recent statewide Democratic primary that included a Black candidate, the 2018 gubernatorial primary.[5] More than 73% of the white voters who chose to vote in the Democratic primary[6] cast their votes for the white candidate, Jared Henderson. A majority of Black voters supported his Black opponent, Leticia Sanders. Nevertheless, Henderson won the Democratic nomination but went on to lose the general election as discussed above.

*White support for Black and White Democrats and Republicans*  White voters' lack of support for white Democrats as well as Black Democrats is not evidence that party rather than race explains the vote, as Dr. Lockerbie contends. It merely means that Black Democrats may not have been specifically targeted for defeat over and above white Democrats. But this is not surprising in Arkansas where Democrats are increasingly unlikely to win statewide elections.[7]

In addition, support among voters for Black Democrats and White Democrats is not the same. Dr. Lockerbie compares the estimated white vote share received by the one Black Democrat, Anthony Bland, in a recent statewide general election to the white vote share received by recent white Democratic candidates. Only one white Democrat received fewer white votes in recent elections than Bland: Jared Henderson, who ran for Governor the same year that Bland ran for Lieutenant Governor (2018). The average percentage of the white vote received by statewide

---

[5] The recent state legislative Democratic primaries analyzed only included Black candidates. Black and white voters supported the same candidates – all incumbents (although Springer in District 34 had only been an incumbent for a couple of months) – in these contests.

[6] The choice of whether to vote in Democratic or Republican primaries is polarized: Black primary voters are much more likely than white voters to choose to vote in Democratic primaries.

[7] Arkansas last elected Democrats to statewide office in 2010.

white Democratic candidates is 19.9;[8] Bland garnered 17.5 percent of the white vote.[9] As Dr. Lockerbie acknowledges in his report, this difference in mean white support for Black Democrats and White Democrats is also found in state legislative elections (Lockerbie Report, page 4).

Dr. Lockerbie does not discuss the difference in white support for Black and white Republicans. White voters had the option of voting for a white Republican in all statewide contests I examined but not in all state legislative elections. The average white vote for white Republicans in the state legislative contests I analyzed was 81.4%, but for Black Republicans the average was 51.2%. Moreover, when a white independent was available as a third option when faced with Black candidates for both major parties, white voters chose the white candidate rather than vote for either Black candidate.

***Interrelationship between party and race***   Arguing that party, not race, accounts for the very different vote choices of Black and white voters suggests that the two variables – race and party – are competing options, but they are in fact highly correlated explanations for the voting patterns found in recent Arkansas elections.[10] The unsurprising fact that Black and white voters often support candidates from different parties does nothing to demonstrate that party rather than race explains voters' preferences. This simplistic observation ignores the role that race plays in explaining partisan identification and a voter's support for one party's candidates over the other party's candidates. The outlined arrows in the diagram below illustrate the argument being made; the solid arrow indicates the relationship being ignored in the contention that party, not race, explains vote choices.

---

[8] Like Dr. Lockerbie, I will summarize using "ei rxc" estimates when possible and "ei 2x2" estimates when ei rxc estimates are not available.

[9] Moreover, the difference between white support and Black support for Bland was larger than for any of the other Democratic candidates that ran statewide in 2018, including Henderson. The gap between Black support and white support for Bland was 73.1; the gaps between Black and white support for the other Democratic candidates in 2018 were 72.3 (Governor), 70.7 (Attorney General) and 69.5 (Secretary of State).

[10] Racially polarized voting patterns that rest on the alignment of race, party and ideology has been referred to as *conjoined polarization*. Bruce Cain and Emily Zhang, "Blurred Lines: Conjoined Polarization and Voting Rights, *Ohio State Law Journal*, 77 (4): 2016.



Social science research reveals the significant role that race, racial attitudes, and racial policy preferences play in dictating individuals' partisan preferences.[11] The relationship between racial attitudes and partisan affiliation is especially strong in the South, where the partisan affiliations of white voters and Black voters have fluctuated directly with the racial policies embraced by the Democratic and Republican parties. Researchers have traced Southern realignment – the shift of white voters from overwhelming support for the Democratic party to nearly equally strong support for the Republican party – to the Democratic party's support for civil rights legislation beginning in the 1960s.[12] According to a recent study by two Princeton economists, "[u]sing newly available data, we conclude that defection among racially conservative whites just after Democrats introduce sweeping Civil Rights legislation explains virtually all of the party's losses in the region."[13]

---

[11] See, for example, Edward Carmines and James Stimson, *Issue Evolution: Race and the Transformation of American Politics.* Princeton, NJ: Princeton University Press, 1989; Maruice Mangum, "The Racial Underpinnings of Party Identification and Political Ideology," *Social Science Quarterly* vol. 94 (5): 2013; Carlos Algara and Isaac Hale, "Racial Attitudes and Political Cross-Pressures in Nationalized Elections: The Case of the Republican Coalition in the Trump Era," *Electoral Studies*, vol. 68: December 2020.

