## SUPPLEMENTAL DECLARATION OF JAY BARTH, Ph.D.

Pursuant to 28 U.S.C. § 1746, I, Jay Barth, hereby declare as follows:

In response to comments in the Defendants' Response in Opposition to Motion for Preliminary Injunction regarding my preliminary report in this case, I would like to supplement that preliminary report in the following ways:

**Senate Factor Seven**

1.      In my discussion of the racial composition of those holding a variety of offices in Arkansas, I made an error as noted in the Defendants' Response (*see* Doc. 53 at 64-65).  At present, there are twelve Black members of the Arkansas State House of Representatives.  I deeply regret and apologize for the mistake.

2.      To be more expansive, of these twelve Black members presently holding seats in the lower body in the General Assembly, eleven of them represent districts that were majority Black according to the 2010 Census data employed by the Board of Apportionment in its redistricting process in 2011.  The twelfth Black House member—Representative Jay Richardson—represents a district (House District 78) where there was no racial majority group at the time of the 2011 redistricting process but a plurality (49.5%) of residents were white. Representative Richardson was preceded in that seat by another African American member, Representative George McGill. The success of Representatives McGill and Richardson are exceptional in that they are the lone Black individuals to represent districts in which the majority of residents are not Black since at

1

least the late 19th century when Black representation in the Arkansas legislature disappeared for eight decades.[1]

3. As noted in the initial report, there is one majority-Black district that is currently represented by a white member—District 12 where Representative David Tollett serves. Representative Tollett was preceded in office by white Democratic Representative Chris Richey who was elected in 2012. Thus, the current majority Black District 12 has been represented throughout its existence by a white representative.

**Senate Factor Six**

4. Defendants describe as "anodyne" an explicit racial appeal during the 2020 election in Arkansas's Second Congressional District (*see* Doc. 53 at 70). While surrounding comments did talk about his opponent's ideology and partisanship, as is completely appropriate during any political campaign, the statement by Congressman French Hill that Senator Joyce Elliott would "be a member of the Congressional Black Caucus" emphasizes his opponent's race in an explicit manner. The Congressional Black Caucus is not an inherently partisan body within the United States Congress.[2] Indeed, over time, the Caucus has had four Republican members, the most recent being Representative Mia Love of Utah who served until 2019.[3] If the true intent of the comment were to emphasize Elliott's liberalism, it would have been more appropriate to suggest that she might join the Congressional Progressive Caucus which has promotion of liberal policies at the heart of its mission rather than the Congressional Black Caucus that is focused on

---

[1] Janine Parry and William Miller, "'The Great Negro State of the Country?' Black Legislators in Arkansas: 1973-2000," *Journal of Black Studies* 36 (2006): 833-872.
[2] "Creation and Evolution of the Congressional Black Caucus," United States House of Representatives website, https://history.house.gov/Exhibitions-and-Publications/BAIC/Historical-Essays/Permanent-Interest/Congressional-Black-Caucus/
[3] Nia-Malika Henderson, "Mia Love Joins a Group She Promised to Dismantle," *Washington Post*, 6 January 2015.

expanding Black representation—both descriptive and substantive—in the House of Representatives. National Republicans criticized the remark by Congressman Hill as offensive, including prominent Republican commentator William Kristol who bemoaned the racialized elements of the remark on his Twitter feed.[4]

5.      The preliminary report included various qualitative and quantitative analyses of the racialized response to President Obama's candidacies and Presidency in the state of Arkansas. However, it is also important to supplement my preliminary report with the findings from another quantitative political science study that highlights Arkansans' high levels of "racial resentment," compared to the residents of other states, that persisted during the Obama era.[5] Political scientists have come to a general consensus on a four-question survey battery to gauge individuals' levels of racial resentment or animus.[6] The questions have been found to be valid indicators of survey respondents' views on key policies where race is central. Three scholars examined the well-respected American National Election Studies (ANES) that included the four questions across all states between 1988 and 2016 to determine state-level patterns of racial resentment and the change in these patterns across time. Most states showed significant movement on levels of racial animus across the years of survey data analyzed. Arkansas was an exception to this trend; as the authors conclude: "Arkansas seems impervious to change."[7] The state showed exceptionally high levels of racial resentment compared to other states for the entire

---

[4] Kristol tweet at https://twitter.com/billkristol/status/1317918143692623873?lang=gl; *see also* David Wasserman, "Final House Ratings: Democrats Poised to Expand Majority by 10 to 15 Seats," *Cook Political Report*, 2 November 2020, (a Republican strategist expressed deep worry that the comment by Hill was an example of the way in which he had "totally mis-litigated" the election and could cost him the race).

