**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**ARKANSAS STATE**
**CONFERENCE NAACP** *et al.*                                                                                    **PLAINTIFFS**

**v.**                                            **Case No. 4:21-cv-01239-LPR**

**THE ARKANSAS BOARD OF**
**APPORTIONMENT** *et al.*                                                                                **DEFENDANTS**

## ORDER

This is a Section 2 Voting Rights Act case.  Plaintiffs allege that the 2021 reapportionment

plan for the Arkansas House of Representatives "dilutes Black voting strength in violation of

Section 2 of the Voting Rights Act . . . ."[1]  The Court is about to hold a preliminary injunction

hearing and then decide Plaintiffs' pending Preliminary Injunction Motion.[2]  Plaintiffs have issued

Rule 45 subpoenas to seven people—commanding their presence and testimony at the upcoming

hearing.[3]  Defendants have moved to quash three of the seven subpoenas.[4]  The decision whether

to quash the subpoenas requires an understanding of the legal standards governing the Section 2

vote-dilution claim made in this case.  Accordingly, before addressing the Motion to Quash, the

Court briefly sketches out the applicable legal standards governing the merits issue in this case.

---

[1] Compl. (Doc. 1) at 0–1, 9. The Complaint contains a page numbering error insofar as the second page of the Complaint is labeled 1, the third page of the Complaint is labeled 2, and so on.  For consistency's sake, I refer to the Complaint's page numbers as they appear on the Complaint itself.  Accordingly, I will refer to the first page of the Complaint (which is not numbered) as page 0.  When I use the term "reapportionment plan," I am referring to the redistricting for the Arkansas House of Representatives that has occurred as a result of the 2020 census.

[2] Order (Doc. 66).

[3] Ex. 1 (Subpoenas) to Defs.' Mot. to Quash (Doc. 59-1) at 1–21.

[4] Defs.' Mot. to Quash (Doc. 59).

## <u>Standards Governing a Section 2 Vote-Dilution Claim</u>

Section 2 of the Voting Rights Act provides that:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . .[5]

Section 2 further clarifies this prohibition as follows:

> A violation . . . is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected] class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.[6]

The Supreme Court has long held that the scope of Section 2's prohibition encompasses the alleged dilution of African-American votes.[7]

Unlike cases alleging a violation of the Fourteenth or Fifteenth Amendment, Section 2 vote-dilution cases primarily focus on the result of—not the motivation behind—the State's reapportionment plan.[8]  As Plaintiffs' Motion for Preliminary Injunction emphasizes, "[i]n 1982, 'Congress substantially revised [Section] 2 to make clear that a violation could be proved by

---

[5] 52 U.S.C. § 10301(a).

[6] *Id.* § 10301(b).

[7] *See, e.g.*, *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2332–33 & 2333 n.5 (2021) (collecting cases).

[8] Since *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986), the Supreme Court has made clear that the language of Section 2 focuses on the results of a reapportionment plan, not the motivation behind the plan.  *See, e.g.*, *Voinovich v. Quilter,* 507 U.S. 146, 155 (1993) ("Only if the apportionment scheme has the *effect* of denying a protected class the equal opportunity to elect its candidate of choice does it violate [Section 2]; where such an effect has not been demonstrated, [Section 2] simply does not speak to the matter.").  To be clear, case law still suggests that a Section 2 violation could also be made out by evidence of purposeful discrimination.  *See, e.g.*, *Nipper v. Smith*, 39 F.3d 1494, 1520 (11th Cir. 1994) ("Thus, under [S]ection 2 as amended, a plaintiff once again may demonstrate a violation by proving *either*: (1) the subjective discriminatory motive of legislators or other relevant officials; *or* (2) the existence of objective factors demonstrating that the electoral scheme interacts with racial bias in the community and allows that bias to dilute the voting strength of the minority group.").  But, as discussed below, Plaintiffs make no argument in the Complaint or in the preliminary injunction briefing that any of the Defendants engaged in purposeful discrimination or had a discriminatory motive.  *See generally* Compl. (Doc. 1); Br. in Supp. of Pls.' Mot. for Prelim. Inj. (Doc. 3); Reply to Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. (Doc. 68).

