**United States Court of Appeals**
*For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
**St. Louis, Missouri 63102**

**Michael E. Gans**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

4:21-cv-01239-LPR

November 20, 2023

> **FILED**
> U.S. DISTRICT COURT
> EASTERN DISTRICT ARKANSAS
> Nov 20, 2023
> Tammy H. Downs, Clerk
> By: JohnHibbs D.C.
> DEP CLERK

Ms. Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
18th Floor
125 Broad Street
New York, NY  10004-2400

   RE:  22-1395  AR State Conference NAACP, et al v. AR Board of Apportionment, et al

Dear Counsel:

   The court has issued an opinion in this case. Judgment has been entered in accordance with the opinion.

   Please review Federal Rules of Appellate Procedure and the Eighth Circuit Rules on post-submission procedure to ensure that any contemplated filing is timely and in compliance with the rules. Note particularly that petitions for rehearing and petitions for rehearing en banc <u>must</u> be received in the clerk's office within 14 days of the date of the entry of judgment. Counsel-filed petitions must be filed electronically in CM/ECF. Paper copies are not required. Except as provided by Rule 25(a)(2)(iii) of the Federal Rules of Appellate Procedure, no grace period for mailing is allowed. Any petition for rehearing or petition for rehearing en banc which is not received within the 14 day period for filing permitted by FRAP 40 may be denied as untimely.

         Michael E. Gans
         Clerk of Court

NDG

Enclosure(s)

cc: Ms. Jacki L. Anderson
   Mr. Jonathan Backer
   Mr. Nicholas J. Bronni
   Mr. Adriel I. Cepeda Derieux
   Mr. Frank H. Chang
   Ms. Pooja Chaudhuri
   Ms.  Clerk, U.S. District Court, Eastern District of Arkansas
   Mr. Craig Coleman
   Mr. Ari Cuenin
   Mr. Jonathan Diaz
   Ms. Erin H Flynn

Mr. Jon M. Greenbaum
Mr. Sam Horan
Mr. Dylan L. Jacobs
Mr. Jeffrey Justman
Ms. Danielle Marie Lang
Ms. Hannah M. Leiendecker
Ms. Angela Liu
Ms. Jennifer L. Merritt
Ms. Erica Abshez Moran
Mr. Cameron Thomas Norris
Mr. Luke M. Reilly
Ms. Valencia Richardson
Mr. Ezra D. Rosenberg
Mr. Bryan L. Sells
Ms. Shannon S. Smith
Mr. Asher Steinberg
Mr. Neil Steiner
Mr. Jonathan Topaz
Mr. Jason Brett Torchinsky
Mr. Matthew F. Williams
Mr. Orion de Nevers

District Court/Agency Case Number(s):   4:21-cv-01239-LPR

# United States Court of Appeals
### *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
### St. Louis, Missouri 63102

**Michael E. Gans**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

November 20, 2023

West Publishing
Opinions Clerk
610 Opperman Drive
Building D D4-40
Eagan, MN 55123-0000

    RE:  22-1395  AR State Conference NAACP, et al v. AR Board of Apportionment, et al

Dear Sir or Madam:

    A published opinion was filed today in the above case.

    Counsel who presented argument on behalf of the appellant and appeared on the brief was Sophia Lin Lakin, of New York, NY. The following attorneys also appeared on the appellant brief;  Bryan L. Sells, of Atlanta, GA.,  Angela Liu, of Chicago, IL.,  Gary L. Sullivan, of Little Rock, AR.,  Ceridwen Cherry, of Washington, DC.,  Jonathan Topaz, of New York, NY.,  Luke M. Reilly, of Philadelphia, PA.,  Matthew F. Williams, of San Francisco, CA.,  Neil Steiner, of New York, NY.,  Adriel I. Cepeda Derieux, of New York, NY.

    Counsel who presented argument on behalf of the appellee and appeared on the brief was Nicholas J. Bronni, AAG, of Little Rock, AR. The following attorneys also appeared on the appellee brief; Asher Steinberg, AAG, of Little Rock, AR., and Dylan L. Jacobs, of Little Rock, AR.

    Counsel who presented argument on behalf of the amicus party in support of appellants United States and appeared on the brief was Jonathan Backer, of Washington, DC.  The following attorney also appeared on the amicus brief of the United States in support of the appellants: Erin H Flynn, of Washington, DC.

    The following attorneys appeared on the amicus brief of Former Department of Justice Attorneys in support of the appellants: Valencia Richardson, of Washington, DC., Jonathan Diaz, of Washington, DC., Orion de Nevers, of Washington, DC., Sam Horan, of Washington, DC., and Danielle Marie Lang, of Washington, DC.

    The following attorneys appeared on the amicus brief of Lawyers' Committee for Civil Rights Under Law in support of the appellants: Jon M. Greenbaum, of Washington, DC., Ezra D. Rosenberg, of Washington, DC., and Pooja Chaudhuri, of Washington, DC.

    The following attorneys appeared on the amicus brief of Bipartisan Group of Supporters of the 1982 Voting Rights Act Amendments in support of the appellants: Craig Coleman,

of Minneapolis, MN., Jeffrey Justman, of Minneapolis, MN., Erica Abshez Moran, of Minneapolis, MN., Hannah M. Leiendecker, of Minneapolis, MN., and Alexandra K. Benton, of Denver, Colorado.

The following attorneys appeared on the amicus brief of Honest Elections Project in support of the appellees: Cameron Thomas Norris, of Arlington, VA., and Frank H. Chang, of Arlington, VA.

The following attorney appeared on the amicus brief of Senator Tom Cotton in support of the appellees: Jason Brett Torchinsky, of Washington, DC.

The following attorney appeared on the amicus brief of the States of Texas, Alabama, Florida, Georgia, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, and Utah in support of the appellees: Ari Cuenin, AAG, of Austin, TX.

The judge who heard the case in the district court was Honorable Lee P. Rudofsky.

If you have any questions concerning this case, please call this office.

Michael E. Gans
Clerk of Court

NDG

Enclosure(s)

cc:  MO Lawyers Weekly

District Court/Agency Case Number(s):  4:21-cv-01239-LPR

# United States Court of Appeals

## For the Eighth Circuit

_____

No. 22-1395

_____

Arkansas State Conference NAACP; Arkansas Public Policy Panel

*Plaintiffs - Appellants*

v.

Arkansas Board of Apportionment; Sarah Huckabee Sanders, in her official
capacity as the Governor of Arkansas Chairman of the Arkansas Board of
Apportionment; John Thurston, in his official capacity as the Secretary of State of
Arkansas and as a member of the Arkansas Board of Apportionment; Tim Griffin,
in his official capacity as the Attorney General of the State of Arkansas and as a
member of the Arkansas Board of Apportionment; State of Arkansas

*Defendants - Appellees*

------------------------------

United States of America

*Interested party - Amicus on Behalf of Appellant(s)*

Former Department of Justice Attorneys; Bipartisan Group of Supporters of the
1982 Voting Rights Act Amendments; Lawyers' Committee for Civil Rights
Under Law

*Amici on Behalf of Appellant(s)*

Honest Elections Project; Senator Tom Cotton; State of Texas; State of Alabama;
State of Florida; State of Georgia; State of Indiana; State of Kentucky; State of
Louisiana; State of Mississippi; State of Missouri; State of Montana; State of
Nebraska; State of Oklahoma; State of South Carolina; State of Utah

*Amici on Behalf of Appellee(s)*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Central

———————

Submitted: January 11, 2023
Filed: November 20, 2023

———————

Before SMITH, Chief Judge, GRUENDER and STRAS, Circuit Judges.

———————

STRAS, Circuit Judge.

Did Congress give private plaintiffs the ability to sue under § 2 of the Voting Rights Act?  Text and structure reveal that the answer is no, so we affirm the district court's[1] decision to dismiss.

## I.

Quarreling over district lines begins like clockwork every ten years after the United States Census.  In 2021, Arkansas experienced it firsthand when it created 11 majority-black districts out of 100 for electing members of its House of Representatives.