[12] See, for example, Carmines and Stimson, 1989; J. Morgan Kousser, "The Immutability of Categories and the Reshaping of Southern Politics," *Annual Review of Political Science* vol. 13: 2010; Ilyana Kuziemko and Ebonya Washington, "Why did the Democrats Lose the South? Bringing New Data to an Old Debate," *American Economic Review,* vol. 108 (10): October 2018.

[13] Kuziemko and Washington, 2018, p. 2865.

The differences in attitudes on racial issues between Republican and Democrats persist today.[14] A recently published study of racial attitudes by the Pew Research Center reports several examples of differences in racial attitudes between Democrats and Republicans, including:

(1) the need for increased attention to the history of slavery and racism – Republicans are far more likely than Democrats to say increased attention to these issues is bad for the country;

(2) the need to ensure equal rights for all Americans – Republicans think only a little (47%) or nothing (30%) needs to be done to ensure equal rights for all Americans, Democrats (74%) agree that a lot more needs to be done to achieve racial equality; and

(3) the progress made thus far towards racial equality – Republicans (71%) are much more likely than Democrats (29%) to say the nation has made a lot of progress toward racial equality over the past half-century.[15]

Similarly, a Harvard political economist and his colleagues recently reported finding "a stark partisan gap among white respondents, particularly in the perceived causes of racial inequities and what should be done about them. White Democrats and Black respondents are much more likely to attribute racial inequities to adverse past and present circumstances and want to act on them with race-targeted and general redistribution policies. White Republicans are more likely to attribute racial gaps to individual actions."[16]

Dr. Lockerbie conducted no analysis to assess the relative roles of race and party in explaining vote choice. His "eyeballing the data" approach should certainly have alerted him to

---

[14] The gap is actually increasing, but primarily due to the more liberal attitudes of Democrats. Robert Griffin, Mayesha Quasem, John Sides, and Michael Tesler, "Racing Apart: Partisan Shifts on Racial Attitudes Over the Last Decade," A Research Report from the Democracy Fund Voter Study Group, October 2021.

[15] *See* "Deep Divisions in Americans' Views of Nation's Racial History – and How to Address It," Report of the Pew Research Center, August 12, 2021.

[16] Alberto Alesina, Matteo Ferroni, and Stephanie Stantcheva, "Perceptions of Racial Gaps, Their Causes, and Ways to Reduce Them," National Bureau of Economic Research Working Papers Series, October 2021.

the high correlation between the two variables. Treating the variables as competing explanations for vote choice ignores the interrelationship between those factors and the role race plays in partisan identification.  In other words, race has both a direct effect and an indirect effect, with party playing a mediating role between race and vote choice. Social scientist have long been aware that failing to account for the possibility of mediation can produce biased conclusions about causation, and they have begun to develop statistical techniques to reduce or eliminate this bias under certain conditions.[17] Dr. Lockerbie does no statistical analysis at all, let alone attempt any of these corrective techniques, and fails even to acknowledge the likely bias in his conclusions.

### IV.       Providing Black voters with an opportunity to elect their candidates of choice

A district-specific, functional analysis is required to determine whether a district provides minority voters with an opportunity to elect their candidates of choice – or, in a slightly more complicated process, if a proposed district is likely to provide this opportunity if it is enacted. I utilize a two-component assessment based on: (1) the demographic composition of the district and (2) the voting patterns of minority and white voters in that district. Both components must be satisfied for me to consider a district likely to provide minority voters with an opportunity to elect their candidates of choice.