[5] Candis Smith, Rebecca J. Kreitzer, and Feiya Suo. "The Dynamics of Racial Resentment Across the 50 US States." *Perspectives on Politics* 18 (2020): 527-538.

[6] Kyle Peyton and Gregory A. Huber, "Racial Resentment, Prejudice, and Discrimination," *Journal of Politics* 83 (2021) doi: 10.1086/711558

[7] Smith, Kreitzer, and Suo, p. 534.

Obama era—2008, 2012, and 2016. This included 2016, a year in which levels of racial resentment were relatively low across the country, but Arkansas's rates of racial resentment were the highest in the country. Together, this provides another key source of information regarding the racialized response to the Obama era in the state's electorate.

**Senate Factors One and Five**

6. One clear linkage between Jim Crow legislation and current policy outcomes comes in the arena of school segregation. As of 2014, despite a number of districts having been declared unitary in recent years, there were still 14 school districts that remained under involuntary oversight by federal courts because of disparities resulting from Jim Crow-era *de jure* segregation and two school districts that have entered into voluntary federal court orders that remained in effect.[8]

7. Relatedly, Arkansas has seen a significant increase in the percentage of Black students in the state attending schools with overwhelmingly Black student populations in the decades following progress in desegregation after the *Brown* decision. Specifically, from 1980 until the early years of the last decade, Arkansas Black students had a 21-point increase in the percentage attending schools where student populations were more than 90 percent Black. Such resegregation into racially identifiable schools is indicative of the ways in which the past continues to live in Arkansas's present on a matter inherently linked to voter participation.[9]

---

[8] Yue Qiu and Nikole Hannah-Jones, "A National Survey of School Desegregation Orders," *ProPublica*, https://projects.propublica.org/graphics/desegregation-orders

[9] Gary Orfield and Erica Frankenberg, with Jongyeon Ee and John Kuscera, Brown *at 60: Great Progress, a Long Retreat and an Uncertain Future*, (Berkeley: The Civil Rights Project, University of California, 2014).

8.      In my report, I discuss the connection between Black Arkansans' low political participation and their economic disadvantages, comparatively poor health care outcomes, poor educational outcomes, and their high rate of engagement in the criminal justice system. All of these patterns are ultimately explained by a famous political science theory known as "the calculus of voting."[10]  Under this theory, which again and again has been supported by empirical research, a key determinant of whether or not a prospective voter casts a ballot are the "costs" of voting to her or him. While such "costs" take numerous forms (such as living exceptionally far away from a voting site), being economically challenged, unhealthy or disabled, relatively uneducated, or impacted by being a current or recent felon all carry with them significant costs that limit participation.[11] Unfortunately, in Arkansas, these costs also disproportionately impact Black citizens.

**Senate Factor Three**

9.      A quantitative study looking at Little Rock's electoral reforms in the 1990s, cited elsewhere in the preliminary report on a related topic, (Doc. 2-10 ¶ 56), has concluded that the city's shift away from majority-vote requirements in its City Board elections has enhanced Black representation in the city's government.[12]  While the study analyzes municipal level elections, it provides empirical evidence that eliminating majority-vote requirements can benefit Black candidates in Arkansas.

---

[10] William H. Riker and Peter C. Ordeshook. "A Theory of the Calculus of Voting." *The American Political Science Review* 62 (1968): 25–42.  Riker and Ordeshook's work built on previous theoretical research by Anthony Downs that was more precarious in terms of empirical support; see Anthony Downs (1957) *An Economic Theory of Democracy*. New York: Harper & Row.

[11] See Benny Geys, "'Rational' Theories of Voter Turnout: A Review," *Political Studies Review* 4 (2006): 16-35, for a full literature review on the "calculus of voting" across the years including empirical research.

[12] Kiril Kolev, Jay Barth, Lora Adams, and Brett Hill, *Governance in Little Rock, Arkansas: At-Large and District Elections and the Impact on Representation*, (Conway, AR: Hendrix College Arkansas Policy Program, 2015).

**Conclusion**

10.     This document seeks to supplement my preliminary report regarding the ways in which Senate Factors One, Three, Five, Six, and Seven are met in Arkansas in regard to the state's Black citizens.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 26 day of January, 2022.

_____

Jay Barth, Ph.D.