showing discriminatory effect alone and to establish as the relevant legal standard the 'results test'. . . .'"[9] The primary question is whether the plan "results in a denial or abridgement of the right . . . to vote on account of race or color"—regardless of the motivation of any of the Defendants.[10] Indeed, in the case at bar, Plaintiffs do not allege or argue that anyone, including the three members of the Board of Apportionment, had the purpose, intent, or motivation to discriminate against African-American Arkansans.[11]   Instead, Plaintiffs focus exclusively on the "results test."   The gist of their argument is that:

> The challenged plan contains just eleven majority-Black House districts even though more than sixteen percent of the state's population is Black[,] and it would be possible to draw sixteen (out of 100) geographically compact, majority-Black House districts.  As a result, the challenged plan impermissibly dilutes Black voting strength in violation of Section 2.[12]

So, how does one go about proving such a results-focused claim?  In *Gingles*, the Supreme Court identified three preconditions for a vote-dilution claim under Section 2.[13]   If a plaintiff satisfies those preconditions, the court next performs a totality-of-the-circumstances analysis to decide whether

> it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected] class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.[14]

---

[9] Br. in Supp. of Pls.' Mot. for Prelim. Inj. (Doc. 3) at 14 (quoting *Gingles*, 478 U.S. at 35–36).

[10] 52 U.S.C. § 10301(a).

[11] *See generally* Compl. (Doc. 1); Br. in Supp. of Pls.' Mot. for Prelim. Inj. (Doc. 3); Reply to Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. (Doc. 68).

[12] Br. in Supp. of Pls.' Mot. for Prelim. Inj. (Doc. 3) at 7.

[13] *Gingles*, 478 U.S. at 50–51.

[14] 52 U.S.C. § 10301(b); *see also Gingles*, 478 U.S. at 79. Defendants have argued that the unequal electoral opportunity must be causally connected to race.  Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. (Doc. 53) at 16–38. Plaintiff disagrees.  Reply to Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. (Doc. 68) at 18–23.  The Court is not, at this time, answering that question.  The Court will consider that question during and after the preliminary injunction hearing.

In performing the totality-of-the-circumstances analysis, courts have been given some direction by Supreme Court precedent.  Specifically, in *Gingles* and its progeny, the Supreme Court has relied on factors outlined in the Senate Judiciary Committee report that accompanied the 1982 amendments to the Voting Rights Act.[15]  The Senate Report states:

> To establish a violation, Plaintiffs could show a variety of factors, depending upon the kind of rule, practice, or procedure called into question.
>
> Typical factors include:
>
> 1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise participate in the democratic process;
>
> 2. The extent to which voting in the elections of the state or political subdivision is racially polarized;
>
> 3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
>
> 4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;
>
> 5. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
>
> 6. Whether political campaigns have been characterized by overt or subtle racial appeals; [and]
>
> 7. The extent to which members of the minority group have been elected to public office in the jurisdiction.[16]

---

[15] *See Gingles*, 478 U.S. at 36–37.  The emphasis and reliance that *Gingles* and its progeny have placed on the Senate Report is—to be polite about it—in serious tension with the more modern legal consensus that legislative history is not law and should not control the meaning of legislation.  *See, e.g.*, *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018) ("But legislative history is not the law.  It is the business of Congress to sum up its own debates in its legislation, and once it enacts a statute[,] we do not inquire what the legislature meant; we only ask what the statute means.") (internal quotation marks and citations omitted).  Nonetheless, the clear thrust of Supreme Court precedent directs me to consider the Senate Factors to the extent they are relevant to the case at bar.

[16] S. Rep. No. 97-417, at 28–29 (1982).

Additional factors that in some cases have had probative value as part of Plaintiffs' evidence to establish a violation are:

Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group [; and]

Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.[17]

*Gingles* and the Senate Report make clear that the factors are non-exhaustive and non-comprehensive;[18] and not each factor is relevant in each case.[19]   Additionally, as argued by Plaintiffs in their preliminary injunction brief and as set forth in precedent, Senate Factors 2 and 7 often predominate the totality-of-the-circumstances analysis.[20]

### The Upcoming Preliminary Injunction Hearing

The Court has explained to the parties its expectation that, at the upcoming preliminary injunction hearing, the parties will put on the stand any person who has submitted a declaration or expert report in this case.[21]   Accordingly, the Court expects at least the following testimony at the preliminary injunction hearing.