The Arkansas NAACP and the Arkansas Public Policy Panel, two advocacy groups with members living throughout the state, oppose the new map.  They sued nearly everyone who had anything to do with it under § 2 of the Voting Rights Act.  *See* 52 U.S.C. § 10301.

The complaint alleged "vote dilution," which comes in two forms.  *See Thornburg v. Gingles*, 478 U.S. 30, 46 & n.11 (1986).  The first is "packing," which

---

[1]The Honorable Lee P. Rudofsky, United States District Judge for the Eastern District of Arkansas.

involves drawing lines that concentrate a cohesive political group into a limited number of districts. *Voinovich v. Quilter*, 507 U.S. 146, 153–54 (1993). An example is turning three possible majority-minority districts into just two by bunching the group's members into two supermajority districts. *See id.*; *see also Gingles*, 478 U.S. at 46 n.11 (describing it as creating "an excessive majority"). The other, "cracking," is basically the opposite. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2492 (2019). It takes a cohesive political group and "divide[s]" its members "among multiple districts," where other voters can numerically overwhelm them. *Id.*

Here, Arkansas has allegedly done a combination of both, making it harder for black voters to elect the representatives they prefer. *See Gingles*, 478 U.S. at 47–51. In the language of the Voting Rights Act, the new map allegedly "deni[es]" or "abridge[s]" their right to vote by creating supermajorities in just a few districts and then spreading out the black voters who remain. 52 U.S.C. § 10301(a).

The advocacy groups use basic statistics to back up their claim. They point to the fact that approximately 16% of Arkansas's population is black, yet the expectation is that only 11% of their preferred candidates will win. The disparity, they say, shows that Arkansas created some hyper-concentrated black districts through "packing" and then "cracked" the remaining black voters to give them minimal impact. Although the groups do not allege intentional discrimination, they seek an injunction preventing state officials from using the new map because of its "discriminatory effects." *Allen v. Milligan*, 143 S. Ct. 1487, 1507 (2023).

Early in the case, the district court started questioning whether the advocacy groups had a cause of action under § 2 at all. Following supplemental briefing and a hearing, it concluded "that the existence (or non-existence) of a private right of action is a jurisdictional question." And even if it was not, the defendants were sure to raise it anyway in a motion to dismiss. So either way, the question needed answering.

-3-

The answer it gave is why we are here today.  After reviewing the text, history, and structure of the Voting Rights Act, the district court concluded that private parties cannot enforce § 2.  The enforcement power belonged solely to the Attorney General of the United States, *see* 52 U.S.C. § 10308(d), who was given five days to join the lawsuit.  When he declined, the case was dismissed.

On appeal, the advocacy groups argue they had the right to sue all along.  Whether they do presents an issue of statutory interpretation that we review de novo.  *See Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*, 773 F.3d 58, 63 (8th Cir. 2014).

## II.

Congress passed the Voting Rights Act in 1965 "to address entrenched racial discrimination in voting."  *Shelby County v. Holder*, 570 U.S. 529, 535 (2013).  States with a history of discrimination had to "preclear[]" any voting-law changes with the Attorney General or a three-judge court located in Washington, D.C.  *Id.* at 537.  It was an "extraordinary measure[] to address an extraordinary problem."  *Id.* at 534.

There were also provisions that all states had to follow, regardless of their history.  One was § 2, which prohibited states and political subdivisions from enacting any "standard, practice, or procedure" that "den[ied] or abridge[d] the right of any citizen of the United States to vote on account of race or color."  42 U.S.C. § 1973 (1970).  Early on, it "had little independent force" because it was a mirror image of the Fifteenth Amendment: each prohibited intentional discrimination.  *Milligan*, 143 S. Ct. at 1499.

The 1980s brought increased scrutiny to § 2.  At the beginning of the decade, the Supreme Court confirmed what many already thought: without "purposeful exclusion" of voters from the political process, there was no § 2 or Fifteenth Amendment violation.  *City of Mobile v. Bolden*, 446 U.S. 55, 61–65 (1980) (plurality opinion).  Discriminatory effects were not enough.  *See id.*

*Bolden* did not sit well with Congress, which jumped into action the following year.   In lieu of purposeful discrimination, the amended § 2 adopted a discriminatory-effects test.   *See Milligan*, 143 S. Ct. at 1500 (describing the compromise that led to the § 2 amendments).   It now reads:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner *which results in* a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . as provided in subsection (b).

> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.   The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301 (emphasis added).   Congress took no action, however, to clarify *who* can sue under § 2.

### III.

The who-gets-to-sue question is the centerpiece of today's case.   The Voting Rights Act lists only one plaintiff who can enforce § 2: the Attorney General.   *See id.* § 10308(d).   We must decide whether naming one excludes others.

When to imply a cause of action is bigger than just this case.   The practice has long been controversial, in part because having the judiciary decide who can sue bypasses the legislative process.   *See Egbert v. Boule*, 142 S. Ct. 1793, 1802–03

(2022); *see also Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1576–77 (2022) (Kavanaugh, J., concurring) ("[W]ith respect to existing implied causes of action, Congress, not this Court, should extend those implied causes of action and expand available remedies.").  The Supreme Court has been increasingly reluctant to go down this road in recent years, often citing the general principle that "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  Gone are the days of divining "congressional purpose." *Id.* at 287 (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964)).

Many statutes simply say when a private right of action is available.  One example is in the Civil Rights Act of 1964, which provides "a civil action for preventive relief" that can "be instituted by the person" experiencing discrimination. 42 U.S.C. § 2000a-3(a).  Separated by only a year from passage of the Voting Rights Act, it leaves little to the imagination.  It says who may sue—a "person"—and when—if unlawful discrimination already exists "or there are reasonable grounds to believe that" someone "is about to engage" in it. *Id.*

When those details are missing, it is not our place to fill in the gaps, except when "text and structure" require it. *Sandoval*, 532 U.S. at 288 (explaining that "legal context matters only to the extent it clarifies text").  Under the modern test for implied rights of action, Congress must have *both* created an individual right *and* given private plaintiffs the ability to enforce it. *See id.* at 288–89; *see also Osher v. City of St. Louis*, 903 F.3d 698, 702 (8th Cir. 2018) (asking "whether the Act unambiguously confers a private right [and] displays an intent to provide a private remedy").

## A.

It is unclear whether § 2 creates an individual right.  Statutes only create private rights when the text is "phrased in terms of the persons benefited." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (citation omitted).  One example is 42 U.S.C.

Appellate Case: 22-1395   Page: 6   Date Filed: 11/20/2023 Entry ID: 5336933

§ 2000d, part of Title VI of the Civil Rights Act of 1964, which says that "[n]o *person* . . . shall . . . be subjected to discrimination." (Emphasis added). It "unmistakabl[y] focus[es]" on the benefited class: anyone subject to discrimination. *Gonzaga Univ.*, 536 U.S. at 284 (emphasis and citation omitted).

Other statutes "focus on the person regulated" or "the agencies that . . . regulat[e]," not "the individuals protected." *Sandoval*, 532 U.S. at 289. A companion provision to the one quoted above "authorize[s] and direct[s]" federal "department[s] and agenc[ies]" to enforce the protections against discrimination. 42 U.S.C. § 2000d-1. It makes no mention of the individuals discriminated against, so it cannot create an individual right. *See Sandoval*, 532 U.S. at 289.

There are elements of both in § 2. The opening passage focuses on what states and political subdivisions cannot do, which is "impose[] or appl[y]" discriminatory voting laws. 52 U.S.C. § 10301(a). It is a "general proscription" of "discriminatory conduct," *California v. Sierra Club*, 451 U.S. 287, 294 (1981) (citation omitted), not a grant of a right "to any identifiable class," *Gonzaga Univ.*, 536 U.S. at 284 (citation omitted). *See Spectra Commc'ns Grp., LLC v. City of Cameron*, 806 F.3d 1113, 1119 (8th Cir. 2015) (explaining that, when a statute is "phrased as a restriction on state and local governments," it is unlikely to be privately enforceable).