*Demographic composition of district*  There is no single universal or statewide target, such as 50% or 55% Black, that can be used to ascertain if a district provides minority voters with an opportunity to elect their candidates of choice. The minority population needed to create an "effective" minority district – that is, one that is likely to elect minority voters' preferred candidates to office – varies depending on the voting patterns of minorities and whites in the specific location of the district. This is the reason the Court requires a district-specific, functional analysis. However, unless voting is not racially polarized (in which case no effective minority districts need be drawn), districts must have a sizeable minority population if minority voters are going to play a decisive role in electing their candidates of choice to office. In Arkansas, where voting is consistently and markedly racially polarized, the only state house districts in which

---

[17] See, for example, Avidit Acharya, Matthew Blackwell, and Maya Sen, "Explaining causal findings without bias: Detecting and assessing direct effects," *American Political Science Review* 110 (3): 2016.

Black voters have consistently been able to elect their candidates of choice in contested elections have been majority Black districts. While this does not necessarily mean that only majority Black districts will provide this opportunity – or that all majority Black districts will provide Black voters an opportunity to elect their candidates of choice – it does suggest that a sizeable Black population is required.

The election of Jay Richardson, a Black Democrat, to represent Old District 78 is not evidence that this district provides Black voters with an opportunity to elect their candidates of choice.[18] As Dr. Lockerbie points out, the district had an effectiveness score of .549, but it also had a BVAP of less than 15%. While it is likely that most Black voters in the district voted for Richardson,[19] they could not have provided enough support to elect Richardson (or any other candidate) had non-Black voters supported a different candidate.[20] The candidates preferred by non-Black voters will inevitably succeed in winning this district because there are simply not enough Black voters to have a decisive impact on who wins. Proposed State House District 49 has approximately the same BVAP as Richardson's old district. If he runs for re-election and non-Black voters support him, Richardson will most likely win (92% of the population of his old district resides in the new district). However, if non-Black voters decline to support Richardson, he will lose, regardless of which candidate Black residents in the district support.

Another state house district Dr. Lockerbie suggests I should have listed as a Black opportunity district in the 2010 plan is State House District 33, with an effectiveness score of .679 but a BVAP of only 25.5%. The same observations apply to this district: the BVAP is too low for Black voters to make up a significant portion of the voters in the general election in this

---

[18] In my original report, I refer to Current, Proposed, and Illustrative districts for the district configurations under the 2010 state house plan, the plan proposed by the Reapportionment Board in 2021, and the illustrative plan put forward by Plaintiffs. Here, I refer to districts under the 2010 plan as "Old" but retain the use of Proposed and Illustrative districts to refer to the recently enacted plan and the illustrative plan.

[19] The voting patterns in House District 78 elections were not analyzed as the district does not overlap with one of the additional Black opportunity districts offered in the Illustrative Plan compared to the Proposed Plan.

[20] The demographic composition of House District 78 was diverse: the 2019 citizen voting age population of the district was 54.3% white, 17.8% Hispanic, 18.1% Black. Fairfax Report, ECF 2-8 at 100.

district. The preferred candidate of White voters prevailed in the old district and white voters will continue to elect their candidates of choice with or without Black support in Proposed District 74. (Slightly over 76% of old District 33 is in Proposed District 74, and the BVAP in the new district is lower at 21.2%.)

There are two additional state house districts under the 2010 plan with effectiveness scores greater than .50: State House Districts 85 and 86. Neither of these districts have BVAPs of even 10% but the effectiveness score of District 85 is .563 and the score in District 86 is .689. These districts were not discussed by Dr. Lockerbie. But the same point can be made: Black voters are not able to impact who is elected in either district. (Both of these districts, like Old District 33 discussed above, elect white Democrats to the legislature.) Both the effectiveness score and the racial composition of the districts must be considered in determining whether a district is likely to provide Black voters with an opportunity to elect their candidates of choice.

***Effectiveness score of district*** Because no elections have taken place in the proposed/illustrative districts, the percentage of votes a Black-preferred candidate is likely to receive must be estimated. Recompiling election results from previous elections to conform with the boundaries of proposed districts is the conventional approach to making this determination. The best election contests to use for this purpose are recent statewide elections that included a viable major party minority candidate supported by minority voters but not by white voters. Statewide candidates are the only candidates appropriate for this exercise because all voters – those in every old district as well as every proposed district – had the opportunity to turn out to vote for the election and to vote for one of the candidates competing.[21] There is only one recent statewide general election in Arkansas that satisfies these conditions: the 2018 race for Lieutenant Governor, in which Black Democrat Anthony Bland ran. He received overwhelming support from Black voters but less than 20% of white voters cast their votes for him.