Plaintiffs will call Dr. Jefferson and Mr. Kopsky to testify regarding their organizations' associational standing.  Plaintiffs will also call their three expert witnesses: Anthony Fairfax, Dr. Lisa Handley, and Dr. Jay Barth.  Mr. Fairfax is a demographic and mapping consultant who

---

[17] *Id.*

[18] 478 U.S. at 45 ("The Report stresses, however, that this list of typical factors is neither comprehensive nor exclusive."); S. Rep. No. 97-417, at 29 (1982).

[19] S. Rep. No. 97-417, at 29 n.118 (1982) ("The courts ordinarily have not used these factors, nor does the committee intend them to be used, as a mechanical 'point counting' device.  The failure of plaintiff to establish any particular factor, is not rebuttal evidence of non-dilution.  Rather, the provision requires the court's overall judgement, based on the totality of circumstances and guided by those relevant factors in the particular case, of whether the voting strength of minority voters is, in the language of *Fortson* and *Burns*, 'minimized or canceled out.'").

[20] Br. in Supp. of Pls.' Mot. for Prelim. Inj. (Doc. 3) at 29, 38 (citing *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1390 (8th Cir. 1995) (en banc)).

[21] Jan. 11, 2022 Telephone Conference Tr. (Doc. 48) at 6.

designed the Plaintiffs' illustrative reapportionment plan.[22]  His testimony will address the first *Gingles* precondition: that the minority population at issue is sufficiently compact to comprise additional majority-minority districts.  Dr. Handley is a voting rights and redistricting expert.[23]  Her testimony will address the second and third *Gingles* preconditions as well as Senate Factor 2—in summary, the existence and extent of racially polarized voting.  Dr. Barth is a political scientist and professor of American politics at Hendrix College.[24]  His testimony will address the totality-of-the-circumstances test—specifically Senate Factors 1, 3, 5, 6, and 7.

These witnesses cover all aspects of the Plaintiffs' affirmative preliminary injunction arguments.  The only numbered Senate Factor that these witnesses do not address is Senate Factor 4, which is about candidate slating processes.  But that is not surprising, as Plaintiffs do not even mention Senate Factor 4 in their preliminary injunction briefing.  Similarly unsurprising is that the Plaintiffs' witnesses do not address the other two (unnumbered) factors that the Senate Report indicated "in some cases have had probative value."[25]  As with Senate Factor 4, Plaintiffs' preliminary injunction briefing does not mention either of those unnumbered factors— responsiveness of elected officials to minority concerns and the tenuousness of the policies underlying the challenged voting practice or procedure.

Defendants will call Andy Davis, Dr. Brad Lockerbie, Josh Bridges, and Finos Buford Johnson, Jr.  Mr. Davis is a statistical consultant who assisted the Board of Apportionment with the reapportionment process.[26]  His testimony will address the Plaintiffs' illustrative plan.  Dr.

---

[22] *See* Ex. 7 (Fairfax Report) to Pls.' Mot. for Prelim. Inj. (Doc. 2-7) at 5.

[23] *See* Ex. 8 (Dr. Handley's Report) to Pls.' Mot. for Prelim. Inj. (Doc. 2-9) at 2.

[24] *See* Ex. 9 (Dr. Barth's Report) to Pls.' Mot. for Prelim. Inj. (Doc. 2-10) at 2.

[25] S. Rep. No. 97-417, at 28–29 (1982).

[26] *See* Ex. 1 (Davis Decl.) to Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. (Doc. 53-1) ¶¶ 1–2.

Lockerbie is a professor of Political Science at East Carolina University.[27]  His testimony will address and attempt to rebut Dr. Handley's report.  Mr. Bridges is an election coordinator in the Secretary of State's Office.[28]  His testimony will address various upcoming election-related deadlines.  Mr. Johnson is the Parliamentarian of the Arkansas House of Representatives.[29]  His testimony will address the past and current political makeup of the House of Representatives.  In addition to these witnesses, Defendants' case relies heavily on Plaintiffs' own statistics.