But then the very same sentence says that, for a violation to occur, the challenged "standard, practice, or procedure . . . [must] result[] in a denial or abridgement of the *right of any citizen* . . . to vote on account of race or color." 52 U.S.C. § 10301(a) (emphasis added). In that way, like the first provision in Title VI, it also "unmistakabl[y] focus[es] on the benefited class": those subject to discrimination in voting. *Gonzaga Univ.*, 536 U.S. at 284 (emphasis and citation omitted). It is unclear what to do when a statute focuses on both. *See Sandoval*, 532 U.S. at 289.

-7-

B.

Greater clarity exists on the private-remedy question. Everyone agrees that § 2 itself contains no private enforcement mechanism. All it does is specify what is unlawful: a "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen . . . to vote on account of race or color." 52 U.S.C. § 10301(a). Not *who* can enforce it.

We must look elsewhere for the who. Another provision, § 12, empowers the Attorney General to bring "an action for preventive relief . . . for a temporary or permanent injunction, restraining order, or other order." 52 U.S.C. § 10308(d). Any mention of private plaintiffs or private remedies, however, is missing.[2] Under a test that requires Congress to "create" causes of action, silence is not golden for the plaintiffs. *Sandoval*, 532 U.S. at 287.

The omission was no accident, given the remedial framework that § 12 provides. *See Karahalios v. Nat'l Fed'n of Fed. Emps., Loc. 1263*, 489 U.S. 527, 533 (1989) (describing the "elemental canon" that, "where a statute expressly provides a remedy," courts should be "reluctant" to imply anything else (citation omitted)). It lays out two paths.

One is for jurisdictions with federal observers, who monitor elections and report violations. *See* 52 U.S.C. §§ 10302(a), 10305. As § 12 itself says, observers have the duty to notify the Attorney General of "well[-]founded" allegations from people who allege that "they have not been permitted to vote." *Id.* § 10308(e). The Attorney General then has the option to file a fast-tracked lawsuit in federal court,

---

[2]The fact that § 12 lists criminal penalties among the potential remedies is strong evidence that it cannot provide a private right of action. *See id.* § 10308(c) (establishing a maximum prison term of five years). After all, private parties cannot seek prison time against violators. *See Frison v. Zebro*, 339 F.3d 994, 999 (8th Cir. 2003) (explaining why it is rare that statutes with criminal penalties give rise to private causes of action).

-8-

*id.* (requiring the court to "hear and determine" the claims "immediately"), without procedural obstacles standing in the way, *id.* § 10308(f) (stating that the proceedings can be "instituted . . . without regard to whether a person asserting rights" has exhausted available remedies).

Jurisdictions without federal observers are different.  There are no fast-tracked lawsuits, but the Attorney General still has the sole option under § 12 to sue violators in a "preventive" action for an injunction or other similar relief to "permit" those subjected to discrimination "to vote."  *Id.* § 10308(d).

Although narrow, these remedies are all the text provides.  *See Botany Worsted Mills v. United States*, 278 U.S. 282, 289 (1929) ("When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.").  And their existence deserves significant weight in the implied-cause-of-action calculus.  As *Sandoval* put it, "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."  532 U.S. at 290; *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012) (noting that the inclusion of one implies the exclusion of another).  Here, Congress not only created a method of enforcing § 2 that does not involve private parties, but it also allowed someone else to bring lawsuits in their place.  If the text and structure of § 2 and § 12 show anything, it is that "Congress intended to place enforcement in the hands of the [Attorney General], rather than private parties."  *Freeman v. Fahey*, 374 F.3d 663, 665 (8th Cir. 2004).

## C.

The advocacy groups urge us to look elsewhere.  One of those places is § 3, which recognizes that *some* voting-rights protections are enforceable by someone other than the Attorney General.  *See* 52 U.S.C. § 10302.  It provides for various forms of equitable and other relief "[w]henever the Attorney General *or an aggrieved person* institutes a proceeding under any statute to enforce the voting

-9-

guarantees of the fourteenth or fifteenth amendment in any State or political subdivision." *Id.* § 10302(a) (emphasis added).

As originally enacted, § 3 did not include the phrase, "or an aggrieved person," which became a problem as courts started to recognize that some voting rights were privately enforceable. The most important one was § 5, which required "covered" jurisdictions to preclear any changes in voting laws. *See* 52 U.S.C. § 10304; *see also Allen v. State Bd. of Elections*, 393 U.S. 544, 556–57 (1969) (implying "a private right of action" under § 5).

Once Congress realized the problem, it added the reference to "aggrieved person[s]." 52 U.S.C. § 10302(a). "The most logical deduction from" this change "is that Congress meant to address those cases brought pursuant to the private right[s] of action that" already existed or that would be created in the future. *Morse v. Republican Party of Va.*, 517 U.S. 186, 289 (1996) (Thomas, J., dissenting, joined by three other Justices).

The text of § 3 bears this out. The next phrase after "aggrieved person" mentions "a proceeding under any statute," which most reasonably refers to statutes that already allow for private lawsuits. 52 U.S.C. § 10302(a); *accord id.* § 10302(b)–(c). An already existing proceeding, in other words, not a new one created by § 3. After all, "institut[ing] a proceeding" requires the underlying cause of action to exist first. *Id.* at § 10302(a).

The history and structure of the Voting Rights Act lend further support. In 1965, no one would have thought that § 3 created a cause of action in favor of the Attorney General, the only person listed in the original version. The reason, as we point out above, is that § 12 already gave the Attorney General the ability to bring one. *See id.* § 10308(d). It would have been strange to read § 3, which supplemented the available remedies, to also create a redundancy: a second, duplicate authorization for the Attorney General to sue. *See City of Chicago v. Fulton*, 141 S. Ct. 585, 591 (2021) ("The canon against surplusage is strongest when an interpretation would

-10-

render superfluous another part of the same statutory scheme." (citation omitted)). How could adding "or an aggrieved person" to a provision that created no right of action transform it into one that creates many?  52 U.S.C. § 10302(a).

Taking their cue from the word "any," the advocacy groups make exactly that argument.  *See Webster's Third New International Dictionary* 97 (1961) (defining "any" as "unlimited in amount").  For them, the amendments to § 3 created new private rights of action for every voting-rights statute that did not have one, including § 2.

To accept this interpretation, we would have to conclude that Congress hid the proverbial "elephant[] in [a] mousehole[]."  *Turkiye Halk Bankasi A.S. v. United States*, 143 S. Ct. 940, 948 (2023) (citation omitted).  And here, it would be a groundbreaking change in "a generalized section" giving private parties the same remedies as the Attorney General.  *Morse*, 517 U.S. at 289 (Thomas, J., dissenting); *see* 52 U.S.C. § 10302 (appointing federal observers, suspending illegal "tests and devices," and providing for preclearance if there are violations).  "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Indeed, on at least one other occasion, the Supreme Court has rejected a near-identical argument.  *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 165 (2008).  When Congress decided to amend the Securities Exchange Act of 1934 to "impose[] heightened pleading requirements and a loss[-]causation requirement," *id.*, on "*any* private action arising under this chapter," 15 U.S.C. § 78u-4(b) (emphasis added), a split emerged over whether the change allowed private parties to pursue aiders and abettors who participated in a fraudulent scheme.  *See Stoneridge Inv. Partners*, 552 U.S. at 162.  Despite the broad language, the Supreme Court said no, the amendments apply only to existing causes of action.  *See id.* at 165–66.  They do not create new ones.  *See id.* at 166.

-11-

Just like the Voting Rights Act, the Securities Exchange Act of 1934 has a variety of government-enforced provisions. One allows the Securities and Exchange Commission to pursue aiders and abettors, similar to how the Attorney General can pursue violators of the Voting Rights Act. *See id.* at 162 (citing 15 U.S.C. § 78t(e)). Against that backdrop, the word "any," the same word used here, "accepted the § 10(b) private cause of action as then defined," but did not "extend it [any] further" to cover aiders and abettors. *Id.* at 166. We exercise the same "restraint," *id.* at 165, by declining to read the words "proceeding under any statute" as a broad authorization to create new implied private rights of action, 52 U.S.C. § 10302(a).