---

[21] State legislative elections are conventionally not used for recompilation purposes. This is because the exercise requires either adding the vote totals of different legislative candidates running in different districts among different sets of voters to produce a "composite" candidate or, as Dr, Lockerbie has done, projecting the votes of a candidate that ran in one district onto voters that were not in that district and did not cast a vote for the candidate.

*Adjusted effectiveness scores*  Dr. Lockerbie offers effectiveness scores "adjusted" upward based on the support for the incumbent legislators in the previously existing districts compared to Bland's support in 2018. This adjustment necessarily rests on faulty assumptions. First, there is an assumption that the voters in the proposed district will be presented with an incumbent, and the advantages that come with that, such as name recognition. Second, it assumes that the new voters in the proposed district (that is, residents drawn into the proposed district that resided in districts other than the one from which the incumbent was elected) will support this candidate at a rate comparable to the incumbent's old constituents. Third, it assumes the racial composition of the new district is the same as that of the old district. The "bonus" points being awarded for the votes received by the incumbent representative over those received by Bland rests on both the racial composition and the voting patterns of Black and white voters in the old district. If the racial composition of the new district is not the same, the bonus should not be the same. I will examine each of these assumptions in relation to the district scores adjusted by Dr. Lockerbie.

Dr. Lockerbie adjusted the effectiveness score I reported for Proposed District 34 from 45.84 up to 51.91 based on Representative Monte Hodges' vote in Old District 55 in 2018 compared to Bland's vote in this district. He argues that this adjustment indicates Hodges should win Proposed District 34 "handily with 57.7% of the vote."[22] There are several problems with his prediction. First, since Hodges has announced plans not to run for re-election in Proposed District 34, there will be no incumbent running in the district and one cannot assume a non-incumbent will experience the same level of support as an incumbent. Second, there is no guarantee that the new voters in the district – more than 25% of the population of Proposed District 34 were residents of districts other than Old District 55 – will support Hodges at the same rate as voters of Old District 55 even if he were to run for re-election. The rate cited by Dr. Lockerbie is overly optimistic in any case: Hodges garnered only 52.2% of the vote in 2020 against the same Black Republican (Gary Tobar) he defeated in 2018 with 61.7% of the vote. Third, the BVAP has declined considerably: old District 55 had a 51.9% BVAP; newly drawn District 34 has a BVAP of only 45.8%. Fourth, providing Black voters with an opportunity to elect their candidates of choice does not mean simply being able to re-elect a popular Black

---

[22] Lockerbie Report, page 5.

incumbent to office – Black voters should have the ability to elect candidates to an open seat when an incumbent retires as well as to elect less well-known challengers running against incumbents.

The effectiveness score I report for Proposed State House District 98 is 44.8 based on Bland's support among the actual residents (Black and white) encompassed within the boundaries of the new district. Dr. Lockerbie adds more than six percentage points to this score based on how well Representative David Fielding, the Black incumbent in old State House District 5, performed compared to Bland. I do not know whether Fielding will run in Proposed District 98 but even if he does, only 64% of the population in Proposed District 98 resided in the district he represented. Put another way, 36% of the population of Proposed District 98 is new to the district, and one cannot assume that they would vote for Fielding (or another Black-preferred candidate) in the same proportions as voters who reside within the district's former boundaries. In addition, the proposed district will have far fewer Black voters than his old district – Proposed District 98 has a BVAP of 44.15%; Old District 5 had a 52.0% BVAP.

### V. Conclusion

Voting in Arkansas is racially polarized as defined by the U.S. Supreme Court. Its presence has been ascertained using the conventional statistical methods employed in minority vote dilution cases. Arguments that voting is not racially polarized must be supported with evidence – and Dr. Lockerbie has provided no evidence in his report that voting is not racially polarized.

Racial polarization impedes the opportunity for Black voters to elect candidates of their choice unless districts are drawn to provide Black voters with an ability to elect their preferred candidates. The Proposed State House Plan decreases the number of majority Black districts from 12 to 11 compared to the plan in place for the past decade and offers five fewer majority Black districts than the Illustrative Plan demonstrates could have been created. The Proposed State House Plan dilutes the voting strength of Black voters in Arkansas by failing to create additional districts that offer Black voters an opportunity to elect their candidates of choice to the Arkansas State House.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 26, 2022.