## The Subpoenas and the Motion to Quash

On January 14, 2022, Plaintiffs subpoenaed seven other people to testify at the hearing: Governor Asa Hutchinson, Attorney General Leslie Rutledge, Secretary of State John Thurston, Betty Dickey, Douglas House, Richard Bearden, and Shelby Johnson.[30]  Plaintiffs described these persons as "Board of Apportionment witnesses."[31]  The Governor, Attorney General, and Secretary of State are the three members of the Board of Apportionment.[32]  In this official capacity, they ultimately voted on and unanimously passed the 2021 reapportionment plan.[33]  Ms. Dickey is or was the coordinator for the Board of Apportionment.[34]  Colonel House is or was part of the Attorney General's redistricting team.[35]  Mr. Bearden is or was part of the Secretary of State's

---

[27] *See* Ex. 4 (Dr. Lockerbie's Report) to Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. (Doc. 53-4) ¶ 3.

[28] *See* Ex. 2 (Bridges Decl.) to Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. (Doc. 53-2) ¶ 2.

[29] *See* Ex. 3 (Johnson Decl.) to Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. (Doc. 53-3) ¶ 1.

[30] Ex. 1 (Subpoenas) to Defs.' Mot. to Quash (Doc. 59-1).

[31] Ex. 2 (Exhibit Emails) to Defs.' Mot. to Quash (Doc. 59-2) at 3.

[32] Ark. Const. art. 8, § 1.

[33] Ex. 6 (Oct. 29, 2021 Bd. Public Hr'g Tr.) to Pls.' Mot. for Prelim. Inj. (Doc. 2-6) at 17–18.

[34] *See* Ex. 3 (July 29, 2021 Bd. Public Hr'g Tr.) to Pls.' Mot. for Prelim. Inj. (Doc. 2-3) at 3.

[35] The Court takes judicial notice of this fact.  *See* Fed. R. Evid. 201; Press Release, Ark. Att'y Gen., Attorney General Rutledge Announces Redistricting Team (Jan. 19, 2021), https://arkansasag.gov/news_releases/attorney-general-rutledge-announces-redistricting-team/; Ex. 3 (July 29, 2021 Bd. Public Hr'g Tr.) to Pls.' Mot. for Prelim. Inj. (Doc. 2-3) at 3.

redistricting team.[36]  Mr. Johnson is or was the Arkansas Geographic Systems Officer and in that capacity is or was involved with data informing the reapportionment plan.[37]

Of the seven subpoenaed witnesses, only three are at issue in the pending Motion to Quash. Defendants have not sought to quash the subpoenas of Dickey, House, Bearden, and Johnson.  And those individuals have not personally sought to quash the subpoenas.  Accordingly, the Court expects Dickey, House, Bearden, and Johnson to appear for testimony at the preliminary injunction hearing.[38]  The Motion to Quash is limited to subpoenas that command the testimony of the Governor, the Attorney General, and the Secretary of State.[39]  For the reasons stated below, the Motion is granted.

The subpoenas at issue and the corresponding Motion to Quash are governed by Federal Rule of Civil Procedure 45.  Subsection (d)(3)(A)(iv) of the Rule provides that "[o]n timely motion, the court . . . must quash or modify a subpoena that . . . subjects a person to undue burden." And even if the subpoena does not present an undue burden, another subsection of the Rule requires quashing or modifying the subpoena if it "requires disclosure of privileged or other protected matter . . . ."[40]  Defendants rely on both these provisions.  With regard to the undue burden subsection of the Rule, Defendants' argument is that (1) the testimony of the constitutional officers would be either completely irrelevant or marginally relevant, and (2) any marginal relevance would be outweighed by the significant burden associated with requiring the highest-

---

[36] The Court takes judicial notice of this fact.  *See* Fed. R. Evid. 201; Oct. 29, 2021 Bd. of Apportionment Meeting Minutes, available at https://arkansasredistricting.org/wp-content/uploads/2021/11/10-29-21-Board-of-Apportionment-Meeting-Minutes.pdf.

[37] *See* Ex. 4 (Aug. 5, 2021 Bd. Public Hr'g Tr.) to Pls.' Mot. for Prelim. Inj. (Doc. 2-4) at 3–4, 7.