As further evidence that Congress did not hide an elephant in this mousehole, the advocacy groups' § 3 argument would make a mess of other statutes. If private plaintiffs have the same causes of action as the Attorney General, then the reverse is true too. After all, the "any[-]statute" language applies to both. *Id.*

The problem is that we already know that private plaintiffs can bring "proceeding[s] . . . to enforce . . . voting guarantees" that the Attorney General cannot. *See id.* § 10302(a)–(c). The most prominent example is 42 U.S.C. § 1983, which allows "citizen[s] . . . or other person[s]" to sue for violations of their constitutional rights. *See League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 944 (11th Cir. 2022) (describing when § 3 remedies are available in a lawsuit involving § 1983 claims, among others). As things stand now, the Attorney General cannot bring a § 1983 action on behalf of someone else. *See* 42 U.S.C. § 1983; *see also Inyo County v. Paiute-Shoshone Indians*, 538 U.S. 701, 711–12 (2003) (explaining that a sovereign has no cause of action under § 1983). Interpreting § 3 as creating a right of action, in other words, creates interpretive difficulties elsewhere.

-12-

Interpreting it in the way we do, on the other hand, avoids the apparent inconsistency.[3]  Private plaintiffs can sue under statutes like 42 U.S.C. § 1983, where appropriate, and the Attorney General can do the same under statutes like § 12.  And then § 3 sets ground rules in the types of lawsuits each can bring.

Zooming out a bit, it becomes clear why the § 3 argument does not work.[4]  The advocacy groups ask us to accept the idea that Congress decided to transform the enforcement of "one of the most substantial" statutes in history by the subtlest of implications.  *Milligan*, 143 S. Ct. at 1500 (citation omitted).  Implausible, to say the least, when measured against the explicit enforcement mechanisms found elsewhere in the Voting Rights Act.  "Congress . . . knows how to create a cause of

---

[3]The district court, for its part, identified one other weakness in the advocacy groups' § 3 argument.  The "any[-]statute" language is immediately followed and modified by, "to enforce the voting guarantees of the fourteenth or fifteenth amendment."  52 U.S.C. § 10302(a).  By focusing solely on the discriminatory impact of Arkansas's new map, not intentional discrimination, the advocacy groups are not attempting to "enforce the voting guarantees of the fourteenth or fifteenth amendment."  *Id.*  Perhaps it is enough that § 2 reflects an effort by *Congress* "to enforce" the Fourteenth and Fifteenth Amendments, but the issue is not free from doubt.  At the very least, it reinforces the elephant-in-a-mousehole problem of extending a private right of action to a discriminatory-effects lawsuit under § 2.

[4]Neither does the argument that § 14(e) impliedly creates a cause of action to enforce § 2.  It allows courts to award attorney fees and expenses to a "prevailing party, other than the United States" in "any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment."  52 U.S.C. § 10310(e).  All the same flaws apply to § 14(e), except it is even more of a stretch because its focus is on "prevailing part[ies]," *id.*, a generic phrase that presumably includes states and political subdivisions, rather than "aggrieved *person[s]*," which at least focuses on individuals, *id.* § 10302(a) (emphasis added).  The point is that § 14(e) still has plenty of meaning even in the absence of a private right of action under § 2, so it provides no support for implying one.  *See, e.g.*, *Donnell v. United States*, 682 F.2d 240, 245 (D.C. Cir. 1982) (discussing how attorney fees are awarded in § 5 cases); *see also League of United Latin Am. Citizens # 4552 (LULAC) v. Roscoe Indep. Sch. Dist.*, 123 F.3d 843, 848–49 (5th Cir. 1997) (evaluating whether a "prevailing *defendant* in a Voting Rights Act case" can receive attorney fees (emphasis added)).

action," and it did not do so here.  *Hernández v. Mesa*, 140 S. Ct. 735, 752 (2020) (Thomas, J., concurring).

IV.

Much of the advocacy groups' argument to the contrary hinges on legislative history, not text or structure.  The statute is silent on the existence of a private right of action, but the committee reports are not.  In 1982, when Congress amended § 2, the House and Senate Judiciary Committees wrote that Congress had "clearly intended" all along to allow private enforcement.  S. Rep. No. 97-417, at 30 (1982) ("[T]he Committee reiterates the existence of the private right of action under Section 2, as has been clearly intended by Congress since 1965."); *accord* H.R. Rep. No. 97-227, at 32 (1981) ("It is intended that citizens have a private cause of action to enforce their rights under Section 2.").

There are many reasons to doubt legislative history as an interpretive tool.  *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) (discussing the problems).  But let's assume for the moment that we should give great weight to it when a statute like the Voting Rights Act is silent on the existence of a private right of action.  *Sandoval* still sets the implied-cause-of-action ground rules, so the question is what—if anything—the legislative history tells us about the "text and structure" of the Voting Rights Act.  532 U.S. at 288.

The answer is nothing.  It does not point to a single word or phrase in the Voting Rights Act in support of the conclusion that a private right of action has existed from the beginning.  *See* S. Rep. No. 97-417, at 30; H.R. Rep. No. 97-227, at 32.  Nor is it clear how the 1982 Congress could possibly have known what a different set of legislators thought 17 years earlier.  *Cf. Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation.").  In short, the legislative history ignores the "text and structure." *Sandoval*, 532 U.S. at 288.

-14-

It also fails to answer an obvious question. If the 1965 Congress "clearly intended" to create a private right of action, then why not say so in the statute? If not then, why not later, when Congress amended § 2? After all, *Bolden* itself hinted just two years earlier that private enforcement of § 2 was still an open question, *see* 446 U.S. at 60 & n.8 (plurality opinion), and the amendments themselves were a response to *Bolden*, *see Milligan*, 143 S. Ct. at 1499–1500.

Perhaps the answer lies in the legislative process itself. One possibility is that no one thought the issue was important enough at the time, especially because Congress's attention was on *how* states and political subdivisions could violate § 2, not *who* could sue. *See id.* at 1500. Another more troubling possibility is that it was "a deliberate effort to amend a statute through . . . committee report[s]." *Exxon Mobil*, 545 U.S. at 570. If "the hard-fought compromise that Congress" reached in amending § 2 left no room for any other changes to the Voting Rights Act, *Milligan*, 143 S. Ct. at 1507, then the next-best way to introduce a possible private right of action would have been through committee reports written by "unrepresentative committee members—or, worse yet, unelected staffers and lobbyists," *Exxon Mobil*, 545 U.S. at 568. Whatever the reason, treating these statements as anything more than the opinions of just a few legislators would "circumvent the Article I process." *Id.* at 570.

In substance, the advocacy groups ask us to excuse the absence of text because legislative history answers the question. At one point, this approach may have held sway. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 412 n.29 (1971) (looking "to the statutes themselves" because the legislative history was ambiguous). But here, the legislative history does not complete the statutory story. Rather, it tells a different story, one not reflected in the text of anything Congress passed. To the extent that legislative history can be helpful in any case, this one is not it.

-15-

V.

Precedent provides a little more guidance, but like legislative history, no firm answer. The advocacy groups argue that courts have been adjudicating § 2 claims brought by private plaintiffs for years, so they must be available. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305 (2018). But assuming their existence, and even discussing them, is different from actually *deciding* that a private right of action exists.[5]

A.

The advocacy groups place the most emphasis on *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996). The issue there was the availability of a private right of action, except the case involved § 10 of the Voting Rights Act, not § 2. *See id.* at 230 (opinion of Stevens, J.). Five Justices agreed that § 10 is privately enforceable, but there was no majority opinion. *See id.* (opinion of Stevens, J., joined by one other Justice); *id.* at 240 (Breyer, J., concurring in the judgment, joined by two other Justices). It is significant because both opinions supporting the judgment discussed § 2 along the way.