[38] The subpoenas issued were for January 27, 2022.  Since the date of issuance, the preliminary injunction hearing was rescheduled.  The Court will treat the subpoenas as if they were issued for the rescheduled dates of the preliminary injunction hearing.  The Court expects the parties and the persons subpoenaed to do the same.

[39] *See* Defs.' Mot. to Quash (Doc. 59) at 1.

[40] Fed. R Civ. P. 45(d)(3)(A)(iii).

level state constitutional officers to come to federal court and testify on short notice.[41]  With regard to the privilege subsection of the Rule, Defendants' argument is that (1) either legislative or deliberative-process privilege applies, and (2) the applicable balancing test would bar any of the questions that Plaintiffs wish to ask the three constitutional officers.[42]  The Court need not (and thus will not) address the privilege argument.  That is because the Court concludes that—in the context of this Preliminary Injunction Motion and the associated hearing—the Defendants have established that each of the subpoenas at issue subjects the respective constitutional officer to an undue burden as that term is used in Rule 45(d)(3)(A)(iv).

The Eighth Circuit has explained that "FRCP 45(d)(3)(A)(iv) prohibits the discovery of information 'where no need is shown, or compliance would be unduly burdensome, or where harm to the person from whom discovery is sought outweighs the need of the person seeking discovery of the information.'"[43]  In short, the undue burden standard of Rule 45 calls for a balancing test that pits the relevance of and need for the testimony (on one side of the scale) against the burdens associated with supplying the testimony (on the other side of the scale).  It is possible this should be an even, head-to-head weighing.  But the better view of the word "undue" is that the burden on the subpoenaed person must significantly outweigh the potential relevance and need of the party seeking the testimony.[44]  Here, that stricter requirement is met.

---

[41] Defs.' Br. in Supp. of Mot. to Quash (Doc. 60) at 3–4, 8–12; Defs.' Reply to Pls.' Opp'n to Mot. to Quash (Doc. 67) at 1, 3.

[42] Defs.' Br. in Supp. of Mot. to Quash (Doc. 60) at 1, 4–8; Defs.' Reply to Pls.' Opp'n to Mot. to Quash (Doc. 67) at 3–8.  Defendants also raise the apex witness rule, but that rule is less a standalone rule of exclusion and more of a way to honor the undue burden or privilege tests.

[43] *In re Mo. Dept. of Corr.*, 839 F.3d 732, 737 (8th Cir. 2016) (quoting *Miscellaneous Docket Matter No. 1 v. Miscellaneous Docket Matter No. 2*, 197 F.3d 922, 925 (8th Cir 1999)).

[44] *Cf. Planned Parenthood of Ark. & E. Okla. v. Jegley*, 864 F.3d 953, 957 n.9 (8th Cir. 2017) (acknowledging, in another legal context, the Supreme Court's holding that an "undue burden" is one where "the benefits are substantially outweighed by the burdens").

<u>The Relevance of the Testimony at Issue and Plaintiffs' Need for Such Testimony</u>

Perhaps the most important observation to be made is one that has been made several times already—in this Order, in a previous Order, and in Defendants' motion to quash papers.[45] Plaintiffs have not alleged in their Complaint and do not argue in their preliminary injunction papers that anyone—including the Governor, Attorney General, or Secretary of State— intentionally or purposefully diluted the voting strength of African-American voters.  Because of this, testimony that goes to the underlying motivations of the constitutional officers is either irrelevant or unnecessary at this stage of the case.

Plaintiffs appear to acknowledge that they have not alleged or argued intentional or purposeful discrimination.  Yet they still assert that testimony from the constitutional officers is relevant and necessary.  To square this circle, Plaintiffs point to a single factor that the Senate Report said "in some cases" had "probative value" in the totality-of-the circumstances analysis.[46] Specifically, the Plaintiffs say the testimony at issue is relevant to "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."[47] Plaintiffs argue the constitutional officers' testimony is likely to help establish the constitutional officers' justification for the plan, the policy or policies underlying the plan, and whether these policies and justifications are tenuous.[48] There are several problems with the Plaintiffs' argument.

First, note that this particular factor does not even make it into the primary numbered factors in the Senate Report (Senate Factors 1–7).  It is not one of the two numbered factors that

---

[45] *See* Recusal Order (Doc. 42) at 2; Defs.' Br. in Supp. of Mot. to Quash (Doc. 60) at 1, 3; Defs.' Reply to Pls.' Opp'n to Mot. to Quash (Doc. 67) at 1.