Justice Stevens, joined by Justice Ginsburg, announced the judgment. *See id.* at 190. Latching on to the same legislative history we discuss above, the opinion accepts the idea that Congress "clearly intended" that a "private right of action under Section 2" has existed "since 1965." *Id.* at 232 (quoting S. Rep. No. 97-417, at 30). From there, it acknowledges that there is no "express authorizing language" creating a private right to sue under any of the three provisions it discusses. *Id.* (analyzing § 2, § 5, and § 10). Then, without examining the text or structure further, it implies a cause of action under § 10 to avoid the "anomalous" result "that both § 2 and § 5

---

[5]For that reason, it is a nonstarter to argue that Congress somehow "ratified" the existence of a private right of action by reauthorizing the Voting Rights Act in 1982 and 2006. Ratification does not apply when the meaning of a reauthorized statute is "far from settled." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 330 (2015) (quotation marks omitted).

-16-

are enforceable by private action but § 10 is not." *Id.* In short, the opinion *assumes* that a private right of action exists under § 2.

Justice Breyer's concurrence, which Justices O'Connor and Souter joined, does the same thing. In a single paragraph, again citing the legislative history, it concludes that Congress must have intended § 10, just like § 2 and § 5, to have a private right of action. *See id.* at 240. It acknowledges that some of the provisions have "differen[t] . . . statutory language and structure," particularly § 5 and § 10, but nevertheless concludes that the differences "are not determinative." *Id.*

Taken at face value, these statements appear to create an open-and-shut case that there must be a way to privately enforce § 2. If five Justices assume it, then it must be true.

The problem, however, is that these were *just* background assumptions—mere dicta at most.[6] The question in *Morse* was about the private enforceability of § 10, which has different requirements and language than § 2. As Judge Friendly once put it, a "judge's power to bind is limited to the issue that is before him." *See United States v. Rubin*, 609 F.2d 51, 69 n.2 (2d Cir. 1979) (Friendly, J., concurring). Assumptions and statements of belief about other issues are not holdings, no matter how confident the court making them may sound. *See* Bryan A. Garner et al., *The*

---

[6]As one might imagine, cases in which the Supreme Court has *expressly* assumed the existence of a private right of action under § 2 to decide other questions are even less helpful. *See Bolden*, 446 U.S. at 60 & n.8 (plurality opinion); *see also Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *cf. Shelby County*, 570 U.S. at 537 (noting that "[b]oth the [f]ederal [g]overnment and individuals have sued to enforce § 2"). In those cases, there is not even any dicta. *See Milligan*, 143 S. Ct. at 1545 n.22 (Thomas, J., dissenting) ("The Court does not address whether § 2 contains a private right of action . . . ."); *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch, J., concurring) ("Because no party argues that the plaintiffs lack a cause of action here, . . . this Court need not and does not address that issue today." (citation omitted)).

-17-

*Law of Judicial Precedent* 44 (2016) ("Not all text within a judicial decision serves as precedent.").  In the case of *Morse*, at least two sitting Justices agree.  *Brnovich*, 141 S. Ct. at 2350 (Gorsuch, J., concurring, joined by Thomas, J.) (characterizing the availability of a private right of action as an "open question"); *Milligan*, 143 S. Ct. at 1545 n.22 (Thomas, J., dissenting, joined by Gorsuch, J.) (leaving the question for another day because it "was not raised in this Court").

Even as dicta, the statements in *Morse* are the least valuable kind.  *See In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1064 (8th Cir. 2017) (en banc).  One reason is that there is hardly any analysis of *why* § 2 is privately enforceable.  Nothing more was necessary because the Supreme Court was deciding something else: the availability of a private right of action under § 10.  *See Permian Basin Area Rate Cases*, 390 U.S. 747, 775 (1968) ("[T]his Court does not decide important questions of law by cursory dicta inserted in unrelated cases.").

A second reason is that the various statements in *Morse* are inconsistent with how we are supposed to approach implied-cause-of-action questions today.  *See In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d at 1064 (explaining that we are bound by "the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings," except when it is "enfeebled by a[] later statement" (brackets and citation omitted)).  Just five years after *Morse*, the Supreme Court made clear that "text and structure" are the guideposts, not "contemporary legal context."  *Sandoval*, 532 U.S. at 287–88; *see Morse*, 517 U.S. at 230–31 (opinion of Stevens, J.) (relying on the latter).  Following those guideposts here leads to the conclusion that there is no "private remedy" to enforce § 2, even assuming the existence of a "private right."[7]  *Sandoval*, 532 U.S. at 286.

---

[7]The dissent is right that "this case presents two paths," *post* at 30, but our view of them is a little different.  The first is to follow what other courts have done: turn an assumption into a holding and conclude that a private right of action exists under § 2.  The second is to figure out the right answer ourselves: start with the text, apply first principles, and use the interpretive tools the Supreme Court has provided.  For us, the choice is clear.  *See Bolden*, 446 U.S. at 60 & n.8 (plurality opinion)

-18-

B.

We have our own case to consider too, *Roberts v. Wamser*, 883 F.2d 617 (8th Cir. 1989). There, a losing candidate brought a § 2 claim, among others, alleging that the city's punch-card voting system had a disproportionate impact on black voters. *See id.* at 618–19. We had to decide "whether the Voting Rights Act can properly be understood as granting an unsuccessful candidate the right to maintain a judicial challenge to allegedly discriminatory voting procedures that . . . caused him to lose the election." *Id.* at 620.

We concluded that losing candidates cannot sue because they are not "aggrieved person[s]" under the Voting Rights Act. *Id.* at 621. The reason, we explained, was that they are not harmed by the loss of the right to vote, "but rather the loss of the votes that [they] claim[] . . . would have [been] received." *Id. Roberts* assumed a private right of action existed under § 2, but only for the purpose of deciding that losing candidates could not bring one.

In wrapping up, we said, "standing to sue under this Act is limited to the Attorney General *and* to 'aggrieved persons,' a category that we hold to be limited to persons whose voting rights have been denied or impaired." *Id.* at 624 (emphasis added). From there, the advocacy groups argue that acknowledging that "aggrieved persons" have standing to sue is tantamount to recognizing a private right of action. *Id.*

There are two problems with this argument. The first is that the quoted sentence goes on to explain why we made the statement: only those "whose voting rights have been denied or impaired" can sue. *Id.* That extra bit supports the notion that we *assumed* that someone other than the Attorney General could sue under § 2, but that the plaintiff's lawsuit was doomed either way. *See id.* ("A defeated

---

(suggesting early on that it was questionable whether § 2 authorized private enforcement).

-19-

candidate, whose goal is to change the outcome of the election, is not a proper party to assert claims under the Voting Rights Act.").  Saying who else might be "aggrieved" was not "necessary to that result."  *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996).

The second is that, even assuming the statement hints at something more, explaining who has standing to sue can be different from the private-right-of-action question.  *See U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 721 n.** (1990) (characterizing the issues as "closely related" (citation omitted)).  As we suggested later, *Roberts* is really a third-party-standing case: losing candidates cannot sue to assert the rights of voters.  *See Glickert v. Loop Trolley Transp. Dev. Dist.*, 792 F.3d 876, 881–82 (8th Cir. 2015).  Sometimes plaintiffs have standing but no cause of action.  *See, e.g.*, *Animal Legal Def. Fund v. Vaught*, 8 F.4th 714, 721 (8th Cir. 2021).  Other times, the opposite is true.  *See, e.g.*, *Davis v. U.S. Bancorp*, 383 F.3d 761, 767 (8th Cir. 2004).  The point is that we should not read too much into a stray comment about a potentially different issue.  *See Roberts*, 883 F.2d 617 (using the word "standing" 31 times).

## VI.

A few loose ends remain.  The first is the advocacy groups' suggestion that we return this case to the district court because it should not have raised the private-right-of-action issue on its own.  They have a point, but they are wrong about the solution.