[46] S. Rep. No. 97-417, at 29 (1982).

[47] Pls.' Opp'n to Mot. to Quash (Doc. 64) at 2.

[48] *Id.* at 9–10.

case law suggests predominates the totality-of-the-circumstances analysis.  It is not even one of the remaining five numbered factors that the Senate Report identifies as "typical factors."  Rather, it appears in a separate, unnumbered grouping of additional factors that the Senate Report says had in some prior cases been of probative value.  Suffice it to say that this factor is of a lesser order than the primary factors.

Second, it is far from clear that the tenuousness factor is actually relevant to the pending Preliminary Injunction Motion.  Plaintiffs' mention of this factor in response to the Motion to Quash is their only mention of this factor in this litigation.  They did not mention this Senate Factor in either their Complaint or in their preliminary injunction papers.  They did not allege or argue in any of those documents that this factor cuts or might cut in their favor.  Given this omission, it is unsurprising that Defendants' brief opposing the preliminary injunction did not raise, discuss, or argue about this Senate Factor.  In short, as the Preliminary Injunction Motion has been framed and briefed by both sides, the tenuousness factor is not at issue.

Third, even if the tenuousness factor were at issue, the constitutional officers' testimony is at best marginally relevant and useful.  At worst, it would be entirely redundant of other information that is already available to the parties.  Specifically, the Plaintiffs have subpoenaed (without objection) four Board of Apportionment staff witnesses.  To varying degrees, and to the extent an applicable privilege is waived or overcome, those witnesses should be able to testify to the policies and justifications underlying the reapportionment map.  Moreover, there are on-the-record transcripts from Board of Apportionment meetings that identify the policies and justifications underlying the reapportionment map: (1) adherence to the constitutional imperative of one-person one-vote, (2) compliance with the Voting Rights Act, (3) adherence to the Equal Protection Clause's proscription of drawing districts on the basis of race, (4) adherence to

11

geographic principles including contiguity, compactness, the minimizing of splitting political subdivisions, and cognizance of communities of interest, (5) maintenance of continuity of representation, and (6) avoidance of drawing lines based on partisanship.[49]  Courts, including the Supreme Court, have made plain their strong preference for use of such public materials over requiring motivation or justification testimony from decisionmakers.  For example, in *Arlington Heights*, the Court juxtaposed the normalcy and utility of using public documents to determine the motivation or justification behind a state action with the extraordinary and unusual step of calling a decisionmaker to testify on his or her motivations or justification.[50]

In their brief, Plaintiffs argued that the four lower-ranking Board of Apportionment witnesses "cannot testify as to the policy underlying the adopted House map because they are not the individuals who made the final decision to adopt the map."[51]  Plaintiffs also argued that "little or no meaningful evidence is available regarding the Board's justification for the adopted plan."[52]  Subsequently, at oral argument, Plaintiffs' position appeared to soften at least a little on these points.  Plaintiffs acknowledged that these sources could provide some evidence on the policies underlying the reapportionment map, but Plaintiffs argued that the three constitutional officers could provide significantly more and better evidence.[53]  The Court is not persuaded by Plaintiffs' argument.  In general, when courts evaluate a state's justifications for some enacted law or policy—for example, as part of a strict scrutiny, intermediate scrutiny, or rational basis analysis—

---

[49] *See, e.g.*, Ex. 3 (July 29, 2021 Bd. Public Hr'g Tr.) to Pls.' Mot. for Prelim. Inj. (Doc. 2-3) at 3–7.

[50] *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) (noting that "legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports," but that it would take an "extraordinary instance[]" to call a member "to the stand . . . to testify concerning the purpose of the official action . . . .").

[51] Pls.' Opp'n to Defs.' Mot. to Quash (Doc. 64) at 9.

[52] *Id.* at 6.