The district court raised the issue out of concern for its own subject-matter jurisdiction.  It looked to our recent decision in *Cross v. Fox* and concluded that the absence of a federal cause of action has jurisdictional consequences.  23 F.4th 797, 801 (8th Cir. 2022).  It can, to be sure, but only when the claim is so "*obviously* doomed to fail" that there is no "substantial question of federal law."  *Id.* (emphasis added) (citation omitted); *see Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312–13 (2005).  In other situations, *Cross* did nothing to upset

-20-

the general rule that the lack of a cause of action does not deprive a federal district court of subject-matter jurisdiction.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction.").

This case is no exception.  For much of the last half-century, courts have assumed that § 2 is privately enforceable.  A deeper look has revealed that this assumption rests on flimsy footing, but we can hardly say that the § 2 claim was "obviously doomed to fail" from the start.  *Cross*, 23 F.4th at 801 (citation omitted). The district court thought it lacked jurisdiction anyway, which is why it dismissed the claim without prejudice.  *See Ahmed v. United States*, 147 F.3d 791, 797 (8th Cir. 1998) ("[D]ismissal for lack of jurisdiction is not an adjudication on the merits and . . . should be without prejudice." (citing Fed. R. Civ. P. 41(b))).  But now that we have concluded that the district court had jurisdiction all along, we modify the dismissal to be with prejudice.  *See Stafford v. Ford Motor Co.*, 835 F.2d 1227, 1232 (8th Cir. 1987) (allowing courts to "affirm the decision . . . upon any ground [that] is adequately supported in the record").

We reject the notion, however, that we must unwind everything the district court did.  After all, it is hardly unusual for us to hear and decide an appeal following a dismissal on the court's own motion.  *See, e.g.*, *Smith v. Boyd*, 945 F.2d 1041, 1042 (8th Cir. 1991) ("We reject [the plaintiff's] claim that the district court lacked authority to dismiss his complaint sua sponte.").  Particularly in a situation like this one, after an opportunity for full briefing and a hearing.  *See id.* at 1043.  Add the fact that the parties have now submitted "thorough[] brief[ing]" on appeal, supplemented by numerous amicus briefs, and it makes little sense to send this case back for a do over.  *Smithrud v. City of St. Paul*, 746 F.3d 391, 396 n.3 (8th Cir. 2014).

-21-

The final loose end is the advocacy groups' belated request to add a § 1983 claim to their complaint. Their theory is that voters can enforce § 2 as a "law[]" of the United States. 42 U.S.C. § 1983. They never requested leave to amend, as they admit, but we have occasionally excused pleading failures "when the proper resolution is beyond any doubt." *Robinson v. Norling*, 25 F.4th 1061, 1063 (8th Cir. 2022) (citation omitted).

The problem is that, as we point out above, very little in this case is "beyond doubt." *Id.* (citation omitted). And complicating matters is the fact that the parties have barely scratched the surface in their discussions of § 1983: even now, we have only a single footnote in one of the briefs mentioning the possibility. Given how little we have, we decline to say anything further about what would have happened if the advocacy groups had acted sooner. *See Steele v. City of Bemidji*, 257 F.3d 902, 905 (8th Cir. 2001) (explaining that plaintiffs cannot amend their complaint on appeal because they need to ask the district court for permission first).

VII.

We accordingly affirm the judgment of the district court but modify the dismissal to be with prejudice.

SMITH, Chief Judge, dissenting.

I respectfully dissent from the court's holding that private plaintiffs lack the ability to sue under § 2 of the Voting Rights Act (VRA). "Since the passage of the Voting Rights Act, federal courts across the country, including . . . the Supreme Court . . . , have considered numerous Section Two cases brought by private plaintiffs." *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1031 (N.D. Ala. 2022) (per curiam) (three-judge court) (citing, *inter alia*, *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021); *Bartlett v. Strickland*, 556 U.S. 1 (2009); *League of United Latin Am. Citizens v. Perry (LULAC)*, 548 U.S. 399 (2006); *Voinovich v. Quilter*, 507 U.S. 146 (1993); *Chisom v. Roemer*, 501 U.S. 380 (1991); *Hous. Laws.' Ass'n*

-22-

*v. Att'y Gen.*, 501 U.S. 419 (1991); *Thornburg v. Gingles*, 478 U.S. 30 (1986)), *order clarified*, No. 2:21-CV-1291-AMM, 2022 WL 272637 (N.D. Ala. Jan. 26, 2022), *and appeal dismissed sub nom. Milligan v. Sec'y of State for Alabama*, No. 22-10278-BB, 2022 WL 2915522 (11th Cir. Mar. 4, 2022), *and aff'd sub nom. Allen v. Milligan*, 599 U.S. 1 (2023); *see also Caster v. Merrill*, No. 2:21-CV-1536-AMM, 2022 WL 264819, at *81 (N.D. Ala. Jan. 24, 2022) (same), *aff'd sub nom. Allen*, 599 U.S. at 1. Admittedly, the Court has never *directly* addressed the existence of a private right of action under § 2; however, it has repeatedly considered such cases, held that private rights of action exist under other sections of the VRA, and concluded in other VRA cases that a private right of action exists under § 2. Until the Court rules or Congress amends the statute, I would follow existing precedent that permits citizens to seek a judicial remedy. Rights so foundational to self-government and citizenship should not depend solely on the discretion or availability of the government's agents for protection. Resolution of whether § 2 affords private plaintiffs the ability to challenge state action is best left to the Supreme Court in the first instance.

"[F]or decades and throughout hundreds of cases a private right of action has been assumed" under § 2. *Coca v. City of Dodge City*, No. 22-1274-EFM, 2023 WL 2987708, at *3 (D. Kan. Apr. 18, 2023), *motion to certify appeal denied*, No. 22-1274-EFM, 2023 WL 3948472 (D. Kan. June 12, 2023).[8] "[T]here has been private

---

[8]Both the Supreme Court and this court have assumed—implicitly and explicitly—that such a private right of action exists. *See, e.g.*, *Allen*, 599 U.S. at 1 (not addressing whether § 2 contains a private right of action because the issue was not raised in the Supreme Court despite being argued below); *Brnovich*, 141 S. Ct. at 2321; *Abbott v. Perez*, 138 S. Ct. 2305 (2018); *Shelby Cnty. v. Holder*, 570 U.S. 529, 537 (2013) ("Both the Federal Government and individuals have sued to enforce § 2 . . . ."); *Bartlett*, 556 U.S. at 1; *LULAC*, 548 U.S. at 399; *Johnson v. De Grandy*, 512 U.S. 997, 1006 (1994) ("The United States merely seeks to litigate its § 2 case for the first time, and the Government's claims, like those of the private plaintiffs, are properly before the federal courts."); *Holder v. Hall*, 512 U.S. 874 (1994); *Voinovich*, 507 U.S. at 146; *Growe v. Emison*, 507 U.S. 25 (1993); *Chisom*, 501 U.S. at 380; *Hous. Laws.' Ass'n*, 501 U.S. at 419; *Gingles*, 478 U.S. at 30; *City of Mobile v. Bolden*, 446 U.S. 55, 60 (1980) (plurality opinion) ("[a]ssuming … that