[53] Jan. 27, 2022 Hr'g Tr. at 10:51:01–10:56:38, 11:09:24–11:12:12.

courts do not require nor need the testimony of lawmakers to determine the underlying justifications.  Courts instead look to other documentary sources, such as the text of a challenged statute, or public records like floor speeches and committee reports, or even the representation of government lawyers as to the asserted justifications.[54]  In this case, we have public transcripts that make clear the justifications for the reapportionment map.  And there is a way for Plaintiffs to challenge those justifications at the preliminary injunction stage.  Plaintiffs' experts can evaluate whether the reapportionment map stuck to or deviated from the justifications.[55]

In support of Plaintiffs' position that testimony from the actual decisionmakers is more than marginally relevant to the tenuousness factor, Plaintiffs' brief points to several non-precedential cases.  None is persuasive.  In *Wright v. Sumter*, a case dealing with a challenge to the method of electing members of a Board of Education, the court did discuss testimony given by the School Board Chairman while analyzing the tenuousness factor.[56]  However, although the School Board Chairman was involved with developing the election method at issue and the School Board voted to recommend the election method to the State Legislature, it was the State Legislature who had to ultimately adopt the plan.[57]  If the School Board Chairman is analogous to anyone in

---

[54] *See, e.g., Abbott v. Perez*, 138 S. Ct. 2305, 2327 (2018) (describing various legislative history as "[t]he only direct evidence brought to our attention" when reviewing a finding of discriminatory intent in a redistricting case); *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) ("Moreover, because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature. . . .  In other words, a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."); *Nordlinger v. Hahn*, 505 U.S. 1, 16 (1992) ("To be sure, the Equal Protection Clause does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification.").

[55] This objective evaluation is really what the tenuousness factor is all about.  Indeed, in a footnote elaborating on this factor, the Senate Report focuses on objective information such as whether "[t]he procedure markedly departs from past practices or from practices elsewhere in the jurisdiction . . . ."  S. Rep. No. 97-417, at 29 n.117 (1982).

[56] 301 F. Supp. 3d 1297, 1321–22 (M.D. Ga. 2018).

[57] *Id.* at 1304–05.

our case, it is the lower-level Board of Apportionment witnesses, not the constitutional officers who ultimately voted on the reapportionment map.

Plaintiffs' citation to *Jeffers v. Beebe* is similarly unavailing. In rejecting a Voting Rights Act challenge and a constitutional challenge to the 2011 Arkansas State Senate reapportionment map, the court did discuss testimony given by the three constitutional officers that comprised the Board of Apportionment.[58] However, that case involved claims of intentional and purposeful discrimination by members of the Board of Apportionment.[59] The testimony was discussed as part of analyzing those specific claims.[60] The court's Section 2 analysis did not mention either the tenuousness factor nor the testimony of the constitutional officers. *Jeffers* provides Plaintiffs no support. Neither does *Jeffers v. Clinton*, which does not mention any witness testimony—let alone testimony from any of the constitutional officers comprising the Board of Apportionment—when discussing the tenuousness factor.[61]

In summary, the relevance of the constitutional officers' testimony—in the context of the Preliminary Injunction Motion and associated hearing—is at best negligible. Given the negligible relevance and the ability to obtain the justifications underlying the map from other sources, Plaintiffs' need for testimony from the constitutional officers is extremely low.

---

[58] 895 F. Supp. 2d 920, 936–38 (E.D. Ark. 2012).

[59] *Id.* at 924.

[60] *See id.* at 935 (discussing testimony in the court's analysis of the Fourteenth and Fifteenth Amendment claims).

[61] 730 F. Supp. 196 (E.D. Ark. 1989). Although they did not do so in their brief, Plaintiffs pointed the Court to *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976 (D.S.D. 2004), during oral argument. In that court's analysis of the tenuousness factor, it cited testimony from a research analyst, who of course is not an ultimate decisionmaker. *Id.* at 1048. It also cited testimony from several legislators (who did ultimately vote on the plan), but that testimony was not about the justifications for their vote. *Id.* One representative (who did not like the ultimate map adopted) testified about expressing concerns to the committee drawing the maps. *Id.* And a group of representatives on the committee testified about not handing out proposed redistricting map at constituent meetings. *Id.* This is far from the situation at issue in the instant case and Preliminary Injunction Motion.