-23-

there exists a private right of action to enforce [§ 2]"); *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924 (8th Cir. 2018); *Cottier v. City of Martin*, 604 F.3d 553 (8th Cir. 2010) (en banc); *Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006); *Johnson-Lee v. City of Minneapolis*, 170 F. App'x 15 (8th Cir. 2006) (unpublished per curiam); *Afr.-Am. Voting Rts. Legal Def. Fund, Inc. v. Missouri*, 133 F.3d 921 (8th Cir. 1998) (unpublished per curiam); *Stabler v. Cnty. of Thurston*, 129 F.3d 1015 (8th Cir. 1997); *Clay v. Bd. of Educ. of City of St. Louis*, 90 F.3d 1357 (8th Cir. 1996); *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382 (8th Cir. 1995) (en banc); *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist., No. 1*, 56 F.3d 904 (8th Cir. 1995); *Afr. Am. Voting Rts. Legal Defense Fund, Inc. v. Villa*, 54 F.3d 1345 (8th Cir. 1995); *Williams v. City of Texarkana*, 32 F.3d 1265 (8th Cir. 1994); *Afr.-Am. Citizens for Change v. St. Louis Bd. of Police Comm'rs*, 24 F.3d 1052 (8th Cir. 1994); *Jeffers v. Clinton*, 992 F.2d 826 (8th Cir. 1993); *Whitfield v. Democratic Party of State of Ark.*, 890 F.2d 1423 (8th Cir. 1989), *opinion vacated and district court judgment aff'd mem. by an equally divided court*, 902 F.2d 15 (8th Cir. 1990) (en banc); *Roberts v. Wamser*, 883 F.2d 617, 624 (8th Cir. 1989) (recognizing that "standing to sue under [§ 2 of the VRA]" includes "persons whose voting rights have been denied or impaired"); *McGruder v. Phillips Cnty. Election Comm'n*, 850 F.2d 406 (8th Cir. 1988); *Buckanaga v. Sisseton Indep. Sch. Dist., No. 54-5*, 804 F.2d 469 (8th Cir. 1986).

And "[s]ince 1982, more than 400 Section 2 cases have been litigated in federal court." Appellants' Br. at 7 (citing Ellen D. Katz et al., *Section 2 Cases Database*, Univ. of Mich. L. Sch. Voting Rights Initiative (2022), https://voting.law.umich.edu/database (VRI_Dataset_2021.12.31 listing 439 electronically-reported cases with judicial decisions between 1982 and 2021 addressing a substantive Section 2 claim)). "Over the past forty years, there have been at least 182 successful Section 2 cases; of those 182 cases, only 15 were brought solely by the Attorney General." *Id.* at 8 (citing Katz, *supra*, at https://voting.law.umich.edu/wp-content/uploads/2022/02/VRI_Codebook.pdf (defining successful cases as those where "the ultimate outcome of the lawsuit was that a plaintiff achieved success on the merits by proving a violation of the VRA," or where "a positive real-world outcome could be determined from the opinions reviewed, e.g. a consent decree or a positive settlement")).

As one district court observed, however, "Justice Gorsuch's concurrence in *Brnovich* . . . upend[ed] that distinct line of precedent, labeling [§] 2's private right of action as 'an open question' in lower courts." *Coca*, 2023 WL 2987708, at *3 (quoting *Brnovich*, 141 S. Ct. at 2350 ("Our cases have assumed—without

-24-

enforcement of Section 2 since the VRA's inception," which "ha[s] co-existed with collective enforcement brought by the United States for decades." *Turtle Mountain Band of Chippewa Indians v. Jaeger*, No. 3:22-CV-22, 2022 WL 2528256, at *6 (D.N.D. July 7, 2022) (citing *Allen v. State Bd. of Elections*, 393 U.S. 544, 555 (1969); *Ala. State Conf. of Nat'l Ass'n for the Advancement of Colored People v. Alabama*, 949 F.3d 647, 652 (11th Cir. 2020), *cert. granted, judgment vacated sub nom.*, 141 S. Ct. 2618 (2021); *Mixon v. Ohio*, 193 F.3d 389, 398–99 (6th Cir. 1999); *Singleton*, 582 F. Supp. 3d at 1031–32). Given the weight of precedent, it is not surprising that the "[d]efendants in this case did not initially argue that Section 2 lacks a private right of action until prompted by the district court," an issue that the district court raised sua sponte. Appellants' Br. at 26.

Why have federal courts largely assumed that § 2 gives private plaintiffs the ability to sue? "The implication of a right of action is rooted in the Blackstonian principle . . . that 'where there is a legal right, there is also a legal remedy.'" Daniel P. Tokaji, *Public Rights and Private Rights of Action: The Enforcement of Federal Election Laws*, 44 Ind. L. Rev. 113, 126 (2010) (quoting *Marbury v. Madison*, 5 U.S. 137, 163 (1803)). In the mid-1960s to 1970s, a "wave of decisions" recognized "impl[ied] private rights of action under various federal statutes." *Id.* at 127. Relevant to the present case, "the Supreme Court recognized private rights of action [under] statutes . . . protecting civil and political rights." *Id.* at 128 (citing *Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979) (holding that Title IX of the Education Amendments of 1972 created a private right of action for victims of education discrimination); *Allen*, 393 U.S. at 557 (implying a private right of action for voters claiming that their states had implemented new electoral rules without complying with § 5 of the VRA)). Over time, a tension developed "between two different conceptions of whether a private right of action should lie." *Id.* at 130. Under the first view, "the question is whether the statute was designed to benefit an identifiable class of persons that includes the plaintiff." *Id.* Under the second view, "the question

---

deciding—that the [VRA] furnishes an implied cause of action under § 2. Lower courts have treated this as an open question." (citation omitted) (Gorsuch, J., concurring))).

-25-

is whether Congress intended to confer a right of action on private plaintiffs." *Id.* Justice Powell adopted the latter approach in his dissenting opinion in *Cannon*. He argued that "[a]bsent the most compelling evidence of affirmative congressional intent, a federal court should not infer a private cause of action." *Cannon*, 441 U.S. at 731 (Powell, J., dissenting). According to Justice Powell, consideration of other factors to determine whether a cause of action exists "is an open invitation to federal courts to legislate causes of action not authorized by Congress. It is an analysis not faithful to constitutional principles and should be rejected." *Id.*

"Although Justice Powell's position did not carry the day in *Cannon*, the Court has increasingly gravitated toward his intent-based test in the years since that case was decided." Tokaji, *supra*, at 131; *see also Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("[P]rivate rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." (citation omitted)). Yet "[s]ome other decisions in the post-*Cannon* period . . . recognized a private right of action, particularly for statutes passed *during the period in which they were routinely implied*," including the VRA. Tokaji, *supra*, at 131 (emphasis added) (citing, *inter alia*, *Morse v. Republican Party of Va.*, 517 U.S. 186, 233–34 (1996) (relying on the contemporary legal context of the VRA to imply a right of action under § 10)). And "although the Supreme Court has not directly decided" whether § 2 provides a private right of action, "it has decided a close cousin of a question, and that precedent strongly suggests that Section Two [of the VRA] provides a private right of action." *Singleton*, 582 F. Supp. 3d at 1031; *see also Caster*, 2022 WL 264819, at *81 (same).

"At the core of" "the vast sea of cases recognizing and affirming the private right of action within Section 2 . . . . lies *Morse*." *Coca*, 2023 WL 2987708, at *4. To properly understand *Morse*, however, one must understand the foundation upon which it was built. In *J.I. Case Co. v. Borak*, 377 U.S. 426 (1964), the Supreme Court "held that a federal statute passed to protect a class of citizens, although not specifically authorizing members of the protected class to institute suit, nevertheless

-26-

implied a private right of action." *Allen*, 393 U.S. at 557; *see also Morse*, 517 U.S. at 231 (acknowledging that *Borak* "applied a highly liberal standard for finding private remedies"). Congress passed the VRA one year later. *Morse*, 517 U.S. at 231. Just a few years after the VRA's passage, the Supreme Court held in *Allen* "that private parties may enforce § 5 of the [VRA]." *Id. Allen* acknowledged that the VRA neither explicitly granted nor denied "private parties authorization to seek a declaratory judgment that a State has failed to comply with the provisions of the Act." 393 U.S. at 554–55. Despite the absence of an express grant of authorization to sue, § 5's language must be analyzed "in light of the major purpose of the Act," the Court explained. *Id.* at 555. Congress's purpose in enacting the VRA was "to make the guarantees of the Fifteenth Amendment finally a reality for all citizens"; it achieved this purpose by "draft[ing] an unusual, and in some aspects a severe, procedure for insuring that States would not discriminate on the basis of race in the enforcement of their voting laws." *Id.* at 556. The Court observed that "achievement of the Act's laudable goal could be severely hampered . . . if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General." *Id.* The Court also "attached significance to the fact that the Attorney General had urged [the Court] to find that private litigants may enforce the Act." *Morse*, 517 U.S. at 231 (citing *Allen*, 393 U.S. at 557 n.23).