<u>The Burdens of Testifying on the Constitutional Officers</u>

Requiring a high-level government official to testify in any form takes that official away from doing the public's business.  As the Seventh Circuit has explained, "depositions of public officials create unique concerns" insofar as they "disrupt 'a busy official who should not be taken away from his [or her] work to spend hours or days answering lawyers' questions.'"[62]  Other courts agree: "It is patently in the public interest that the [high-level constitutional officer] be not unnecessarily hampered or distracted in the important duties cast upon him [or her] by law" and such "public interest obviously transcends the convenience that would otherwise be afforded private litigants by the availability of that official as an expert witness . . . ."[63]  "Public policy requires that the time and energies of public officials be conserved for the public's business to as great an extent as may be consistent with the ends of justice in particular cases."[64]  Indeed, a request for testimony is a higher-order burden than a request for documents.[65]  That is because compelled testimony primarily requires the time, focus, and energy of the principal officer, not just that of his or her team.  Indeed, compelled testimony requires the principal officer's time, focus, and energy not just for the day in question, but also for significant preparation with his or her legal team.

There are also federalism and comity issues to consider.  A federal court commanding the presence and testimony of state constitutional officers is no small thing.  This is especially true when the state constitutional officers are required to testify about their internal thoughts to a federal authority.  Of course, in rare cases—where the relevance of and need for the testimony is strong

---

[62] *Stagman v. Ryan*, 176 F.3d 986, 994 (7th Cir. 1999) (quoting *Olivieri v. Rodriguez*, 122 F.3d 406, 409 (7th Cir. 1997)).

[63] *Cal. State Bd. of Pharmacy v. Superior Ct.*, 144 Cal. Rptr. 320, 322–23 (Cal. 1978).

[64] *State ex. rel. Paige v. Canady*, 475 S.E.2d 154, 161 (W. Va. 1996) (quoting *Monti v. State*, 563 A.2d 629, 631 (Vt. 1989) in turn quoting *Cmty. Fed. Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 96 F.R.D. 619, 621 (D.D.C. 1983)).

[65] *See Bethune-Hill v. Virginia State Bd. of Elections*, 114 F. Supp. 3d 323, 342 (E.D. Va. 2015) ("[A] request for documents is less burdensome than a request for testimony . . . .").

enough—these burdens can be overcome.[66]  But this is not such a case (at least not at this point) for the reasons described in the foregoing section.

Finally, it is important to recognize the procedural posture of this case and how that affects the burden analysis.  We are not in discovery or at trial.  That is, Plaintiffs are not seeking to depose the constitutional officers or have them testify at trial.  Rather, we are at an extremely preliminary stage of this litigation, and Plaintiffs are seeking to have the constitutional officers testify at a preliminary injunction hearing.  Even Plaintiffs acknowledge this increases the burden associated with such testimony.[67]  For one thing, there is the cumulative burden to think about.  If the constitutional officers are required to testify at the preliminary injunction hearing, such testimony would be in addition to any later depositions and trial testimony.  For another thing, the short-notice nature of testimony in a preliminary injunction setting increases the burden because the usual scheduling flexibility available in the discovery-deposition and trial-planning process is absent.  In a short-fuse preliminary injunction setting, constitutional officers would be squeezed on their preparation time and testimony dates.

In short, the burdens that would be placed on the three highest-level state constitutional officers by commanding their presence and testimony at this preliminary injunction hearing significantly outweigh the negligible relevance of and the extremely low need for such testimony.[68]  Accordingly, the Court GRANTS the Motion to Quash.  The three constitutional officers at issue here do not need to attend, or testify, at the preliminary injunction hearing.[69]

---

[66] *Vill. of Arlington Heights*, 429 U.S. at 268.

[67] Jan. 27, 2022 Hr'g Tr. at 11:34:33–11:36:11.

[68] The Court's decision today only applies for the purposes of the preliminary injunction hearing.  The Court leaves open the question of whether the constitutional officers will be subject to discovery, including deposition testimony, at a later stage of this case.

[69] At the close of evidence at the preliminary injunction hearing, the Court will allow the Plaintiffs to proffer *ex parte* a written list of questions that it would have asked the constitutional officers.  If the nature of the questions

IT IS SO ORDERED this 31st day of January 2022.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

and the conduct of the hearing alters the Court's view, the Court will hold open the hearing record for the constitutional officers to answer any appropriate questions in writing to the extent privilege does not apply.