It is against this backdrop that a majority of the justices held in *Morse* that § 10 of the VRA also affords private plaintiffs the ability to sue. *Id.* at 233–34 (opinion of Stevens, J., joined by Ginsburg, J.); *id.* at 240 (Breyer, J., concurring in the judgment, joined by O'Connor & Souter, JJ.). In announcing the judgment of the court and delivering an opinion joined by Justice Ginsburg, Justice Stevens relied on the analysis set forth in *Allen* to conclude that the Court's "observations about § 5 . . . apply as forcefully to § 10." *Id.* at 231. After recounting *Allen*, he then stated:

> Congress has not only ratified *Allen*'s construction of § 5 in subsequent reenactments, see H.R. Rep. No. 91–397, p. 8 (1970), but extended its logic to other provisions of the Act. Although § 2, like § 5, provides no right to sue on its face, "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress

-27-

since 1965." S. Rep. No. 97–417, at 30 (citing *Allen*); see also H.R. Rep. No. 97–227, p. 32 (1981). We, in turn, have entertained cases brought by private litigants to enforce § 2. See, *e.g.*, *Chisom v. Roemer*, 501 U.S. 380, 111 S. Ct. 2354, 115 L. Ed. 2d 348 (1991); *Johnson v. De Grandy*, 512 U.S. 997, 114 S. Ct. 2647, 129 L. Ed. 2d 775 (1994). It would be anomalous, to say the least, to hold that both § 2 and § 5 are enforceable by private action but § 10 is not, when all lack the same express authorizing language.

*Id.* at 232 (alteration in original).

In his opinion concurring in the judgment, Justice Breyer, joined by Justices O'Connor and Souter, "agree[d] . . . that Congress must be taken to have intended to authorize a private right of action to enforce § 10 of the Act." *Id.* at 240. Justice Breyer concurred in Justice Stevens's conclusion that *Allen*'s holding that a private right of action exists to enforce § 5 "applies with similar force not only to § 2 but also to § 10." *Id.* (citing S. Rep. No. 97–417, pt. 1, p. 30 (1982) (implied private right of action to enforce § 2 "has been clearly intended by Congress since 1965")). Justice Breyer did not know of any reason "why Congress would have wanted to treat enforcement of § 10 differently from enforcement of §§ 2 and 5." *Id.* As a result, he concluded that "Congress intended to establish a private right of action to enforce § 10, no less than it did to enforce §§ 2 and 5." *Id.*

Is *Morse*'s statement about § 2 providing a private right of action "non-binding dicta because the Court was not addressing an express challenge to private Section 2 enforcement"? *Pendergrass v. Raffensperger*, No. 1:21-CV-05339-SCJ, 2022 WL 1518234, at *7 (N.D. Ga. Jan. 28, 2022). "The . . . debate whether this statement is dicta or actually part of the holding. . . . is largely irrelevant . . ." *Coca*, 2023 WL 2987708, at *4 n.32. "Appellate courts should afford deference and respect to Supreme Court dicta, particularly where, as here, it is consistent with longstanding Supreme Court precedent." *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1064 (8th Cir. 2017) (en banc). Because *Morse*'s statement that a private right of action exists under § 2 was built on a firm foundation of precedent, including

-28-

*Borak* and *Allen*, it "is not subordinate clause, negative pregnant, devoid-of-analysis, throw-away kind of dicta. It is well thought out, thoroughly reasoned, and carefully articulated analysis by the Supreme Court describing the scope of one of its own decisions." *Singleton*, 582 F. Supp. 3d at 1032 (quoting *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006)); *see also Pendergrass*, 2022 WL 1518234, at *7 ("Even so, dicta from the Supreme Court is not something to be lightly cast aside." (quoting *Peterson v. BMI Refractories*, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997))). As a result, "[e]ven if the Supreme Court's statements in *Morse* about Section Two are technically dicta, they deserve greater respect than Defendants would have us give." *Singleton*, 582 F. Supp. 3d at 1032; *see also Caster*, 2022 WL 264819, at *81 (same). Taken together, Justice Steven's and Justice Breyer's opinions show that "[f]ive justices concurred" in the "reasoning [that] the understanding that Section Two provides a private right of action was necessary to reach the judgment that Section Ten provides a private right of action." *Singleton*, 582 F. Supp. 3d at 1031; *see also Caster*, 2022 WL 264819, at *81 (same). To hold that § 2 fails to "provide a private right of action would badly undermine the rationale offered by the Court in *Morse*." *Singleton*, 582 F. Supp. 3d at 1031; *see also Caster*, 2022 WL 264819, at *81 (same).

Furthermore, since the Court decided *Morse*, "scores if not hundreds of cases have proceeded under the assumption that Section 2 provides a private right of action. All the while, Congress has consistently reenacted the VRA without making substantive changes, impliedly affirming the previously unanimous interpretation of Section 2 as creating a private right of action." *Coca*, 2023 WL 2987708, at *4. And, post-*Sandoval*, courts have continued to permit "[o]rganizations and private parties . . . to enforce Section 2 of the VRA." *Veasey v. Perry*, 29 F. Supp. 3d 896, 906 (S.D. Tex. 2014) (citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008); *LULAC*, 548 U.S. at 399; *De Grandy*, 512 U.S. at 997; *Chisom*, 501 U.S. at 380; *League of United Latin Am. Citizens v. City of Boerne*, 675 F.3d 433 (5th Cir. 2012)). Justice Gorsuch's concurrence in *Brnovich* certainly "flagged" the issue of whether the Supreme Court should directly address the existence of a private right of action under § 2, but "it [remains] undisputed that the Supreme Court and federal district courts have repeatedly heard cases brought by private plaintiffs under Section 2."

-29-

*Robinson v. Ardoin*, 605 F. Supp. 3d 759, 819 (M.D. La. 2022) (citing cases), *cert. granted before judgment*, 142 S. Ct. 2892 (2022), *and cert. dismissed as improvidently granted*, 143 S. Ct. 2654 (2023).

In sum, this case presents two paths. The first is to "adhere to the extensive history, binding precedent, and implied Congressional approval of Section 2's private right of action." *Coca*, 2023 WL 2987708, at *5. The alternative path taken by the majority attempts to "predict the Supreme Court's future decisions" by "conduct[ing] a searchingly thorough examination of Section 2's text, legislative history, and the *Sandoval* analysis." *Id.* "Holding that Section Two does not provide a private right of action would work a major upheaval in the law, and [I am] not prepared to step down that road today." *Singleton*, 582 F. Supp. 3d at 1032; *see also Caster*, 2022 WL 264819, at *81 (same). As a result, I favor the first path. And "[t]he simple fact is that [a majority of the justices] explicitly recognized a private right of action under Section 2 in *Morse*. While that private right has been called into question by two Supreme Court justices,[9] the Supreme Court has yet to overrule itself on that precise issue." *Coca*, 2023 WL 2987708, at *5; *see also Pendergrass*, 2022 WL 1518234, at *7 ("[T]here is no reason to ignore or refute the decades of Section 2 litigation challenging redistricting plans in which courts (including the Supreme Court) have never denied a private plaintiff the ability to bring a Section 2 claim."). "It would be ambitious indeed for a [lower] court . . . to deny a private right of action in the light of precedent and history." *League of United Latin Am. Citizens v. Abbott*, No. EP-21-CV-00259-DCG-JES-JVB, 2021 WL 5762035, at *1 (W.D. Tex. Dec. 3, 2021) (three-judge court). Until the Supreme Court instructs otherwise, I would hold that § 2 contains an implied private right of action.

Accordingly, I would reverse the judgment of the district court and remand for further proceedings.

---

[9] Justice Thomas joined Justice Gorsuch's concurrence in *Brnovich*.

-30-